## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EDGEMARC ENERGY HOLDINGS, LLC, *et al.*,[1] | Case No. 19-11104 (___) |
| Debtors. | (Joint Administration Requested) |

## MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING, BUT NOT DIRECTING, THE PAYMENT OF PREPETITION CLAIMS OF CERTAIN LIENHOLDERS

The above-captioned debtors and debtors-in-possession (the "Debtors"), by and through their proposed undersigned counsel, hereby submit this *Motion of Debtors for Entry of Interim and Final Orders Authorizing, but not directing, the Payment of Prepetition Claims of Certain Lienholders* (the "Motion"). In support of the Motion, the Debtors rely on the *Declaration of Callum Streeter in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration")[2] filed contemporaneously with this Motion, and respectfully state as follows:

### Jurisdiction and Venue

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: EdgeMarc Energy Holdings, LLC (6900), EM Energy Manager, LLC (5334), EM Energy Employer, LLC (8026), EM Energy Ohio, LLC (6935), EM Energy Pennsylvania, LLC (1541), EM Energy West Virginia, LLC (3771), EM Energy Keystone, LLC (7506), EM Energy Midstream Ohio, LLC (1268), and EM Energy Midstream Pennsylvania, LLC (3963). The Debtors' corporate headquarters and mailing address is 1800 Main Street, Suite 220, Canonsburg, PA 15317.

[2] Capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to them in the First Day Declaration.

dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.[3]

2.      The legal predicates for the relief sought herein are sections 105(a), 363, 507(a), and 541 of title 11 of chapter 11 of the United States Code (as amended or modified, the "Bankruptcy Code") and rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

4.      On the date hereof (the "Petition Date"), each of the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.

5.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date of this Motion, no trustee, examiner or statutory committee has been appointed in these Chapter 11 Cases.

6.      Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' business and capital structure is set forth in detail in the First Day Declaration filed contemporaneously herewith and incorporated by reference.

---

[3] Pursuant to Local Rule of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") 9013-1(f), the Debtors hereby confirm their consent to entry of a final order by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

A.    **Specific Background**

7.    In the ordinary course of business, the Debtors incur various expenses necessary to ensure the continued production and sale of their hydrocarbons with respect to certain categories, including:

(a)    Marketing Counter Parties.    The Debtors rely on certain vendors to gather, treat, compress, process, transport, and market natural gas and other related products (collectively, the "Gas"), which belong to both the Debtors and other interest owners, from the site of extraction at the well through the gathering systems and processing plants and into transportation pipelines, which deliver the Gas to sales points in various locations where the Debtors sell the Gas. These vendors physically possess the Gas once it is extracted from the Debtors' wells and placed into their various gathering, processing and transportation systems until it is sold to the customer.

(b)    Shippers and Warehousemen.    The Debtors rely on certain vendors to transport, store, and deliver, for example, casing, valves, drilling pipe and other inventory of the Debtors.

(c)    Lien Claimants.    The Debtors rely on suppliers of goods or services necessary for the drilling and operation of the Debtors' wells and reparation of equipment and vehicles used in the process of extracting Gas.

i.    *Marking Agreement Counterparties*

8.    The Debtors engage in contractual agreements (the "Marketing Agreements") with certain vendors who charge the Debtors to gather, treat, compress, process, transport, and market and deliver the Gas from the wellhead to the sales points where such Gas is sold (the "Marketing Expense"). In this process, the Debtors first engage certain vendors to gather the

Gas from the well site to either a compression station or a processing plant through gathering lines (collectively, the "Gatherers"). The Gatherers take possession of the Gas, generally at the outlet of the Debtors' custody transfer meter, and transport such Gas through its gathering lines to one or more compression stations or processing plants where the Gas is initially processed. The processed Gas and associated liquids are then shipped by transportation pipeline operators (together with the Gatherers, the "Marketing Agreement Counterparties") through several transportation pipelines to sales points where the Debtors sell the Gas. As a result of the foregoing, the Marketing Agreement Counterparties regularly possess Gas belonging to the Debtors and certain of the Debtors' partners. The Marketing Agreement Counterparties also are responsible for marketing the Gas for sale.

