## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>EDGEMARC ENERGY HOLDINGS, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 19-11104 (BLS)<br><br>(Joint Administration Requested) |

## MOTION OF DEBTORS FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR SALE OF DEBTORS' ASSETS, (B) APPROVING STALKING HORSE BID PROTECTIONS, (C) SCHEDULING AUCTION FOR, AND HEARING TO APPROVE, SALE OF DEBTORS' ASSETS, (D) APPROVING FORM AND MANNER OF NOTICES OF SALE, AUCTION AND SALE HEARING, (E) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES AND (F) GRANTING RELATED RELIEF AND (II)(A) APPROVING SALE OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (C) GRANTING RELATED RELIEF

The above-captioned debtors and debtors-in-possession (the "Debtors"), by and through

their proposed undersigned counsel, hereby submit this *Motion of Debtors for Entry of Orders*

*(I)(A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Approving Stalking Horse*

*Protections, (C) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets,*

*(D) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (E) Approving*

*Assumption and Assignment Procedures and (F) Granting Related Relief and (II)(A) Approving*

*Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances,*

*(B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases and*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, where applicable, are: EdgeMarc Energy Holdings, LLC (6900), EM Energy Manager, LLC (5334), EM Energy Employer, LLC (8026), EM Energy Ohio, LLC (6935), EM Energy Pennsylvania, LLC (1541), EM Energy West Virginia, LLC (3771), EM Energy Keystone, LLC (7506), EM Energy Midstream Ohio, LLC (1268) and EM Energy Midstream Pennsylvania, LLC (3963). The Debtors' corporate headquarters and mailing address is 1800 Main Street, Suite 220, Canonsburg, PA 15317.

*(C) Granting Related Relief* (this "<u>Sale Motion</u>").  In support of this Sale Motion, the Debtors rely on (i) the *Declaration of Elliot Ross in Support of the Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Approving Stalking Horse Protections, (C) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief and (II)(A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* (the "<u>Ross Declaration</u>"), which is attached hereto as **<u>Exhibit A</u>**, and (ii) the *Declaration of Callum Streeter in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "<u>First Day Declaration</u>")[2] filed contemporaneously with this Sale Motion, and respectfully state as follows:

<u>**Jurisdiction and Venue**</u>

1.      The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.[3]

---

[2] All capitalized terms not herein defined shall have the same meaning ascribed to them in the Bidding Procedures and Bidding Procedures Order.

[3] Pursuant to Local Rule of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>") 9013-1(f), the Debtors hereby confirm their consent to entry of a final order by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

2.      The legal predicates for the relief sought herein are sections 105(a), 363, 365, 503 and 507 of title 11 of chapter 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended or modified, the "Bankruptcy Code") and rules 2002, 6003, 6004, 6006, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

4.      On the date hereof (the "Petition Date"), each of the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by filing with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date of this Motion, no trustee, examiner or statutory committee has been appointed in these Chapter 11 Cases.

6.      Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' business and capital structure is set forth in detail in the First Day Declaration filed contemporaneously herewith and incorporated by reference.

## Preliminary Statement

7.      The Debtors have commenced the Chapter 11 Cases in order to pursue the sale of all or substantially all of their assets pursuant to section 363 of the Bankruptcy Code to maximize the value of their estates and the recoveries of their stakeholders.  The Debtors are independent oil and gas companies engaged in the acquisition, production, exploration and development of

natural gas and natural gas liquids from underground deposits in the Appalachian Basin (collectively, the "Business").

8.     As described more fully in the First Day Declaration, in early 2019, following the Revolution Explosion, the shut-in of Debtor EM Energy Pennsylvania, LLC's operations, located in Butler County, Pennsylvania, and the commencement of litigation with ETC Northeast Pipeline, LLC ("ETC"), the Debtors, in consultation with their advisors, explored various strategic alternatives and ultimately determined that a sale of all or substantially all of their assets (collectively, the "Assets") would be the best way to maximize value for the benefit of their stakeholders.

9.     The Debtors have developed bidding and auction procedures (the "Bidding Procedures") to govern the sale of the Assets (the "Sale"). The Bidding Procedures allow interested parties to submit bids for any or all of the Debtors' assets, subject to the terms and provisions of the Bidding Procedures.

10.    The Debtors propose the following timeline for their sale process, which is described in greater detail in this Motion:

| Date | Event |
| --- | --- |
| **June 13, 2019, at [_]m.** | Bidding Procedures Hearing |
| **July 24, 2019, at [_]m.** | Bid Deadline |
| **August 12, 2019, at [_]m.** | Service of Notices of Qualified Bidder Status |
| **On or prior to August 14, 2019, at [_]m.** | Auction |
| **7 days prior to the Sale Hearing** | Sale Objection Deadline and Assumption and Assignment Objection Deadline |
| **Prior to or at Sale Hearing** | Adequate Assurance Objection Deadline |
| **August 16, 2019, at [_]m. (or such later time as the Debtors may be heard)** | Sale Hearing |

11.    The Bidding Procedures are reasonable and designed with the objective of generating the best value for the Assets, while affording the Debtors maximum flexibility to execute asset sales in a quick and efficient manner. The Debtors are confident that the Bidding Procedures and the other relief requested herein satisfy the requirements of section 363 of title 11 of the United States Code (the "Bankruptcy Code") and will facilitate the sale of the Assets for the best value for the benefit of all of the Debtors' stakeholders.

**Relief Requested**

12.    By this Sale Motion, the Debtors request entry of the an order, substantially in the form attached hereto as **Exhibit B** (the "Bidding Procedures Order"),

i.     authorizing and approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as **Exhibit 1**, in connection with the Sale;

ii.    authorizing, but not obligating, the Debtors to select a Stalking Horse Bidder (as defined herein) prior to the Bid Deadline;

iii.   approving the Bid Protections for Stalking Horse Bidder(s), if any, in accordance with the terms and conditions set forth in the Bidding Procedures and subject to entry of Stalking Horse Approval Order;

iv.    scheduling an auction of the Assets (the "Auction") to be held on or prior to August 14, 2019 at [ ].m. (prevailing Eastern Time);

v.     scheduling a hearing (the "Sale Hearing") to consider approval of the proposed Sale, to be held on August 16, 2019 at [ ].m. (prevailing Eastern Time);

vi.    authorizing and approving the form of (A) notice of the sale of the Assets, the Bid Deadline, the Auction and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice") and (B) notice to each relevant non-Debtor contract counterparty (each, a "Contract Counterparty") to a Potentially Assumed Contracts (as defined below) regarding the Debtors' potential assumption and assignment of such contract and the amount necessary to cure any defaults thereunder (the "Cure Claims"), substantially in the form

attached to the Bidding Procedures Order as **Exhibit 3** (the "Potential Assumption and Assignment Notice");

vii.    authorizing and approving procedures for the assumption and assignment of the Contracts and the determination of Cure Claims with respect thereto (collectively, the "Assumption and Assignment Procedures"); and

viii.    granting related relief.