9.      It is crucial that the Debtors comply with their Marketing Agreements in order to continue to receive revenue from production that they market on behalf of themselves and third parties. If the Marketing Expenses are not paid, a Marketing Agreement Counterparty could refuse to release Gas or associated revenues to the Debtors or refuse to accept delivery of additional Gas. In instances where delivery of Gas is refused, the Debtors may be forced to shut-in a well, which could result in economic consequences beyond the temporary cessation of production and revenue therefrom. For instance, once a well is shut-in, it may not be possible to re-establish production. In addition, the act of shutting in a well can trigger obligations to other interest owners in that well, including payment obligations or potential forfeiture of the Debtors' interest under the terms of an oil and gas lease. Thus, any disruption in the gathering, processing, transportation, or marketing of Gas by the Marketing Agreement Counterparties – even for only a few days – could have a significant negative impact on the Debtors' cash flows and production capabilities. Without the seamless compliance with their Marketing Agreements

and the ability to make the Debtors' production marketable for sale, the Debtors' revenue stream and ability to operate their business could be irreparably impaired to the detriment of the Debtors' estates and all stakeholders.

10.    Likewise, the failure to collect Gas revenue or having a well shut-in could also impact the Debtors' ability to timely make payments to third parties holding an interest in production.  Thus, the Debtors are seeking authority to pay certain prepetition amounts owed to the Marketing Agreement Counterparties (the "Marketing Claims").

11.    Over the past twelve months, the average monthly amount paid by the Debtors to the Marketing Agreement Counterparties on behalf of the Debtors and their partners is approximately $2.2 million for the Gatherers and $3.5 million for remaining Marketing Agreement Counterparties. As of the Petition Date, the Debtors estimate that they may owe Marketing Claims of approximately $3.9 million, $1.1 million of which will come due in the first twenty-one days of the Chapter 11 Cases.  The Debtors request authority to pay the Marketing Claims as such amounts become due in the ordinary course of business.

ii.    ***Shippers and Warehousemen***

12.    In the ordinary course of business, the Debtors use approximately 31 vendors (collectively, the "Shippers and Warehousemen") to transport and store drilling pipe, casing, valves, wellheads, tanks, separators, and other inventory when not being used.  The Debtors pay the Shippers and Warehousemen in arrears. Therefore, the Debtors believe that it is likely that they owe the Shippers and Warehousemen certain amounts for transportation and storage fees. Additionally, if the Debtors were to default on any obligation to the Warehousemen, the Warehousemen may assert a lien, attempt to take possession of the Debtors' property, and bar the Debtors' access to their inventory.

13.     Under most state laws, Shippers and Warehousemen may have a lien[4] on the goods in its possession, which lien secures the charges or expenses incurred in connection with the transportation or storage of such goods.[5]  Additionally, pursuant to Bankruptcy Code section 363(e), the Shippers and Warehousemen may be entitled to adequate protection in the form of a possessory lien.  As a result, certain Shippers and Warehousemen may refuse to deliver or release equipment or supplies in their possession or control, as applicable, before the prepetition amounts owed to them by the Debtors (collectively, the "Shipping and Warehousing Claims") have been satisfied and their liens released.

14.     Furthermore, the Debtors are also the operators for a number of wells in which they own an interest with other third parties.  If the Debtors are unable to pay the Shipping and Warehousing Claims and any of the Shippers and Warehousemen assert a lien on a well that the Debtors' operate, the Debtors potentially could be removed as an operator of such well.[6]

15.     Thus, the Debtors seek authority to pay the Shippers and Warehousemen for any prepetition obligations and to continue to pay the Shippers and Warehousemen in the ordinary course of business to prevent irreparable harm to the Debtors' estates.  As of the Petition Date, the Debtors estimate that they have approximately $3.2 million of Shippers and Warehousemen's Claims outstanding, of which approximately, $1.6 million will come due and owing within the first twenty-one (21) days of these Chapter 11 Cases.

---

[4] The Debtors do not concede that any liens (contractual, common law, statutory or otherwise) described in this Motion are valid, and the Debtors expressly reserve the right to contest the extent, validity and perfection of any and all such liens, and to seek avoidance thereof.

[5] For example, Uniform Commercial Code section 7-307 provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." *See* U.C.C. §7-307(1).

[6] The Debtors do not concede that any such lien would constitute a valid basis for removing the Debtors as operator of any well.  The Debtors reserve the right to contest any such assertion.