## Marketing Process

13.    As described in the First Day Declaration, prior to the Petition Date, the Debtors, with the assistance of their advisors Evercore Group, L.L.C. ("Evercore") and Davis Polk & Wardwell LLP ("Davis Polk"), explored various strategic alternatives and ultimately determined that a sale of all or substantially all of their assets would be the best way to maximize value for the benefit of their stakeholders. Prior to the Petition Date, the Debtors, together with Evercore, engaged in preliminary discussions with certain interested parties regarding the purchase of some or all of the Assets, including potentially serving as a Stalking Horse Bidder for the Assets.

14.    Prior to the Petition Date, the Debtors, together with Evercore, engaged in preliminary discussions with certain interested parties regarding the purchase of some or all of the Assets, including potentially serving as a Stalking Horse Bidder for the Assets. Commencing on the Petition Date, the Debtors will continue to progress a robust marketing process for the Assets. Specifically, the Debtors, with the assistance of Evercore and Davis Polk, intend to market the Assets to potential buyers, including, without limitation, those potential buyers previously approached, by (a) engaging potential buyers and investors that may have an interest in bidding for the Assets, (b) delivering updated materials to such interested parties, (c) managing and providing access to a data room of confidential information on the Assets to interested parties and (d) providing customized information packets to potential purchasers as appropriate. *See* Ross Decl. at ¶ 8.

15.    The Debtors believe that completion of the sale process in the time and manner set forth herein will maximize the value of the Assets. In formulating the Bidding Procedures and time periods contained therein, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and to potential purchasers with the need to efficiently sell the Assets. The Debtors believe that the auction process and time periods set forth in the Bidding Procedures will provide parties with sufficient time and information to formulate competing bids to purchase some or all of the Assets. Thus, the Debtors have determined that pursuing the Sale in the manner and within the time periods described above is in the best interest of the Debtors' estates and will provide interested parties with sufficient opportunity to participate.

## Bidding Procedures

**A.    Overview**

16.    The Bidding Procedures are designed to promote a competitive and efficient sale process. If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for the Assets on a schedule consistent with the deadlines under the Bidding Procedures and the Debtors' chapter 11 strategy.

17.    In accordance with Local Bankruptcy Rule 6004-1(c)(i), certain of the key terms of the Bidding Procedures are highlighted in the chart below.[4]

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| Provisions | Parts 1 and 2 of the Bidding Procedures set forth the Qualified Bid and Qualified |

---

[4] To the extent that there is any inconsistency between the terms of the Bidding Procedures and the summary of such terms in this Sale Motion, the terms of the Bidding Procedures shall control. Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Bidding Procedures.

| | |
|---|---|
| **Governing Qualification of Bidders and Qualified Bids** Local Bankruptcy Rule 6004-1(c)(i)(A)-(B) | **Bidder requirements.**<br><br>**A. Interested Parties**<br><br>   1. <u>Required Information</u>. Interested Parties must deliver the following items (the "**Preliminary Bid Documents**") to Evercore if determined to be necessary by the Debtors in consultation with the DIP Agent and the Creditors' Committee (if any):<br><br>     a.  an executed confidentiality agreement substantially in form and substance acceptable to the Debtors;<br><br>     b.  a statement and other factual support demonstrating, to the Debtors' satisfaction, that the Interested Party has a bona fide interest in purchasing any or all of the Assets;<br><br>     c.  if practicable, a description of the nature and extent of any due diligence the Interested Party wishes to conduct and the date in advance of the Bid Deadline (as defined below) by which such due diligence will be completed; and<br><br>     d.  sufficient information to allow the Debtors, in their sole discretion, to determine that the Interested Party has the financial wherewithal and any required internal corporate, legal or other authorizations to close the sale transaction, including, but not limited to, current audited financial statements of the Interested Party (or such other form of financial disclosure acceptable to the Debtors in their sole discretion) or, if the Interested Party is an entity formed for the purpose of acquiring any or all of the Assets, (A) current audited financial statements of the equity holder(s) (the "**Sponsor(s)**") of the Interested Party (or such other form of financial disclosure acceptable to the Debtors in their discretion), (B) a written commitment acceptable to the Debtors in their sole discretion that the Sponsor(s) are responsible for the Interested Party's obligations in connection with the bidding process and (C) copies of any documents evidencing any financing commitments necessary to consummate the transaction.<br><br>If the Debtors determine in their sole discretion after receipt of the Preliminary Bid Documents that an Interested Party's desire to become a Potential Bidder is solely on account of a bona fide interest in purchasing any or all of the Assets, such Interested Party will be deemed a "**Potential Bidder**" and the Debtors will deliver to such Potential Bidder (a) a form of purchase agreement and (b) access to the Debtors' confidential electronic data room concerning the Assets (the "**Data Room**"), which access may be limited by the Debtors in their sole discretion.<br><br>**B. Due Diligence**. Until the Bid Deadline, in addition to granting access to the Data Room, the Debtors will provide Potential Bidders with reasonable due diligence access and additional information, as may be reasonably requested by a Potential Bidder. If any Potential Bidder is (or is affiliated with) a competitor of the Debtors, the Debtors may withhold any information or due diligence access from such Potential Bidder that the Debtors determine is sensitive, proprietary or otherwise not appropriate for disclosure.<br><br>**C. Bid Deadline** – July 24, 2019, at 5:00 p.m. (prevailing Eastern Time)<br><br>**D. Qualified Bid Requirements**.<br><br>   1. <u>Required Bid Documents</u>. A Qualified Bid must be accompanied by the |

following documents:

    a.   an executed letter stating that the bidder's offer is irrevocable until consummation of a transaction involving the Assets identified in such bid and that such bidder agrees to serve as an Alternate Bidder in accordance with the Bidding Procedures;

    b.   a duly authorized and executed purchase agreement, which purchase agreement must be based on the form purchase agreement provided by Evercore, marked to show any revisions, including, among other things, the purchase price for the Assets identified in such Bid, together with all exhibits and schedules;

    c.   written evidence of a firm commitment for financing to consummate the proposed transaction, or other evidence of ability to consummate the proposed transaction without financing, that is satisfactory to the Debtors (in their sole discretion); and

    d.   written evidence acceptable to the Debtors (in their sole discretion) demonstrating financial wherewithal, operational ability and corporate authorization to consummate the proposed transaction.