*iii.* ***Lien Claimants***

16.    In addition to the Shipping and Warehousing Claims, in the ordinary course of their business, the Debtors routinely contract with, rely on, and incur expenses (the "Operating Expenses") with respect to the services provided by a number of third parties that perform labor or furnish or transport materials, equipment, or supplies used in the drilling, operating, or maintenance of an oil or gas property, a number of whom may assert mechanics' liens and materialmen's liens or other liens that attach to the Debtors' interests in their oil and gas leases under relevant state law (the "Potential Lien Claims"). As such, these third parties (the "Lien Claimants") could assert Lien Claims against the Debtors and their property if the Debtors fail to pay for the Operating Expenses, which can take the form of rentals, extensions, lump sum payments, minimum payments, or damage payments.

17.    The Debtors also are the operators for a number of wells.  If the Debtors are unable to pay the Operating Expenses, and if the Lien Claimant asserts a lien on a well that the Debtors' operate, the Debtors potentially could be removed as operator of such well.[7]

18.    Pursuant to Bankruptcy Code section 362(b)(3), the act of perfecting statutory liens, to the extent consistent with Bankruptcy Code section 546(b), is expressly excluded from the automatic stay. Further, notwithstanding the automatic stay imposed by Bankruptcy Code section 362, Lien Claimants may be entitled to assert and perfect statutory liens against the Debtors' property during these Chapter 11 Cases and with respect to any prepetition claims against the Debtors.

19.    Generally, state law governing the Debtors' oil and gas properties protect the rights of Lien Claimants by granting them statutory liens to secure payment for their services.

---

[7] The Debtors do not concede that the assertion of any such lien would constitute a valid basis for removing the Debtors as operator of any well. The Debtors reserve the right to contest any such assertion.

For example, chapter 1311 of the Ohio Revised Code grants the original contractor and "every subcontractor, laborer, and material supplier" a lien to secure payment for labor, services or supplies provided "which further the production of oil and gas." OHIO REV. CODE ANN. § 1311.021. Furthering the production of oil and gas is broadly defined to include performing labor or providing supplies involved in "digging, drilling, boring, operating, completing, or repairing, any well drilled or constructed . . . or for altering, repairing, or constructing any oil derrick, oil tank, or leasehold production pipe line." *Id.* Such liens can attach to the Debtors' actual working interest in the oil and gas lease. *See, e.g., id.*

20.    Although the Debtors generally make timely payments to the Lien Claimants, a number of the payments may not have been made prior to the Petition Date for certain prepetition Operating Expenses, which may result in the Lien Claimants having a right to assert and perfect Potential Lien Claims. Accordingly, at any given time, the Debtors and their assets may be subject to a wide variety of Potential Lien Claims.

21.    As is typical in the industry, the Operating Expenses vary and are not uniform or entirely predictable on a month-to-month basis. In the twelve months preceding the Petition Date, the Debtors paid approximately $121.7 million in Operating Expenses.

22.    The Debtors seek only to pay undisputed, prepetition Operating Expenses owed in the Debtors' ordinary course of business (the "Lien Claims"). As of the Petition Date, the Debtors estimate that they have prepetition Lien Claims outstanding in excess of $10 million, of which approximately, $1.8 million will come due and owing within the first twenty-one (21) days of these Chapter 11 Cases. To ensure that the Lien Claims are satisfied in the ordinary course of business so as to not irreparably harm the Debtors' business or interfere with the

Debtors' relationships with its partners during the postpetition basis, the Debtors seek the authority to pay the Lien Claims as they become due and payable in the ordinary course.

## Relief Requested

23.     By this Motion, and pursuant to Bankruptcy Code sections 105(a) and 363(b) and Bankruptcy Rules 6003 and 6004 of the Bankruptcy Rules, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors in their business judgment to pay the Marketing Claims, the Shippers and Warehousemen Claims, and the Lien Claims in amounts the Debtors determine necessary to (a) obtain releases of critical or valuable goods that may be subject to liens; (b) maintain a reliable, efficient and smooth distribution system; or (c) induce critical Marketing Arrangement Counterparties, Shippers and Warehousemen, and Lien Claimants to continue to provide the services described herein.   The Debtors also seek authorization for the applicable banks to process, honor, and pay all checks on account of claims with respect to Marketing Arrangement Counterparties, Shippers and Warehousemen and Lien Claimants paid pursuant to this Motion and to rely on the representations of the Debtors as to which checks are issued and authorized to be paid.