2.   <u>Assets; Consideration</u>. A bid will only be considered if the bid:

    a.   identifies the legal name of the purchaser (including any Sponsor(s), if the purchaser is an entity formed for the purpose of consummating the proposed transaction);

    b.   if a "Partial Bid," identifies the Assets to be purchased;

    c.   is not materially more burdensome, less favorable or more conditional than the terms of the Stalking Horse Bid (as defined below), as determined by the Debtors in their sole discretion;

    d.   identifies all executory contracts and unexpired leases of which the Potential Bidder seeks assignment from the Debtors, if any;

    e.   is not conditioned on (i) obtaining financing or (ii) the outcome of unperformed due diligence;

    f.   is not conditioned on the receipt of any third party approvals or consents, including without limitation board of director approval (excluding required Court approval and required governmental, licensing or regulatory approval or consent, if any);

    g.   with respect to any governmental, licensing or regulatory approvals or consents, includes a description of all such approvals or consents that are required to consummate the proposed transaction (including any antitrust approval or clearance related to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended), together with evidence satisfactory to the Debtors in their sole discretion of the ability of the bidder to obtain such approvals or consents in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such approvals or consents;

    h.   is accompanied by a cash deposit by wire transfer to an escrow agent selected by the Debtors (the "**Deposit Agent**") in an amount equal to 10% of the cash purchase price set forth in connection with such Bid (any such deposit, a "**Good Faith Deposit**");

i.  indicates that the bidder will not seek any transaction or break-up fee, expense reimbursement, or similar type of payment (other than if such bid is selected to be a Stalking Horse Bid and subject to the provisions of Part 3 of the Bidding Procedures);

j.  provides for a commitment to close as soon as practicable, but in no event later than September 17, 2019;

k.  sets forth the representatives that are authorized to appear and act on behalf of the bidder in connection with the proposed transaction;

l.  fully discloses the identity of each entity that will be bidding for the Debtors' assets or otherwise financing such Bid (including through the issuance of debt in connection with such Bid), and a summary of any such financing;

m.  indicates that the bidder waives any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code related to bidding for the Assets;

n.  if the bid contemplates the assumption and assignment of any contracts or leases, includes evidence of the bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Debtors and assigned to the bidder, in a form that will permit the Debtors to disseminate immediately such evidence to the non-Debtor counterparties to such contracts and leases;

o.  constitutes a good faith, bona fide offer to effectuate the proposed transaction; and

p.  is received on or before the Bid Deadline (as such deadline may be extended in accordance with the Bidding Procedures).

E.  **Designation of Qualified Bids; Cure of Non-Qualifying Bids.** The Debtors shall have the right, in their Permitted Discretion, to deem a bid a Qualified Bid even if such bid does not conform to one or more of the requirements above or does not include one or more Required Bid Documents. If the Debtors receive a bid prior to the Bid Deadline that is not a Qualified Bid, the Debtors may, in their sole discretion, provide the bidder with the opportunity to remedy any deficiencies following the Bid Deadline but not later than two days prior to the Auction. If any bid is determined by the Debtors not to be a Qualified Bid, and the applicable bidder fails to remedy such bid in accordance with the Bidding Procedures, the Debtors shall promptly instruct the Deposit Agent to return such bidder's Good Faith Deposit.

F.  **Credit Bid.** The DIP Secured Parties shall be deemed Qualified Bidders and shall have the right to credit bid, in accordance with the DIP Documents and subject to the Carve-Out, up to the full amount of the DIP Obligations in any sale contemplated by the Bid Procedures pursuant to section 363(k) of the Bankruptcy Code; *provided*, that if the DIP Secured Parties submit a bid for any of the Assets, the DIP Agent shall cease being a consultation party as set forth in the Bidding Procedures. Each of the Prepetition Secured Parties shall be deemed Qualified Bidders and shall have the right to credit bid up to the full amount of the applicable Prepetition Secured Debt, subject to the Carve-Out in any sale contemplated by the Bid Procedures pursuant to section 363(k) of the Bankruptcy Code.

G.  **Deemed Acknowledgments and Representations.** Each Qualified Bidder shall

be deemed to acknowledge and represent that such bidder:

1. has had an opportunity to conduct any and all due diligence regarding the Assets that are the subject of the Auction prior to making any such bids;

2. has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; and

3. did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith, except as expressly stated in the Bidding Procedures or, as to the Successful Bidder(s), the asset purchase agreement(s) with such Successful Bidder(s).



**Provisions Providing Bid Protections to Stalking Horse or Initial Bidder**
Local Bankruptcy Rule 6004-1(c)(i)(C)

**Part 3 of the Bidding Procedures outlines the terms of selecting a Stalking Horse Bidder and providing Bid Protections.**

A. **Selection of the Stalking Horse Bidder**. Prior to the Bid Deadline, the Debtors shall be fully authorized, but not obligated, in an exercise of their business judgment (in consultation with the DIP Agent and Creditors' Committee (if any)) to agree with any Qualified Bidder that:

1. such Qualified Bidder's Qualified Bid shall serve as the minimum bid for the Assets or any lot thereof (such Qualified Bidder, a "**Stalking Horse Bidder**" and, such Qualified Bid, a "**Stalking Horse Bid**"); and

2. that the Debtors will enter into the transaction(s) contemplated in such Stalking Horse Bid unless a higher or otherwise better Qualified Bid or Subsequent Bid is submitted with respect to such Assets or lot thereof, as determined by the Debtors in accordance with these Bidding Procedures.

Promptly upon the designation of a Stalking Horse Bid, the Debtors shall file a notice of selection of the Stalking Horse Bidder and serve such notice on the Notice Parties. Parties in interest may object to the designation of a Stalking Horse Bidder or any of the terms of such Stalking Horse Bid (each, a "**Stalking Horse Objection**") within seven (7) calendar days after service of the notice of selection of the Stalking Horse Bidder. If a timely Stalking Horse Objection is filed, the Debtors will schedule a hearing (the "**Stalking Horse Hearing**") regarding such Stalking Horse Objection as soon as reasonably practicable seeking approval of such Stalking Horse Bid on or before August 8, 2019 (the "**Stalking Horse Approval Order**"). In absence of a Stalking Horse Objection, upon the expiration of the objection deadline, the Debtors will submit the Stalking Horse Approval Order to the Court, which may enter such order without a hearing.