24.     The Debtors' payments to the Marketing Arrangement Counterparties, Shippers and Warehousemen, and Lien Claimants shall not exceed $1.1 million on account of prepetition Marketing Claims on an interim basis and $3.9 million on a final basis, $1.6 million on account of prepetition Shipping and Warehousing Claims on an interim basis and $3.2 million on a final basis, and $1.8 million on account of prepetition Lien Claims on an interim basis and $10 million on a final basis.

## Basis For Relief

25.     The Debtors' business is dependent upon the timely delivery of Gas, services, and equipment to and from the areas in which they operate. Any disruption in this system would have

severe negative effects on the Debtors' business. The Debtors believe that the value of the Gas, equipment, and supplies in the possession or control of the Shippers and Warehousemen, or Lien Claimants, and the potential injury to the Debtors if they are not timely released, is likely to substantially exceed the amount of Shipping and Warehousing Claims and Lien Claims asserted by such parties. Indeed, even if the Shippers and Warehousemen, or Lien Claimants did not have valid liens under applicable state law, their possession (and retention) of the Debtors' equipment, supplies, or Gas would severely disrupt, and potentially cripple, the Debtors' operations. For these reasons, the Debtors believe that it is necessary and essential to their restructuring efforts and the enhancement and preservation of the value of their estates that they be permitted to make payments on account of certain Shipping and Warehousing Claims and Lien Claims.

26.    In addition, many of the invoices for the Marketing Arrangement Counterparties, Shippers and Warehousemen and Lien Claimants will cover both prepetition and postpetition expenses.  Given the volume of invoices, and the Debtors' limited workforce, separating any prepetition portions from the postpetition portions on each individual invoice would be impractical or even impossible for the Debtors to timely accomplish.  Failure to timely satisfy these invoices for the Marketing Arrangement Counterparties, Shippers and Warehousemen, and Lien Claimants could have material consequences, including, without limitation, being removed as an operator and the assertion of significant secured claims (statutory and/or contractual) against the Debtors' estates.

27.    The Court has the legal authority under Bankruptcy Code sections 105(a), 1107(a), 1108, and 363(b), and the "necessity of payment" doctrine to grant the relief requested herein.  The payment of the Marketing Claims, Shipper and Warehousing Claims and Lien

Claims is vital to the Debtors' ability to transition smoothly into chapter 11 and preserve their going concern value.

28.     Pursuant to Bankruptcy Code sections 1107(a) and 1108, debtors-in-possession are authorized to operate the business while maintaining a "fiduciary duty to act in the best interest of the estate as a whole, including its creditors, equity interest holders and other parties in interest." *LaSalle Nat'l Bank v. Perelman*, 82 F.Supp.2d 279, 292 (D. Del. 2000).  Implicit in the fiduciary duties of any debtor-in-possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *In re CoServ, LLC.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Some courts have noted there are instances in which a debtor can fulfill this fiduciary duty "by the preplan satisfaction of a prepetition claim." *Id.*  The *CoServ* court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*  In the instant case, the Debtors are operating as debtors-in-possession consistent with Bankruptcy Code sections 1107(a) and 1108 and payment of the Marketing Claims, Shipper and Warehousing Claims and Lien Claims is necessary to protect and preserve the Debtors' going concern value and maximize their value for all creditors and stakeholders.  Thus, the Court should authorize the relief requested in this Motion.

29.     In addition, Bankruptcy Code section 363(b)(1) empowers the Court, after notice and a hearing, to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  The debtor's decisions to use, sell or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor.  *See, e.g., In re Martin (Myers v. Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper (Fulton State Bank v. Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991));

*Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. and Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *see also In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the evidence presented before him or her a good business reason to grant such application); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 674 (Bankr. S.D.N.Y. 1989) (noting the standard for determining a section 363(b) motion is "a good business reason."). As the payments of Marketing Claims, Shipper and Warehousing Claims and Lien Claims are critical to the Debtors' successful restructuring, the payments thereof are in the sound business judgment of the Debtors.

30.    The Debtors further submit that payment of the Marketing Claims, Shipper and Warehousing Claims and Lien Claims is necessary and appropriate and is authorized under Bankruptcy Code section 105(a), pursuant to the "necessity of payment" doctrine, which "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).