B. **Bid Protections**. In the event that the Debtors select one or more Stalking Horse Bidder(s) in accordance with the Bidding Procedures, the Debtors shall be fully authorized, but not obligated, in an exercise of their business judgment (in consultation with the DIP Agent and Creditors' Committee (if any)) to offer the following bid protections to such Stalking Horse Bidder(s), subject to entry of the Stalking Horse Approval Order, payable if the Debtors consummate a sale pursuant to a Qualified Bid other than the Stalking Horse Bid (if the assets subject to such sale are those to which such Stalking Horse Bid relates) paid out of the proceeds of the sale to which they relate :

1. payment of a break-up fee in an amount not to exceed 3% of the cash purchase price set forth in the Stalking Horse Bid (the "**Break-Up Fee**"); and

2. reimbursement of the reasonable and documented costs and expenses of the Stalking Horse Bidder (the "**Expense Reimbursement**" and, together with the Break-Up Fee, the "**Bid Protections**") in an amount not to exceed 1% of the



cash purchase price set forth in the Stalking Horse Bid;

*provided, however*, that

    a.  the payment of such Break-Up Fee and/or Expense Reimbursement shall be subject to the terms and conditions of the definitive agreement(s) executed between the Debtors and such Stalking Horse Bidder(s); and

    b.  no Break-Up Fee shall be paid to a credit bidder.

**C.**  **Notice.** Notice of the Bid Protections on the terms agreed to by the Debtors and one or more Stalking Horse Bidders shall be provided concurrent with the notice of such Stalking Horse Bidder(s) in accordance with the Bidding Procedures Order. Until paid, any Break-Up Fee or Expense Reimbursement provided pursuant to the Bidding Procedures Order shall constitute allowed superpriority administrative expense claims arising in the Debtors' chapter 11 cases under sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code; provided, however, that such superpriority claims shall be subject to and subordinate in all respects to (i) the liens and claims granted to the DIP Secured Parties and Prepetition Secured Parties in the DIP Order; and (ii) the Carve-Out (as defined in the DIP Order).

| | |
|---|---|
| **Provisions Permitting the Modification of Bidding and Auction Procedures** Local Bankruptcy Rule 6004-1(c)(i)(D) | **Part 10 of the Bidding Procedures authorizes the Debtors, except as otherwise provided in the Bidding Procedures or the Bidding Procedures Order, in consultation with the DIP Agent and Creditors' Committee (if any), to modify the Bidding Procedures and implement additional procedural rules that the Debtors determine will better promote the goals of the bidding process and discharge the Debtors' fiduciary duties.** |
| <br><br>**Provisions Regarding Closing with Alternate Backup Bidders** Local Bankruptcy Rule 6004-1(c)(i)(E) | **Parts 5 and 6 of the Bidding Procedures sets forth procedures by which the Debtors shall select the Successful Bids.**<br><br>A.  **Selection of Successful Bids.** Prior to the conclusion of the Auction, the Debtors shall (in each case in their Permitted Discretion (as defined in the Bidding Procedures) (a) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale transaction, (b) determine and identify the highest or otherwise best offer or collection of offers (the "**Successful Bid(s)**"), (c) determine and identify the next highest or otherwise best offer or collection of offers (the "**Alternate Bid(s)**") and (d) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the identity of the party or parties that submitted the Successful Bid(s) (the "**Successful Bidder(s)**"), the amount and other material terms of the Successful Bid(s), the identity of the party or parties that submitted the Alternate Bid(s) (the "**Alternate Bidder(s)**") and the amount and other material terms of the Alternate Bid(s). No additional bids may be considered after the Auction is closed.<br><br>B.  **Alternative Bid.** The Debtors' presentation to the Court of the Successful Bid(s) and Alternate Bid(s) will not constitute the Debtors' acceptance of such bid(s), which acceptance will only occur upon approval of such bid(s) by the Court. Following the Court's entry of the Sale Order approving such bid(s), the Debtors and the Successful Bidder(s) shall proceed to consummate the transaction(s) contemplated by the Successful Bid(s), in all cases within the milestones set in the DIP Order. If the Debtors and the Successful Bidder(s) fail to consummate the proposed transaction(s), then the Debtors shall file a notice with the Court advising of such failure. Upon the filing of such notice with the Court, the Alternate Bid(s) will be deemed to be the Successful Bid(s) and the Debtors will be authorized but not directed, in their sole discretion, to effectuate the transaction(s) with the Alternate Bidder(s) subject to the terms of the Alternate Bid(s) of such Alternate Bidder(s) without further order of the Court. If such failure to consummate the sale is the result of a breach by the Successful Bidder(s) (such bidder(s), the "**Breaching Bidder(s)**") of its (their) purchase agreement(s), the Debtors reserve the right to seek all available remedies from the Breaching Bidder(s), subject to the terms of the applicable purchase agreement.<br><br>C.  **Execution of Definitive Documentation.** Within two Business Days after the completion of the Auction, the Successful Bidder(s) and the applicable Debtors shall complete and execute all agreements, instruments and other documents necessary to consummate the applicable sale transaction(s) or otherwise contemplated by the applicable Successful Bid(s). Promptly following the selection of the Successful Bid(s) and Alternate Bid(s), the Debtors shall file a notice of the Successful Bid(s) and Alternate Bid(s) with the Court and cause such notice to be published on the Case Information Website, which shall constitute definitive proof that the Debtors have closed the Auction. |

**B.    Noticing Procedures**

18.    The Bidding Procedures and the Bidding Procedures Order provide the following

"Noticing Procedures":

a.    **Sale Notice.** Within one Business Day after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice by first-class mail upon the following parties or, in lieu thereof, their counsel, if known: (i) the Notice Parties (as defined below); (ii) counsel for any statutory committee appointed in the Chapter 11 Cases; (iii) all entities known to have expressed an interest in a transaction with respect to the Assets; (iv) the Internal Revenue Service; (v) all known taxing authorities to which the Debtors are subject; (vi) all entities known or reasonably believed to have asserted a Lien on any of the Assets; (vii) counterparties to the Debtors' executory contracts and unexpired leases; and (viii) those entities and individuals appearing on the Debtors' creditor matrix (collectively, the "Sale Notice Parties"). On or about the same date, the Debtors shall publish the Sale Notice on the Debtors' case information website (located at https://cases.primeclerk.com/edgemarc (the "Case Information Website")).