31.    Under Bankruptcy Code section 105(a), the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the Debtors' assets. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) (noting that Bankruptcy Code section 105 "has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings"); *In re Nixon*, 404 F. App'x 575, 578 (3d Cir. 2010) ("It is well settled that the court's power under § 105(a) is broad"); *In re Nortel Networks, Inc.*, 532 B.R. 494, 554 (Bankr.

D. Del. 2015) ("The Third Circuit has construed [Bankruptcy Code section 105] to give bankruptcy courts 'broad authority' to provide appropriate equitable relief to assure the orderly conduct of reorganization proceedings, and to craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain.") (citations omitted); *see also In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("[Bankruptcy Code] [s]ection 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.").

32.    The Court's power to utilize the "doctrine of necessity" in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  The United States Supreme Court first articulated the doctrine of necessity more than a century ago, in *Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. *See id.* at 309.  The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in *Miltenberger*. *See In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581-82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the continued operation of the [debtor] in serious jeopardy."); *Friedman's Inc. v. Roth Staffing Cos., L.P. (In re Friedman's Inc.)*, Case No. 09-10161 (CSS), 2011 Bankr. LEXIS 4500, at *7-8 (Bankr. D. Del. Nov. 30, 2011) ("[t]he 'doctrine of necessity' stands for the proposition that a bankruptcy court may allow payment outside of a plan of reorganization on account of a pre-petition obligation

where such payment is critical to the reorganization process.") (citing *In re Enron Corp.*, 2003 WL 1562202, at *20 (Bankr. S.D.N.Y. 2003)); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (D. Del. 1999).

33.    The doctrine of necessity "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Just for Feet, Inc.*, 242 B.R. at 826 (stating that where the debtor "cannot survive absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment); *In re Sharon Steel Corp.*, 159 B.R. 730, 736 (Bankr. W.D. Penn. 1993) (noting that courts grant debtors the authority to pay certain prepetition claims "where the payment is necessary to permit the effectuation of the rehabilitative purposes of the Bankruptcy Code").

34.    The doctrine of necessity is an accepted component of modern bankruptcy jurisprudence. *See In re Just for Feet, Inc.*, 242 B.R. at 826 (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy debtor's business by refusing to deliver new inventory on eve of debtor's key sales season); *see also Official Comm. of Unsecured Creditors of Motor Coach Indus. Int'l v. Motor Coach Indus. Int'l (In re Motor Coach Indus. Int'l)*, No. 09-078-SLR, 2009 U.S. Dist. LEXIS 10024, at *7 n.5 (D. Del. Feb. 10, 2009); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994).

35.    Federal courts consistently have found that postpetition payment of prepetition obligations may be necessary to preserve or enhance the value of a debtor's estate for the benefit of all parties. *See, e.g., Miltenberger*, 106 at 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of [crucial] business relations"); *In re Just for*

*Feet, Inc.*, 242 B.R. at 825; *In re Sharon Steel Corp.*, 159 B.R. at 736; *see also In re Lehigh and N.E. Ry. Co.*, 657 F.2d at 581 (finding that a payment of prepetition debt made to prevent a creditor from withholding critical services or materials is in the interest of all parties); *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175 (holding that the "ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept").

36.     The Debtors submit that the requested relief represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm and is justified under Bankruptcy Code sections 363(b), 507, 1108, 1109 and 105(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004. This is because any delay in paying the Marketing Claims, Shipper and Warehousing Claims and Lien Claims would have a material and devastating impact on the Debtors' operations and would undoubtedly force the Debtors to spend significant time and resources focusing on particularized disputes with the very parties on whom they depend.

37.     The Debtors expect to pay, and should have the funds available under their requested debtor in possession financial facility to pay, the Marketing Claims, Shipper and Warehousing Claims and Lien Claims in the ordinary course of business postpetition. The Debtors submit that the requested relief allows the Debtors to conduct their business in a manner already within the ordinary course of business.

38.     The Debtors also request that all applicable banks and other financial institutions be authorized to (a) receive, process, honor, and pay all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to the Marketing Claims, Shipper and Warehousing Claims and Lien Claims paid pursuant to this Motion regardless of whether the

checks were presented or fund transfer requests were submitted before or after the Petition Date and (b) rely on the Debtors' designation of any particular check as approved by order of the Court.