b.    **Notice of Determination of Qualified Bids.** By 12:00 p.m. (prevailing Eastern Time) on the date that is two Business Days prior to the Auction, the Debtors will (A) notify each Qualified Bidder that has timely submitted a Qualified Bid that its bid is a Qualified Bid and (B) provide all Qualified Bidders with (1) copies of the Qualified Bid or combination of Qualified Bids that the Debtors believe is the highest or otherwise best offer (the "Starting Bid(s)"), (2) an explanation of how the Debtors value the Starting Bid(s) and (3) a list identifying all of the Qualified Bidders and their respective Qualified Bids.

c.    **Provisions Governing the Auction.** If the Debtors receive no more than one (1) Bid that is a Qualified Bid, the Debtor, in its sole discretion, shall (i) notify all Potential Bidders and the Bankruptcy Court in writing that (a) the Auction is cancelled and (b) such Qualified Bid is the Successful Bid, and (ii) if applicable the Debtors shall seek authority at the Sale Hearing to consummate the Sale transactions with such Qualified Bidder contemplated by its Qualified Bidder Purchase Agreement. If the Debtors receive two (2) or more Qualified Bids, the Debtors will conduct an auction (the "Auction").

d.    **Notice of Auction Results.** Promptly following the selection of the Successful Bid(s) and Alternate Bid(s), the Debtors shall file a notice of the Successful Bid(s) and Alternate Bid(s) (the "Notice of Auction Results") with the Court and cause such notice to be published on the Case

Information Website, which shall constitute definitive proof that the Debtors have closed the Auction.

19.     The Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the applicable objection deadline, the Bid Deadline and the time and location of the Auction and Sale Hearing. Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002 and Local Bankruptcy Rule 2002-1.

## Assumption and Assignment Procedures

20.     In connection with the Sale, the Debtors anticipate that they will assume and assign to the Successful Bidder (or its designated assignee(s)) all or certain of the Potentially Assumed Contracts pursuant to section 365(b) of the Bankruptcy Code.   Accordingly, the Debtors hereby seek approval of the proposed Assumption and Assignment Procedures set forth herein, which, among other things, (a) outline the process by which the Debtors will serve notice to all Contract Counterparties regarding the proposed assumption and assignment, related Cure Claims, if any, and information regarding the Successful Bidder's adequate assurance of future performance and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of the Potentially Assumed Contracts. The proposed Assumption and Assignment Procedures are as follows:

a.     **Executory Contract List.**

i.     No later than three Business Days after entry of the Bidding Procedures Order, the Debtors shall file with the Court a list of executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (such contracts, the "Potentially Assumed Contracts" and such list the "Executory Contract List").

ii.    If it is discovered that an Executory Contract should have been included on the Executory Contract List but was not (such contract, a "<u>Previously Omitted Contract</u>"), or in the event that the Debtors seek to modify a Cure Claim, the Debtors will promptly file with the Court a revised Executory Contract List.

b.    **<u>Potential Assumption and Assignment Notice</u>**.  Simultaneously with the filing of the Executory Contract List (or any revised Executory Contract List) or as soon as reasonably practicable thereafter, serve on each relevant Contract Counterparty the Potential Assumption and Assignment Notice.

c.    **<u>Assumption and Assignment Objections</u>**.

i.    <u>Objection Deadlines</u>. Any Contract Counterparty may object to the proposed assumption or assignment of its Assumed Contract, the Debtors' proposed Cure Claims, if any, or the ability of a Stalking Horse Bidder (if any) to provide adequate assurance of future performance (an "<u>Assumption and Assignment Objection</u>").  All Assumption and Assignment Objections must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Claims the Contract Counterparty believes is required to cure defaults under the relevant Assumed Contract and supporting materials evidencing the same, (D) be filed by no later than **<u>seven (7) days prior to the Sale Hearing</u>** (the "<u>Assumption and Assignment Objection Deadline</u>") and (E) be served on (1) proposed counsel for the Debtors, (y) Davis Polk & Wardwell LLP, 450 Lexington Ave., New York, New York 10017, Attn: Darren S. Klein and Aryeh Falk and (z) Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801, Attn: Adam G. Landis and Kerri K. Mumford, (2) counsel to any statutory committee appointed in the Chapter 11 Cases, (3) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801, and (4) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Assumption and Assignment Objection Notice Parties</u>").

ii.    <u>Resolution of Assumption and Assignment Objections</u>. The Court will hear and determine any properly and timely filed and served Assumption and Assignment Objection at the Sale Hearing or, if filed after the Sale Hearing, on an expedited basis, and in any event no later than closing of the Sale.  If such objection has not been resolved prior to the closing of the Sale (whether by an order of the Court or by agreement with the Contract Counterparty), the Successful Bidder(s) shall pay as soon as reasonably practicable after the closing date any Disputed Cure Claim pursuant to an

order of the Court or mutual agreement between the Debtors, the Successful Bidder(s) and the applicable Contract Counterparty.

iii.   <u>Failure to File Timely Assumption and Assignment Objection</u>. If a Contract Counterparty fails to properly and timely file and serve an Assumption and Assignment Objection in accordance with these Assumption Procedures, the Contract Counterparty shall be forever barred from asserting any objection with regard to the assumption or assignment of its Assumed Contract, and notwithstanding anything to the contrary in the Assumed Contract or any other document, the Cure Claims set forth in the Potential Assumption and Assignment Notice shall be the only amount necessary to cure outstanding defaults under the applicable Assumed Contract under section 365(b) of the Bankruptcy Code arising out of or related to any events occuring prior to the closing of the Sale, whether known or unknown, due or to become due, accrued, absolute, contingent or otherwise, and the Contract Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to such Assumed Contract against the Debtors, the Successful Bidder or the property of any of them.

d.   **Post-Auction Adequate Assurance Objection**. Following the Auction, the Debtors shall serve the Notice of Auction Results on each Contract Counterparty that received a Potential Assumption and Assignment Notice at the same time as such Notice of Auction Results is filed with the Court and published on the Case Information Website. Objections of any Contract Counterparty related solely to the identity of and adequate assurance of future performance provided by the Successful Bidder (an "<u>Adequate Assurance Objection</u>") must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules, (C) state, with specificity, the legal and factual bases thereof, (D) be filed by **no later than the Sale Hearing or, if earlier, fourteen days following service of the Notice of Auction Results** (the "<u>Adequate Assurance Objection Deadline</u>") and (E) be served on the Assumption and Assignment Objection Notice Parties.

e.   **Reservation of Rights**. The inclusion of an Assumed Contract, or Cure Claims with respect thereto, on a Potential Assumption and Assignment Notice or the Executory Contract List shall not constitute or be deemed a determination or admission by the Debtors, the Successful Bidder(s) or any other party in interest that such contract or lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code. The Debtors reserve all of their rights, claims and causes of action with respect to each Assumed Contract listed on the Potential Assumption and Assignment Notice and Executory Contract List. The Debtors' inclusion of any Assumed Contract on the Potential Assumption and Assignment

Notice and Executory Contract List shall not be a guarantee that such Assumed Contract ultimately will be assumed or assumed and assigned.