39.    As a result of the commencement of the Chapter 11 Cases, and in the absence of an order of the Court providing otherwise, the Debtors' checks, wire transfers and direct deposit transfers for the Marketing Claims, Shipper and Warehousing Claims and Lien Claims may be dishonored or rejected by the financial institutions.   The Debtors represent that each of these checks or transfers is or will be drawn on the Debtors' operating accounts and can be identified readily as relating directly to payment of the Marketing Claims, Shipper and Warehousing Claims and Lien Claims.

40.    Authorization to pay any amounts for the Marketing Claims, Shipper and Warehousing Claims and Lien Claims shall not be deemed to constitute a postpetition assumption, reaffirmation or adoption of any contract, lease or other agreement pursuant to Bankruptcy Code section 365.   Moreover, authorization to pay the Marketing Claims, Shipper and Warehousing Claims and Lien Claims shall not affect the Debtors' right to contest the amount or validity of any Marketing Claim, Shipper and Warehousing Claim or Prepetition Lien Claim.

### Bankruptcy Rule 6003 Satisfied and Request for Waiver of Stay

41.    The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein and in the First Day Declaration, Bankruptcy Rules 6003 and 6004 have been satisfied, and the relief requested herein should be granted.

42.    Specifically, Bankruptcy Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting the following: . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001.

43.     The Third Circuit Court of Appeals has interpreted language similar to that used in Bankruptcy Rule 6003 in the context of preliminary injunctions.  In that context, irreparable harm has been interpreted as a continuing harm that cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.  *See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 Fed. App'x 907, 910 (3d Cir. 2007) (citing *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)).  Further, the harm must be shown to be actual and imminent, not speculative or unsubstantiated.  *See, e.g., Acierno v. New Castle Cnty.*, 40 F.3d 645, 653-55 (3d Cir. 1994)

44.     The Debtors also request that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates.

45.     Accordingly, the relief requested herein is appropriate under the circumstances and under Bankruptcy Rule 6003 and 6004(h) as the exigent nature of the relief sought herein justifies immediate relief.

## Debtors' Reservation of Rights

46.     Nothing contained herein is intended or should be construed as an admission as to

the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any

claim, or an approval or assumption of any agreement, contract, or lease under Bankruptcy Code

section 365.   The Debtors expressly reserve their rights to contest any claims related to the

Obligations under applicable non-bankruptcy law.   Likewise, if the Court grants the relief sought

herein, any payment made pursuant to the Court's order is not intended and should not be

construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to

dispute such claim subsequently.

## Notice and No Prior Request

47.     Notice of this Motion has been given to the following parties or, in lieu thereof, to

their counsel, if known: (a) the U.S. Trustee; (b) each of the Debtors' twenty (20) largest

unsecured creditors on a consolidated basis; (c) Hunton Andrews Kurth LLP, as counsel to the

Prepetition Agent; (d) the Internal Revenue Service; (e) the attorneys general for the states in

which the Debtors conduct business; (f) the United States Attorney's Office for the District of

Delaware; and (g) all parties who have requested notice in these Chapter 11 Cases pursuant to

Bankruptcy Rule 2002.   Based on the urgency of the circumstances surrounding this Motion and

the nature of the relief requested herein, the Debtors respectfully submit that no further notice is

required.

48.     The Debtors have not previously sought the relief requested herein from the Court

or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the

relief requested herein and grant the Debtors such other and further relief as is just and proper.

Dated: May 15, 2019
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
Kimberly A. Brown (No. 5138)
Holly M. Smith (No. 6497)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
         mumford@lrclaw.com
         brown@lrclaw.com
         smith@lrclaw.com

-*and*-


**DAVIS POLK & WARDWELL LLP**
Darren S. Klein (*pro hac vice* application pending)
Lara Samet Buchwald (*pro hac vice* application pending)
Aryeh E. Falk (*pro hac vice* application pending)
Jonah A. Peppiatt (*pro hac vice* application pending)
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email: darren.klein@davispolk.com
         lara.buchwald@davispolk.com
         aryeh.falk@davispolk.com
         jonah.peppiatt@davispolk.com

*Proposed Counsel to the Debtors*
*and Debtors-In-Possession*