**Approval of the Relief Requested Is Warranted
and in the Best Interests of the Debtors and Their Stakeholders**

A.     **The Bidding Procedures are Fair, Appropriate and Should Be Approved**

21.     The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate. *See Burtch et al. v. Ganz, et al. (In re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to maximize and protect the value of the estate's assets); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that main goal of any proposed sale of property of a debtor's estate is to maximize value). Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that Bidding Procedures "encourage bidding and . . . maximize the value of the debtor's assets").

22.     The Bidding Procedures provide for an orderly, uniform and appropriately competitive process through which interested parties may submit offers to purchase the Assets. The Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to obtain the highest or otherwise best offer reasonably available for the Assets. Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction in a fair and transparent manner that will encourage participation by

financially capable bidders with demonstrated ability to consummate a timely Sale. Courts in this district have approved procedures similar to the proposed Bidding Procedures in connection with chapter 11 asset sales. *See, e.g., In re TerraVia Holdings, Inc., et al.*, Case No. 17-11655 (CSS) (Bankr. D. Del. Aug. 22, 2017); *In re BPS US Holdings Inc.*, Case No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016); *In re SFX Entertainment, Inc.*, Case No. 16-10238 (MFW) (Bankr. D. Del. Mar. 23, 2016); *In re Sundevil Power Holdings, LLC*, Case No. 16-10369 (KJC) (Bankr. D. Del. Mar. 3, 2016); *In re Fresh & Easy Neighborhood Market Inc.*, Case No. 13-12569 (KJC) (Bankr. D. Del. Oct. 24, 2013). Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate and in the best interests of the Debtors, their estates and all parties in interest.

**B.    The Bid Protections That May Be Granted to a Stalking Horse Bidder Have a Sound Business Purposes and Should Be Approved**

23.    As noted above, the Bidding Procedures allow (but do not require) the Debtors, in the exercise of their business judgment (in consultation with the DIP Secured Parties), to, prior to the Bid Deadline, (a) agree with a Qualified Bidder that its Qualified Bid will serve as the minimum bid for the Assets, and constitute a Stalking Horse Bid[5] and (b) offer the Bid Protections to such Stalking Horse Bidder. While the Debtors are not committed to offering the Bid Protections at this time, the Debtors ask the Court to authorize them to offer these Bid Protections because the Debtors believe that, in appropriate circumstances, the presence of a Stalking Horse Bidder will benefit all stakeholders. For the avoidance of doubt, however, the Bid Protections will (x) remain subject to the terms and conditions of the definitive agreement(s)

---

[5] In the case multiple bids for non-overlapping lots of the Bid Assets, the Bidding Procedures allow the possibility of multiple Stalking Horse Bids.

executed between the Debtors and such Stalking Horse Bidder(s) and (z) not be paid to a credit bidder.

24.    Courts have identified at least two instances in which bid protections in the form of break-up fees and expense reimbursements may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533. Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *See id.*; *see also In re Reliant Energy Channel View LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

25.    In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award break-up fees and expense reimbursements:

a.    the presence of self-dealing or manipulation in negotiating the break-up fee or expense reimbursement;

b.    whether the fee or reimbursement harms, rather than encourages, bidding;

c.    the reasonableness of the break-up fee or expense reimbursement relative to the purchase price;

d.    whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e.   the ability of the request for a break-up fee or expense reimbursement to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.   the correlation of the fee or reimbursement to a maximum value of the debtor's estate;

g.   the support of the principal secured creditors and creditors' committees of the break-up fee;

h.   the benefits of the safeguards to the debtor's estate; and

i.   the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee or expense reimbursement.

*See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 536.

26.    Here, the Bid Protections contemplated by the Bidding Procedures squarely satisfy the *O'Brien* Factors.  The Break-Up Fee would enable the Debtors to secure an adequate floor for the Assets and insist that competing bids be materially higher or otherwise better than the Stalking Horse Bid – a clear benefit to the Debtors' estates.  *See* Ross Decl. at ¶ 10. Moreover, it is likely that a prospective Stalking Horse Bidder would not agree to act as a stalking horse without the Bid Protections.  Without the Court authorizing the Debtors to offer the Bid Protections, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose the downside protection that could be afforded by the existence of a Stalking Horse Bidder.  *Id.*

27.    The Break-Up Fee and Expense Reimbursement are reasonable and appropriate in light of the nature of the transaction and the efforts that will necessarily have been expended  by a Stalking Horse Bidder (to the extent the Debtors' choose a Qualified Bid to be a Stalking Horse Bid).  Moreover, the Bid Protections will only be offered to the extent that the Debtors believe, in the exercise of their business judgment, and consistent with their fiduciary duties, that offering these protections will enhance the ultimate recovery to be received by all stakeholders.  The Bid

Protections are also sized appropriately. *See* Ross Decl. at ¶ 10.  The Break-Up Fee will not exceed 3% of the cash purchase price set forth in the Stalking Horse Bid, and as set forth in the Ross Declaration, the Expense Reimbursement of up to 1% of the cash purchase price set forth in the Stalking Horse Bid will represent only a small percentage of any reasonable price that might be offered by a Stalking Horse Bidder. *Id.* Additionally, both the Break-Up Fee and the Expense Reimbursement will be subject to consultation with the DIP Secured Parties and the negotiation and execution of a definitive agreement between the Debtors and the Stalking Horse Bidder.  In sum, the Debtors' ability to offer the Bid Protections will enable them to ensure the sale of the Assets at a price they believe to be fair, while, at the same time, providing the Debtors with the potential to achieve an even greater benefit to the Debtors' estates in the form of a higher or otherwise better offer for the Assets.

28.    This Court has approved protections similar to, and in excess of, the proposed Bid Protections as reasonable and consistent with the type and range of bidding protections typically approved. *See, e.g., In re TerraVia Holdings, Inc., et al.*, Case No. 17-11655 (CSS) (Bankr. D. Del. Aug. 22, 2017) (approving expense reimbursement up to an amount representing approximately 1.5% of the consideration in addition to a break-up fee); *In re CIBER, Inc.*, Case No. 17-10772 (BJS) (Bankr. D. Del. May 2, 2017) (approving a break-up fee and expense reimbursement that in the aggregate represented approximately 3.0% of the consideration); *In re American Apparel, LLC*, Case No. 16-12551 (BLS) (Bankr. D. Del. Dec. 5, 2016) (approving a break-up of 3.0% in connection with a $66 million sale of assets); *In re BPS US Holdings Inc.*, Case No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016) (approving a break-up fee of 3.5% in connection with a $575 million sale of assets); *In re Nirvanix, Inc.*, Case No. 13-12595 (BLS) (Bankr. D. Del. Oct. 23, 2013), (approving total bid protections of 11%—comprising a $150,000

break-up fee and $150,000 expense reimbursement for a $2,800,000 stalking horse bid); *In re First Place Fin. Corp.*, Case No. 12- 12961 (BLS) (Bankr. D. Del. Nov. 26, 2012) (approving total bid protections of 6.6%— comprising a $3 million break-up fee and a $1 million expense reimbursement on a transaction with $60 million in aggregate consideration.); *In re Hub Holding Corp., et al.*, Case No. 09- 11770 (PJW) (Bankr. D. Del. June 30, 2009) (approving total bid protections of 6.43%— comprising a $2,880,000 break-up fee and $1,750,000 expense reimbursement for a $72,000,000 stalking horse bid.); *In re Fluid Routing Solutions Intermediate Holding Corp., et al.*, Case No. 09-10384 (CSS) (Bankr. D. Del. Feb. 19, 2009), (approving total bid protections of 6.82%— comprising a $750,000 break-up for an $11,000,000 stalking horse bid).

29.    Accordingly, the Debtors submit that the Bid Protections have a sound business purpose, are fair and appropriate under the circumstances and should be approved.

**C.    The Proposed Sale Satisfies the Requirements of Section 363 of the Bankruptcy Code**

30.    Ample authority exists for approval of the Sale contemplated by this Sale Motion. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of a debtor's estate, courts have approved the authorization of a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus.,*

*Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

31.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard:  (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).  Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del.1985)).

### 1.     *The Debtors Have Demonstrated a Sound Business Justification for the Proposed Sale*

32.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders.  *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063; *In re Food Barn Stores, Inc.*, 107 F.3d at 564-65 (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).

33.     As set forth above, a strong business justification exists for the sale of the Debtors' Assets.  An expeditious sale of the Assets is required to maximize the value of the Debtors assets and recoveries for the Debtors' stakeholders.  Moreover, the timely

consummation of the proposed Sale is required under the express terms of the DIP Credit Agreement.

**2.    *The Noticing Procedures Are Reasonable and Appropriate***

34.    The Noticing Procedures described above are reasonably calculated to provide all of the Debtors' known creditors and all other parties in interest with adequate, timely notice of, among other things, the proposed Sale, Bidding Procedures, Auction and Sale Hearing.

**3.    *The Proposed Sale Will Produce a Fair and Reasonable Purchase Price for the Assets***

35.    As set forth above, the Debtors believe that the proposed Sale will produce fair and reasonable purchase prices for the Assets.

36.    The Bidding Procedures, including the ability to designate a Stalking Horse Bidder prior to the Bid Deadline, were carefully designed to facilitate a robust and competitive bidding process. The Debtors are poised to commence a competitive bidding process to maximize the value of the Assets sold at the Auction. The Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare all bids received to determine which bids are in the best interests of the Debtors' estates and their stakeholders, while allowing the Debtors appropriate degrees of discretion to determine the Successful Bidder. A Sale governed by the Bidding Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase price for the Assets, but also the highest or otherwise best value for the Assets, which will inure to the benefit of all parties in interest in the Chapter 11 Cases.

**4.    *The Successful Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code***

37.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section

363(b) is later reversed or modified on appeal.  Specifically, section 363(m) of the Bankruptcy

Code states the following:

> The reversal or modification on appeal of an authorization under
> [section 363(b) of the Bankruptcy Code] . . . does not affect the
> validity of a sale ... to an entity that purchased . . . such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale . . . were stayed
> pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code fosters the "'policy of not only

affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to

those orders and judgments upon which third parties rely.'"  *Reloeb Co. v. LTV Corp (In re*

*Chateaugay Corp.*), No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May

10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 147); *see also Allstate Ins. Co.*

*v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith

transfers of property will not be affected by the reversal or modification on appeal of an unstayed

order, whether or not the transferee knew of the pendency of the appeal").

38.     While the Bankruptcy Code does not define "good faith," the Third Circuit has

held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'"  *In re*

*Abbotts Diaries*, 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection

with the sale must usually amount to fraud, collusion between the purchaser and other bidders or

the trustee or an attempt to take grossly unfair advantage of other bidders); *see also In re Bedford*

*Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R.

833, 839 (D.N.J. 1995).

39.     In other words, a party would have to show fraud or collusion between the buyer

and the debtor in possession, the trustee or other bidders to demonstrate a lack of good faith.  *See*

*Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d

269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"). Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1998 (7th Cir. 1978)).

40.     The Debtors submit that a Successful Bidder under the Bidding Procedures (whether or not a Stalking Horse Bidder), would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.  It is expected that, as is customary, Qualified Bidders will engage separate counsel and other professional advisors to represent their respective interests in determining the terms of their Qualified Bids and with respect to the sale process generally.  To the best of the Debtors' knowledge, information, and belief, no party has engaged in any conduct that would cause or permit a Sale to be set aside under section 363(m) of the Bankruptcy Code.

41.     Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process.  Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Assets. *See* Bidding Procedures § 4.  Any asset purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's length and in good faith. Accordingly, the Debtors seek a finding that any Successful Bidder (including the Stalking Horse Bidder) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

42.     Based on the foregoing, the Debtors submit that they have demonstrated that the proposed Sale is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

**D.      The Assets Should Be Sold Sale Free and Clear of Liens, Claims, Interests and Encumbrances Under Section 363(f) of the Bankruptcy Code**

43.     In the interest of attracting the best offers, the Assets should be sold free and clear of any and all liens, claims, interests and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests and encumbrances attaching to the proceeds of the applicable sale.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if any one of the following conditions is satisfied:

    a.      applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    b.      such entity consents;

    c.      such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

    d.      such interest is in bona fide dispute; or

    e.      such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

44.     Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment

that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

45.     The Debtors submit that the sale of the Assets free and clear of liens, claims, interests and encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.  To the extent a party objects to the Sale on the basis that it holds a prepetition lien or encumbrance on the Assets, the Debtors believe that any such party could be compelled to accept a monetary satisfaction of such claims, under section 363(f)(5) of the Bankruptcy Code, or that such lien is in bona fide dispute, under section 363(f)(4) of the Bankruptcy Code.

46.     Moreover, the Debtors will send the Sale Notice to any known purported prepetition lienholders.  If such lienholders do not object to the proposed Sale, then their consent should reasonably be presumed.  Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim or encumbrance on any of the Assets timely objects to this Sale Motion, such party shall be deemed to consent to any Sale approved at the Sale Hearing.  *See Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein).

47.     The purpose of a sale order authorizing the transfer of assets free and clear of all claims, liens and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.  Moreover, without such assurances, potential bidders may choose not to participate in the Auction, or may

submit reduced bid amounts, to the detriment of the Debtors' stakeholders. Accordingly, the Debtors request that the Court authorize the sale of the Assets free and clear of any liens, claims, interests and encumbrances (with the exception of Permitted Encumbrances and Assumed Liabilities), in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests and encumbrances (including all DIP Liens and Superpriority DIP Claims in favor of the DIP Agent and the DIP Lenders (as each is defined in the DIP Motion)) attaching to the proceeds thereof in the same order of relative priority, with the same validity, force and effect as prior to such.

### E.    Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized

48.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).    Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease. *See, e.g., In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that a debtor's decision to assume or reject executory contract is governed by business judgment standard and may only be overturned if decision is product of bad faith, whim, or caprice). The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989).

49.    Any assumption of the Transferred Contracts is an exercise of the Debtors' sound business judgment because the transfer of such Contracts is necessary to the Debtors' ability to

obtain the best value for their Assets. The assumption and assignment of Transferred Contracts will be a critical component of the value of any Bid. Given that consummation of the Sale is critical to the Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption of Transferred Contracts is an exercise of sound business judgment and, therefore, should be approved.

50.     The consummation of any Sale involving the assignment of a Proposed Assumed Contract will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Contracts to be assumed be cured or that the Debtors provide adequate assurance that such defaults will be promptly cured. The Debtors' assumption and assignment of Transferred Contracts will be contingent upon payment of the Cure Claims and effective only upon the closing of an applicable Sale. As set forth above, the Debtors propose to file with the Court and serve on each Contract Counterparty a Potential Assumption and Assignment Notice, which will set forth the Debtors' good faith calculations of Cure Claims , if any, with respect to each Contract listed. Contract Counterparties will have a meaningful opportunity to raise any objections to the proposed assumption of their respective Contracts prior to closing of the Sale.

51.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided." The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y.

1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) (finding that, "[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Among other things, adequate assurance may be provided by evidencing the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when the prospective assignee of a lease has financial resources and has expressed willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).

52.     As set forth above and in the Bidding Procedures, for a bid to qualify as a Qualified Bid, a Potential Bidder must include with its bid information regarding its ability (and the ability of its designated assignee, if applicable) to perform under any Contracts proposed to be assumed. Each affected Contract Counterparty will have an opportunity to object to the ability of the Successful Bidder to provide adequate assurance as provided in the Bidding Procedures Order. To the extent necessary, the Debtors will present facts at the Sale Hearing or any subsequent hearing to hear an Assumption and Assignment Objection to show the financial wherewithal, willingness and ability of the Successful Bidder to perform under the Transferred Contracts.

53.     In addition, to facilitate the assumption and assignment of Transferred Contracts, the Debtors further request that the Court find that all anti-assignment provisions contained therein, whether such provisions expressly prohibit or have the effect of restricting or limiting

assignment of such Assumed Contract, to be unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[6]

### Waiver of Bankruptcy Rules 6004(a), 6004(h) and 6006(d)

54.     The Debtors request that the Court (a) find that notice of the Sale Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances and (b) waive the fourteen-day stay requirements under Bankruptcy Rules 6004(h) and 6006(d).  In light of the Debtors' current financial condition and their obligation to comply with the conditions to closing the Sale contemplated by the DIP Credit Agreement, the proposed Sale contemplated herein should be consummated as soon as practicable to allow the Debtors to maximize value for their estates and stakeholders.  Accordingly, the Debtors request that the Bidding Procedures Order, the Sale Order and any order authorizing the assumption and assignment of a Proposed Assumed Contract in connection with a Sale be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) be waived.

### Notice and No Prior Request

55.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the U.S. Trustee; (b) each of the Debtors' twenty (20) largest unsecured creditors on a consolidated basis; (c) KeyBank National Association, the administrative agent under the Debtors' proposed postpetition secured credit facility and prepetition secured credit facility; (e) the Debtors' prepetition equity owners; (f) the United

---

[6] Section 365(f)(1) of the Bankruptcy Code provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . .." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) of the Bankruptcy Code further provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3)

States Attorney's Office for the District of Delaware; (g) the attorneys general for the states in which the Debtors conduct business; (h) local and state environmental authorities and the Environmental Protection Agency; (i) the Federal Energy Regulatory Commission; and (j) all parties who have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  In light of the nature of the relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

56.    The Debtors have not previously sought the relief requested herein from the Court or any other court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

WHEREFORE the Debtors respectfully request that the Court enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit B**, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: May 15, 2019
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
Kimberly A. Brown (No. 5138)
Holly M. Smith (No. 6497)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
       mumford@lrclaw.com
       brown@lrclaw.com
       smith@lrclaw.com

*-and-*

**DAVIS POLK & WARDWELL LLP**

Darren S. Klein (*pro hac vice* pending)
Lara Samet Buchwald (*pro hac vice* pending)
Aryeh E. Falk (*pro hac vice* pending)
Jonah A. Peppiatt (*pro hac vice* pending)
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email: darren.klein@davispolk.com
       lara.buchwald@davispolk.com
       aryeh.falk@davispolk.com
       jonah.peppiatt@davispolk.com

*Proposed Counsel to the Debtors and Debtors-In-Possession*