# **EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| EDGEMARC ENERGY HOLDINGS, LLC, *et al.*, | Case No. 19-11104 (BLS) |
| Debtors.[1] | Joint Administration Requested |
|  | Re: Docket No. 13 |

**INTERIM ORDER, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507, (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of EdgeMarc Energy Holdings, LLC and its subsidiaries that are debtors and debtors in possession (the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for entry of interim and final orders, among other things:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, where applicable, are: EdgeMarc Energy Holdings, LLC (80-0766900), EM Energy Manager, LLC (30-0745334), EM Energy Employer, LLC (80-0838026), EM Energy Ohio, LLC (80-0846935), EM Energy Pennsylvania, LLC (38-3881541), EM Energy West Virginia, LLC (90-0883771), EM Energy Keystone, LLC (82-0857506), EM Energy Midstream Ohio, LLC (46-3841268), EM Energy Midstream Pennsylvania, LLC (46-3843963). The Debtors' corporate headquarters and mailing address is 1800 Main Street, Suite 220, Canonsburg, PA 15317.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Documents or the Motion, as applicable.

(i)     Authorizing EM Energy Employer, LLC (the "**Borrower**") to obtain, and the other Debtors (collectively, in their capacity as such, the "**Guarantors**" and, together with the Borrower, the "**Loan Parties**") to guaranty, debtor-in-possession credit financing in an aggregate principal amount of up to $107,793,041 million (the "**DIP Financing**") to be funded by the Prepetition Lenders (in their capacity as lenders under the DIP Facilities, the "**DIP Lenders**") under a secured term loan and letter of credit facility (the "**DIP Facility**") consisting of (A) new money term loans (the "**DIP Term Loans**")) in an aggregate principal amount of up to $30 million, and (B) roll-up term loans (the "**DIP Roll-Up Loans**" and, together with the DIP Term Loans, the "**DIP Loans**"), which shall be subject and subordinate to the DIP Term Loans, to refinance dollar-for-dollar the Prepetition Secured Debt held by the DIP Lenders in the aggregate principal amount up to $77,793,041.00 million, with such amount depending upon the Letters of Credit Outstanding;

(ii)    deeming all Prepetition Letters of Credit (as defined below) issued and outstanding under the Prepetition Credit Agreement (as defined below) as cancelled and reissued under the DIP Credit Agreement (as defined below) in their full amounts and without modification of their terms (such reissued letters of credit, the "**DIP Letters of Credit**");

(iii)   authorizing the Loan Parties, in connection with the DIP Facility, to (A) execute and enter into the Superpriority Secured Debtor-in-Possession Credit Agreement, among the Loan Parties, the DIP Lenders, and KeyBank National Association ("**KeyBank**"), as administrative agent (solely in such capacity, the "**DIP Agent**") and as the Letter of Credit Issuer (as defined in the DIP Credit Agreement), together with the DIP Agent and DIP Lenders, the "**DIP Secured Parties**"), substantially in the form attached hereto as Exhibit A (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Credit Agreement**" and, together with the schedules and exhibits attached thereto and all agreements, documents, instruments and amendments executed and delivered in connection therewith, including the Approved Budget, the "**DIP Documents**") and (B) to perform all such other and further acts as may be required in connection with the DIP Documents;

(iv)    granting to the DIP Agent, for the benefit of the DIP Lenders, valid, enforceable, non-avoidable and automatically and fully perfected liens and security interests, subject only to the (a) the Carve-Out, and (b) valid, enforceable and non-avoidable Liens or security interests that are (i) in existence on the Petition Date (as defined below), (ii) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (iii) senior in priority to the Prepetition Liens granted the Prepetition Secured Parties under and in connection with the Prepetition Loan in accordance

with applicable law (the "**Permitted Prior Liens**"), to secure the DIP Obligations, which liens and security interests shall have the rankings and priorities set forth herein;

(v)    granting superpriority administrative claims to the DIP Secured Parties payable from, and having recourse to, all prepetition and post-petition property of the Loan Parties' estates and all proceeds thereof (other than Avoidance Actions, but, subject to and effective upon entry of the Final Order, including Avoidance Proceeds), subject to the Carve-Out and the Permitted Prior Liens;

(vi)    authorizing the Loan Parties (A) upon entry of this Interim Order, to incur in multiple draws on and after the Closing Date, DIP Term Loans in an aggregate principal amount of up to $15 million (the "**Initial DIP Term Loans**") (the incurrence of such loans upon entry of this Interim Order, the "**Interim Financing**") and (B) subject to and effective upon entry of the Final Order, to incur in multiple draws, additional DIP Term Loans in an aggregate principal amount of $30 million, in each case subject to the terms and conditions set forth in the DIP Documents, this Interim Order, and the Final Order;

(vii)    subject to and effective upon entry of the Final Order, to use the DIP Roll-Up Loans to refinance and discharge dollar-for-dollar Prepetition Secured Debt held by the DIP Lenders in the aggregate principal amount of up to $77,793,041.00 million;

(viii)    authorizing the Debtors' use of the proceeds of the DIP Facility pursuant to the DIP Credit Agreement and the other DIP Documents, including the "Approved Budget" (as defined in the DIP Credit Agreement and including any permitted variances and carry forward amounts, the "**Approved Budget**");

(ix)    authorizing the Debtors to continue to use the Cash Collateral (subject to the Approved Budget) and all other Prepetition Collateral, and the granting of the Adequate Protection Obligations to the Prepetition Secured Parties with respect to, *inter alia*, such use of their Cash Collateral to the extent of diminution in the value of the Prepetition Collateral (including Cash Collateral);

(x)    approving certain stipulations by the Debtors with respect to the Prepetition Loan Documents and the Prepetition Collateral as set forth herein;

(xi)    modifying the automatic stay as set forth herein and the DIP Documents, to the extent necessary, to implement and effectuate the foregoing and the other terms and provisions of the DIP Documents, the Interim Order and Final Order; and

(xii) scheduling a final hearing (the "**Final Hearing**"), to be held within 30 days after the Petition Date, to consider entry of the Final Order approving the DIP Facilities and use of Cash Collateral, as set forth in the DIP Motion and the DIP Documents; and

the Court having jurisdiction to consider the matters raised in the Motion pursuant to

28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012; and the Court having authority to

hear the matters raised in the Motion pursuant to 28 U.S.C. § 157; and venue being proper before

this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and consideration of the Motion and the

requested relief being a core proceeding that the Court can determine pursuant to 28 U.S.C.

§ 157(b)(2); and due and proper notice of the Motion and opportunity for a hearing on the

Motion having been given to the parties listed therein, and it appearing that no other or further

notice need be provided; and the Court having reviewed and considered the Motion, the Streeter

Declaration and the Ross Declaration; and the Court having held an interim hearing on the

Motion (the "**Interim Hearing**"); and the Court having determined that the legal and factual

bases set forth in the Motion and at the Interim Hearing establish just cause for the relief granted

herein; and the Court having determined that there is good and sufficient cause for the relief set

forth herein, which is necessary to avoid immediate and irreparable harm to the Debtors and

their estates as contemplated by Bankruptcy Rules 4001 and 6003; and upon all of the

proceedings had before the Court; and after due deliberation and sufficient cause appearing

therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.  *Petition Date.*  On May 15, 2019 (the "**Petition Date**"), each of the Debtors filed a separate voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (this "**Court**") commencing the Chapter 11 Cases.

B.  *Debtors in Possession.*  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.  *Committee Formation.*  As of the date hereof, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not appointed a statutory committee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (if appointed, a "**Committee**").

D.  *Jurisdiction and Venue.*  The Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue of the Chapter 11

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Cases and related proceedings is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

E.     *Notice.*  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and under the circumstances, no other or further notice of the Motion or the entry of this Interim Order shall be required, except as set forth in paragraph 38 below.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

F.     *Debtors' Stipulations Regarding the DIP Facility.*  The Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree (the "**Debtors' DIP Stipulations**") as follows:

(i)     <u>Release of Claims</u>.  Upon entry of this Interim Order, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of KeyBank, National Association and its respective affiliates, assigns, or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees, and other representatives of the foregoing (each solely in its capacity as such and all of the foregoing, collectively, the "**DIP Secured Party Releasees**") from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights, and other rights of disgorgement or recovery against any and all of the DIP Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with entering into and consummating the DIP Term Loans; *provided* that, nothing herein

6

shall relieve the DIP Secured Party Releasees from fulfilling their obligations or commitments under the DIP Facility or the rights of parties in interest with respect to the Prepetition Secured Parties set forth in paragraphs 20 and 21.

G.      *Debtors' Stipulations Regarding the Prepetition Credit Agreement.* After consultation with their attorneys and financial advisors, and without prejudice to the rights of a Committee or any other party in interest (subject to the limitations thereon contained in paragraphs 20 and 21 below), the Debtors acknowledge, admit, stipulate and agree that:

(i)      Prepetition Credit Facility. Pursuant to that certain Amended and Restated Credit Agreement, dated as of December 19, 2017 (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the **"Prepetition Credit Agreement"** and, together with the schedules and exhibits attached thereto and all agreements, documents, instruments, and amendments executed and delivered in connection therewith, the **"Prepetition Loan Documents"**), among the Borrower, KeyBank, as administrative agent and collateral agent (in such capacity, the **"Prepetition Agent"**), and as the Letter of Credit Issuer (as defined in the Prepetition Credit Agreement) and the lenders party thereto (the **"Prepetition Lenders"** and, together with the Prepetition Agent and the Letter of Credit Issuer, the **"Prepetition Secured Parties"**), the Prepetition Lenders provided revolving credit and other financial accommodations to, and issued letters of credit for the account of, the Borrower (the **"Prepetition Credit Facility"**), which Prepetition Credit Facility has been guaranteed on a joint and several basis by certain of the Debtors (the **"Prepetition Guarantors"**).

(ii)      Prepetition Secured Debt. As of the Petition Date, the Borrower and the Prepetition Guarantors were justly and lawfully indebted and liable to the Prepetition

Secured Parties, without defense, counterclaim, or offset of any kind, in respect of (a) outstanding loans in the aggregate principal amount of not less than $41 million, (b) L/C Obligations (as defined in the Prepetition Credit Agreement) (the "**Prepetition Letters of Credit**") in the amount of not less than $37 million, and (c) Hedging Obligations (as defined in the Prepetition Credit Agreement), pursuant to and in accordance with the terms of, the Prepetition Loan Documents (collectively, such indebtedness together with accrued and unpaid interest thereon and fees, expenses, charges, indemnities, and other obligations incurred in connection therewith as provided in the Prepetition Loan Documents, the "**Prepetition Secured Debt**").

(iii)   <u>Validity of Prepetition Secured Debt</u>.  (a) The Prepetition Secured Debt constitutes legal, valid, binding, and non-avoidable obligations of the Borrower and the Prepetition Guarantors, enforceable in accordance with the terms of the Prepetition Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code) and (b) no portion of the Prepetition Secured Debt or any payments made to the Prepetition Secured Parties or applied to or paid on account of the Prepetition Secured Debt prior to the Petition Date is subject to any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action, or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law.

(iv)   <u>Prepetition Liens</u>.  The liens and security interests granted to the Prepetition Secured Parties (the "**Prepetition Liens**"), pursuant to and in connection with the Prepetition Loan Documents, are (a) valid, binding, perfected, enforceable liens and security interests in the Collateral (as defined in the Prepetition Credit Agreement) (the

"**Prepetition Collateral**"), (b) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense, or claim under the Bankruptcy Code or applicable non-bankruptcy law, and (c) as of the Petition Date, subject only to Permitted Prior Liens.

(v)     No Control.  To the extent set forth in paragraph 23, none of the Prepetition Secured Parties controls the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the Prepetition Loan Documents.

(vi)     No Claims or Causes of Action.  No claims, counterclaims or causes of action of any kind or nature exist against, or with respect to, the Prepetition Secured Parties under any agreements by and among the Debtors and any of the Prepetition Secured Parties that is in existence as of the Petition Date, whether related to the Prepetition Loan Documents or any other agreement with the Debtors.

H.     *Findings Regarding the DIP Financing and Use of Cash Collateral.*

(i)     Good and sufficient cause has been shown for the entry of this Interim Order.

(ii)     The Loan Parties have an immediate and critical need to obtain the DIP Financing and to continue to use the Prepetition Collateral (including "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code ("**Cash Collateral**")), in each case on an interim basis, in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with

9

vendors, suppliers and customers, to make payroll, to make capital expenditures, to

administer these Chapter 11 Cases, and to satisfy other working capital and operational

needs.  The access of the Loan Parties to sufficient working capital and liquidity through

the use of Cash Collateral and other Prepetition Collateral, incurrence of new

indebtedness under the DIP Documents and other financial accommodations provided

under the DIP Documents are necessary and vital to the preservation and maintenance of

the going concern values of the Loan Parties and to a successful sale process.

(iii)     The Loan Parties are unable to obtain financing on more favorable terms

from sources other than the DIP Lenders and are unable to obtain adequate unsecured

credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative

expense.  The Loan Parties are also unable to obtain secured credit allowable under

section 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code without granting to the

DIP Secured Parties the DIP Liens and the DIP Superpriority Claims and incurring the

Adequate Protection Obligations, in each case subject to the Carve-Out and the terms and

conditions set forth in this Interim Order and in the DIP Documents.

(iv)     Based on the Motion, the Streeter Declaration, the Ross Declaration, and

the record presented to the Court at the Interim Hearing, the terms of the DIP Financing

and the terms on which the Loan Parties may continue to use the Prepetition Collateral

(including Cash Collateral) pursuant to this Interim Order and the DIP Documents are

fair and reasonable, reflect the Loan Parties' exercise of prudent business judgment and

constitute reasonably equivalent value and fair consideration.

(v)     Absent order of the court and the provision of adequate protection (if the

Court determined there were grounds for adequate protection under the Bankruptcy

10

Code), consent of the Prepetition Secured Parties is required for the Loan Parties' use of Cash Collateral and the other Prepetition Collateral. The Prepetition Secured Parties have consented to the Loan Parties' use of Cash Collateral and the other Prepetition Collateral, and the Loan Parties' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

(vi)    The DIP Financing and the use of the Prepetition Collateral have been negotiated in good faith and at arm's length among the Loan Parties and the DIP Secured Parties, and all of the Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation, all "Obligations" (as defined in the DIP Documents), in each case owing to the DIP Secured Parties or any of their respective banking affiliates (collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Secured Parties and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(vii)    The Prepetition Secured Parties have acted in good faith regarding the DIP Financing and the Loan Parties' continued use of the Prepetition Collateral (including Cash Collateral) to fund the administration of the Loan Parties' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations and the granting of the Adequate Protection Liens), in accordance

11

with the terms hereof, and the Prepetition Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of sections 363(m) and 364(e), as may be applicable, of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(viii)    The Prepetition Secured Parties are entitled to the adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363, 364 and 507(b) of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral are fair and reasonable, reflect the Loan Parties' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral; *provided* that nothing in this Interim Order or the other DIP Documents shall (a) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order, (b) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior), or (c) prejudice, limit, or otherwise impair the rights of any of the Prepetition Secured Parties to seek new, different, or additional adequate protection for any diminution in value of their interests in the Prepetition Collateral from and after the Petition Date or assert the interests of any of the Prepetition Secured Parties and the rights of any other party in interest to object to such relief are hereby preserved.

(ix)    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules.  Absent

granting the relief set forth in this Interim Order, the Loan Parties' estates will be immediately and irreparably harmed.  Consummation of the DIP Financing and the use of the Prepetition Collateral (including Cash Collateral) in accordance with this Interim Order and the DIP Documents are, therefore, in the best interests of the Loan Parties' estates.

I.    *Permitted Prior Liens; Continuation of Prepetition Liens.*  Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, or a Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien.  Subject to and effective upon entry of the Final Order, the right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien and is expressly subject to the DIP Liens.  The Prepetition Liens, and the DIP Liens that prime the Prepetition Liens, are continuing liens and the DIP Collateral is and will continue to be encumbered by such liens in light of the integrated nature of the DIP Facilities, the DIP Documents, and the Prepetition Loan Documents.

J.    *Immediate Entry.*  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).

**IT IS HEREBY ORDERED THAT:**

1.    *Interim Financing Approved.*  The interim relief requested in the Motion is granted, and the use of Cash Collateral on an interim basis and the Interim Financing is authorized and approved, in each case in accordance with the terms and conditions set forth in

the DIP Documents, the Approved Budget and this Interim Order.  Any objections to the Motion

with respect to the entry of this Interim Order that have not been withdrawn, waived or settled,

and all reservations of rights included therein, are hereby denied and overruled on the merits.

The rights of all parties in interest to object to the entry of a Final Order on the Motion are fully

reserved.

      2.    *Authorization of the DIP Financing and the DIP Documents.*

      (a)    The Loan Parties are hereby authorized to execute, deliver, enter into and,

as applicable, perform all of their obligations under this Interim Order and the DIP

Documents and such other and further acts as may be necessary, appropriate, or desirable

in connection therewith, in each case in accordance with and subject to the terms of this

Interim Order and the DIP Documents.  The Borrower is hereby authorized to borrow

money and obtain DIP Letters of Credit pursuant to the DIP Credit Agreement, subject to

any limitations on borrowing under the DIP Documents, which shall be used for all

purposes permitted under the DIP Documents, including, without limitation, to pay

certain costs, fees, and expenses related to the Chapter 11 Cases, to pay the Adequate

Protection Payments, and to fund working capital and for general corporate purposes of

the Loan Parties during the Chapter 11 Cases, in each case, subject to the Approved

Budget (except as to Statutory Fees, as that term is defined in paragraph 6 below, which

shall not be subject to any budget) and in accordance with this Interim Order and the DIP

Documents, and the Guarantors are hereby authorized to guaranty the DIP Obligations.

Notwithstanding anything in the DIP Credit Agreement, the Borrower may only make

Borrowings of DIP Term Loans that are consistent with and limited to the draws set forth

in the Approved Budget.

(b)      In furtherance of the foregoing and without further approval of the Court, each Debtor is authorized to perform all acts, to make, execute, and deliver all instruments, certificates, agreements, and documents (including, without limitation, the execution or recordation of security agreements, mortgages, and financing statements), and to pay all fees in connection with or that may be reasonably required, necessary, or desirable for the Loan Parties' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i)      the execution and delivery of, and performance under, each of the DIP Documents;

(ii)      the execution and delivery of, and performance under, one or more amendments, waivers, consents, or other modifications to and under the DIP Documents, in each case, in such form as the Loan Parties, the DIP Agent and the requisite DIP Lenders may agree, it being understood that no further approval of the Court shall be required for any authorizations, amendments, waivers, consents, or other modifications to and under the DIP Documents (and any fees and other expenses, amounts, charges, costs, indemnities, and other obligations paid in connection therewith) that the Debtors represent are not material or adverse to the Debtors and that do not (A) shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder, (B) increase existing fees or add new fees thereunder (excluding, for the avoidance of doubt, any amendment, consent or waiver fee), or (C) shorten the case Milestones set forth in the DIP Credit Agreement; *provided*, however, that advance copies of such amendments, waivers, consents, or other

15

modifications will be provided to the U.S. Trustee and any Committee, both of

which shall have three business days to object on grounds that the proposed

amendments, waivers, consents, or other modification are material and should be

subject to court approval, upon notice to parties in interest.  Notwithstanding the

foregoing as of the date hereof, the term Milestone in the DIP Credit Agreement

shall be amended to extend the deadline for entry of the Final DIP Order to 35

days after the Petition Date.  The foregoing shall be without prejudice to the Loan

Parties' right to seek approval from the Court of any modification or amendment

on an expedited basis; and

      (iii)     the performance of all other acts necessary, appropriate, or

desirable under or in connection with the DIP Documents.

3.     *Roll-Up*.  Subject to and effective upon entry of the Final Order, all of the

Prepetition Secured Debt shall immediately, automatically and irrevocably be deemed to have

been converted into DIP Roll-Up Loans and shall be entitled to all the priorities, privileges,

rights, and other benefits afforded to the other DIP Obligations under the Final Order and the

DIP Loan Documents, in each case subject to the terms and conditions set forth in the Final

Order, DIP Documents and the reservation of rights of parties in interest in paragraph 20 below.

4.     *Release of DIP Secured Party Releasees.*  The release set forth in paragraph F

hereof in favor of the DIP Secured Party Releasees is hereby approved upon entry of this Interim

Order.

5.     *DIP Obligation*s.  Upon execution and delivery of the DIP Documents, the DIP

Documents shall constitute valid, binding and non-avoidable obligations of the Loan Parties,

enforceable against each Loan Party thereto in accordance with the terms of the DIP Documents

and this Interim Order as of the date of the entry of this Interim Order.  No obligation, payment,

transfer or grant of security to the DIP Secured Parties under the DIP Documents or this Interim

Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code

or under any applicable law (including, without limitation, under section 502(d), 544, 548, 549

or 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions

Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute

or common law), or subject to any defense, reduction, setoff, recoupment, claim, or

counterclaim.

6.      *Carve-Out.*

(a)      As used in this Interim Order, the "**Carve-Out**" shall mean a carve-out

from the DIP Superpriority Claims, the DIP Liens, the 507(b) Claims, the Adequate

Protection Liens and the Prepetition Liens, in an amount equal to the sum of (i) all fees

required to be paid to the Clerk of the Court and to the U.S. Trustee under section

1930(a) of title 28 of the United States Code plus interest at the statutory rate (without

regard to the Carve-Out Trigger Notice, without being subject to any budget (collectively,

the "**Statutory Fees**"); (ii) all reasonable fees and expenses incurred by a trustee and

payable under section 726(b) of the Bankruptcy Code, in an aggregate amount not to

exceed $50,000 (without regard to the Carve-Out Trigger Notice); (iii) to the extent

allowed by final order of the Court at any time and provided for in the Approved Budget,

for the Debtors' professionals and the Committee's professionals, respectively, all unpaid

fees and expenses (the "**Professional Fees**") incurred by persons or firms retained by the

Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code or by a Committee,

if any, pursuant to section 328 and 1103 of the Bankruptcy Code (collectively,

the "**Professional Persons**") at any time on or before (a) the date of delivery by the DIP

Agent of a Carve-Out Trigger Notice and (b) the Termination Date (as defined in the DIP

Credit Agreement) (such day, the "**Carve-Out Trigger Date**"), whether allowed by the

Court prior to or after the Carve-Out Trigger Date; (iv) to the extent allowed by final

order of the Court, (a) Professional Fees incurred after the Carve-Out Trigger Date in an

amount not to exceed $1,000,000 (the "**Post Trigger Date Carve-Out Amount**"); *plus*

(b) any completion or sales fee and any divestiture fee (including, in each case, pursuant

to credit bid) that is earned and payable by the Debtors' pursuant to an engagement letter

between the Debtors and the Debtors' investment banker, Evercore, that is approved by

the Court (the "**Evercore Fees**"); *provided* that, other than in the event of a credit bid,

such fees shall be payable from the proceeds of the applicable asset sale or other

transaction (the "**Completion Fee Carve-Out Reserve**"); and (v) amounts held as of the

Petition Date as a retainer by the Professional Persons retained by the Debtors to be used

to pay Professional Fees allowed by final order of the Court (clauses (i) through (v),

collectively, the "**Carve-Out Amount**"), in each case subject to the limits imposed by

the DIP Orders.  For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean

a written notice delivered by email by the DIP Agent to the Debtors' lead restructuring

counsel, the U.S. Trustee, and counsel to any Committee, which notice may be delivered

following the occurrence and during the continuation of an "Event of Default" under the

DIP Documents and the acceleration of the DIP Obligations (an "**Event of Default**"),

stating that the Post Trigger Date Carve-Out Amount has been invoked.

  (b) Prior to the occurrence of the Carve-Out Trigger Date, the Debtors are

authorized (subject to the Approved Budget), for the Debtors' Professional Persons and

the Committee's Professional Persons, respectively, to pay Professional Fees that are authorized to be paid in accordance with the provisions of the Bankruptcy Code and any order entered by the Court establishing procedures for the payment of compensation to Professional Persons in these Chapter 11 Cases, as the same may be due and payable, and such payments shall not reduce the Carve-Out Amount.

(c)    Upon the closing of the DIP Facility (the "**Closing**"), the Debtors shall deposit in a segregated non-interest bearing account (the "**Carve-Out Reserve**") the following amounts: (i) the Post Trigger Date Carve-Out Amount; and (ii) an additional $1,000,000 for payment of pre-Carve-Out Trigger Date fees and expenses of Professional Persons as set forth in paragraph 6(a)(iii). Upon the closing of any sale or other transaction (i) upon which the Evercore Fees are earned and payable, the Debtors shall deposit or segregate cash in an amount equal to the Evercore Fees in the Completion Fee Carve-Out Reserve and (ii) the Debtors shall segregate cash into the Carve-Out Reserve in an amount equal to the Carve-Out Amount at the time of such closing *less* any amounts already in the Carve-Out Reserve. No fees shall be paid to Evercore or any other professional retained in these cases by the Debtors or the Committee absent order of this Court approving a fee application on notice, except as otherwise expressly provided in any order this Court may enter regarding interim compensation procedures.

(d)    The Carve-Out Reserve and Completion Fee Carve-Out Reserve shall be held in a segregated non-interest bearing account maintained by the DIP Agent in trust to pay the Professional Fees and other obligations included in the Carve-Out, and the Carve-Out Reserve and Completion Fee Carve-Out Reserve shall be available only to satisfy such obligations benefiting from the Carve-Out until paid in full; *provided* that payment

of any Evercore Fees or any other completion, sale or divestiture fees from the Carve-Out Reserve (other than from the Completion Fee Carve-Out Reserve) shall be subject and subordinate, and junior to payment of all other Professional Fees from the Carve-Out Reserve. The DIP Agent shall allow funds in the Carve-Out Reserve and Completion Fee Carve-Out Reserve to be released to pay obligations payable from the Carve-Out Reserve and Completion Fee Carve-Out Reserve, respectively, upon written instruction from the Debtors.

(e)    To the extent the Carve-Out Reserve and/or Completion Fee Carve-Out Reserve have not been reduced to zero after the payment in full of all obligations payable from the Carve-Out Reserve or Completion Fee Carve-Out Reserve, respectively, they shall be used to pay the DIP Agent for the benefit of the DIP Secured Parties until the DIP Obligations have been indefeasibly paid in full in cash and all DIP Commitments have been terminated. Notwithstanding anything to the contrary herein, the Prepetition Agent and the DIP Agent, each on behalf of itself and the relevant secured parties, (y) shall not sweep or foreclose on the Carve-Out Reserve or Completion Fee Carve-Out Reserve and (z) shall have a security interest upon any residual interests in the Carve-Out Reserve and/or Completion Fee Carve-Out Reserve, respectively, available following satisfaction in cash in full of all obligations included in the Carve-Out, and the priority of such liens on the residuals shall be consistent with this Interim Order. Further, notwithstanding anything to the contrary herein, (A) the failure of the Carve-Out Reserve to satisfy in full the allowed Professional Fees shall not affect the priority of the Carve-Out and (B) in no way shall the Carve-Out, the Post Trigger Date Carve-Out Amount, the Carve-Out Reserve or Completion Fee Carve-Out Reserve, or any of the foregoing be

construed as a cap or limitation on the amount of the allowed Professional Fees due and
payable by the Debtors.

(f)     Notwithstanding anything to the contrary herein or in the DIP Documents,
the Carve-Out shall be senior to, the DIP Superpriority Claims, the DIP Liens, the 507(b)
Claims, the Adequate Protection Liens, the Prepetition Liens, and all other liens and
claims granted under this Interim Order, the DIP Documents, or otherwise securing or in
respect of the DIP Obligations or the Adequate Protection Obligations.

7.     *No Direct Obligation to Pay Allowed Professional Fees.*  Nothing in this Interim
Order or otherwise shall be construed to obligate the Prepetition Secured Parties or the DIP
Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any
Professional Person or to guarantee that the Debtors have sufficient funds to pay such
compensation or reimbursement.

8.     *DIP Superpriority Claims.*  Pursuant to section 364(c)(1) of the Bankruptcy Code,
all of the DIP Obligations shall constitute allowed superpriority administrative expense claims
against the Loan Parties (without the need to file any proof of claim) with priority over any and
all administrative expense claims, priority claims and unsecured claims against the Loan Parties,
now existing or hereafter arising, of any kind whatsoever specified in sections 503(b) and/or
507(b) of the Bankruptcy Code, including, without limitation, all administrative expenses or
other claims arising under section 105, 328, 330, 331, 365, 503(b), 507(a) (other than 507(a)(1)),
507(b),  1113, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations),
whether or not such expenses or claims may become secured by a judgment lien or other non-
consensual lien, levy, or attachment, which allowed claims (the "**DIP Superpriority Claims**")
shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative

expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and post-petition property of the Loan Parties and all proceeds thereof (excluding the Loan Parties' claims and causes of action under sections 502(d), 506(c), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code and under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and similar statutes or common law (collectively, the "**Avoidance Actions**", which, for the avoidance of doubt, excludes Debtors' claims and causes of action under section 549 of the Bankruptcy Code or similar state or other applicable law and the proceeds of each of the foregoing), but including, subject to and effective upon entry of the Final Order, any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement, or otherwise ("**Avoidance Proceeds**"), subject to the Carve-Out. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise. The DIP Superpriority Claims shall be *pari passu* in right of payment with one another and senior to the Adequate Protection Claims; *provided* that the DIP Superpriority Claims in respect of the DIP Roll-Up Loans shall be subject and subordinate to the DIP Superpriority Claims in respect of the DIP Term Loans.

9.      *DIP Liens.* As security for the DIP Obligations, effective and perfected upon the date of the Petition Date and without the necessity of the execution, recordation or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements, notations on certificates of title for titled goods or other similar documents, or the possession or control by the DIP Agent of, or over, any and all tangible and intangible prepetition and post-petition property of the Loan Parties, whether existing on the Petition Date or thereafter acquired

22

including, without limitation, any and all cash of the Loan Parties (whether maintained with the DIP Agent or otherwise, except for the Carve-Out Reserve) and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, the proceeds of any and all commercial tort claims of the Debtors of any kind or nature, including, but not limited to, proceeds of claims and commercial tort claims against ETC Northeast Pipeline LLC and its affiliates, any claim or rights under section 549 of the Bankruptcy Code, rights under license agreements and other intellectual property, letter-of-credit rights, investment property and support obligations, all books and records pertaining to the property described in this paragraph, all property of the Loan Parties held by any DIP Secured Party, all other goods (including but not limited to fixtures) and personal property of the Loan Parties, whether tangible or intangible and wherever located, Avoidance Proceeds (subject to and effective upon entry of the Final Order), capital stock of subsidiaries, wherever located, and, to the extent not covered by the foregoing, all other assets or property of the Debtors, whether tangible, intangible, real, personal or mixed, and the proceeds, products, rents, and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing, in each case other than the Avoidance Actions, but including, subject to and effective upon entry of the Final Order, any Avoidance Proceeds (collectively, the "**DIP Collateral**"), the following security interests and liens are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "**DIP Liens**"):

23

(a)    <u>First Priority Lien on Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior security interest in and lien upon DIP Collateral, that, on or as of the Petition Date, is not subject to a valid, perfected, and non-avoidable lien as of the Petition Date or perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (collectively, "**Unencumbered Property**"), including, but not limited to Avoidance Proceeds, subject to and effective upon entry of the Final Order.

(b)    <u>Priming Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority priming security interest in and lien upon all DIP Collateral (wherever located and the proceeds, products, rents and profits thereof), subject and subordinate only to the Permitted Prior Liens, but senior in all respects to the Prepetition Liens, Adequate Protection Liens and all other liens that are not Permitted Prior Liens (any such liens primed pursuant to this clause (b), the "**Primed Liens**");

(c)    <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all DIP Collateral immediately junior to Permitted Prior Liens.

(d)    <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Loan Parties and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation,

24

but subject to and effective upon entry of Final Order, any liens or security interests

granted in favor of any federal, state, municipal, or other governmental unit (including

any regulatory body), commission, board, or court for any liability of the Loan Parties, or

(C) any intercompany or affiliate liens or security interests of the Loan Parties or

(ii) subordinated to or made *pari passu* with any other lien or security interest under

section 363 or 364 of the Bankruptcy Code granted after the date hereof.

(e)    <u>Relative Priority of DIP Liens</u>.  Notwithstanding anything to the contrary

herein, the DIP Liens in respect of the DIP Roll-Up Loans shall be subject and

subordinate to the DIP Liens in respect of the DIP Term Loans in all respects.

(f)    For the avoidance of doubt, any DIP Liens on DIP Collateral relating to

real property of the Debtors granted pursuant to this paragraph 9 shall include, for the

ratable benefit of the related DIP Secured Parties, in each case to the extent constituting

DIP Collateral, all of each Debtor's right, title and interest now or hereafter acquired in

and to all land, together with the buildings, structure, and other improvements thereon,

now or hereafter owned by any Debtor, including all easements, rights-of-way, and

similar rights relating thereto and all leases, tenancies, and occupancies thereof, and (i) all

goods, accounts, inventory, general intangibles, instruments, documents, contract rights

and chattel paper, (ii) all reserves, escrows or impounds and all deposit accounts

maintained by each Debtor with respect to such real estate, (iii) other than Permitted Prior

Liens, all leases, licenses, concessions, occupancy agreements or other agreements

(written or oral, now or at any time in effect) which grant to any person a possessory

interest in, or the right to use, all or any part of such real estate, together with all related

security and other deposits, (iv) all of the rents, revenues, royalties, income proceeds,

profits, accounts receivable, security and other types of deposits, and other benefits paid or payable by parties to the leases for using, leasing, licensing possessing, operating from, residing in, selling or otherwise enjoying such real estate, (v) all other agreements, such as construction contracts, architects' agreements, engineers' contracts, utility contracts, maintenance agreements, management agreements, service contracts, listing agreements, guaranties, warranties, permits, licenses, certificates and entitlements in any way relating to the construction, use, occupancy, operation, maintenance, enjoyment or ownership of such real estate, (vi) all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages, and appurtenances appertaining to the foregoing, (vii) all property tax refunds payable with respect to such real estate, (viii) all accessions, replacements and substitutions for any of the foregoing and all proceeds thereof, (ix) all insurance policies, unearned premiums therefor and proceeds from such policies covering any of the above property now or hereafter acquired by each Debtor as an insured party, and (x) all awards, damages, remunerations, reimbursements, settlements or compensation heretofore made or hereafter to be made to any Debtor by any governmental authority pertaining to any condemnation or other taking (or any purchase in lieu thereof) of all or any such real estate.

10.    *Maintenance of Letters of Credit.*  Subject to and effective upon entry of the Final

Order, the Prepetition Letters of Credit shall be deemed to have been cancelled and reissued as

DIP Letters of Credit in their full undrawn amounts and without modification of the terms of the

Prepetition Letters of Credit other than their deemed issuance as DIP Letters of Credit.

11.    *Automatic Stay.*

(a)    The automatic stay provisions of section 362 of the Bankruptcy Code are

hereby modified to the extent necessary to permit the DIP Secured Parties to enforce all

of their rights under the DIP Documents and (i) immediately upon the occurrence of an

Event of Default, to declare (A) the termination, reduction, or restriction of any further

DIP Commitment to the extent any such DIP Commitment remains and (B) all applicable

DIP Obligations to be immediately due and payable, without presentment, demand,

protest, or other notice of any kind, all of which are expressly waived by the Loan

Parties, and (ii) unless the Court orders otherwise during the Remedies Notice Period (as

defined below), upon the occurrence of an Event of Default and the giving by the DIP

Agent of five business days' prior written notice (which shall run concurrently with any

notice required to be provided under the DIP Documents) (the "**Remedies Notice**

**Period**") delivered by email to the Debtors' lead restructuring counsel (with a copy by

email to the Committee, if any, and the U.S. Trustee) (the "**Remedies Notice**"), (A) to

withdraw consent to the Loan Parties' continued use of any Cash Collateral and/or (B) to

exercise all other rights and remedies provided for in the DIP Documents and under

applicable law; *provided* that, during the Remedies Notice Period, the Loan Parties shall

be permitted to continue to use Cash Collateral in the ordinary course of business (subject

to the Approved Budget) and may request an expedited hearing before the Court.  After

delivery of the Remedies Notice and during and after the Remedies Notice Period, any

payments proposed to be made by the Debtors in accordance with the Approved Budget

shall be subject to prior review by the DIP Agent and its professionals and the DIP Agent

may object to any proposed payment solely on the grounds that such payment is not in

the ordinary course of business and is not included in the Approved Budget.

(b)    No rights, protections, or remedies of the DIP Secured Parties granted by

the provisions of this Interim Order or the DIP Documents shall be limited, modified, or

impaired in any way by (i) any actual or purported withdrawal of the consent of any party

to the Loan Parties' authority to continue to use Cash Collateral, (ii) any actual or

purported termination of the Loan Parties' authority to continue to use Cash Collateral, or

(iii) the terms of any other order or stipulation related to the Loan Parties' continued use

of Cash Collateral or the provision of adequate protection to any party.

12.    *Payment of DIP Agent Fees and Expenses.*  The Loan Parties shall make current

cash payments of the reasonable and documented prepetition and post-petition fees and expenses

incurred by the DIP Agent in connection with the Chapter 11 Cases in any manner (limited, in

the case of the advisors to the DIP Agent, to Huron Consulting Group Inc., Hunton Andrews

Kurth LLP, and Connolly Gallagher LLP and including the allocated costs (with no profit

margin) of the DIP Agent's internal counsel in connection with the Chapter 11 Cases) promptly

upon receipt of invoices therefor, which payments  shall be made within 10 days (which time

period may be extended by the applicable professional) after the receipt by the Debtors, the

Committee, if any, and the U.S. Trustee (the "**Review Period**") of invoices therefor (the

"**Invoiced Fees**") and without the necessity of filing formal fee applications, including such

amounts arising before or after the Petition Date.  The invoices for such Invoiced Fees shall

include a list of professionals who worked on the matter, their hourly rate (if such professionals

bill at an hourly rate), the number of hours each professional billed (except for financial advisors

compensated on other than an hourly basis) and, with respect to the invoices of law firms, the

year of law school graduation for each attorney, as well as a summary description of services

provided and a list of expenses incurred by the applicable professional firm. Such Invoiced Fees

shall not be required to contain detailed time entries of any professional, provided, however, that

the U.S. Trustee reserves the right to seek copies of invoices containing such detailed time

entries; *provided further, however,* that any Invoiced Fees may be redacted to protect privileged,

confidential, or proprietary information, provided that the U.S. Trustee reserves his right to seek

to obtain unredacted copies of such invoices . The Debtors, the Committee, if any, and the U.S.

Trustee may object to any portion of the Invoiced Fees (the "**Disputed Invoiced Fees**") within

the Review Period by filing with the Court a motion or other pleading setting forth the specific

objections to the Disputed Invoiced Fees in reasonable narrative detail and the bases for such

objections; *provided* that payment of any undisputed portion of Invoiced Fees shall not be

delayed based on any objections thereto.

13.     *Limitation on Charging Expenses Against Collateral.* Subject only to and

effective upon entry of the Final Order, except to the extent of the Carve-Out, no costs or

expenses of administration of the Chapter 11 Cases or any future proceeding that may result

therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code,

shall be charged against or recovered from the DIP Collateral (including Cash Collateral) or the

Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle

of law, without the prior written consent of the DIP Agent or the Prepetition Agent, and no such

consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured

Parties or the Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment, or claim against the DIP Collateral or Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise.

14.    *Payments Free and Clear.*  Any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Secured Parties pursuant to the provisions of this Interim Order or the DIP Documents shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, and subject to and effective upon entry of the Final Order, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code (whether asserted or assessed by, through, or on behalf of the Debtors) or 552(b) of the Bankruptcy Code.

15.    *Use of Cash Collateral.*  The Debtors are hereby authorized, subject to the Approved Budget and the terms and conditions of this Interim Order, to use all Cash Collateral.

16.    *Adequate Protection of Prepetition Secured Parties.*  Until entry of a Final Order approving the DIP Roll-Up Loans, the Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1), and 507(b) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, for and equal in amount to the aggregate diminution in the value of the Prepetition Secured Parties' prepetition security interests in the Prepetition Collateral from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, but not limited to, the Debtors' use, sale or lease of Cash Collateral and other Prepetition Collateral, the imposition of the automatic stay and/or the Carve-Out (the "**Adequate Protection Claims**").  In consideration of the foregoing, the Prepetition

Secured Parties are hereby granted the following (collectively, the "**Adequate Protection Obligations**"):

(a)    <u>Adequate Protection Liens</u>.  Until entry of a Final Order approving the DIP Roll-Up Loans, the Prepetition Agent (for itself and for the benefit of the Prepetition Lenders) is hereby granted (effective and perfected upon the Petition Date and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements, or other agreements), in the amount of its respective Adequate Protection Claim, a valid, perfected replacement security interest in and lien upon (the "**Adequate Protection Liens**") the DIP Collateral (including, without limitation, subject to and effective upon entry of the Final Order, the Avoidance Proceeds), which Adequate Protection Liens shall secure the Adequate Protection Claims, and subject and subordinate only to the Carve-Out, the DIP Liens, and the Permitted Prior Liens.

(b)    <u>507(b) Claims</u>. Until entry of a Final Order approving the DIP Roll-Up Loans, the Prepetition Agent is hereby granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of its Adequate Protection Claims with, except as set forth in this Interim Order, priority in payment over any and all administrative expense claims, priority claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of the kind specified in section 507(b) of the Bankruptcy Code, including but not limited to claims specified in sections 105, 328, 330, 331, 365, 503(b), 507(a)(other than section 507(a)(1)), 507(b), 1113 and 1114 (the "**507(b) Claims**"), which 507(b) Claims (subject to DIP Liens and DIP Superpriority Claims) shall have recourse to and be payable from all of the DIP Collateral (including, without limitation, subject to and effective upon

31

entry of the Final Order, the Avoidance Proceeds).  The 507(b) Claims shall be subject

and subordinate to the Carve-Out, the DIP Superpriority Claims, the DIP Liens, and the

Permitted Prior Liens.  Except to the extent expressly set forth in this Interim Order or the

DIP Credit Agreement, the Prepetition Secured Parties shall not receive or retain any

payments, property or other amounts in respect of the 507(b) Claims unless and until the

DIP Obligations (other than contingent indemnification obligations as to which no claim

has been asserted) and the DIP Superpriority Claims have indefeasibly been paid in cash

in full and all DIP Commitments have been terminated.

(c)     Adequate Protection Cash Payments.  Until entry of a Final Order

approving the DIP Roll-Up Loans, and in each case subject to reallocation or

recharacterization as payment of principal under section 506(a) and (b) of the Bankruptcy

Code as may be ordered by the Court in connection with a timely and successful

Challenge pursuant to paragraph 20 or 21 below, until the indefeasible discharge of the

Prepetition Secured Debt, the Prepetition Agent, for the benefit of the Prepetition Secured

Parties, shall receive current payment in cash on the last business day of each month in an

amount equal to the sum of all post-petition unpaid interest accruing on all outstanding

principal, interest, fees, and other amounts owing under the applicable Prepetition

Secured Debt (as of the Petition Date), in each case at the applicable default rate (the

payments in this subparagraph (c), the "**Adequate Protection Payments**").

(d)     Prepetition Secured Parties Fees and Expenses.  The Loan Parties shall

make current cash payments of the reasonable and documented prepetition and post-

petition fees and expenses incurred by the Prepetition Agent in connection with the

Chapter 11 Cases in any manner (limited, in the case of the advisors to the Prepetition

Secured Parties, to Huron Consulting Group Inc., Hunton Andrews Kurth LLP, and

Connolly Gallagher LLP, and including the allocated costs (with no profit margin) of the

Prepetition Lenders' internal counsel in connection with the Chapter 11 Cases) promptly

upon receipt of invoices therefor, which payments shall be made in accordance with the

procedures set forth in paragraph 12 hereof with respect to payment of the fees and

expenses of the DIP Agent.

      (e)     All Adequate Protection Liens and 507(b) Claims granted by this Interim

Order are subject to any appropriate remedy ordered by the Court, if and to the extent that

the underlying Prepetition Liens or Prepetition Claims of the Prepetition Secured Parties

are successfully challenged pursuant to paragraph 20 of this Interim Order.

      17.    *Reservation of Rights of Prepetition Secured Parties.*  Under the circumstances

and given that the above-described adequate protection is consistent with the Bankruptcy Code,

including section 506(b) thereof, the Court finds that the adequate protection provided herein is

reasonable and sufficient to protect the interests of the Prepetition Secured Parties; *provided* that

any of the Prepetition Secured Parties may request further or different adequate protection, and

the Debtors or any other party may contest any such request.

      18.    *Perfection of DIP Liens and Adequate Protection Liens.*

      (a)     The DIP Agent, the DIP Lenders and the Prepetition Secured Parties are

hereby authorized, but not required, to file or record (and to execute in the name of the

Loan Parties, as their true and lawful attorneys, with full power of substitution, to the

maximum extent permitted by law) financing statements, trademark filings, copyright

filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take

possession of or control over cash or securities, or take any other action in order to

validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent, on behalf of the DIP Secured Parties, or the Prepetition Secured Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination, at the time and on the date of entry of this Interim Order.  Upon the request of the DIP Agent, each of the Prepetition Secured Parties and the Loan Parties, without any further consent of any party, is authorized (in the case of the Loan Parties) and directed (in the case of the Prepetition Secured Parties) to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve, and enforce the DIP Liens.  All such documents shall be deemed to have been recorded and filed as of the Petition Date.

(b)    This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, taking possession of or control over cash, deposit accounts, securities, or other assets, or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, customs broker agreement or freight forwarding agreement) to validate or perfect (in accordance with applicable non-

bankruptcy law) the DIP Liens and the Adequate Protection Liens, or to entitle the DIP

Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, a

certified copy of this Interim Order may, in the discretion of the DIP Agent, be filed with

or recorded in filing or recording offices in addition to or in lieu of such financing

statements, mortgages, notices of lien or similar instruments, and all filing offices are

hereby authorized to accept such certified copy of this Interim Order for filing and/or

recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code

shall be modified to the extent necessary to permit the DIP Agent and Prepetition Secured

Parties to take all actions, as applicable, referenced in this subparagraph (b) and the

immediately preceding subparagraph (a).

19.    *Preservation of Rights Granted Under This Interim Order*.

    (a)    Other than the Carve-Out, Permitted Prior Liens and other claims and liens

expressly granted by this Interim Order, no claim or lien having a priority superior to or

that is *pari passu* with those granted by this Interim Order to the DIP Secured Parties or

the Prepetition Secured Parties, respectively, shall be permitted while any of the DIP

Obligations or the Adequate Protection Obligations remain outstanding, and, except as

otherwise expressly provided in this Interim Order, the DIP Liens and the Adequate

Protection Liens shall not be (i) subject or junior to any lien or security interest that is

avoided and preserved for the benefit of the Loan Parties' estates under section 551 of the

Bankruptcy Code, (ii) subordinated to or made *pari passu* with any other lien or security

interest, whether under section 364(d) of the Bankruptcy Code or otherwise,

(iii) subordinated to or made *pari passu* with any liens arising after the Petition Date,

including, without limitation, subject to and effective upon entry of the Final Order, any

liens or security interests granted in favor of any federal, state, municipal, or other

domestic or foreign governmental unit (including any regulatory body), commission,

board, or court for any liability of the Loan Parties, or (iv) subject or junior to any

intercompany or affiliate liens or security interests of the Loan Parties.

(b)    Notwithstanding any order that may be entered converting any of the

Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of

the Chapter 11 Cases under section 1112 of the Bankruptcy Code or that otherwise is at

any time entered, (i) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, and

the Adequate Protection Liens shall continue in full force and effect and shall maintain

their priorities as provided in this Interim Order until all DIP Obligations and Adequate

Protection Obligations shall have been indefeasibly paid in full in cash (and such DIP

Superpriority Claims, 507(b) Claims, DIP Liens, and Adequate Protection Liens shall,

notwithstanding such dismissal or conversion, remain binding on all parties in interest),

(ii) the other rights granted by this Interim Order shall not be affected, and (iii) the Court

shall retain jurisdiction, for the purposes of enforcing the claims, liens and security

interests referred to in this paragraph 19 and otherwise in this Interim Order.

(c)    If any or all of the provisions of this Interim Order are hereafter reversed,

modified, vacated, or stayed, such reversal, modification, vacatur, or stay shall not affect

(i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection

Obligations incurred prior to the actual receipt of written notice by the DIP Agent or the

Prepetition Agent, as applicable, of the effective date of such reversal, modification,

vacatur, or stay or (ii) the validity, priority, or enforceability of the DIP Liens or the

Adequate Protection Liens.  Notwithstanding any such reversal, modification, vacatur, or

stay of any use of Cash Collateral, any DIP Obligations or any Adequate Protection

Obligations incurred by the Loan Parties to the DIP Secured Parties or the Prepetition

Secured Parties, as the case may be, prior to the actual receipt of written notice by the

DIP Agent or the Prepetition Agent, as applicable, of the effective date of such reversal,

modification, vacatur, or stay shall be governed in all respects by the original provisions

of this Interim Order, and the DIP Secured Parties and the Prepetition Secured Parties

shall be entitled to all the rights, remedies, privileges and benefits granted in section

364(e) of the Bankruptcy Code, this Interim Order and the DIP Documents.

(d)     Except as expressly provided in this Interim Order or in the DIP

Documents, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the 507(b)

Claims, the Adequate Protection Liens, and the Adequate Protection Obligations and all

other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured

Parties granted by the provisions of this Interim Order and the DIP Documents shall

survive, and shall not be modified, impaired, or discharged by the entry of an order

(i) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy

Code, dismissing any of the Chapter 11 Cases, terminating the joint administration of the

Chapter 11 Cases or by any other act or omission, (ii) approving the sale of any DIP

Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent

permitted by the DIP Documents), or (iii) confirming a chapter 11 plan in any of the

Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Loan

Parties have waived any discharge as to any remaining DIP Obligations or Adequate

Protection Obligations.  The terms and provisions of this Interim Order and the DIP

Documents shall continue in the Chapter 11 Cases, in any successor cases if the Chapter

11 Cases cease to be jointly administered and in any superseding chapter 7 cases under

the Bankruptcy Code, and the DIP Obligations, the DIP Liens, the DIP Superpriority

Claims, the 507(b) Claims, the Adequate Protection Liens, and the Adequate Protection

Obligations and all other rights and remedies of the DIP Secured Parties and the

Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP

Documents shall continue in full force and effect until the DIP Obligations are

indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the

Commitments have been terminated.

20.     *Effect of Stipulations on Third Parties.*

(a)     The Debtors' stipulations, admissions, agreements and releases contained

in this Interim Order (other than releases with respect to the DIP Secured Party

Releasees, which releases are binding upon all parties upon entry of this Interim Order)

shall be binding upon (i) the Debtors and their estates, in all circumstances and for all

purposes and (ii) all other parties in interest, including, without limitation, any statutory

or non-statutory committees appointed or formed in the Chapter 11 Cases (including a

Committee, if any) and any other person or entity acting or seeking to act on behalf of the

Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or

elected for any of the Debtors, in all circumstances and for all purposes unless (A) such

committee or any other party in interest (subject in all respects to any agreement or

applicable law that may limit or affect such entity's right or ability to do so), in each case,

with standing granted by the Court, has timely filed an adversary proceeding (subject to

the limitations contained herein, including, *inter alia*, in this paragraph 20) (1) objecting

to or challenging the amount, validity, perfection, enforceability, priority, or extent of the

Prepetition Secured Debt or the Prepetition Liens or (2) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests, or defenses (collectively, a "**Challenge**") against the Prepetition Secured Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and their respective successors and assigns thereof, in each case in their respective capacity as such (each, a "**Representative**" and, collectively, the "**Representatives**") in connection with matters related to any claims of the Debtors against the Prepetition Secured Parties, the Prepetition Loan Documents, the Prepetition Secured Debt, the Prepetition Liens, the Prepetition Collateral, or otherwise, *provided* that all pleadings filed in connection with a Challenge shall set forth the basis for such challenge or claim, (B) such Challenge has been filed prior to the latest of (1) (Y) with respect to parties in interest (other than a Committee), 75 calendar days after entry of this Interim Order and (Z) with respect to a Committee, if any, 60 calendar days after the appointment of the Committee, (2) any such later date as has been agreed to, in writing, by the Prepetition Agent, and (3) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable time period set forth in this paragraph 20 (the time period established by the foregoing clauses (1) through (3), the "**Challenge Period**"), provided, however, that if any of the Debtors' cases convert to a Chapter 7, or if a Chapter 11 trustee is appointed, *prior to* the expiration of the Challenge Period, the Challenge Period shall be extended for the Chapter 7 or Chapter 11 trustee to 40 days after their

appointment; and (C) there is a final non-appealable order sustaining such Challenge in favor of the plaintiff in such timely filed adversary proceeding or contested matter. Any Challenge not so specified and filed prior to the expiration of the Challenge Period shall be deemed forever, waived, released, and barred.

(b)     If no such Challenge is filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding, then (i) the Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order shall be binding on all parties in interest, including, without limitation, the Committee, if any, (ii) the obligations of the Loan Parties under the Prepetition Loan Documents, including the Prepetition Secured Debt, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, offset, or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s), (iii) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance, or other defense, (iv) the Prepetition Secured Debt and the Prepetition Liens shall not be subject to any other or further claim or challenge by a Committee, if any, any non-statutory committees appointed or formed in the Chapter 11 Cases, any trustee or examiner with enlarged powers appointed or elected in any of the Chapter 11 Cases or any subsequent chapter 7 case of the Debtors or any other party in interest acting or seeking to act on behalf of the Debtors' estates, and (v) any defenses, claims, causes of action, counterclaims, and offsets by a Committee, if any, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party acting or seeking to act on behalf of the Debtors' estates, whether arising under the Bankruptcy Code or

otherwise, against any of the Prepetition Secured Parties and their Representatives arising

out of or relating to the any claims of the Debtors against the Prepetition Secured Parties,

the Prepetition Loan Documents or otherwise shall be deemed forever waived, released,

and barred.  If any such Challenge is filed during the Challenge Period, the stipulations,

admissions, agreements, and releases contained in this Interim Order shall nonetheless

remain binding and preclusive (as provided in this subparagraph (b)) on a Committee, if

any, and on any other person or entity, except to the extent that such stipulations,

admissions, agreements, and releases were expressly and successfully challenged in such

Challenge as set forth in a final, non-appealable order of the Court or any other court of

competent jurisdiction.  Nothing in this Interim Order vests or confers on any Person (as

defined in the Bankruptcy Code), including a Committee, if any, or any non-statutory

committees appointed or formed in the Chapter 11 Cases, standing or authority to pursue

any claim or cause of action belonging to the Debtors or their estates, including, without

limitation, Challenges with respect to the Prepetition Loan Documents, the Prepetition

Secured Debt or the Prepetition Liens, or claims, counterclaims or causes of action of the

Debtors against any Prepetition Secured Party.

21.     *Limitation on Use of DIP Financing Proceeds and Collateral.*  Notwithstanding

anything herein or in any other order entered by the Court to the contrary, no proceeds of the DIP

Facility, DIP Collateral, Prepetition Collateral (including Cash Collateral), or the Carve-Out may

be used (a) for Professional Fees incurred for (i) any litigation or threatened litigation (whether

by contested matter, adversary proceeding, or otherwise, including any investigation in

connection with litigation or threatened litigation) against any of the DIP Agent, the DIP

Lenders, or the Prepetition Secured Parties or for the purpose of objecting to or challenging the

validity, perfection, enforceability, extent, amount or priority of any claim, lien, or security

interest held or asserted by any of the DIP Agent, the DIP Lenders, or the Prepetition Secured

Parties or (ii) asserting any defense, claim, cause of action, counterclaim, or offset with respect

to the DIP Obligations, the Prepetition Secured Debt (including, without limitation, for lender

liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code,

applicable non-bankruptcy law or otherwise), the DIP Liens, or the Prepetition Liens or against

any of the Prepetition Secured Parties or their respective Representatives, (b) to prevent, hinder,

or otherwise delay any of the DIP Agent's or the Prepetition Secured Parties' assertion,

enforcement, or realization on the Prepetition Collateral or the DIP Collateral in accordance with

the DIP Documents, the Prepetition Loan Documents or this Interim Order other than to seek a

determination that an Event of Default has not occurred or is not continuing, or in connection

with a remedies hearing, (c) to seek to modify any of the rights granted to the DIP Agent, the

DIP Lenders, or the Prepetition Secured Parties under this Interim Order or under the DIP

Documents or the Prepetition Loan Documents, in each of the foregoing cases without such

parties' prior written consent, which may be given or withheld by such party in the exercise of its

respective sole discretion, or (d) to pay any amount on account of any claims arising prior to the

Petition Date unless such payments are approved by an order of the Court (including, without

limitation, hereunder); *provided* that notwithstanding anything to the contrary herein, the

Committee, if any, may use the proceeds of the DIP Collateral (including Cash Collateral),

and/or the Carve-Out to investigate (but not prosecute or initiate the prosecution of, including the

preparation of any complaint or motion on account of) prior to (but not after) the delivery of a

Carve-Out Trigger Notice, (y) the claims and liens of the Prepetition Secured Parties, and (z)

potential claims, counterclaims, causes of action, or defenses against the Prepetition Secured

Parties; *provided further* that no more than an aggregate of $50,000 of the proceeds of the DIP

Collateral (including Cash Collateral) and/or the Carve-Out may be used by the Committee, if

any, in respect of the investigations set forth in the preceding proviso (the "**Investigation**

**Budget**").

22.     *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions

of this Interim Order, including all findings herein, shall be binding upon all parties in interest in

the Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP Lenders, the

Prepetition Secured Parties, the Committee, if any, any non-statutory committees appointed or

formed in the Chapter 11 Cases, the Debtors, and their respective successors and assigns

(including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of

any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or

any other fiduciary appointed as a legal representative of any of the Debtors or with respect to

the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent,

the DIP Lenders, the Prepetition Secured Parties, the Debtors, and their respective successors and

assigns; *provided* that the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall

have no obligation to permit the use of the DIP Collateral or Prepetition Collateral (including

Cash Collateral) or to extend any financing to any chapter 7 trustee, chapter 11 trustee, or similar

responsible person appointed for the estates of the Debtors.

23.     *Limitation of Liability.*  In determining to make any loan or other extension of

credit under the DIP Credit Agreement, to permit the use of Cash Collateral or in exercising any

rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents,

the DIP Agent and the DIP Lenders (and the Prepetition Secured Parties in respect of the use of

Cash Collateral) shall not (a) be deemed to be in "control" of the operations of the Debtors, (b)

43

owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates, and (c) be deemed to be acting as a "Responsible Person," "Owner," or "Operator" with respect to the operation or management of the Debtors, so long as the DIP Agent's and the DIP Lenders' actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of "responsible person" or "managing agent" to exist under applicable law (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any similar federal or state statute).

24.    *Inapplicability of Bar Date; Master Proof of Claim.*  Any order entered by the Court establishing a bar date for any claims (including, without limitation, administrative claims) in any of the Chapter 11 Cases or any subsequent chapter 7 case of any of the Debtors shall not apply to any DIP Secured Party or any Prepetition Secured Party. The DIP Secured Parties and the Prepetition Secured Parties shall not be required to file proofs of claim or requests for allowance and payment of administrative expenses authorized by this Interim Order in any of the Chapter 11 Cases or any subsequent chapter 7 case of any of the Debtors. The provisions of this Interim Order, and, upon the entry thereof, the Final Order, relating to the amount and/or priority of the DIP Loans, the Prepetition Secured Debt, the Adequate Protection Claims, the Adequate Protection Liens, any Adequate Protection Obligations pursuant to this Interim Order, the Prepetition Liens, the DIP Liens, the DIP Superpriority Claims  and the Adequate Protection Liens shall constitute a sufficient and timely filed proof of claim and/or administrative expense request in respect of such obligations and such secured status. However, in order to facilitate the processing of claims, to ease the burden upon the Court, and to reduce an unnecessary expense to

the Debtors' estates, the Prepetition Agent is authorized to, but not required to, file in the

Debtors' lead Chapter 11 Case *In re EdgeMarc Energy Holdings, LLC, et al.,* Case No. 19-

11104, a single, master proof of claim on behalf of the Prepetition Secured Parties, on account of

any and all of their respective claims arising under the applicable Prepetition Loan Documents

and hereunder (each, a "**Master Proof of Claim**") applicable against each of the Debtors.  Upon

the filing of a Master Proof of Claim, the Prepetition Agent and the Prepetition Secured Parties,

and each of their respective successors and assigns, shall be deemed to have filed a proof of

claim in the amount set forth opposite its name therein in respect of its claims against each of the

Debtors of any type or nature whatsoever with respect to the applicable Prepetition Loan

Documents, and the claim of each Prepetition Secured Party (and each of its respective

successors and assigns), named in a Master Proof of Claim shall be treated as if such entity had

filed a separate proof of claim in each of the Chapter 11 Cases.  The Master Proofs of Claim

shall not be required to identify whether any Prepetition Secured Party acquired its claim from

another party and the identity of any such party or to be amended to reflect a change in the

holders of the claims set forth therein or a reallocation among such holders of the claims asserted

therein resulting from the transfer of all or any portion of such claims.  Nothing in this Interim

Order shall waive the right of any DIP Secured Party or any Prepetition Secured Party to file its

own proof of claim against any of the Debtors.  The provisions of this paragraph 24 and each

Master Proof of Claim are intended solely for the purpose of administrative convenience and

shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote

separately on any plan proposed in the Chapter 11 Cases.  The Master Proofs of Claim shall not

be required to attach any instruments, agreements, or other documents evidencing the obligations

owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments,

agreements, or other documents will be provided upon reasonable written request to counsel to the Prepetition Agent.

25.     *Insurance*.  To the extent that the Prepetition Agent or any Prepetition Lender is listed as loss payee or additional insured under any of the Borrower's or Guarantors' insurance policies, the DIP Agent is also deemed to be the loss payee or additional insured, as applicable, under such insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, *first*, to the payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted), and *second*, to the payment of the applicable Prepetition Secured Debt.

26.     *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rule 4001(a)(3), 6004(h), 6006(d), 7062, or 9014, any Local Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

27.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

28.     *Payments Held in Trust for the DIP Agent and DIP Lenders*.  Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral, or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the Commitments in accordance with the DIP

Documents, such person, or entity shall be deemed to have received, and shall hold, such

payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP

Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise

instructed by the Court, for application in accordance with the DIP Documents and this Interim

Order.

29.     *Disposition of DIP Collateral.* Unless the DIP Obligations and the Prepetition

Secured Debt are indefeasibly paid in full, in cash, upon the closing of a sale or other disposition

of the DIP Collateral or Prepetition Collateral, the Debtors shall not sell, transfer, lease,

encumber, or otherwise dispose of any portion of the DIP Collateral or any Prepetition Collateral

(or enter into any binding agreement to do so) (other than (x) the sale of crude oil, natural gas, or

other hydrocarbons in the ordinary course of business, (y) other transactions permitted under the

DIP Documents or (z) transactions for an aggregate consideration of less than $500,000) without

the prior written consent of the DIP Agent and, solely with respect to the Prepetition Collateral,

the Prepetition Agent, in each case such consent not to be unreasonably withheld (and no such

consent shall be implied from any other action, inaction, or acquiescence by any DIP Secured

Party or Prepetition Secured Party or any order of this Court), except as permitted in the DIP

Loan Documents and/or the Prepetition Loan Documents, as applicable, and/or this Interim

Order.   Except to the extent otherwise expressly provided in the DIP Loan Documents or this

Interim Order and subject to the Carve-Out, all proceeds from the sale, transfer, lease,

encumbrance, or other disposition of any DIP Collateral (other than the sale of crude oil, natural

gas, or other hydrocarbons in the ordinary course of business) shall be remitted to the DIP Agent

for application to the DIP Obligations and then to the Prepetition Secured Debt, in each case, in

accordance with the terms of this Interim Order and the DIP Loan Documents or the Prepetition

Loan Documents, as the case may be.

30.     *Credit Bidding.*  The DIP Secured Parties shall have the right to credit bid, in

accordance with the DIP Documents and subject to the Carve-Out, up to the full amount of the

DIP Obligations in any sale of the Prepetition Collateral, in each case pursuant to section 363(k)

of the Bankruptcy Code and subject to any successful Challenge, without the need for further

Court order authorizing the same and whether any such sale is effectuated through section 363(k)

or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy

Code or otherwise.  Subject to paragraph 20 hereof and section 363(k) of the Bankruptcy Code,

each of the Prepetition Secured Parties shall have the right to credit bid up to the full amount of

the applicable Prepetition Secured Debt.  The Debtors shall pay the fees and expenses of the DIP

Secured Parties and Prepetition Secured Parties in connection with any such credit bid, subject to

the procedures set forth in paragraph 12 hereof.

31.     *No Marshalling.*  Subject to and effective upon entry of the Final Order, in no

event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable

doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or Prepetition

Collateral.  Upon entry of this Interim Order, the DIP Secured Parties and the Prepetition

Secured Parties are entitled to all of the rights and benefits of section 552(b) of the Bankruptcy

Code, and subject to and effective upon entry of the Final Order, the "equities of the case"

exception shall not apply.

32.     *Bankruptcy Rules.*  The requirements of Bankruptcy Rules 4001, 6003, and 6004,

in each case to the extent applicable, are satisfied by the contents of the Motion.

33.  *Necessary Action.*  The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Interim Order.

34.  *Retention of Jurisdiction.*  The Court shall retain jurisdiction to implement, interpret and enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors.

35.  *Final Hearing.*  The Final Hearing is scheduled for June 17, 2019 at 10 a.m. before the Court.

36.  *Inconsistency.*  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents or the Motion on the one hand, and of this Interim Order on the other, the provisions of this Interim Order shall govern and control.

37.  *Objections.*  Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon (a) counsel to the Debtors, (i) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attention: Darren S. Klein (darren.klein@davispolk.com) and Aryeh Ethan Falk (aryeh.falk@davispolk.com) and (ii) Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801, Attention: Adam G. Landis (landis@lrclaw.com) and Kerri K. Mumford (mumford@lrclaw.com), (b) counsel to the DIP Agent and DIP Lenders, (i) Hunton Andrews Kurth LLP, 600 Travis Street, Suite 4200, Houston, TX 77002, Attention: Timothy A. "Tad" Davidson (TadDavidson@andrewskurth.com) and Joseph Rovira (JosephRovira@andrewskurth.com) and (ii) Connolly Gallagher LLP, 1201 North Market Street, 20th Floor, Wilmington, DE 19801, Attention: Jeffrey Wisler (jwisler@connollygallagher.com),  (c) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox

49

35, Wilmington, DE 19801, Attention: Juliet M. Sarkessian (juliet.m.sarkessian@usdoj.gov) and

(d) any other party that has filed a request for notices with the Court, in each case by no later

than June 10, 2019 at 4:00 p.m. (prevailing Eastern Time).

38.     The Debtors shall promptly serve copies of this Interim Order, with notice of entry of the same, and notice of the Final Hearing date and objection deadline (which shall constitute adequate notice of the Final Hearing, including, without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under sections 506(c) and 552(b) of the Bankruptcy Code) to the parties having been given notice of the Interim Hearing, including the Debtors' largest 20 unsecured creditors on a consolidated basis, as well as all parties known to the Debtors to be asserting liens against or security interest in, any of the Prepetition Collateral, DIP Collateral or reclamation claims; the Internal Revenue Service; all state taxing authorities in the states in which the Debtors have any tax liabilities; the Environmental Protection Agency and state environmental regulatory authorities in the states in which the Debtors operate, and any other federal or state regulatory authorities governing the Debtors' industry; the U.S. Attorney's Office; the Delaware Attorney General; the United States Trustee; to any party that has filed a request for notices with the Court; and to the Committee after the same has been appointed, or such Committee's counsel, if the same shall have been appointed.

Dated: _____, 2019
        Wilmington, Delaware


_____
JUDGE BRENDAN LINEHAN SHANNON
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

*Execution Version*

**SENIOR SECURED SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of May 15, 2019

among

EM ENERGY EMPLOYER, LLC
as the Borrower,

The Several Lenders
from Time to Time Parties Hereto,

and

KEYBANK, NATIONAL ASSOCIATION,
as Administrative Agent and Letter of Credit Issuer,

---

# TABLE OF CONTENTS

**Page**

### SECTION 1.
### DEFINITIONS

| | | |
|---|---|---|
| 1.1 | Defined Terms | 1 |
| 1.2 | Other Interpretive Provisions | 31 |
| 1.3 | Accounting Terms | 32 |
| 1.4 | References to Agreements, Laws, Etc | 32 |
| 1.5 | Times of Day | 32 |
| 1.6 | Timing of Payment or Performance | 33 |
| 1.7 | Intentionally Reserved | 33 |
| 1.8 | Intentionally Reserved | 33 |
| 1.9 | Intentionally Reserved | 33 |
| 1.10 | Uniform Commercial Code | 33 |

### SECTION 2.
### AMOUNT AND TERMS OF CREDIT.

| | | |
|---|---|---|
| 2.1 | Commitments | 33 |
| 2.2 | Minimum Amount of Each Borrowing | 33 |
| 2.3 | Notice of Borrowing | 33 |
| 2.4 | Disbursement of Funds | 34 |
| 2.5 | Repayment of Loans; Evidence of Debt | 34 |
| 2.6 | Intentionally Reserved | 35 |
| 2.7 | Pro Rata Borrowings | 35 |
| 2.8 | Interest | 35 |
| 2.9 | Intentionally Reserved | 36 |
| 2.10 | Increased Costs, Illegality, Etc | 36 |
| 2.11 | Intentionally Reserved | 36 |
| 2.12 | Change of Lending Office | 37 |
| 2.13 | Notice of Certain Costs | 37 |
| 2.14 | Intentionally Reserved | 37 |
| 2.15 | Defaulting Lenders | 37 |
| 2.16 | Priority and Liens | 37 |
| 2.17 | Payment of Obligations | 37 |
| 2.18 | No Discharge; Survival of Claims | 37 |

### SECTION 3.
### LETTERS OF CREDIT

| | | |
|---|---|---|
| 3.1 | Letters of Credit | 38 |
| 3.2 | Notice of Amendment | 38 |
| 3.3 | Intentionally Reserved | 39 |
| 3.4 | Agreement to Repay Letter of Credit Drawings | 39 |
| 3.5 | Intentionally Reserved | 40 |
| 3.6 | Intentionally Reserved | 41 |
| 3.7 | Role of Letter of Credit Issuer | 41 |
| 3.8 | Cash Collateral | 41 |
| 3.9 | Applicability of ISP and UCP | 42 |
| 3.10 | Conflict with Issuer Documents | 42 |

i

3.11    Letters of Credit Issued for Guarantors .................................................................... 42

SECTION 4.
FEES; COMMITMENTS.

4.1    Fees ............................................................................................................................. 42
4.2    Voluntary Reduction of Commitments ...................................................................... 43
4.3    Mandatory Termination of Commitments .................................................................. 44

SECTION 5.
PAYMENTS

5.1    Voluntary Prepayments .............................................................................................. 44
5.2    Mandatory Prepayments ............................................................................................ 44
5.3    Method and Place of Payment .................................................................................... 45
5.4    Net Payments ............................................................................................................. 45
5.5    Computations of Interest and Fees ............................................................................ 48
5.6    Limit on Rate of Interest ............................................................................................ 48

SECTION 6.
CONDITIONS PRECEDENT TO INITIAL CREDIT EVENT.

6.1    Approved Budget ........................................................................................................ 49
6.2    DIP Orders .................................................................................................................. 49
6.3    Credit Documents ....................................................................................................... 50
6.4    Representations ........................................................................................................... 50
6.5    Closing Certificates .................................................................................................... 50
6.6    Authorization of Proceedings of Each Credit Party; Organizational Documents ..... 50
6.7    Cash Collateral ........................................................................................................... 50
6.8    Perfected Security Interest ......................................................................................... 51
6.9    Fees ............................................................................................................................. 51
6.10   Reserve Report ........................................................................................................... 51
6.11   No Default; Representations and Warranties ............................................................. 51
6.12   Notice of Borrowing .................................................................................................. 51

SECTION 7.
CONDITIONS PRECEDENT TO CREDIT EVENTS.

7.1    Additional New-Money Loans ................................................................................... 52
7.2    No Default; Representations and Warranties ............................................................. 52
7.3    Notice of Borrowing .................................................................................................. 52

SECTION 8.
REPRESENTATIONS, WARRANTIES AND AGREEMENTS.

8.1    Corporate Status ......................................................................................................... 53
8.2    Corporate Power and Authority; Enforceability ........................................................ 53
8.3    No Violation ............................................................................................................... 53
8.4    Litigation .................................................................................................................... 53
8.5    Margin Regulations .................................................................................................... 53
8.6    Approvals .................................................................................................................... 53
8.7    Investment Company Act ........................................................................................... 54
8.8    True and Complete Disclosure ................................................................................... 54
8.9    Financial Condition; Financial Statements ................................................................ 54
8.10   Tax Matters ................................................................................................................. 54
8.11   Compliance with ERISA ............................................................................................ 55

8.12    Subsidiaries...............................................................................................55
8.13    Parent Company Ownership.....................................................................55
8.14    Environmental Laws.................................................................................55
8.15    Properties..................................................................................................56
8.16    Insurance...................................................................................................56
8.17    Violations of Law......................................................................................57
8.18    Gas Imbalances, Prepayments..................................................................57
8.19    Marketing of Production............................................................................57
8.20    Hedge Agreements....................................................................................57
8.21    Use of Proceeds........................................................................................57
8.22    Primary Business......................................................................................57
8.23    Patriot Act.................................................................................................57
8.24    Sanctions Laws and Regulations..............................................................57
8.25    EEA Financial Institutions.......................................................................58

## SECTION 9.
## AFFIRMATIVE COVENANTS.

9.1    Information Covenants...............................................................................58
9.2    Books, Records and Inspections................................................................63
9.3    Maintenance of Insurance..........................................................................63
9.4    Payment of Taxes......................................................................................63
9.5    Consolidated Corporate Franchises...........................................................64
9.6    Compliance with Statutes, Regulations, Etc.............................................64
9.7    ERISA........................................................................................................64
9.8    Maintenance of Properties.........................................................................64
9.9    Intentionally Reserved...............................................................................65
9.10    End of Fiscal Years; Fiscal Quarters.......................................................65
9.11    Additional Guarantors, Grantors and Collateral......................................65
9.12    Use of Proceeds........................................................................................66
9.13    Further Assurances....................................................................................66
9.14    Reserve Reports.......................................................................................67
9.15    Title Information........................................................................................68
9.16    Commodity Exchange Act Keepwell Provisions......................................68
9.17    Intentionally Reserved..............................................................................69
9.18    Minimum Hedge Agreements....................................................................69

## SECTION 10.
## NEGATIVE COVENANTS.

10.1    Limitation on Indebtedness......................................................................69
10.2    Limitation on Liens...................................................................................71
10.3    Limitation on Fundamental Changes.........................................................72
10.4    Limitation on Sale of Assets.....................................................................72
10.5    Limitation on Investments........................................................................73
10.6    Limitation on Dividends............................................................................74
10.7    Transaction with Affiliates.......................................................................74
10.8    Case Matters..............................................................................................75
10.9    Changes in Business..................................................................................76
10.10    Negative Pledge Agreements..................................................................76
10.11    Hedge Agreements...................................................................................76
10.12    Financial Covenants................................................................................77
10.13    Intentionally Deleted...............................................................................78

10.14 Amendment to LLC Agreement ............................................................. 78
10.15 Sanctions; Use of Proceeds ................................................................. 78
10.16 Superpriority Claims ............................................................................ 78
10.17 Cash Collateral ..................................................................................... 78

SECTION 11.
EVENTS OF DEFAULT.

11.1 Events of Default .................................................................................. 78
11.2 Remedies ............................................................................................... 81

SECTION 12.
THE ADMINISTRATIVE AGENT.

12.1 Appointment ......................................................................................... 83
12.2 Delegation of Duties ............................................................................ 83
12.3 Exculpatory Provisions ........................................................................ 83
12.4 Reliance by the Administrative Agent .................................................. 84
12.5 Notice of Default .................................................................................. 84
12.6 Non-Reliance on Administrative Agent and Other Lenders ................. 85
12.7 Indemnification ..................................................................................... 85
12.8 The Administrative Agent in Its Individual Capacity ........................... 86
12.9 Successor Administrative Agent ........................................................... 86
12.10 Withholding Tax ................................................................................... 87
12.11 Security Documents and Administrative Agent under Security Documents and Guarantee ..... 87
12.12 Right to Realize on Collateral and Enforce Guarantee ......................... 87
12.13 Administrative Agent May File Proofs of Claim .................................. 88
12.14 Certain ERISA Matters ......................................................................... 88

SECTION 13.
MISCELLANEOUS.

13.1 Amendments, Waivers and Releases ..................................................... 90
13.2 Notices .................................................................................................. 92
13.3 No Waiver; Cumulative Remedies ........................................................ 93
13.4 Survival of Representations and Warranties ......................................... 93
13.5 Payment of Expenses; Indemnification ................................................ 93
13.6 Successors and Assigns; Participations and Assignments .................... 95
13.7 Replacements of Lenders under Certain Circumstances ....................... 99
13.8 Adjustments; Set-off ............................................................................. 100
13.9 Counterparts .......................................................................................... 100
13.10 Severability ........................................................................................... 101
13.11 Integration ............................................................................................ 101
13.12 GOVERNING LAW .............................................................................. 101
13.13 Submission to Jurisdiction; Waivers .................................................... 101
13.14 Acknowledgments ................................................................................ 102
13.15 WAIVERS OF JURY TRIAL ................................................................ 102
13.16 Confidentiality ...................................................................................... 102
13.17 Release of Collateral and Guarantee Obligations ................................ 103
13.18 USA PATRIOT Act ............................................................................... 104
13.19 Payments Set Aside .............................................................................. 104
13.20 Reinstatement ....................................................................................... 105
13.21 Disposition of Proceeds ....................................................................... 105
13.22 Collateral Matters; Hedge Agreements ................................................ 105

13.23    Limitation of Recourse ................................................................................... 105
13.24    Interest Rate Limitation .................................................................................. 105
13.25    Incorporation of DIP Orders by Reference ..................................................... 106
13.26    Flood Insurance Provisions ............................................................................ 106
13.27    Acknowledgement and Consent to Bail-In of EEA Financial Institutions ............................ 106

Schedules and Exhibits

Schedule 1.1(a) Closing Date Guarantors
Schedule 1.1(b) Existing Cash Management Agreements
Schedule 1.1(c) Existing Hedge Agreements
Schedule 1.1(d) Existing Letters of Credit
Schedule 2.1      New-Money Commitments
Schedule 8.4      Litigation
Schedule 8.12    Subsidiaries
Schedule 8.13    Parent Company Ownership
Schedule 8.15    Title Exceptions
Schedule 8.19    Closing Date Gas Imbalances
Schedule 8.20    Closing Date Marketing Agreements
Schedule 8.21    Closing Date Hedge Agreements
Schedule 10.2    Closing Date Liens
Schedule 10.5    Closing Date Investments
Schedule 13.2    Notice Addresses

Exhibit A          Form of Reserve Report Certificate
Exhibit B          Form of Notice of Borrowing
Exhibit C          Intentionally Reserved
Exhibit D          Form of Assignment and Acceptance Agreement
Exhibit E          Form of Promissory Note
Exhibit F          Approved Budget
Exhibit G          Intentionally Reserved
Exhibit H          Form of Guarantee
Exhibit I          Form of Interim DIP Order
Exhibit J          Form of Security Agreement
Exhibits K-1 – K-4        Forms of U.S. Tax Compliance Certificates

**THIS SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**, dated as of May 15, 2019, among EM Energy Employer, LLC, a Delaware limited liability company (the "Borrower") (such terms and each other capitalized term used but not defined in this preamble having the meaning provided in Section 1), the financial institutions and other lending institutions from time to time parties as lenders hereto (each a "Lender" and, collectively, the "Lenders"), KeyBank, National Association, as Administrative Agent.

WHEREAS, the Borrower, KeyBank, National Association, as arranger and administrative agent (the "Existing Administrative Agent") and the lenders party thereto have heretofore entered into that certain Amended and Restated Credit Agreement dated as of December 19, 2017 (as amended from time to time, the "Existing Credit Agreement");

WHEREAS, on May __, 2019 (the "Petition Date"), the Borrower and the Guarantors commenced Chapter 11 case numbers [___] through [___], as jointly administered for procedural purposes at Chapter 11 case number [___] (each a "Case" and collectively, the "Cases") by filing with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C.§§ 101 et seq., and have continued to operate their business as debtors-in-possession pursuant to Sections 1107 and 1108 thereof[1];

WHEREAS, the Borrower has requested and the Lenders have agreed to make secured term loans to the Borrower consisting of a priming, super-priority debtor-in-possession secured delayed draw credit facility in the aggregate principal amount not to exceed $107,793,041 which shall consist of (x) $30,000,000 of New-Money Loans and (y) subject to entry of the Final DIP Order, $77,793,041 of Roll-Up Loans, subject to this Agreement and, when entered, the Interim DIP Order, or the Final DIP Order (each as defined herein), as applicable; and

WHEREAS, the Lenders are willing to extend such credit to the Borrower under this Agreement upon the terms and subject to the conditions set forth in this Agreement and the Interim DIP Order or the Final DIP Order, as applicable.

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

SECTION 1.
DEFINITIONS

1.1    Defined Terms.

(a)    As used herein, the following terms shall have the meanings specified in this Section 1.1 unless the context otherwise requires (it being understood that defined terms in this Agreement shall include in the singular number the plural and in the plural the singular):

"ABR" shall mean for any day a fluctuating rate per annum equal to the rate of interest in effect for such day as publicly announced from time to time by the Administrative Agent as its "prime rate". The "prime rate" is a rate set by the Administrative Agent based upon various factors, including the Administrative Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in the ABR due to a change in such rate announced by the Administrative Agent in the

---

[1] Case numbers to be confirmed.

Federal Funds Effective Rate shall take effect at the opening of business on the day specified in the public announcement of such change.

"ABR Loan" shall mean each Loan bearing interest based on the ABR.

"Acceptable Bid Procedures" means bid procedures consistent with the Milestones and otherwise in form and substance reasonably satisfactory to the Administrative Agent, it being understood and agreed that the form of bid procedures attached to the "stalking horse" asset purchase agreement and provided to the Administrative Agent prior to the date hereof are Acceptable Bid Procedures.

"Acceptable Bid Procedures Order" means an order of the Bankruptcy Court approving the Acceptable Bid Procedures in form and substance reasonably satisfactory to the Administrative Agent, including the designation of a stalking horse bidder (or a designee thereof) as the "stalking horse" purchaser with a cash bid sufficient to satisfy the Minimum Repayment Condition, it being understood and agreed that the form of bid procedures order attached to the "stalking horse" asset purchase agreement and provided to the Administrative Agent prior to the date hereof is an Acceptable Bid Procedures Order.

"Acceptable Plan" means a Chapter 11 Plan in form and substance satisfactory to the Administrative Agent as to the treatment of claims arising under this Agreement and under the Existing Credit Agreement, and otherwise in form and substance satisfactory to the Administrative Agent, it being understood and agreed that to the extent Chapter 11 Plan proposes to indefeasibly pay in full, in cash the Existing Obligations and the Obligations, the consent rights of Administrative Agent shall be limited to reasonable satisfaction with customary release provisions.

"Acceptable Sale Order" means an order approving the Sale Transaction in form and substance reasonably satisfactory to the Administrative Agent, it being understood and agreed that (x) any such Sale Transaction (including, if assets are to be sold in multiple packages, all proposed sales consistent with the Bidding Procedures) must provide for the payment to the Administrative Agent at closing of the Sale Transaction in cash in an amount that satisfies the Minimum Repayment Condition to be an "Acceptable Sale Order" and (y) the form of sale order attached to the "stalking horse" asset purchase agreement and provided to the Administrative Agent prior to the date hereof is an Acceptable Sale Order.

"Additional New-Money Loans" means the total amount remaining of the New-Money Commitment less the amount of the Initial New-Money Loan prior to the Availability Period

"Adequate Protection Liens" means the Liens granted to the Existing Administrative Agent, and the Existing Lenders, as further set forth in the DIP Orders.

"Adequate Protection Payments" means (i) payment or reimbursement on a monthly basis of the Professional Fees (including legal and financial adviser (if any) fees and expenses) of the Existing Administrative Agent, the Existing Lenders, the Administrative Agent and the Lenders to the extent set forth in this Agreement and in the Existing Credit Agreement, as applicable, including any unpaid amounts incurred prior to the Petition Date and (ii) any amounts paid to the Existing Administrative Agent and the Existing Lenders as adequate protection, including any periodic cash payments consistent with the Approved Budget.

"Administrative Agent" shall mean KeyBank, National Association, as the administrative agent for the Lenders under this Agreement and the other Credit Documents, or any successor administrative agent appointed in accordance with the provisions of Section 12.9.

"Administrative Agent's Office" shall mean the Administrative Agent's address and, as appropriate, account as set forth on Schedule 13.2, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"Administrative Questionnaire" shall mean, for each Lender, an administrative questionnaire in a form approved by the Administrative Agent.

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise. "Controlling" ("controlling") and "controlled" shall have meanings correlative thereto.

"Agreement" shall mean this Senior Secured Superpriority Debtor In Possession Credit Agreement, as the same may be amended, amended and restated, supplemented or modified from time to time.

"Anti-Corruption Laws" shall mean all laws, rules, and regulations of any jurisdiction applicable to the Credit Parties from time to time concerning or relating to bribery or corruption.

"Applicable Margin" shall mean, for any day, with respect to any Loan, the rate *per annum* equal to (a) five and three-quarters percent (5.75%) prior to the Availability Period, and (b) five and one-quarter of one percent (5.25%) during the Availability Period.

"Approved Budget" means, initially, the 13 week rolling cash flow forecast attached hereto as Exhibit F and, subsequently, each budget delivered and approved in accordance with Section 9.1(n) hereof. The Approved Budget shall have been certified by a Financial Officer of the Borrower, which certifications, shall among other things, certify that the projections contained therein have been prepared in good faith based upon assumptions believed by the Credit Parties to be reasonable at the time made, and that such projections contain no statements or conclusions which are based upon or include information known to the Credit Parties to be misleading in any material respect or which fail to take into account material information known to the Credit Parties regarding the matters reported therein.

"Approved Counterparty" means (a) any Hedge Bank and (b) any other Person that engages in the ordinary course of its operations in the business of offering Hedge Agreements if, at the time such Person enters into a Hedge Agreement with any Credit Party, such Person or its credit support provider has a long term senior unsecured debt rating of at least "BBB-" by S&P, and at least "Baa3" by Moody's.

"Approved Fund" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Petroleum Engineers" shall mean (a) Netherland, Sewell & Associates, Inc., (b) Ryder Scott Company Petroleum Consultants, L.P., and (c) at the Borrower's option, any other independent petroleum engineers selected by the Borrower and reasonably acceptable to the Administrative Agent.

"Approved Purposes" shall have the meaning provided in Section 9.12.

"Assignment and Acceptance" shall mean an assignment and acceptance substantially in the form of Exhibit D or such other form as may be approved by the Administrative Agent.

"Auction" means an auction in connection with the Sale Transaction if there is more than one qualified bidder in accordance with the Acceptable Bid Procedures.

"Authorized Officer" shall mean as to the Borrower or any other Credit Party, the Chairman of the Board, the President, the Chief Executive Officer, the Chief Financial Officer, the Chief Operations Officer, the Treasurer, any manager, managing member or general partner of such Person and, solely for purposes of notices given pursuant to Section 2, Section 3, Section 4 and Section 5, any other officer of the applicable Person so designated by any of the foregoing officers in a notice to the Administrative Agent or any other officer or employee of the applicable Person designated in or pursuant to an agreement between the applicable Person and the Administrative Agent.  Any document delivered hereunder that is signed by an Authorized Officer shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of the Borrower or any other Credit Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Person.

"Availability Period" means the period from and including initial date on which the conditions specified in Section 7 are satisfied or waived in accordance with Section 7 to the earlier of the Termination Date and the draw schedule set forth under the Approved Budget.

"Avoidance Action" shall have the meaning provided in Section 6.2(b).

"Bail-In Action" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule.

"Bank Price Deck" shall mean the Administrative Agent's forward curve for each of oil, natural gas and other Hydrocarbons, as applicable, furnished to the Borrower by the Administrative Agent from time to time in accordance with the terms of this Agreement.

"Bankruptcy Code" shall mean Title 11 of the United States Code, as previously and hereafter amended, and codified as 11 U.S.C. Section 101, et seq.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and local rules of the Bankruptcy Court, each as amended, and applicable to the Cases.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code, or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Benefited Lender" shall have the meaning provided in Section 13.8.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors" shall mean, with respect to any Credit Party, its board of directors or similar governing body.

"Borrower" shall have the meaning provided in the introductory paragraph hereto.

"Borrowing" shall mean the incurrence of one Class of Loan on a given date.

"Business Day" shall mean any day excluding Saturday, Sunday and any other day on which banking institutions in New York City are authorized by law or other governmental actions to close.

"Capital Expenditures" shall mean, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Leases) by the Borrower and the Guarantors during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on a consolidated statement of cash flows of the Borrower and its Subsidiaries.

"Capital Lease" shall mean, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is, or is required to be, accounted for as a capital lease on the balance sheet of that Person; provided that leases that are re-characterized as Capital Leases due to a change in GAAP after the Closing Date shall not be treated as Capital Leases for any purpose under this Agreement but shall instead be treated as they would have been in accordance with GAAP in effect on the Closing Date.

"Capitalized Lease Obligations" shall mean, as applied to any Person, all obligations under Capital Leases of such Person or any of its Subsidiaries, in each case taken at the amount thereof accounted for as liabilities in accordance with GAAP; provided that obligations that are re-characterized as Capital Lease Obligations due to a change in GAAP after the Closing Date shall not be treated as Capital Lease Obligations for any purpose under this Agreement but shall instead be treated as they would have been in accordance with GAAP as in effect on the Closing Date.

"Carve-Out" has the meaning assigned to such term in the DIP Orders.

"Carve-Out Reserve" has the meaning assigned to such term in the DIP Orders.

"Carve-Out Trigger Notice" has the meaning assigned to such term in the DIP Orders.

"Cases" has the meaning set forth in the Recitals.

"Cash Collateral" means all cash and cash equivalents of the Credit Parties, including, but not limited to, all cash and cash equivalents in the Cash Collateral Account and all other "cash collateral" as defined in Section 363(a) of the Bankruptcy Code, but excluding any cash in the Carve-Out Reserve (as set forth in the DIP Orders).

"Cash Collateral Account" means, in respect of the Credit Parties one or more deposit accounts maintained with KeyBank National Association in accordance with this Agreement (including, for the avoidance of doubt, any lockboxes or similar accounts, any related securities accounts and any accounts holding cash equivalents), and with respect to which the Secured Parties shall have a perfected DIP Lien as security for the payment and performance of the Obligations by virtue of, and having priority set forth in, the DIP Orders.

"Cash Collateralize" shall have the meaning provided in Section 3.8(c).

"Cash Management Agreement" shall mean the Existing Cash Management Agreements and any other agreement entered into from time to time by the Borrower or any of the Borrower's Subsidiaries in connection with Cash Management Services for collections, other Cash Management Services and for operating, payroll and trust accounts of such Person, including automatic clearing house services, controlled disbursement services, electronic funds transfer services, lockbox services, stop payment services and wire transfer services.

"Cash Management Bank" shall mean any Person that either (a) at the time it provides Cash Management Services, (b) on the Closing Date or (c) at any time after it has provided any Cash Management Services, is the Administrative Agent, a Lender or an Affiliate of a the Administrative Agent or Lender.

"Cash Management Obligations" shall mean obligations owed by a Credit Party to any Cash Management Bank in connection with, or in respect of, any Cash Management Services.

"Cash Management Services" shall mean (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services) and (c) any other demand deposit or operating account relationships or other cash management services, including any Cash Management Agreement.

"Casualty Event" shall mean, with respect to any Collateral, (a) any damage to, destruction of, or other casualty or loss involving, any property or asset or (b) any seizure, condemnation, confiscation or taking under the power of eminent domain of, or any requisition of title or use of, or relating to, or any similar event in respect of, any property or asset.

"CFC" shall mean a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change in Law" shall mean the occurrence after the date of this Agreement of any of the following: (a) the adoption of any law, treaty, order, policy, rule or regulation after the Closing Date, (b) any change in any law, treaty, order, policy, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender or a Letter of Credit Issuer (or, for purposes of Section 2.10, by any lending office of such Lender or by such Lender's or the Letter of Credit Issuer's holding company, if any) with any guideline, request, directive or order enacted or promulgated after the Closing Date by any central bank or other Governmental Authority (whether or not having the force of law); provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines, directives, orders, rules and regulations adopted, enacted or promulgated by the Bank for International Settlements, the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall be deemed to have gone into effect after the Closing Date regardless of the date adopted, enacted or promulgated and shall be included as a Change in Law only to the extent a Lender is imposing applicable increased costs or costs in connection with capital adequacy and liquidity requirements similar to those described in Section 2.10(c) generally on other borrowers of loans under United States reserve-based credit facilities.

"Change of Control" shall mean that any one or more of the following has occurred: (a) the Permitted Investors cease to (i) own or control, directly or indirectly, more than 50% of aggregate issued and outstanding Voting Stock or limited liability company membership interests in the Borrower and (ii)

control, directly or indirectly, at least a majority of the voting power on the Board of Directors of the Borrower, or (b) the Borrower ceases to be directly or indirectly wholly-owned by EdgeMarc Energy Holdings, LLC and EM Energy Manager, LLC.

"Chapter 11 Plan" means a plan of reorganization or liquidation with respect to any of the Credit Parties.

"Class" refers to whether such Loan, or the Loans comprising such Borrowing are New-Money Loans or Roll-Up Loans and when used in reference to any Commitment, refers to whether such Commitment is a New-Money Commitment or a Roll-Up Loan Commitment, and when used in reference to any Lender, refers to whether such Lender has a Loan or Commitment of such Class.

"Closing Date" shall mean May __, 2019.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder.  Section references to the Code are to the Code, as in effect at the Closing Date.

"Collateral" shall mean all property pledged or purported to be pledged pursuant to this Agreement, the other Credit Documents, the Existing Credit Documents and the DIP Orders.  The term "Collateral" shall include, but not be limited to, Oil and Gas Properties and any other property or asset of any kind whether real, personal or mixed, tangible or intangible.

"Commitment" means, with respect to each Lender (to the extent applicable), such Lender's New-Money Commitment, Roll-Up Loan Commitment or any combination thereof (as the context requires).  As of the Closing Date, the aggregate amount of the Commitments is $107,793,041.

"Commitment Percentage" shall mean, at any time, for each Lender, the percentage obtained by dividing (a) such Lender's Commitment at such time by (b) the amount of the Total Commitment at such time; provided that at any time when the Total Commitment shall have been terminated, each Lender's Commitment Percentage shall be the percentage obtained by dividing (i) such Lender's Total Exposure at such time by (ii) the aggregate Total Exposures of all Lenders at such time.

"Committee" means an official creditors' committee of creditors holding unsecured claims appointed by the Office of the United States Trustee for the District of Delaware in respect of the Cases pursuant to Section 1102(a) of the Bankruptcy Code.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Confidential Information" shall have the meaning provided in Section 13.16.

"Confirmation Order" means an order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, confirming an Acceptable Plan.

"Contractual Requirement" shall have the meaning provided in Section 8.3.

"Credit Documents" shall mean this Agreement, the Guarantee, the Security Documents and any promissory notes issued by the Borrower under this Agreement and, on and after the Final Order Entry Date, each Letter of Credit.

"Credit Event" shall mean and include the making of a Loan and the issuance of a Letter of Credit.

"Credit Party" shall mean each of the Borrower and each Guarantor.

"Default" shall mean any event, act or condition that with notice or lapse of time, or both, would constitute an Event of Default.

"Default Rate" shall have the meaning provided in Section 2.8(b).

"Defaulting Lender" shall mean any Lender whose acts or failure to act, whether directly or indirectly, causes it to meet any part of the definition of "Lender Default".

"Deposit Account" shall have the meaning ascribed thereto in the UCC.

"DIP Default Notice Period" shall have the meaning provided in Section 11.2.

"DIP Liens" means all Liens on and security interests in the Collateral granted to the Administrative Agent and each of the Lenders pursuant to this Agreement, the other Credit Documents and the DIP Orders.

"DIP Orders" means the Final DIP Order and/or the Interim DIP Order, as the context requires.

"Disposition" shall have the meaning provided in Section 10.4.  "Dispose" shall have a correlative meaning.

"Disqualified Institution" shall mean (i) those Persons that have been specified in writing by the Borrower to the Administrative Agent prior to the Closing Date and (ii) any competitor of the Borrower and its Subsidiaries and any Affiliates of such competitor subsequently identified after the Closing Date in writing to the Administrative Agent by the Borrower, in each case other than any such Affiliate that is a bona fide debt fund that extends credit or buys loans in the ordinary course of business, which designations shall not apply retroactively to disqualify any Persons that have previously acquired an assignment or participation interest in the Loans.

"Disqualified Stock" shall mean, with respect to any Person, any Stock or Stock Equivalents of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Stock or Stock Equivalents that is not Disqualified Stock), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than as a result of a change of control or asset sale to the extent the terms of such Stock or Stock Equivalents provide that such Stock or Stock Equivalents shall not be required to be repurchased or redeemed until the Maturity Date has occurred or such repurchase or redemption is otherwise permitted by this Agreement (including as a result of a waiver hereunder)), in whole or in part, in each case prior to the date that is 91 days after the Maturity Date hereunder; provided that, if such Stock or Stock Equivalents are issued to any plan for the benefit of employees of a Credit Party or by any such plan to such employees, such Stock or Stock Equivalents shall not constitute Disqualified Stock solely because it may be required to be repurchased by a Credit Party in order to satisfy applicable statutory or regulatory obligations; provided, further, that any Stock or Stock Equivalents held by any future, present or former employee, director, manager or consultant of the Borrower, any of its Subsidiaries or any of its direct or indirect parent companies or any other entity in which the Borrower or a Guarantor has an Investment and is designated in good faith as an "affiliate" by the Board of Directors of the Borrower, in each case pursuant to any equity holders'

agreement, management equity plan or stock incentive plan or any other management or employee benefit plan or agreement shall not constitute Disqualified Stock solely because it may be required to be repurchased by a Credit Party.

"Distressed Person" shall have the meaning provided in the definition of the term "Lender-Related Distress Event" below.

"Dividends" shall have the meaning provided in Section 10.6.

"Dollars" and "$" shall mean dollars in lawful currency of the United States of America.

"Domestic Subsidiary" shall mean each Subsidiary of the Borrower that is organized under the laws of the United States or any state thereof or the District of Columbia.

"Drawing" shall have the meaning provided in Section 3.4.

"EEA Financial Institution" shall mean (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" shall mean any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"EM Pennsylvania" shall mean EM Energy Pennsylvania, LLC.

"Environmental Claims" shall mean any and all actions, suits, orders, decrees, demands, demand letters, claims, Liens, notices of noncompliance, violation or potential responsibility or investigation (other than internal reports prepared by or on behalf of the Borrower or any of the Subsidiaries (a) in the ordinary course of such Person's business or (b) as required in connection with a financing transaction or an acquisition, lease or disposition of real estate) or proceedings arising under or based upon any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereinafter, "Claims"), including, without limitation, (i) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief relating to the presence, release or threatened release of Hazardous Materials or arising from alleged injury or threat of injury to health or safety (to the extent relating to human exposure to Hazardous Materials), or the environment including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands.

"Environmental Law" shall mean any applicable Federal, state or local statute, law, rule, regulation, ordinance, code and rule of common law now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment, including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata

and natural resources such as wetlands, or human health or safety (to the extent relating to human exposure to Hazardous Materials), or relating to the emission, release, discharge, management, handling, presence, disposal or human exposure to Hazardous Materials.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.  Section references to ERISA are to ERISA as in effect on the Closing Date and any subsequent provisions of ERISA amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" shall mean each person (as defined in Section 3(9) of ERISA) that together with the Borrower would be deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" shall have the meaning provided in Section 8.11(a).

"ETC" shall mean ETC Northeast Pipeline, LLC.

"ETC Agreements" shall mean, collectively, (i) that certain Amended and Restated Gathering and Processing Agreement dated as of November 13, 2017, by and between EM Pennsylvania and ETC, (ii) that certain Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-101) dated as of November 13, 2017 (as supplemented by the Memorandum of Individual Transaction Confirmation to Gathering and Processing Agreement dated as of November 13, 2017), by and between EM Pennsylvania and ETC and (iii) that certain Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102) dated as of November 13, 2017 (as supplemented by the Memorandum of Individual Transaction Confirmation to Gathering and Processing Agreement dated as of November 13, 2017), by and between EM Pennsylvania and ETC, in each case whether or not such agreement has been terminated and as the same may be amended, restated, supplemented or otherwise modified from time to time in a manner not materially adverse to the Lenders (for the avoidance of doubt, any amendment (a) further restricting the amount of indebtedness (as such term is used therein) or liens (as such term is used therein) permitted to be incurred under any such ETC Agreement as in effect on the date hereof or (b) increasing the amount of Indebtedness or Liens incurred pursuant to the ETC Agreements as in effect on the date hereof would be materially adverse to the Lenders).

"EU Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Event of Default" shall have the meaning provided in Section 11.

"Excluded Stock" shall mean (a) any Stock or Stock Equivalents that is Voting Stock of any Foreign Subsidiary that is a CFC in excess of 66% of the outstanding Voting Stock of such Foreign Subsidiary, (b) Stock or Stock Equivalents that is Voting Stock of a FSHCO in excess of 66% of the outstanding Voting Stock of such FSHCO, (c) any Stock or Stock Equivalents of a CFC that is not a first-tier CFC of the Borrower, (d) Stock or Stock Equivalents that is Voting Stock of a Domestic Subsidiary that is disregarded as separate from a CFC for U.S. federal income tax purposes in excess of 66% of the outstanding Voting Stock of such Domestic Subsidiary or (e) any Stock or Stock Equivalents to the extent the pledge thereof would be prohibited by any Requirement of Law.

"Excluded Swap Obligation" means, with respect to a Credit Party, any Swap Obligation, if and to the extent that, all or a portion of the guarantee of such Credit Party of, or the grant by such Credit Party of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes

illegal under the Commodity Exchange Act, or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Credit Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to Section 9.16 and any other "keepwell, support or other agreement for the benefit of such Credit Party and any and all guarantees of such Credit Party's Swap Obligations by other Credit Parties) at the time such Credit Party's guarantee or such Credit Party's grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes" shall mean, with respect to the Administrative Agent or any Lender, (a) net income Taxes and franchise and excise Taxes (imposed in lieu of net income Taxes) imposed on the Administrative Agent or Lender as a result of any current or former connection between the Administrative Agent or Lender and the jurisdiction of the Governmental Authority imposing such tax (other than any such connection arising from the Administrative Agent or Lender having executed, delivered or performed its obligations or received a payment under, received or perfected a security interest under, engaged in any other transaction pursuant to, or having been a party to or having enforced, this Agreement or any other Credit Document, or sold or assigned an interest in any Loan or Credit Document), (b) any U.S. federal withholding Tax that is imposed on amounts payable to any Lender under the law in effect at the time (i) such Lender becomes a party to this Agreement (or, in the case of a Participant, on the date such Participant became a Participant hereunder) (other than pursuant to an assignment (participation or other transfer) request by the Borrower under Section 13.7)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 5.4, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) any Tax to the extent attributable to such Lender's failure to comply with Section 5.4(d), Section 5.4(e) and Section 5.4(f), as applicable (in the case of any Non-U.S. Lender) or Section 5.4(g) (in the case of a U.S. Lender), (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Existing Administrative Agent" has the meaning set forth in the Recitals.

"Existing Cash Management Agreements" means the Cash Management Agreements described on Schedule 1.1(b) which, on and after entry of the Final DIP Order, shall be secured pursuant to this Agreement and the DIP Orders.

"Existing Credit Agreement" shall have the meaning provided in the Recitals.

"Existing Credit Documents" means the "Credit Documents" as defined in the Existing Credit Agreement.

"Existing Hedge Agreements" means the Hedge Agreements described on Schedule 1.1(c) which, on and after the Final DIP Order Entry Date, shall be secured pursuant to this Agreement and the DIP Orders.

"Existing Lenders" means the lenders under the Existing Credit Agreement.

"Existing Letters of Credit" means the letters of credit described on Schedule 1.1(d) that were issued under the Existing Credit Agreement and that shall be deemed refunded, refinanced, replaced and issued under this Agreement upon entry of the Interim DIP Order.

"Existing Liens" means the Liens securing the Existing Obligations for the benefit of the Existing Secured Parties.

"Existing Loans" means the Loans under, and as defined in, the Existing Credit Agreement that shall be deemed refunded, refinanced, replaced and made under this Agreement and pursuant to the terms of the Interim DIP Order.

"Existing Obligations" means the "Obligations" as defined in the Existing Credit Agreement.

"Existing Secured Parties" means the "Secured Parties" as defined in the Existing Credit Agreement.

"Exit Fee" means the fee payable pursuant to Section 4.1(f). For the avoidance of any doubt, the Exit Fee shall not be assessed on the portion of Loans which constitute the Roll-Up Loans.

"Extraordinary Proceeds" means any cash or cash equivalents received by a Credit Party (a) not in the ordinary course of business, and/or (b) from or in respect of (ii) pension plan reversions, (iii) any insurance provider, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, and (v) a Casualty Event.

"Fair Market Value" shall mean, with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a Disposition of such asset at such date of determination assuming a Disposition by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as reasonably determined by the Borrower.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations promulgated thereunder or official administrative interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into in connection with the implementation of such sections of the Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any such intergovernmental agreement.

"Federal Funds Effective Rate" shall mean, for any day, the weighted average of the per annum rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published on the next succeeding Business Day by the Federal Reserve Bank of New York or, if such rate is not so published for any date that is a Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal Funds brokers of recognized standing selected by it; provided that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Final DIP Order" means the order of the Bankruptcy Court in form and substance acceptable to the Administrative Agent and the Lenders in their sole discretion and as may otherwise be agreed in writing or on the record by the Administrative Agent and the Lenders at the final hearing with respect to such order in the Cases, entered in the Cases after notice and final hearing pursuant to the Bankruptcy Rules or such other procedures as approved by the Bankruptcy Court which, among other matters (but not by way of limitation), authorizes the Borrower to obtain credit and the Credit Parties to incur (or guaranty) the Obligations and grant DIP Liens under the Credit Documents, as the case may be, and

provides for the superpriority of the Administrative Agent's and the Lenders' claims, grants adequate protection to the Secured Parties and authorizes the use of Cash Collateral, as the same may be modified or supplemented from time to time after the Final Order Entry Date with the written consent of the Required Lenders.

"Final Order Entry Date" means the date on which the Final DIP Order was entered on the docket of the Bankruptcy Court.

"Financial Officer" means the chief financial officer or treasurer of the Borrower, or any other officer having substantially the same authority and responsibility.

"Financial Performance Covenants" shall mean the covenants of the Borrower set forth in Section 10.12.

"First Variance Report" shall have the meaning provided in Section 9.1(n)(ii).

"Flood Insurance Laws" shall mean the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, the National Flood Insurance Reform Act of 1994, the Biggert-Waters Flood Insurance Reform Act of 2012 and the regulations issued in connection therewith by the Office of the Controller of the Currency, the Federal Reserve Board and other Governmental Authorities, each as it may be amended, reformed or otherwise modified from time to time.

"Foreign Corporate Subsidiary" shall mean a Foreign Subsidiary that is treated as a corporation for U.S. federal income tax purposes.

"Foreign Plan" shall mean any employee benefit plan, program, policy, arrangement or agreement providing pension or retirement benefits that is maintained or contributed to by the Credit Parties with respect to employees employed outside the United States that is required to be funded through a trust or other funding vehicle other than a trust or funding vehicle maintained exclusively by a Governmental Authority.

"Foreign Subsidiary" shall mean each Subsidiary of the Borrower that is not a Domestic Subsidiary.

"Fronting Fee" shall have the meaning provided in Section 4.1(c).

"FSHCO" shall mean any direct or indirect Subsidiary (including a disregarded entity for U.S. federal income tax purposes) substantially all of whose assets consist of Stock or Stock Equivalents of one or more direct or indirect Foreign Corporate Subsidiaries.

"Fund" shall mean any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"G&A Expenses" means, for any period, the aggregate of all general and administrative expenses of the Credit Parties paid in cash, determined on a consolidated basis in accordance with GAAP, excluding legal fees and other non-recurring items acceptable to the Administrative Agent.

"GAAP" shall mean generally accepted accounting principles in the United States of America, as in effect from time to time; provided, however, that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change

occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"Goldman Sachs" shall mean Goldman Sachs Lending Partners LLC and its Affiliates (other than GS Private Equity).

"Governmental Authority" shall mean any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including a central bank or stock exchange.

"Granting Lender" shall have the meaning provided in Section 13.6(g).

"GS Private Equity" shall mean Goldman Sachs Merchant Banking Division (including its affiliated entities and funds, investments, Persons, vehicles or accounts that are managed or sponsored by Goldman, Sachs & Co. or its Affiliates (other than Goldman Sachs) or for which Goldman, Sachs & Co. or its Affiliates (other than Goldman Sachs) acts as investment advisor), and their respective successors, in each case to the extent Goldman Sachs Merchant Banking Division has voting discretion with respect to the direct or indirect investment in the Parent Company by such entities, funds, investments, Persons, vehicles or accounts.

"Guarantee" shall mean the Guarantee made by any Guarantor in favor of the Administrative Agent for the benefit of the Secured Parties substantially in the form of Exhibit H.

"Guarantee Obligations" shall mean, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; provided, however, that the term "Guarantee Obligations" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"Guarantors" shall mean (a) EM Energy Manager, LLC, (b) Parent Company, and (c) each Subsidiary of the Borrower listed on Schedule 1.1(a) and each other Subsidiary that becomes a party to the Guarantee after the Closing Date pursuant to Section 9.11 or otherwise.

"Hazardous Materials" shall mean (a) any petroleum or petroleum products, radioactive materials, friable asbestos, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing regulated levels of polychlorinated biphenyls, and radon gas, (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", or "pollutants", or words of similar import, under any applicable Environmental Law and (c) any other chemical, material or substance, which is prohibited, limited or regulated by any Environmental Law.

"Hedge Agreements" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, put transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, fixed-price physical delivery contracts, whether or not exchange traded, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement. Notwithstanding the foregoing, agreements or obligations to physically sell any commodity at any index-based price shall not be considered Hedge Agreements.

"Hedge Bank" shall mean (a) any Person (other than the Borrower or any of its Subsidiaries) that (x) at the time it enters into a Hedge Agreement with the Borrower or a Guarantor is the Administrative Agent or a Lender or an Affiliate of the Administrative Agent or a Lender, or (y) at any time after it enters into a Hedge Agreement with the Borrower or a Guarantor it becomes the Administrative Agent or a Lender or an Affiliate of the Administrative Agent or a Lender or (b) with respect to any Hedge Agreement with the Borrower or a Guarantor that is in effect on the Closing Date, any Person (other a Credit Party) that is the Administrative Agent or a Lender or an Affiliate of the Administrative Agent or a Lender.

"Hedge Liquidation" means, with respect to any Hedge Agreement, the sale, assignment, novation, unwind or termination of all or any part of such Hedge Agreement or the creation of any off-setting positions in respect thereof; provided that for purposes of this definition, a Hedge Agreement shall not be deemed to have been liquidated if, (a) such Hedge Agreement is novated from the existing counterparty to an Approved Counterparty, with the Borrower or a Guarantor being the "remaining party" for purposes of such novation, or (b) upon its termination, it is replaced, in a substantially contemporaneous transaction, with one or more Hedge Agreements with approximately the same mark-to-market value and without cash payments to a Credit Party in connection therewith.

"Hedge PV" shall mean, with respect to any commodity Hedge Agreement, the present value, discounted at 9% per annum, of the future receipts expected to be paid to the Borrower or the Guarantors under such Hedge Agreement netted against the most recent Bank Price Deck provided to the Borrower by the Administrative Agent; provided, however, that the "Hedge PV" shall never be less than $0.00.

"Hedging Obligations" shall mean, with respect to any Person, the obligations of such Person under Hedge Agreements and the Existing Hedge Agreements.

"<u>Highest Lawful Rate</u>" shall mean, with respect to each Lender, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Loans under laws applicable to such Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"<u>Historical Financial Statements</u>" shall mean the unaudited consolidated financial statements of the Borrower as of December 31, 2018, and the unaudited consolidated financial statements of the Borrower as of March 31, 2019.

"<u>Hydrocarbon Interests</u>" shall mean all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"<u>Hydrocarbons</u>" shall mean oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"<u>Indebtedness</u>" of any Person shall mean (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (c) the deferred purchase price of assets or services that in accordance with GAAP would be included as a liability on the balance sheet of such Person (other than (i) any earn-out obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and (ii) obligations resulting under firm transportation contracts or take or pay contracts entered into in the ordinary course of business), (d) the face amount of all letters of credit issued and outstanding for the account of such Person and, without duplication, all drafts drawn thereunder, (e) all indebtedness (excluding prepaid interest thereon) of any other Person secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person, (f) the principal component of all Capitalized Lease Obligations of such Person, (g) net Hedging Obligations of such Person, (h) all obligations of such Person in respect of Disqualified Stock, (i) the undischarged balance of any Production Payment and Reserve Sales created by such Person or for the creation of which such Person directly or indirectly received payment, and (j) without duplication, all Guarantee Obligations of such Person; provided that Indebtedness shall not include (i) trade and other ordinary course payables and accrued expenses arising in the ordinary course of business, (ii) deferred or prepaid revenue, and (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  For purposes hereof, the amount of any net Hedging Obligations on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of Indebtedness of any Person for purposes of clause (e) above shall be deemed to be equal to the least of (i) the aggregate unpaid amount of such Indebtedness, (ii) the Fair Market Value of the property encumbered thereby as determined by such Person in good faith and (iii) the maximum amount for which such Person may be liable in respect of such Indebtedness.

"<u>Indemnified Liabilities</u>" shall have the meaning provided in <u>Section 13.5</u>.

"Indemnified Taxes" shall mean all Taxes (including Other Taxes) other than (a) Excluded Taxes and (b) any interest, penalties, or expenses caused by an Agent's or Lender's gross negligence or willful misconduct.

"Initial New-Money Loan" shall mean an amount up to $15,000,000.

"Initial Reserve Report" shall mean that certain report prepared by Netherland Sewell & Associates and received by the Administrative Agent on April 15, 2019.

"Interim DIP Order" means the order of the Bankruptcy Court substantially in the form of Exhibit I (except as may otherwise be agreed in writing or on the record by the Administrative Agent and the Lenders at the interim hearing with respect to such order in the Cases) entered in the Cases after an interim hearing pursuant to the Bankruptcy Rules, which, among other matters (but not by way of limitation), authorizes, on an interim basis, the Borrower to obtain credit and the Credit Parties to incur (or guaranty) the Obligations and grant DIP Liens under the Credit Documents, as the case may be, and provides for the superpriority of the Administrative Agent's and the Lenders' claims, grants adequate protection to the Secured Parties and authorizes the use of Cash Collateral, as the same may be modified or supplemented from time to time after the Interim Order Entry Date, and before the Final Order Entry Date, with the written consent of the Required Lenders.

"Interim Order Entry Date" means the date on which the Interim DIP Order is entered on the docket of the Bankruptcy Court.

"Investment" shall mean, for any Person: (a) the acquisition (whether for cash, property, services or securities or otherwise) of Stock, Stock Equivalents, bonds, notes, debentures, partnership or other ownership interests or other securities of any other Person (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such sale), (b) the making of any deposit with, or advance, loan or capital contribution to, assumption of Indebtedness of, purchase or other acquisition of any other Indebtedness or equity participation or interest in, or other extension of credit to, any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such Person) (including any partnership or joint venture), (c) the entering into of any guarantee of, or other contingent obligation with respect to, Indebtedness or (d) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.

"ISP" shall mean, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"Issuer Documents" shall mean, with respect to any Letter of Credit and any other document, agreement and instrument entered into by the Letter of Credit Issuer and the Borrower (or any Guarantor) or in favor of the Letter of Credit Issuer and relating to such Letter of Credit.

"L/C Maturity Date" shall mean the date that is three Business Days prior to the Maturity Date.

"L/C Obligations" shall mean, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unpaid Drawings. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Lender" shall have the meaning provided in the preamble to this Agreement.

"Lender Default" shall mean (i) the refusal or failure of any Lender to make available its portion of any incurrence of Loans or participations in Letters of Credit, which refusal or failure is not cured within two Business Day after the date of such refusal or failure, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied; (ii) any Lender notifying the Borrower, the Administrative Agent or the Letter of Credit Issuer in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied, (iii) the failure of any Lender to pay over to the Administrative Agent, any Letter of Credit Issuer or any other Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, unless the subject of a good faith dispute; (iv) a Lender has notified the Borrower or the Administrative Agent that it does not intend or expect to comply with any of its funding obligations or has made a public statement to that effect with respect to its funding obligations under this Agreement; (v) the failure by a Lender to confirm in a manner reasonably satisfactory to the Administrative Agent that it will comply with its obligations under this Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (vi) upon receipt of such written confirmation by the Administrative Agent and the Borrower; (vii) a Distressed Person has admitted in writing that it is insolvent or such Distressed Person becomes subject to a Lender-Related Distress Event; or (viii) a Lender or any Person that directly or indirectly controls such Lender, as the case may be, is or becomes the subject of a Bail-In Action.

"Lender-Related Distress Event" shall mean, with respect to any Lender, that such Lender or any Person that directly or indirectly controls such Lender (each, a "Distressed Person"), as the case may be, is or becomes subject to a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver or similar official (including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such capacity) is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person or any Person that directly or indirectly controls such Distressed Person is subject to a forced liquidation, or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt; provided that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Lender or any Person that directly or indirectly controls such Lender by a Governmental Authority or an instrumentality thereof so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"Letter of Credit" shall have the meaning provided in Section 3.1.

"Letter of Credit Exposure" shall mean, with respect to any Lender, at any time, the sum of (a) the principal amount of any Unpaid Drawings in respect of which such Lender has made (or is required to have made) payments to the Letter of Credit Issuer pursuant to Section 3.4(a) at such time and (b) such Lender's Commitment Percentage of the Letters of Credit Outstanding at such time (excluding the portion thereof consisting of Unpaid Drawings in respect of which the Lenders have made (or are

required to have made) payments to the Letter of Credit Issuer pursuant to Section 3.4(a)) minus the amount of cash or deposit account balances held by the Administrative Agent to Cash Collateralize outstanding Letters of Credit and Unpaid Drawings under Section 3.8.

"Letter of Credit Issuer" shall mean the Administrative Agent, any of its Affiliates or any replacement or successor appointed pursuant to Section 3.6.

"Letters of Credit Outstanding" shall mean, at any time, the sum of, without duplication, (a) the aggregate Stated Amount of all outstanding Letters of Credit and (b) the aggregate principal amount of all Unpaid Drawings in respect of all Letters of Credit.

"Lien" shall mean any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including (a) the lien or security interest arising from a mortgage, encumbrance, pledge, security agreement or a financing lease, consignment or bailment for security purposes or (b) production payments and the like payable out of Oil and Gas Properties; provided that in no event shall an operating lease be deemed to be a Lien.

"Liquidity" shall mean, as of any date, the sum, without duplication of the aggregate Dollar equivalent of all unrestricted cash and Permitted Investments held by the Credit Parties at such time. As used herein, the term "unrestricted" as it relates to such cash or Permitted Investments would exclude any such amounts representing deposits, escrows, sinking fund payments or other amounts that are otherwise encumbered (other than pursuant to the Credit Documents) or dedicated for a particular use and/or which would not be characterized as "unrestricted cash" on the financial statements of such entities in accordance with GAAP, and in any event, shall not include the unfunded New-Money Commitments.

"LLC Agreement" shall mean the Limited Liability Company Agreement of the Borrower dated as of July 25, 2012, as amended from time to time.

"Loans" means each New-Money Loan and each Roll-Up Loan.

"Material Adverse Effect" shall mean a material adverse effect on (a) the business, assets, operations or condition, financial or otherwise, of the Borrower and the other Credit Parties, taken as a whole (excluding the filing of the Cases, the events and conditions related and/or leading up thereto and the effects thereof and any action required to be taken under the Credit Documents or under the DIP Orders), (b) the ability of any Credit Party to perform any of its obligations under the Credit Documents to which it is a party, (c) the Collateral, or the Administrative Agent's Liens (on behalf of itself and the other Secured Parties) on the Collateral or other validity or priority of any such Lien, or (d) the rights of or benefits available to the Administrative Agent or the Lenders under any of the Credit Documents.

"Maturity Date" means 180 days after the Final Order Entry Date.

"Milestone" means the following milestones to be completed in each case in accordance with the applicable timing referred to below (or such later dates as may be approved by the Administrative Agent in its sole discretion):

(a) the approval by the Bankruptcy Court of this Agreement and the facility described herein, in form and substance satisfactory to the Administrative Agent and the Lenders on an interim basis, pursuant to the Interim DIP Order as entered by the Bankruptcy Court in the Cases within fifteen (15) days of the Petition Date and/or on a final basis pursuant to the Final DIP Order within thirty (30) days of the Petition Date,

(b) within 15 days after the Petition Date, the Credit Parties shall file a motion with the Bankruptcy Court seeking approval of the Acceptable Bid Procedures and the Sale Transaction.

(c) within 45 days after the Petition Date, the Acceptable Bid Procedures Order shall have been entered in the Cases;

(d) within 70 days after the Petition Date, the Credit Parties shall have executed an asset purchase agreement that satisfies the Minimum Repayment Condition, on terms and conditions acceptable to the Administrative Agent and the Existing Administrative Agent in their sole discretion;

(e) within 85 days after the Petition Date, the Bankruptcy Court shall have entered an order approving a stalking horse bidder that satisfies the Minimum Repayment Condition and is otherwise on terms and conditions acceptable to the Administrative Agent and the Existing Administrative Agent in their sole discretion;

(f) within 100 days after the Petition Date, an Auction shall have commenced if there is more than one qualified bidder in accordance with the Acceptable Bid Procedures;

(g) within 110 days after the Petition Date, the Acceptable Sale Order shall have been entered in the Cases.

(h) within 15 days following the events set forth in clause (h) above, the Sale Transaction shall have been closed or otherwise consummated and all of the Obligations and Existing Obligations shall have been indefeasibly paid in full, in cash.

"Minimum Borrowing Amount" shall mean $500,000 (or, if less, the entire remaining New-Money Commitment at the time of such Borrowing).

"Minimum Repayment Condition" means with respect to a Sale Transaction, the purchase agreement and sale order provide that on the Closing Date all of the outstanding Obligations and Existing Obligations in respect of this Agreement and the Existing Credit Agreement shall be indefeasibly paid in full in cash, and all L/C Obligations and Hedging Obligations shall be cash collateralized in accordance with the terms of Section 3.8(a).

"Moody's" shall mean Moody's Investors Service, Inc. or any successor by merger or consolidation to its business.

"Mortgage" shall mean a mortgage or a deed of trust, deed to secure debt, trust deed, assignment of as-extracted collateral, fixture filing or other security document entered into by the owner of a Mortgaged Property and the Administrative Agent for the benefit of the Secured Parties in respect of that Mortgaged Property, in such form as agreed between the Borrower and the Administrative Agent.

"Mortgaged Property" shall mean, initially, each parcel of real property and improvements thereto owned by the Borrower or a Guarantor and identified on Schedule 1.1(e), and each other parcel of real property and improvements thereto with respect to which a Mortgage is required to be granted pursuant to Section 9.11.

"Multiemployer Plan" shall mean a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"New-Money Commitment" means as to each Lender, its obligation to make a Loan to the Borrower pursuant to Section 2.1 in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.1 under the caption "New-Money Commitment" or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"New-Money Loan" shall mean a Loan pursuant to Section 2.1(a).

"Non-Consenting Lender" shall have the meaning provided in Section 13.7(b).

"Non-Defaulting Lender" shall mean and include each Lender other than a Defaulting Lender.

"Non-Professional Fee Carry Forward Amount" means, the amount (if any) by which the budgeted total disbursements (excluding debt service and Professional Fees) as stated in the Approved Budget for the immediately preceding week exceeded the actual total disbursements (excluding debt service and Professional Fees) for such immediately preceding week. The Non-Professional Fee Carry Forward Amounts shall be offset or accrue a negative balance by the amount (if any) by which the actual total disbursements (excluding debt service and Professional Fees) exceeded the budgeted total disbursements (excluding debt service and Professional Fees) as stated in the Approved Budget for the immediately preceding week. The Non-Professional Fee Carry Forward Amounts shall accrue on a cumulative basis from the four week period then ending or until a new proposed DIP Budget is approved (which proposed DIP Budget, for the avoidance of doubt, will incorporate in the current line item the amount of remaining Non-Professional Fee Carry Forward Amounts, if any), from which point such Non-Professional Fee Carry Forward Amounts from periods preceding the new Approved Budget shall be disregarded.

"Non-U.S. Lender" shall mean any Lender that is not a U.S. Lender.

"Notice of Borrowing" shall mean a written request of the Borrower in accordance with the terms of Section 2.3 and substantially in the form of Exhibit B or such other form as shall be approved by the Administrative Agent (acting reasonably) , including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent.

"Obligations" shall mean all advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party arising under any Credit Document, the DIP Orders or otherwise with respect to any Loan or Letter of Credit or under any Secured Cash Management Agreement or Secured Hedge Agreement, in each case, entered into with the Credit Parties, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees (including, without limitation, the Exit Fee) that accrue after the commencement by or against any Credit Party or any Affiliate thereof (other than Goldman Sachs) in any proceeding under any bankruptcy or insolvency law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.  Without limiting the generality of the foregoing, the Obligations of the Credit Parties under the Credit Documents (and any of their Subsidiaries to the extent they have obligations under the Credit Documents) include the obligation (including Guarantee Obligations) to pay principal, interest, charges, expenses, fees, attorney costs, indemnities and other amounts payable by any Credit Party under any Credit Document.  Notwithstanding the foregoing, (a) the obligations of a Credit Party under any Secured Hedge Agreement and under any Secured Cash Management Agreement shall be secured and guaranteed pursuant to the Security Documents and the Guarantee only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (b) any release of Collateral or Guarantors effected in the manner permitted by this Agreement and the other Credit Documents shall not require the consent of the holders of Hedging

Obligations under Secured Hedge Agreements or of the holders of Cash Management Obligations under Secured Cash Management Agreements.  Notwithstanding the foregoing, Excluded Swap Obligations shall not be an Obligation of any Guarantor that is not a Qualified ECP Guarantor.

"Oil and Gas Properties" shall mean (a) Hydrocarbon Interests, (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests, (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests, (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests, (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests, (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or property (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, gas processing plants and pipeline systems and any related infrastructure to any thereof, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing; provided that the Oil and Gas Properties shall not include any "building" or "mobile home" (each as defined in Regulation H as promulgated by the Federal Reserve Board under the Flood Insurance Laws).

"Ongoing Hedges" shall have the meaning assigned to such term in Section 10.11(a)

"Other Taxes" shall mean any and all present or future stamp, registration, court or documentary, intangible, recording, or any other excise, property or similar Taxes (including interest, fines, penalties, additions to Tax and related expenses with regard thereto) arising from any payment made or required to be made under this Agreement or any other Credit Document or from the execution or delivery of, registration or enforcement of, consummation or administration of, or otherwise with respect to, this Agreement or any other Credit Document.

"OTPP" shall mean Ontario Teachers' Pension Plan Board and its controlled Affiliates and associated funds, and their related successors.

"Overnight Rate" shall mean, for any day, the greater of (a) the Federal Funds Effective Rate and (b) an overnight rate determined by the Administrative Agent or the Letter of Credit Issuer, as the case may be, in accordance with banking industry rules on interbank compensation.

"Parent Company" shall mean EdgeMarc Energy Holdings, LLC.

"Participant" shall have the meaning provided in Section 13.6(c).

"Participant Register" shall have the meaning provided in Section 13.6(c).

"Patriot Act" shall have the meaning provided in Section 13.18.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"Permitted Investments" shall mean:

(a)    United States dollars;

(b)    securities issued or unconditionally guaranteed by the United States government or any agency or instrumentality thereof, in each case having maturities and/or reset dates of not more than 24 months from the date of acquisition thereof;

(c)    securities or readily marketable direct obligations issued or fully guaranteed by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof or any political subdivision of such state or any public instrumentality thereof having maturities of not more than 24 months from the date of acquisition thereof and, at the time of acquisition, having an investment grade rating generally obtainable from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from another nationally recognized rating service);

(d)    commercial paper maturing no more than 12 months after the date of creation thereof and, at the time of acquisition, having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service) and corporate notes or bonds maturing no more than 12 months after the date of acquisition thereof and, at the time of acquisition, having a rating of at least A- or A3 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(e)    certificates of deposit, time deposits with, or domestic and LIBOR certificates of deposit or bankers' acceptances maturing no more than two years after the date of acquisition thereof issued by any Lender or any other bank having combined capital and surplus of not less than $250,000,000 in the case of domestic banks and $100,000,000 (or the Dollar equivalent thereof) in the case of foreign banks;

(f)    repurchase agreements with a term of not more than 90 days for underlying securities of the type described in clauses (b), (c), (e) and (g) entered into with any bank meeting the qualifications specified in clause (e) above or securities dealers of recognized national standing;

(g)    marketable short-term money market and similar funds (i) either having assets in excess of $500,000,000 or (ii) having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(h)    Investments with average maturities of 36 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower); and

(i)    investment funds investing substantially all their assets in securities of one or more of the types of securities described in clauses (a) through (h) above.

"Permitted Investors" shall mean (a) GS Private Equity, and (b) OTPP, provided however, notwithstanding anything herein to the contrary, neither the Parent Company, the Borrower nor any of their respective Subsidiaries shall be a "Permitted Investor".

"Permitted Liens" shall mean:

(a)    Liens for Taxes, assessments or governmental charges or claims not yet overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP;

(b)    Liens in respect of property or assets of the Borrower or any of the Guarantors imposed by law, such as landlords', vendors', suppliers', carriers', warehousemen's, repairmens', construction contractors', workers' and mechanics' Liens and other similar Liens arising in the ordinary course of business or incident to the exploration, development, operation or maintenance of Oil and Gas Properties, in each case so long as such Liens arise in the ordinary course of business and do not individually or in the aggregate have a Material Adverse Effect;

(c)    Liens incurred or pledges or deposits made in connection with workers' compensation, unemployment insurance and other types of social security, old age pension, public liability obligations or similar legislation and deposits securing liabilities to insurance carriers under insurance or self-insurance arrangements in respect of such obligations, or incurred to secure the performance of tenders, statutory obligations, plugging and abandonment obligations, surety, stay, customs and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (including letters of credit issued in lieu of such bonds or to support the issuance thereof) incurred in the ordinary course of business or otherwise constituting Investments permitted by Section 10.5;

(d)    ground leases, subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Credit Parties are located;

(e)    easements, rights-of-way, restrictive covenants, licenses, restrictions (including zoning restrictions), title defects, exceptions, deficiencies or irregularities in title, encroachments, protrusions, servitudes, permits, conditions and covenants (including, for the avoidance of doubt, the dedication of committed reserves under the ETC Agreements) and other similar charges or encumbrances (including in any rights of way or other property of a Credit Party for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil or other minerals or timber, and other like purposes, or for joint or common use of real estate, rights of way, facilities and equipment) not interfering in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole and, to the extent reasonably agreed by the Administrative Agent, any exception on the title reports issued in connection with any Oil and Gas Property;

(f)    any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under any lease, sublease, license or sublicense permitted by this Agreement and covering only the assets so leased or licensed;

(g)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(h)    Liens on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit issued for the account of the Credit Parties; provided that such Lien

secures only the obligations of the Borrower or such Guarantors in respect of such letter of credit to the extent permitted under Section 10.1;

(i)     leases, licenses, subleases or sublicenses granted to others not interfering in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole;

(j)     Liens arising from precautionary Uniform Commercial Code financing statement or similar filings made in respect of operating leases entered into by the Credit Parties;

(k)     Liens created in the ordinary course of business in favor of banks and other financial institutions over credit balances of any bank accounts commodity trading accounts or other brokerage accounts of the Borrower and the Guarantors held at such banks or financial institutions, as the case may be;

(l)     Liens which arise in the ordinary course of business under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, farm-in agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements that are usual and customary in the oil and gas business and are for claims which are not delinquent or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP; provided (i) that any such Lien referred to in this clause is limited to the assets that are the subject of the relevant agreement and does not materially impair the use of the property covered by such Lien for the purposes for which such property is held by a Credit Party or materially impair the value of such property subject thereto, (ii) no such Lien secures Indebtedness and (iii) such Liens are taken into account in computing the net revenue interests and working interests of the Credit Parties;

(m)     Existing Liens; and

(n)     any zoning, building, entitlement or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole.

The parties acknowledge and agree that no intention to subordinate the priority afforded the Liens granted in favor of the Administrative Agent, for the benefit of the Secured Parties, under the Security Documents is to be hereby implied or expressed by the permitted existence of such Permitted Liens.

"Person" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any Governmental Authority.

"Petition Date" has the meaning set forth in the Recitals.

"Petroleum Industry Standards" shall mean the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question.

"Plan" shall mean any multiemployer or single-employer plan, as defined in Section 4001 of ERISA and subject to Title IV of ERISA, that is or was within any of the preceding six plan years

maintained or contributed to by (or to which there is or was an obligation to contribute or to make payments to) the Borrower or an ERISA Affiliate.

"Pledge Agreements" shall mean, collectively, (i) the Pledge Agreement entered into by the Borrower, the other pledgors party thereto and the Administrative Agent, for the benefit of the Secured Parties in such form as agreed between the Borrower and the Administrative Agent, and (ii) the Pledge Agreement entered into by EM Energy Manager, LLC, EdgeMarc Energy Holdings, LLC and the Administrative Agent, for the benefit of the Secured Parties in such form as agreed between the Borrower and the Administrative Agent.

"Pledgors" shall mean the Borrower and each other Person party to a Pledge Agreement, other than the Administrative Agent.

"Prepetition Payment" means a payment on account of any (a) "critical vendor payments" or (b) trade payables (including, without limitation, in respect of reclamation claims) or any other claim that would constitute a prepetition claim against a Credit Party.

"Production Payments and Reserve Sales" shall mean the grant or transfer by a Credit Party to any Person of the right to receive all or a portion of the production or the proceeds from the sale of production attributable to such properties where the holder of such interest has recourse solely to such production or proceeds of production.

"Professional Fee Carry Forward Amount" means, the amount (if any) by which the budgeted total Professional Fees of the Credit Parties as stated in the Approved Budget for the immediately preceding week exceeded the actual total Professional Fees of the Credit Parties for such immediately preceding week. The Professional Fee Carry Forward Amounts shall be offset or accrue a negative balance the amount (if any) by which the actual total Professional Fees of the Credit Parties exceeded the budgeted total Professional Fees of the Credit Parties as stated in the Approved Budget for the immediately preceding week. The Professional Fee Carry Forward Amounts shall accrue on a cumulative basis until a new Proposed DIP Budget is approved (which proposed DIP Budget, for the avoidance of doubt, will incorporate in the current line item the amount of remaining Professional Fee Carry Forward Amounts, if any), from which point such Professional Fee Carry Forward Amounts from periods preceding the new Approved Budget shall be disregarded.

"Professional Fees" means attorneys' fees and the fees of any other professionals.

"Proposed DIP Budget" shall have the meaning provided in Section 9.1(n)(i).

"Proved Developed Non-Producing Reserves" shall mean oil and gas reserves that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and "Developed Non-Producing Reserves".

"Proved Developed Producing Reserves" shall mean oil and gas reserves that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and "Developed Producing Reserves".

"Proved Reserves" shall mean oil and gas reserves that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following: (a) "Developed Producing Reserves", (b) "Developed Non-Producing Reserves" or (c) "Undeveloped Reserves".

"PTEs" shall have the meaning provided in Section 12.14.

"PV-9" shall mean, with respect to any Proved Reserves expected to be produced from any Oil and Gas Properties, the net present value, discounted at 9% *per annum*, of the future net revenues expected to accrue to the Borrower's and the Guarantors' collective interests in such reserves during the remaining expected economic lives of such reserves, calculated in accordance with the most recent Bank Price Deck provided to the Borrower by the Administrative Agent.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, (i) each Credit Party that has total assets exceeding $10,000,000 at the time the relevant guarantee of obligations under, or grant of a security interest to secure, such Swap Obligation or (ii) such other Person that constitutes an "eligible contract participant" under the Commodity Exchange Act, or any regulation promulgated thereunder, and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Register" shall have the meaning provided in Section 13.6(b)(iv).

"Regulation T" shall mean Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Reimbursement Date" shall have the meaning provided in Section 3.4(a).

"Related Parties" shall mean, with respect to any specified Person, such Person's Affiliates and the directors, officers, managers, employees, agents, trustees and advisors of such Person or such Person's Affiliates and any Person that possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"Reportable Event" shall mean an event described in Section 4043 of ERISA and the regulations thereunder, other than any event as to which the 30-day notice period has been waived.

"Required Lenders" shall mean, at any date, (a) Non-Defaulting Lenders having or holding at least 50% of the Total Commitment at such date or (b) if the Total Commitment has been terminated, Non-Defaulting Lenders having or holding at least 50% of the outstanding principal amount of the Loans and Letter of Credit Exposure (excluding the Loans and Letter of Credit Exposure of Defaulting Lenders) in the aggregate at such date.

"Requirement of Law" shall mean, as to any Person, any law, treaty, rule, regulation statute, order, ordinance, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding upon such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"Reserve Report" shall mean the Initial Reserve Report and any other subsequent report, in form and substance reasonably satisfactory to the Administrative Agent, setting forth, as of each June 30th or December 31st, in reasonable detail for each Oil and Gas Property or interest of a Credit Party located within the geographic boundaries of the United States of America that the Borrower desires to have

included in the calculation of the Borrowing Base the reserves attributable to such property or interest (and presented for each such property or interest by separate category (in accordance with Petroleum Industry Standards) as Proved Developed Producing Reserves, Proved Developed Non-Producing Reserves, Proved Developed Behind Pipe Reserves, Proved Developed Shut-in Reserves, and Undeveloped Reserves), which report shall (i) contain a projection of the rate of projection and future net revenues, operating expenses (including production Taxes and ad valorem expenses) and Capital Expenditures with respect thereto as of such date, based upon the PV-9, (ii) take into account any "over-produced" status under gas balancing arrangements and (iii) otherwise contain information and analysis comparable in scope to that contained in the Initial Reserve Report, and (iv) contain any other engineering data reasonably requested by the Administrative Agent.

"Reserve Report Certificate" shall mean a certificate of an Authorized Officer in substantially the form of Exhibit A certifying as to the matters set forth in Section 9.14(c).

"Roll-Up Loan Commitment" shall mean, (i) as to all Lenders, the aggregate amount of the Roll-Up Loan Commitments of each Lender, which, as of the date the Final DIP Order is entered shall be $77,793,041, which amount shall be comprised of a roll-up and refinancing of the Existing Loans and reissuance of the Existing Letters of Credit and shall be deemed fully funded and reissued by the Lenders upon entry of the Final DIP Order, and (ii) as to each Lender, such Lender's Commitment Percentage of the aggregate Roll-Up Loan Commitment.

"Roll-Up Loans" shall mean any Loans pursuant to Section 2.1(b) and Unpaid Drawings pursuant to Section 3.4(a).

"Rolling Variance Report" shall have the meaning provided in Section 9.1(n)(v).

"S&P" shall mean Standard & Poor's Ratings Services or any successor by merger or consolidation to its business.

"Sale Transaction" means the sale of all or substantially all of the assets of the Credit Parties pursuant to Section 363 or Section 1129 of the Bankruptcy Code pursuant to the Acceptable Bid Procedures and the Acceptable Sale Order.

"Sanctioned Country" shall mean, at any time, a country, region or territory that is itself the subject or target of any Sanctions (at the time of the Closing Date, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" shall mean, at any time, (a) any Person listed in any Sanctions-related list maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom, (b) any Person located, organized or resident in a Sanctioned Country or (c) any Person owned 50 percent or more or controlled by any such Person or Persons described in the foregoing clauses (a) or (b).

"Sanctions" shall mean all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Second Variance Report" shall have the meaning provided in Section 9.1(n)(iii).

"Secured Cash Management Agreement" means (a) any Existing Cash Management Agreement that as of the Final DIP Order Entry Date has not expired or been terminated in accordance with its terms and (b) any Cash Management Agreement by and between the Borrower or any of its Subsidiaries and any Cash Management Bank.

"Secured Hedge Agreement" shall mean (a) any Existing Hedge Agreement that as of the Final DIP Order has not expired or been terminated in accordance with its terms and (b) any Hedge Agreement by and between the Credit Parties and any Hedge Bank.

"Secured Parties" shall mean, collectively, the Administrative Agent, the Letter of Credit Issuer, each Lender, each Hedge Bank that is party to any Secured Hedge Agreement, each Cash Management Bank that is a party to any Secured Cash Management Agreement and each sub-agent pursuant to Section 12 appointed by the Administrative Agent with respect to matters relating to the Credit Documents or by the Administrative Agent with respect to matters relating to any Security Document.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Agreement" shall mean the Security Agreement entered into by the Borrower, the other grantors party thereto and the Administrative Agent, for the benefit of the Secured Parties, substantially in the form of Exhibit J.

"Security Documents" shall mean, collectively, the Security Agreement, the Pledge Agreements, the Mortgages and each other security agreement or other instrument or document executed and delivered pursuant to Section 9.11 or 9.13 or pursuant to any other such Security Documents or otherwise to secure or perfect the security interest in any or all of the Obligations.

"SPV" shall have the meaning provided in Section 13.6(g).

"Stated Amount" of any Letter of Credit shall mean the maximum amount from time to time available to be drawn thereunder, determined without regard to whether any conditions to drawing could then be met.

"Stock" shall mean any and all shares of capital stock or shares in the capital, as the case may be (whether denominated as common stock or preferred stock or ordinary shares or preferred shares, as the case may be), beneficial, partnership or membership interests, participations or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity, whether voting or non-voting.

"Stock Equivalents" shall mean all securities convertible into or exchangeable for Stock and all warrants, options or other rights to purchase or subscribe for any Stock, whether or not presently convertible, exchangeable or exercisable.

"Subsidiary" of any Person shall mean and include (a) any corporation more than 50% of whose Stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time Stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries and (b) any limited liability company, partnership, association, joint venture or other entity of which such Person directly or

indirectly through Subsidiaries has more than a 50% equity interest at the time.  Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of the Borrower.

"Superpriority Claim" means a claim against a Credit Party in any of the Cases that is a superpriority administrative expense claim having priority over any or all administrative expenses and other claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c) and/or 726 thereof (to the extent permitted by law)), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

"Swap Obligation" means, with respect to any Credit Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" shall mean, in respect of any one or more Hedge Agreements, (a) for any date on or after the date such Hedge Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedge Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedge Agreements (which may include a Lender or any Affiliate of a Lender).

"Syndication Agent" shall have the meaning provided in the preamble to this Agreement.

"Taxes" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings (including backup withholding) or other similar charges imposed by any Governmental Authority whether computed on a separate, consolidated, unitary, combined or other basis and any interest, fines, penalties or additions to Tax with respect to the foregoing.

"Termination Date" means the earliest to occur of (a) the Maturity Date, (b) a determination by the Bankruptcy Court not to enter the Interim DIP Order or the Final DIP Order in form and substance satisfactory to the Lenders in their sole discretion by the applicable time periods set forth in clause (a) of the definition of "Milestone", (c) acceleration of the Obligations by the Lenders after the occurrence of any Event of Default, (d) if a plan of reorganization or liquidation has been confirmed by order of the Bankruptcy Court, the effective date of such plan of reorganization or liquidation, which provides for (i) the indefeasible payment in full, in cash of all of the Obligations owing under this Agreement and the Existing Credit Documents or (ii) is otherwise acceptable to the Administrative Agent and Lenders in their sole discretion, (e) the effective date of the Sale Transaction, (f) the appointment of a Chapter 11 trustee or other disinterested person with expanded powers pursuant to Section 1104(c) of the Bankruptcy Code or the dismissal of any of the Cases, (g) the conversion of any of the Cases under Chapter 11 of the Bankruptcy Code to cases under Chapter 7 of the Bankruptcy Code, and (h) the filing or support by any Credit Party of a plan of reorganization that is not an Acceptable Plan.

"Test Date" shall have the meaning provided in Section 10.12(b).

"Third Variance Report" shall have the meaning provided in Section 9.1(n)(iv).

"Total Commitment" shall mean the sum of the New-Money Commitments and Roll-Up Commitments of the Lenders.

"Total Exposure" shall mean, with respect to any Lender at any time, the sum of (a) the aggregate principal amount of the Loans of such Lender then outstanding and (b) such Lender's Letter of Credit Exposure at such time.

"Transactions" shall mean, collectively, the entering into of the Credit Documents and the funding of the Loans under this Agreement on the Closing Date, the payment of transaction expenses on the Closing Date and the other transactions contemplated by this Agreement and the Credit Documents.

"Transferee" shall have the meaning provided in Section 13.6(e).

"UCC" shall mean the Uniform Commercial Code of the State of New York or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"Unfunded Current Liability" shall mean, with respect to any Plan at any time, the amount of any of its unfunded benefit liabilities as defined in Section 4001(a)(18) of ERISA, determined in accordance with the assumptions used for funding the Plan pursuant to Section 412 of the Code for its most recent fiscal year.

"United States Trustee" means the trustee appointed by the Bankruptcy Court to supervise the administration of the Cases.

"Unpaid Drawing" shall have the meaning provided in Section 3.4(a).

"U.S. Lender" shall have the meaning provided in Section 5.4(g).

"U.S. Tax Compliance Certificate" shall have the meaning provided in Section 5.4(e)(i).

"Variance Report" shall mean, collectively, the First Variance Report, Second Variance Report, Third Variance Report and the Rolling Variance Reports.

"Voting Stock" shall mean, with respect to any Person, such Person's Stock or Stock Equivalents having the right to vote for the election of directors of such Person under ordinary circumstances.

"Write-Down and Conversion Powers" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.2    Other Interpretive Provisions.  With reference to this Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Credit Document shall refer to such Credit Document as a whole and not to any particular provision thereof.

(c)    Article, Section, Exhibit and Schedule references are to the Credit Document in which such reference appears.

(d)      The term "including" is by way of example and not limitation.

(e)      The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(f)      In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(g)      Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Credit Document.

(h)      Any reference to any Person shall be constructed to include such Person's successors or assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(i)      Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

(j)      The word "will" shall be construed to have the same meaning as the word "shall".

(k)      The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(l)      No provision of any Credit Document shall be interpreted or construed against any Person solely because such Person or its legal counsel drafted such provision.

1.3      <u>Accounting Terms</u>.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Historical Financial Statements, except as otherwise specifically prescribed herein.

1.4      <u>References to Agreements, Laws, Etc</u>.  Unless otherwise expressly provided herein, (a) references to organizational documents, agreements (including the Credit Documents) and other Contractual Requirements shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendment and restatements, extensions, supplements and other modifications are permitted by any Credit Document and (b) references to any Requirement of Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Requirement of Law.

1.5      <u>Times of Day</u>.  Unless otherwise specified, all references herein to times of day shall be references to New York City (daylight or standard, as applicable).

1.6     Timing of Payment or Performance.   When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day.

1.7     Intentionally Reserved.

1.8     Intentionally Reserved.

1.9     Intentionally Reserved.

1.10    Uniform Commercial Code.   Terms not otherwise defined in this Agreement and defined in the UCC shall have the meanings attributed to such terms in the UCC.

## SECTION 2.
## AMOUNT AND TERMS OF CREDIT.

2.1     Commitments.

(a)     Subject to the terms and conditions set forth herein and in the DIP Orders, each Lender severally, not jointly, agrees to make to the Borrower, on and after the Closing Date (and in each case, subject to the conditions set forth in Article 7), New-Money Loans in an aggregate amount not to exceed such Lender's Commitment Percentage of the New-Money Commitment and the sum of all outstanding New-Money Loans not to exceed the New-Money Commitment.

(b)     The Administrative Agent, the Lenders and the Credit Parties each acknowledges and agrees that the Roll-Up Loans shall be deemed fully funded and the Existing Letters of Credit shall be deemed reissued hereunder concurrently with the entry of the Final DIP Order (without any notice of request by the Borrower) in accordance with the terms of the DIP Orders, and the Roll-Up Loan Commitment of each Existing Lender shall expire upon the deemed funding of the Roll-Up Loans and the reissuance of the Existing Letters of Credit hereunder on such date.

(c)     Each Lender's New-Money Commitment shall be automatically reduced by such Lender's Commitment Percentage of the funded amount of each Borrowing and shall expire and automatically terminate on the Termination Date (if not earlier terminated), and all Loans and all other Obligations owed under the Credit Documents or with respect to the Loans shall be paid in full not later than the Termination Date.  Amounts borrowed under this Section 2.1(a) and repaid or prepaid may not be reborrowed.

2.2     Minimum Amount of Each Borrowing.   The aggregate principal amount of each Borrowing requested after the Initial New-Money Loan shall be in a minimum amount of at least the Minimum Borrowing Amount for such Loans and in a multiple of $100,000 in excess thereof.

2.3     Notice of Borrowing.   Whenever the Borrower desires to incur New-Money Loans, the Borrower shall give the Administrative Agent at the Administrative Agent's Office, prior to 5:00 p.m. on the Business Day prior to the requested date of each such Borrowing (a "Notice of Borrowing") which shall specify (i) the aggregate principal amount of the New-Money Loans to be made, (ii) the date of the Borrowing (which shall be a Business Day), and (iii) the current aggregate Total Exposures (without regard to the requested Borrowing) of all Lenders and the *pro forma* aggregate Total Exposures (giving effect to the requested Borrowing) of all Lenders.  The Administrative Agent shall promptly give each Lender written notice (or telephonic notice promptly confirmed in writing) of each proposed Borrowing

of New-Money Loans, of such Lender's Commitment Percentage thereof and of the other matters covered by the related Notice of Borrowing.  Notwithstanding anything to the contrary hereunder, with respect to the New-Money Commitment, (x) the Borrower shall only be entitled to make one Borrowing from the Lenders prior to the Availability Period in an amount up to the Initial New-Money Loan upon entry of the Interim DIP Order and (x) up to one (1) Borrowing per calendar week from the Lenders from time to time during the Availability Period in the aggregate amount up to the Additional New-Money Loans.

2.4    <u>Disbursement of Funds</u>.

(a)    No later than 2:00 p.m. on the date specified in each Notice of Borrowing, each Lender will make available its Commitment Percentage of each Borrowing requested to be made on such date in the manner provided below.

(b)    Each Lender shall make available all amounts it is to fund to the Borrower under any Borrowing in immediately available funds to the Administrative Agent at the Administrative Agent's Office in Dollars, and the Administrative Agent will make available to the Borrower, by depositing to a Cash Collateral Account the aggregate of the amounts so made available in Dollars.  Unless the Administrative Agent shall have been notified by any Lender prior to the 2:00 p.m. on the date of any such Borrowing that such Lender does not intend to make available to the Administrative Agent its portion of the Borrowing or Borrowings to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing, and the Administrative Agent, in reliance upon such assumption, may (in its sole discretion and without any obligation to do so) make available to the Borrower a corresponding amount.  If such corresponding amount is not in fact made available to the Administrative Agent by such Lender and the Administrative Agent has made available such amount to the Borrower, the Administrative Agent shall be entitled to recover such corresponding amount from such Lender.  If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor the Administrative Agent shall promptly notify the Borrower and the Borrower shall pay such corresponding amount to the Administrative Agent in Dollars with one (1) Business Day of such demand.  The Administrative Agent shall also be entitled to recover from such Lender or the Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower to the date such corresponding amount is recovered by the Administrative Agent, at a rate *per annum* equal to (i) if paid by such Lender, the Overnight Rate or (ii) if paid by the Borrower, the then-applicable rate of interest or fees, calculated in accordance with <u>Section 2.8</u>, for the respective Loans.

(c)    Nothing in this <u>Section 2.4</u> shall be deemed to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to fulfill its commitments hereunder).

2.5    <u>Repayment of Loans; Evidence of Debt</u>.

(a)    The Borrower promises and agrees to repay to the Administrative Agent, for the benefit of the applicable Lenders, on the Maturity Date, all Loans outstanding on such date together with all other amounts due under this Agreement or the other Credit Documents, including the Exit Fee.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to the appropriate lending office of such Lender

resulting from each Loan made by such lending office from time to time, including the amounts of principal and interest payable and paid to such lending office from time to time under this Agreement.

(c)      The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 13.5(b), and a subaccount for each Lender, in which Register and subaccounts (taken together) shall be recorded (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d)      The entries made in the Register and accounts and subaccounts maintained pursuant to clauses (b) and (c) of this Section 2.5 shall, to the extent permitted by applicable Requirements of Law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

(e)      Any Lender may request that Loans made by it be evidenced by a promissory note substantially in the form of Exhibit E.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its permitted assigns).  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 13.6(c)) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if applicable, to such payee and its permitted assigns).

2.6      Intentionally Reserved.

2.7      Pro Rata Borrowings.  Each Borrowing of Loans under this Agreement shall be made by each Lender on the basis of its Commitment Percentage of the New-Money Commitment.  It is understood that (a) no Lender shall be responsible for any default by any other Lender in its obligation to make Loans hereunder and that each Lender severally but not jointly shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to fulfill its commitments hereunder and (b) failure by a Lender to perform any of its obligations under any of the Credit Documents shall not release any Person from performance of its obligation under any Credit Document.

2.8      Interest.

(a)      The unpaid principal amount of each Loan shall bear interest from the date of the Borrowing thereof until maturity (whether by acceleration or otherwise) at a rate *per annum* that shall at all times be the Applicable Margin plus the ABR, in each case, in effect from time to time; provided that if the interest rate so determined from time to time is less than (x) eleven percent (11%) prior to the Availability Period, the interest rate shall be deemed to be eleven percent (11%), and (y) ten and one-half percent (10.5%) during the Availability Period, the interest rate shall be deemed to be ten and one-half percent (10.5%).

(b)      If all or a portion of (i) the principal amount of any Loan or (ii) any amounts (including interest) payable hereunder with respect thereto shall not be paid when due (whether at stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate *per annum* that is (the "Default Rate") to the extent permitted by applicable Requirements of Law, the rate described in

Section 2.8(a) plus (x) three percent (3%) prior to the Availability Period, and (y) two and one-half percent (2.5%) during the Availability Period, in each case, from the date of such non-payment to the date on which such amount is paid in full (after as well as before judgment).

(c)     Interest on each Loan shall accrue from and including the date of any Borrowing to but excluding the date of any repayment thereof and shall be payable in Dollars; provided that any Loan that is repaid on the same date on which it is made shall bear interest for one day.  Except as provided below, interest shall be payable in respect of each Loan, (i) monthly in arrears on the last Business Day of each calendar month, and (ii) (A) on any prepayment (on the amount prepaid), (B) at maturity (whether by acceleration or otherwise) and (C) after such maturity, on demand.

(d)     All computations of interest hereunder shall be made in accordance with Section 5.5.

2.9     Intentionally Reserved.

2.10    Increased Costs, Illegality, Etc.

(a)     Intentionally Reserved.

(b)     Intentionally Reserved.

(c)     If, after the Closing Date, any Change in Law relating to capital adequacy or liquidity of any Lender or compliance by any Lender or its parent with any Change in Law relating to capital adequacy or liquidity occurring after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or its parent's capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent could have achieved but for such Change in Law (taking into consideration such Lender's or its parent's policies with respect to capital adequacy or liquidity), then from time to time, promptly (but in any event no later than fifteen days) after written demand by such Lender (with a copy to the Administrative Agent), the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any applicable Requirement of Law as in effect on the Closing Date (except as otherwise set forth in the definition of Change in Law).  Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to the Borrower, which notice shall set forth in reasonable detail the basis of the calculation of such additional amounts, although the failure to give any such notice shall not, subject to Section 2.13, release or diminish the Borrower's obligations to pay additional amounts pursuant to this Section 2.10(c) upon receipt of such notice.

(d)     Notwithstanding the foregoing, it is understood that this Section 2.10 shall not apply to (i) Taxes indemnifiable under Section 5.4, (ii) net income, franchise, branch profits and excise Taxes (imposed in lieu of net income Taxes) imposed on the Administrative Agent or Lender as a result of a present or former connection between the Administrative Agent or Lender and the jurisdiction imposing such Tax, and (iii) Taxes included under clauses (b), (c) or (d) of the definition of Excluded Taxes.

2.11    Intentionally Reserved.

2.12    <u>Change of Lending Office</u>.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of <u>Section 2.10(c)</u>, or <u>Section 5.4</u> with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event; <u>provided</u> that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section.  Nothing in this <u>Section 2.12</u> shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in <u>Section 2.10</u>.

2.13    <u>Notice of Certain Costs</u>.  Notwithstanding anything in this Agreement to the contrary, to the extent any notice required by <u>Section 2.10</u> or <u>Section 5.4</u> is given by any Lender more than 180 days after such Lender has knowledge (or should have had knowledge) of the occurrence of the event giving rise to the additional cost, reduction in amounts, loss, tax or other additional amounts described in such Sections, such Lender shall not be entitled to compensation under <u>Section 2.10</u> or <u>Section 5.4</u>, as the case may be, for any such amounts incurred or accruing prior to the 181st day prior to the giving of such notice to the Borrower; <u>provided</u> that if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

2.14    <u>Intentionally Reserved</u>.

2.15    <u>Defaulting Lenders</u>.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)    Unused Fees shall cease to accrue on the unfunded portion of the New-Money Commitment of such Defaulting Lender pursuant to <u>Section 4.1(b)</u>; and

(b)    the Commitment and Total Exposure of such Defaulting Lender shall not be included in determining whether all Lenders or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to <u>Section 13.1</u>); <u>provided</u> that any waiver, amendment or modification requiring the consent of all Lenders pursuant to <u>Section 13.1</u> (other than <u>Section 13.1(b)(vii)</u>) or requiring the consent of each affected Lender pursuant to <u>Section 13.1(a)(i)</u>, shall require the consent of such Defaulting Lender (which for the avoidance of doubt would include any change to the Maturity Date applicable to such Defaulting Lender, decreasing or forgiving any principal or interest due to such Defaulting Lender, any decrease of any interest rate applicable to Loans made by such Defaulting Lender (other than the waiving of the Default Rate) and any increase in such Defaulting Lender's Commitment).

2.16    <u>Priority and Liens</u>.  The Credit Parties hereby covenant, represent and warrant, upon entry of the DIP Order, the Obligations of the Credit Parties hereunder and under the other Credit Documents and under the Secured Hedge Agreements and the Secured Cash Management Agreements shall have the priority and Liens set forth in the DIP Order, in each case, subject to the Carve-Out and as further described in the DIP Order.

2.17    <u>Payment of Obligations</u>.  Subject to the DIP Orders, upon the occurrence of the Termination Date (whether at maturity, by acceleration or otherwise), the Lenders shall be entitled to immediate payment of the Obligations without further application to or order of the Bankruptcy Court.

2.18    <u>No Discharge; Survival of Claims</u>.  Each Credit Party agrees that (a) any Chapter 11 Plan or any related Confirmation Order entered in the Cases shall not discharge or otherwise affect in any way any of the Obligations of the Credit Parties to the Secured Parties under this Agreement and the related

Credit Documents, other than after the payment in full in cash to the Secured Parties of all of the Obligations under this Agreement, the Related Credit Documents, and the Existing Credit Documents (and the Cash Collateralization of all outstanding Letters of Credit in the amount required hereunder and subject to documentation reasonably satisfactory to the Letter of Credit Issuer and the related Credit Documents on or before the effective date of a Chapter 11 Plan and termination of the Commitments and (B) to the extent its Obligations under this Agreement, the other Credit Documents, and the Existing Credit documents are not satisfied in full, unless otherwise agreed to the Administrative Agent and the Existing Administrative Agent, (i) its Obligations arising under this Agreement, the related Credit Documents, and the Existing Credit Documents shall not be discharged by the entry of such Confirmation Order (and each Credit Party pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Administrative Agent, the Lenders, the Letter of Credit Issuer, the Hedge Bank, and the Cash Management Bank pursuant to the DIP Orders and the Liens granted to the Administrative Agent pursuant to the DIP Orders shall not be affected in any manner by the entry of such confirmation order.

SECTION 3.
LETTERS OF CREDIT

3.1    <u>Letters of Credit</u>. Subject to the terms and conditions set forth herein, including entry of the Final DIP Order, the Existing Letters of Credit under the Existing Credit Agreement shall be deemed to have been issued and to be outstanding hereunder and, on and after the date of entry of the Final DIP Order, shall constitute Letters of Credit for all purposes hereunder and under the Credit Documents and shall no longer be deemed to be outstanding under the Existing Credit Agreement. All Unpaid Drawings occurring after entry of the Interim DIP Order and prior to entry of the Final DIP Order approving the Roll-Up Loans shall automatically and irrevocably be deemed converted into Roll-Up Loans upon the entry of the Final Order. Any Unpaid Drawing occurring after the entry of the Final DIP Order approving the Roll-Up Loans shall immediately, automatically and irrevocably be deemed to constitute a Roll-Up Loan.

3.2    <u>Notice of Amendment</u>.

(a)    To request the amendment of a Letter of Credit the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Letter of Credit Issuer requested date of amendment, renewal or extension) a notice:

(i)    identifying the Letter of Credit to be amended;

(ii)    specifying the date of amendment (which shall be a Business Day);

(iii)    specifying the date on which such Letter of Credit shall be amended or extended to expire; <u>provided</u> that no Letter of Credit shall be renewed or extended except for automatic renewals as described in paragraph (b) below;

(iv)    specifying the outstanding amount of such Letter of Credit;

(v)    specifying the name and address of the beneficiary thereof and such other information as shall be necessary to amend, renew or extend such Letter of Credit; and

(vi)    specifying the current total Letter of Credit Exposures (without regard to the requested amendment) and the pro forma total Letter of Credit Exposures (after giving effect the requested amendment).

(b)    In no event shall the Borrower be permitted to request an increase in the Stated Amount, or a renewal or extension, of any Letter of Credit pursuant to this Section 3.2 except pursuant to the automatic renewal provisions of any such Letter of Credit.

(c)    For all purposes of this Agreement, the amount of a Letter of Credit that, by its terms or the terms of any document related thereto, provides for one or more automatic increases in the Stated Amount thereof shall be deemed to be the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at the time of determination; provided, however, that this provision does not constitute Letter of Credit Issuer's acceptance of such automatic increases.

3.3    Intentionally Reserved.

3.4    Agreement to Repay Letter of Credit Drawings.

(a)    The Borrower hereby agrees to reimburse the Letter of Credit Issuer, by making payment in Dollars to the Administrative Agent in immediately available funds, for any payment or disbursement made by the Letter of Credit Issuer under any Letter of Credit (each such amount so paid until reimbursed, an "Unpaid Drawing"), within one Business Day after the date on which such payment or disbursement is made, if the Letter of Credit Issuer provides notice to the Borrower of such payment or disbursement prior to 11:00 a.m. on the next succeeding Business Day of such payment or disbursement (such date for reimbursement, the "Reimbursement Date"), with interest on the amount so paid or disbursed by the Letter of Credit Issuer, to the extent not reimbursed prior to 5:00 p.m. on the Reimbursement Date, from the Reimbursement Date to the date the Letter of Credit Issuer is reimbursed therefor at a rate per annum that shall at all times be the Default Rate plus the ABR as in effect from time to time; provided that, notwithstanding anything contained in this Agreement to the contrary, unless the Borrower shall have notified the Administrative Agent and the relevant Letter of Credit Issuer prior to 10:00 a.m. on the Reimbursement Date that the Borrower intends to reimburse the relevant Letter of Credit Issuer for the amount of such drawing with funds other than the proceeds of Loans, the Borrower shall be deemed to have given a Notice of Borrowing requesting that, with respect to Letters of Credit, the Lenders make Loans (which shall be Roll-Up Loans) on the Reimbursement Date in the amount of such drawing.    Such Loans shall be made without regard to the Minimum Borrowing Amount.    The Administrative Agent shall use the proceeds of such Loans solely for purpose of reimbursing the Letter of Credit Issuer for the related Unpaid Drawing.    In the event that the Borrower fails to Cash Collateralize any Letter of Credit that is outstanding on the Maturity Date, the full amount of the Letters of Credit Outstanding in respect of such Letter of Credit shall be deemed to be an Unpaid Drawing subject to the provisions of this Section 3.4 except that the Letter of Credit Issuer shall hold the proceeds received from the Lenders as contemplated above as cash collateral for such Letter of Credit to reimburse any Drawing under such Letter of Credit and shall use such proceeds first, to reimburse itself for any Drawings made in respect of such Letter of Credit following the L/C Maturity Date, second, to the extent such Letter of Credit expires or is returned undrawn while any such cash collateral remains, to the repayment of obligations in respect of any Loans that have not paid at such time and third, to the Borrower or as otherwise directed by a court of competent jurisdiction.    Nothing in this Section 3.4(a) shall affect the Borrower's obligation to repay all outstanding Loans when due in accordance with the terms of this Agreement.

(b)    The obligations of the Borrower under this Section 3.4 to reimburse the Letter of Credit Issuer with respect to Unpaid Drawings (including, in each case, interest thereon) shall be absolute and unconditional under any and all circumstances and irrespective of any set-off, counterclaim or defense to payment that the Borrower or any other Person may have or have had against the Letter of Credit Issuer, the Administrative Agent or any Lender, including, without limitation, the following:

(i)     any defense based upon the failure of any drawing under a Letter of Credit (each a "Drawing") to conform to the terms of the Letter of Credit or any non-application or misapplication by the beneficiary of the proceeds of such Drawing;

(ii)     any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Credit Document;

(iii)     the existence of any claim, counterclaim, setoff, defense or other right that the Borrower or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the Letter of Credit Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iv)     any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(v)     waiver by the Letter of Credit Issuer of any requirement that exists for the Letter of Credit Issuer's protection and not the protection of the Borrower or any waiver by the Letter of Credit Issuer which does not in fact materially prejudice the Borrower;

(vi)     honor of a demand for payment presented electronically even if such Letter of Credit requires that demand be in the form of a draft;

(vii)     any payment made by the Letter of Credit Issuer in respect of an otherwise complying item presented after the date specified as the expiration date of, or the date by which documents must be received under such Letter of Credit if presentation after such date is authorized by the UCC, the ISP or the UCP, as applicable;

(viii)     any payment by the Letter of Credit Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the Letter of Credit Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any debtor relief law; or

(ix)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrower or any Subsidiary.

The Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Borrower's instructions or other irregularity, the Borrower will immediately notify the Letter of Credit Issuer. The Borrower shall be conclusively deemed to have waived any such claim against the Letter of Credit Issuer and its correspondents unless such notice is given as aforesaid.

3.5     Intentionally Reserved.

3.6     Intentionally Reserved.

3.7     Role of Letter of Credit Issuer.  Each Lender and the Borrower agree that, in paying any drawing under a Letter of Credit, the Letter of Credit Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  None of the Letter of Credit Issuer, the Administrative Agent, any of their respective Affiliates nor any correspondent, participant or assignee of the Letter of Credit Issuer shall be liable to any Lender for (a) any action taken or omitted in connection herewith at the request or with the approval of the Required Lenders, (b) any action taken or omitted in the absence of gross negligence or willful misconduct or (c) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document.  The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement.  None of the Letter of Credit Issuer, the Administrative Agent, any of their respective Affiliates nor any correspondent, participant or assignee of the Letter of Credit Issuer shall be liable or responsible for any of the matters described in this Section 3; provided that anything in such Section to the contrary notwithstanding, the Borrower may have a claim against the Letter of Credit Issuer, and the Letter of Credit Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower which the Borrower proves were caused by the Letter of Credit Issuer's willful misconduct or gross negligence or the Letter of Credit Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit.  In furtherance and not in limitation of the foregoing, the Letter of Credit Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and the Letter of Credit Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

3.8     Cash Collateral.

(a)     Upon the request of the Required Lenders if, as of the L/C Maturity Date, there are any Letters of Credit Outstanding, the Borrower shall immediately Cash Collateralize the then Letters of Credit Outstanding.  Concurrently with the closing of the Sale Transaction, the Credit Parties shall pay to the Administrative Agent cash in an amount equal to (i) one hundred five percent (105%) of any Letters of Credit Outstanding and (ii) the total amount of all Hedging Obligations, and the cash so paid to the Administrative Agent shall be used either to reimburse (x) the Letter of Credit Issuer for any Drawing on the Letters of Credit Outstanding or (y) the Hedge Banks on the Hedging Obligations, and any amounts in excess of the amounts reimbursed to the Letter of Credit Issuer and/or Hedge Banks shall be returned to the Credit Parties after there are no longer any Letters of Credit Outstanding or Hedging Obligations outstanding.

(b)     Intentionally Reserved.

(c)     For purposes of this Agreement, "Cash Collateralize" shall mean to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Letter of Credit Issuer and the Lenders, as collateral for the L/C Obligations, cash or deposit account balances in an amount equal to the amount of the Letters of Credit Outstanding required to be Cash Collateralized pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent and the Letter of Credit Issuer

(which documents are hereby consented to by the Lenders). Derivatives of such term have corresponding meanings. The Borrower hereby grants to the Administrative Agent, for the benefit of the Letter of Credit Issuer, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing. Such cash Collateral shall be maintained in blocked, interest bearing deposit accounts established by and in the name of the Borrower, but under the "control" (as defined in Section 9-104 of the UCC) of the Administrative Agent.

3.9     Applicability of ISP and UCP. Unless otherwise expressly agreed by the Letter of Credit Issuer and the Borrower when a Letter of Credit is issued, (a) the rules of the ISP shall apply to each standby Letter of Credit and (b) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance, shall apply to each commercial Letter of Credit. Notwithstanding the foregoing, the Letter of Credit Issuer shall not be responsible to the Borrower for, and the Letter of Credit Issuer's rights and remedies against the Borrower shall not be impaired by, any action or inaction of the Letter of Credit Issuer required or permitted under any law, order, or practice that is required or permitted to be applied to any Letter of Credit or this Agreement, including any Requirement of Law or any order of a jurisdiction where the Letter of Credit Issuer or the beneficiary is located, the practice stated in the ISP or UCP, as applicable, or in the decisions, opinions, practice statements, or official commentary of the ICC Banking Commission, the Bankers Association for Finance and Trade - International Financial Services Association (BAFT-IFSA), or the Institute of International Banking Law & Practice, whether or not any Letter of Credit chooses such law or practice.

3.10    Conflict with Issuer Documents. In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

3.11    Letters of Credit Issued for Guarantors. Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Guarantor, the Borrower shall be obligated to reimburse the Letter of Credit Issuer hereunder for any and all Drawings under such Letter of Credit. The Borrower hereby acknowledges that the issuance of Letters of Credit for the account of Guarantors inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of such Guarantors.

SECTION 4.
FEES; COMMITMENTS.

4.1     Fees.

(a)     Intentionally Reserved.

(b)     The Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Commitment Percentage, a commitment fee (the "Unused Fee") for each day from the Closing Date until the Termination Date. Each Unused Fee shall be payable by the Borrower (i) quarterly in arrears on the last Business Day of each March, June, September and December (for the three-month period (or portion thereof) ended on such day for which no payment has been received) and (ii) on the Termination Date (for the period ended on such date for which no payment has been received pursuant to clause (i) above), and shall be computed for each day during such period at a rate per annum equal to (x) 3.0% prior to the Availability Period, and (y) 2.5% during the Availability Period, in each case, on the New-Money Commitments.

(c)     The Borrower agrees to pay to each Letter of Credit Issuer a fee in respect of each Letter of Credit issued by it (the "Fronting Fee"), for the period from the date of issuance of such

Letter of Credit to the termination or expiration date of such Letter of Credit, computed at the rate for each day equal to 0.125% *per annum* on the daily Stated Amount of such Letter of Credit (or at such other rate *per annum* as agreed in writing between the Borrower and the Letter of Credit Issuer). Such Fronting Fees shall be due and payable by the Borrower (i) quarterly in arrears on the last Business Day of each March, June, September and December and (ii) on the Termination Date (for the period for which no payment has been received pursuant to clause (i) above).

(d)     The Borrower agrees to pay directly to the Letter of Credit Issuer upon each issuance of, drawing under, and/or amendment of, a Letter of Credit issued by it such amount as the Letters of Credit Issuer and the Borrower shall have agreed upon for issuances of, drawings under or amendments of, letters of credit issued by it.

(e)     The Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Commitment Percentage an upfront fee (the "Upfront Fee") equal to 3.0% of the aggregate principal amount of the New-Money Commitments provided hereunder (such may take the form of original issue discount at the election of the Required Lenders), which such Upfront Fee shall be earned, due and payable on the Closing Date. Notwithstanding the foregoing, no applicable original issue discount shall reduce the amount of Obligations.

(f)     The Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Commitment Percentage an exit fee (the "Exit Fee") in an amount equal to (x) 3.0 % prior to the Availability Period, and (y) 2.5% during the Availability Period, in each case, of (i) the amount of the reduction in New-Money Commitments (other than by reason of a Borrowing, but including any reduction resulting from a termination of the New-Money Commitment as contemplated in the definition of "Termination Date") and (ii) the principal amount of the New-Money Commitments prepaid or repaid, including, for the avoidance of doubt, any repayment following the Maturity Date or following any acceleration thereof. The Exit Fee shall be payable on the date of each such reduction of New-Money Commitments and/or payment or prepayment of New-Money Commitments, as applicable.

4.2     Voluntary Reduction of Commitments.

(a)     Upon at least two Business Days' prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent at the Administrative Agent's Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders), the Borrower shall have the right, without premium or penalty, on any day, permanently to terminate or reduce the Commitments, as determined by the Borrower, in whole or in part; provided that (i) any such termination or reduction shall apply proportionately and permanently to reduce the Commitments of each of the Lenders, (ii) any partial reduction pursuant to this Section 4.2 shall be in the amount of at least $500,000 and in multiples of $100,000 in excess thereof, and (iii) after giving effect to such termination or reduction and to any prepayments of the Loans made on the date thereof in accordance with this Agreement (including pursuant to Section 5.2(a)), the aggregate amount of all Lenders' Total Exposures shall not exceed the Total Commitment.

(b)     The Borrower may at any time terminate the Total Commitment upon (i) the payment in full of all outstanding Loans, together with accrued and unpaid interest thereon, (ii) the payment in full of the accrued and unpaid fees, and (iii) the payment in full of all reimbursable expenses and other Obligations (other than Hedge Obligations under Secured Hedge Agreements, Cash Management Obligations under Secured Cash Management Agreements and contingent indemnification obligations not then due and payable) together with accrued and unpaid interest thereon, as applicable.

4.3     Mandatory Termination of Commitments.  The Total Commitment shall terminate at 5:00 p.m. on the Termination Date.

SECTION 5.
PAYMENTS

5.1     Voluntary Prepayments.  The Borrower shall have the right to prepay Loans, without premium or penalty, in whole or in part from time to time on the following terms and conditions:

(a)     the Borrower shall give the Administrative Agent at the Administrative Agent's Office at least three (3) Business Days' written notice (or telephonic notice promptly confirmed in writing) of its intent to make such prepayment, the amount of such prepayment and the specific Borrowing(s) being prepaid, which notice shall be given by the Borrower no later than 1:00 p.m. on the date of such prepayment and shall promptly be transmitted by the Administrative Agent to each of the Lenders; and

(b)     each partial prepayment shall be in a minimum amount of $500,000 and in multiples of $100,000 in excess thereof.

Each such notice shall specify the date and amount of such prepayment.  At the Borrower's election in connection with any prepayment pursuant to this Section 5.1, such prepayment shall not be applied to any Loans of a Defaulting Lender.

5.2     Mandatory Prepayments.

(a)     Repayment Following Optional Reduction of Commitments.  If, after giving effect to any termination or reduction of the Commitments pursuant to Section 4.2(a), the aggregate Total Exposures of all Lenders exceeds the Total Commitment (as reduced), then the Borrower shall on the same Business Day (i) prepay the Loans on the date of such termination or reduction in an aggregate principal amount equal to such excess and (ii) if any excess remains after prepaying all of the Loans as a result of any Letter of Credit Exposure, pay to the Administrative Agent on behalf of the Letter of Credit Issuer an amount in cash equal to such excess to be held as Cash Collateral as provided in Section 3.8.

(b)     Dispositions; Net Cash Proceeds and Extraordinary Proceeds.  Subject to the Carve-Out, and the funding in full of the Carve-Out Reserve in accordance with the DIP Orders, unless waived by the Administrative Agent in its sole discretion (i) immediately upon any Disposition (other than a Disposition permitted by Section 10.4(a)) by the Credit Parties of any property, the Borrower shall immediately prepay the outstanding Loans in accordance with Section 5.2(c) in an amount equal to 100% of the net cash proceeds received by such Person in connection with such Disposition; provided, the Borrower shall only be required to prepay the outstanding Loans for net cash proceeds received in excess of $100,000 individually and $200,000 in the aggregate; provided, further, nothing contained in this Section 5.2(b) shall permit a Credit Party to sell or otherwise Dispose of any property other than in accordance with this Agreement, and (ii) immediately upon the receipt by a Credit Party of any Extraordinary Proceeds in any one or series of related events, the Borrower shall immediately prepay the outstanding Loans in accordance with Section 5.2(c) in an amount equal to 100% of such Extraordinary Proceeds, net of any reasonable expenses incurred in collecting such Extraordinary Proceeds; provided, the Borrower shall only be required to prepay the outstanding Loans for Extraordinary Proceeds received in excess of $100,000 individually and $200,000 in the aggregate.

(c)     Application to Loans.  With respect to each prepayment of Loans elected under Section 5.1 or required by Section 5.2, the Borrower may designate the Loans to be prepaid; provided that

(A) each prepayment of any Loans made pursuant to a Borrowing shall be first applied *pro rata* among the New-Money Loans, and second to the Roll-Up Loans and (B) notwithstanding the provisions of the preceding clause (A), no prepayment of Loans shall be applied to the Loans of any Defaulting Lender unless otherwise agreed in writing by the Borrower.  In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its reasonable discretion.

(d)     Application of Proceeds.  The application of proceeds pursuant to this Section 5.2 shall reduce the aggregate amount of Lenders' New-Money Commitments hereunder and amounts prepaid may be reborrowed subject to the New-Money Commitment.  Each prepayment under this Section 5.2 shall include a portion of the Exit Fee payable to each Lender in accordance with such Lender's Commitment Percentage of the New-Money Commitments.

5.3     Method and Place of Payment.

(a)     All payments under this Agreement shall be made by the Borrower without condition, set-off, counterclaim, recoupment or deduction of any kind, to the Administrative Agent for the ratable account of the Lenders entitled thereto not later than 2:00 p.m., in each case, on the date when due and shall be made in immediately available funds at the Administrative Agent's Office or at such other office as the Administrative Agent shall specify for such purpose by notice to the Borrower; it being understood that written or facsimile notice by the Borrower to the Administrative Agent to make a payment from the funds in the Borrower's account at the Administrative Agent's Office shall constitute the making of such payment to the extent of such funds held in such account.  All repayments or prepayments of any Loans (whether of principal, interest or otherwise) hereunder and all other payments under each Credit Document shall be made in Dollars.  The Administrative Agent will thereafter cause to be distributed on the same day (if payment was actually received by the Administrative Agent prior to 2:00 p.m. or, otherwise, on the next Business Day in the sole discretion of the Administrative Agent) like funds relating to the payment of principal or interest or fees ratably to the Lenders entitled thereto.

(b)     For purposes of computing interest or fees, any payments under this Agreement that are made later than 2:00 p.m. shall be deemed to have been made on the next succeeding Business Day in the sole discretion of the Administrative Agent.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

(c)     Unless the Administrative Agent shall have received notice from the Borrower by 2:00 p.m. on the day prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.  A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this subsection (c) shall be conclusive, absent manifest error.

5.4     Net Payments.

(a)    Any and all payments made by or on behalf of any Credit Party shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes; provided that if any withholding agent shall be required by applicable Requirements of Law to deduct or withhold any Taxes from such payments, then (i) if the amounts so withheld are Indemnified Taxes, the sum payable by the applicable Credit Party shall be increased as necessary so that after making all required deductions and withholdings (including deductions or withholdings applicable to additional sums payable under this Section 5.4) the Administrative Agent or any Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the withholding agent shall make such deductions or withholdings and (iii) the withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority within the time allowed and in accordance with applicable Requirements of Law.  Whenever any Indemnified Taxes are payable by any Credit Party, as promptly as possible thereafter, such Credit Party shall send to the Administrative Agent for its own account or for the account of the Letter of Credit Issuer or Lender, as the case may be, a certified copy of an original official receipt (or other evidence acceptable to such Lender, acting reasonably) received by such Credit Party showing payment thereof.

(b)    The Credit Parties shall jointly and severally timely pay and shall indemnify and hold harmless the Administrative Agent and each Lender (whether or not such Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority) with regard to any Other Taxes.

(c)    The Credit Parties shall indemnify and hold harmless the Administrative Agent and each Lender within 15 Business Days after written demand therefor, for the full amount of any Indemnified Taxes imposed on the Administrative Agent or such Lender as the case may be, on or with respect to any payment by or on account of any obligation of any Credit Party (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 5.4) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate setting forth reasonable detail as to the amount of such payment or liability delivered to the Borrower by a Lender or the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)    Any Lender that is entitled to an exemption from or reduction of any applicable withholding Tax with respect to payments under this Agreement or any other Credit Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(e)    Without limiting the generality of the foregoing, each Non-U.S. Lender with respect to any Loan made to the Borrower shall, to the extent it is legally entitled to do so:

(i)    deliver to the Borrower and the Administrative Agent, prior to the date on which the first payment to the Non-U.S. Lender is due hereunder, two copies of (A) in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding Tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", United States Internal Revenue Service Form W-8BEN or Form W-8BEN-E (or any applicable successor form) (together with a certificate representing that such Non-U.S. Lender is not a bank for purposes of

Section 881(c)(3)(A) of the Code, is not a 10% shareholder (within the meaning of Section 881(c)(3)(B) of the Code) of the Borrower, is not a controlled foreign corporation related to the Borrower (within the meaning of Section 881(c)(3)(C) of the Code) and the interest payments in question are not effectively connected with the United States trade or business conducted by such Lender (a "U.S. Tax Compliance Certificate") substantially in the form of Exhibit K-1), (B) Internal Revenue Service Form W-8BEN, Form W-8BEN-E or Form W-8ECI (or any applicable successor form), as applicable, in each case properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or reduced rate of, U.S. Federal withholding Tax on payments by the Borrower under this Agreement, (C) to the extent a non-U.S. Lender is not the beneficial owner, Internal Revenue Service Form W-8IMY (or any applicable successor form), a U.S. Tax Compliance Certificate substantially in the form of Exhibit K-2 or Exhibit K-3 (provided that if the non-U.S. Lender is a partnership and one or more direct or indirect partners of such non-U.S. Lender are claiming the portfolio interest exemption, such non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit K-4 on behalf of each direct and indirect partner) and all necessary attachments (including the forms described in clauses (A) and (B) above, as required) or (D) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made; and

    (ii)  deliver to the Borrower and the Administrative Agent two further copies of any such form or certification (or any applicable successor form) on or before the date that any such form or certification expires or becomes obsolete and after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower;

    (f)  unless in any such case any Change in Law has occurred prior to the date on which any such delivery would otherwise be required that renders any such form inapplicable or would prevent such Non-U.S. Lender from duly completing and delivering any such form with respect to it and such Non-U.S. Lender promptly so advises the Borrower and the Administrative Agent. Each Person that shall become a Participant pursuant to Section 13.6 or a Lender pursuant to Section 13.6 shall, upon the effectiveness of the related transfer, be required to provide all the forms and statements required pursuant to Section 5.4; provided that in the case of a Participant such Participant shall furnish all such required forms and statements to the Lender from which the related participation shall have been purchased. If any Lender or the Administrative Agent determines, in its sole discretion, exercised in good faith, that it has received a refund of an Indemnified Tax (including an Other Tax) for which a payment has been made by a Credit Party pursuant to this Agreement, then the Lender or the Administrative Agent shall reimburse such Credit Party for such amount (net of all out-of-pocket expenses of such Lender or the Administrative Agent, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund. Such Credit Party, upon the request of the Lender or the Administrative Agent, agrees to repay the amount paid over to such Credit Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender or the Administrative Agent in the event the Lender or the Administrative Agent is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. Neither the Lenders nor the Administrative Agent shall be obliged to disclose any information regarding its tax returns or tax affairs to any Credit Party in connection with this clause (f) or any other provision of this Section 5.4.

(g)     Each Lender and Agent with respect to the Loan and any other Loan made to the Borrower that is a United States person under Section 7701(a)(30) of the Code (each, a "U.S. Lender") shall deliver to the Borrower and the Administrative Agent two United States Internal Revenue Service Forms W-9 (or substitute or successor form), properly completed and duly executed, certifying that such Lender or Agent is exempt from United States backup withholding (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete, (iii) after the occurrence of a change in the Agent's or Lender's circumstances requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent, and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

(h)     If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (h), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(i)     The agreements in this Section 5.4 shall survive the termination of this Agreement, the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, and the payment, satisfaction, or discharge of the Loans and all other amounts payable hereunder.

5.5     Computations of Interest and Fees. Except as provided in the next succeeding sentence, Interest on the outstanding principal amount of Loans shall be calculated on the basis of a 360-day year for the actual days elapsed. Interest on ABR Loans in respect of which the rate of interest is calculated on the basis of the Administrative Agent's prime rate and interest on overdue interest shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed.

5.6     Limit on Rate of Interest.

(a)     No Payment Shall Exceed Lawful Rate. Notwithstanding any other term of this Agreement, the Borrower shall not be obligated to pay any interest or other amounts under or in connection with this Agreement or otherwise in respect to any of the Obligations in excess of the amount or rate permitted under or consistent with any applicable law, rule or regulation.

(b)     Payment at Highest Lawful Rate. If the Borrower is not obliged to make a payment that it would otherwise be required to make, as a result of Section 5.6(a), the Borrower shall make such payment to the maximum extent permitted by or consistent with applicable laws, rules and regulations.

(c)     Adjustment if Any Payment Exceeds Lawful Rate. If any provision of this Agreement or any of the other Credit Documents would obligate any Credit Party to make any payment of interest or other amount payable to the Administrative Agent or any Lender in an amount or calculated at a rate that would be prohibited by any applicable Requirement of Law, then notwithstanding such

provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable Requirements of Law, such adjustment to be effected, to the extent necessary, by reducing the amount or rate of interest required to be paid by the Borrower to the affected Lender under <u>Section 2.8</u>.

(d)    <u>Rebate of Excess Interest</u>. Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if the Administrative Agent or any Lender shall have received from any Credit Party an amount in excess of the maximum permitted by any applicable Requirement of Law, then such Credit Party shall be entitled, by notice in writing to the Administrative Agent to obtain reimbursement from the Administrative Agent, such Lender, as the case may be, in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by the Administrative Agent or such Lender to the Borrower.

SECTION 6.
CONDITIONS PRECEDENT TO INITIAL CREDIT EVENT.

The effectiveness of this Agreement, and the obligations of the Lenders to make the Initial New-Money Loan, is subject to the satisfaction of the following conditions precedent, except as otherwise agreed or waived pursuant to <u>Section 13.1</u>.

6.1    <u>Approved Budget</u>.    The Lenders shall have received the certified Approved Budget, which shall be in form and substance satisfactory to the Lenders.

6.2    <u>DIP Orders</u>. The Administrative Agent (with copy to the Lenders) shall have received a certified copy of the Interim DIP Order, which Interim DIP Order (i) shall have been entered on the docket of the Bankruptcy Court on or before the Closing Date and within the time period set forth in clause (a) of the definition of "Milestone", and (ii) shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated (in the case of a modification or amendment, in a manner that is adverse to the interests of the Administrative Agent or the Lenders in any respect). Additionally, (a) the Interim DIP Order shall include provisions that create Liens upon the Collateral in favor of the Administrative Agent and the Lenders securing all of the Obligations, which shall be deemed valid and perfected as of the Petition Date by entry of the Interim DIP Order with respect to each Credit Party and which shall constitute continuing Liens on the Collateral in favor of the Administrative Agent. The Administrative Agent and the Lenders shall not be required to file or record (but shall have the option and each of the Credit Parties hereby grants the Administrative Agent the authority to file or record) any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the Liens and security interest granted by or pursuant to this Agreement, the DIP Orders or any other Credit Document.

(b)    Pursuant to Section 364(c)(1) of the Bankruptcy Code, the Obligations of the Credit Parties shall at all times constitute allowed Superpriority Claims against each of the Credit Parties in the Cases (without the need to file any proof of claim), with priority over any and all claims against the Credit Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 365, 503(b), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including Adequate Protection Payments), whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, which Superpriority Claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code, and which Superpriority Claims shall be payable from and have recourse to all pre- and post-petition property of the Credit Parties and all proceeds thereof (excluding the Credit Parties' claims and causes of action under Sections 502(d), 506(c), 544, 545, 547, 550 and 553 of the Bankruptcy Code and

under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and similar statutes or common law, and any commercial tort claims (collectively, the "Avoidance Actions"), which for the avoidance of doubt, excludes each Credit Party's claims and causes of action under Section 549 of the Bankruptcy Code or similar state or other applicable law and the proceeds of each of the foregoing), but including, upon entry of the Final DIP Order, any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise (the "Avoidance Proceeds"), subject to the Carve-Out. The Superpriority Claims shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that the Interim DIP Order or any provision thereof is vacated, reversed or modified, on appeal or otherwise. The Superpriority Claims shall be *pari passu* in right of payment with one another and senior to the Adequate Protection Payments; provided, that the Superpriority Claims in respect of the Roll-Up Loans shall be subject and subordinate to the Superpriority Claims in respect of the New-Money Loans.

6.3    Credit Documents. The Administrative Agent shall have received:

(a)    this Agreement, executed and delivered by a duly Authorized Officer of each of the Borrower, the Administrative Agent and each Lender;

(b)    the Guarantee, executed and delivered by a duly Authorized Officer of each Person that is a Guarantor as of the Closing Date;

(c)    the Security Agreement, executed and delivered by a duly Authorized Officer of the Borrower, all other grantors party thereto, the Administrative Agent and each Person that is a Guarantor as of the Closing Date; and

(d)    the Pledge Agreements, each executed and delivered by a duly Authorized Officer of the Administrative Agent and each Pledgor party thereto as of the Closing Date.

6.4    Representations. On the Closing Date, the representations and warranties of the Credit Parties in the Credit Documents shall be true and correct in all material respects.

6.5    Closing Certificates. The Administrative Agent shall have received a certificate of the Credit Parties, dated the Closing Date, in form and substance reasonably satisfactory to the Administrative Agent, with appropriate insertions, executed by the Chief Operations Officer or Chief Financial Officer of each Credit Party, and attaching the documents referred to in Section 6.6 and such other closing certificates as it may reasonably request.

6.6    Authorization of Proceedings of Each Credit Party; Organizational Documents. The Administrative Agent shall have received (a) a copy of the resolutions, in form and substance reasonably satisfactory to the Administrative Agent, of the Board of Directors of each Credit Party (or a duly authorized committee thereof) authorizing (i) the execution, delivery and performance of the Credit Documents (and any agreements relating thereto) to which it is a party and (ii) in the case of the Borrower, the extensions of credit contemplated hereunder, (b) true and complete copies of each of the organizational documents of each Person that is a Credit Party as of the Closing Date and (c) a copy of a good standing certificate of each Person that is a Credit Party as of the Closing Date, dated a date reasonably close to the Closing Date.

6.7    Cash Collateral. The Credit Parties shall have expended all available Cash Collateral of the Lenders in excess of $5,000,000 prior to (or contemporaneously with) making any requests for Loans hereunder.

6.8    <u>Perfected Security Interest</u>.  The Administrative Agent for the benefit of the Secured Parties shall be satisfied in their sole discretion that the Interim DIP Order or Security Documents required to be executed on the Closing Date create (or will create, upon proper filing, recording or registration thereof, or upon entry of, the Interim DIP Order) a valid and perfected security interest in the Collateral.

6.9    <u>Fees</u>.  The Existing Agent, the Administrative Agent, the Existing Lenders, and the Lenders shall have received the reasonable and documented prepetition and post-petition fees and expenses incurred by them in connection with the Chapter 11 Cases as required by the Interim DIP Order, including, without limitation, the Professional Fees of the Existing Agent, the Administrative Agent, the Existing Lenders, and the Lenders and the reasonable fees, disbursements and other charges of counsel to the Arranger, Administrative Agent and Lenders) payable by the Credit Parties.

6.10    <u>Reserve Report</u>.  The Lenders shall have received the Initial Reserve Report, and any supplementary information reasonably requested by the Administrative Agent necessary to determine the existence and location of all Proved Reserves of the Borrower and the Guarantors included in the Initial Reserve Report as of the Closing Date.

6.11    <u>No Default; Representations and Warranties</u>.  At the time of the Initial New-Money Loan, and also after giving effect thereto (i) no material adverse change has occurred in the Credit Parties' operations, performance or properties (in each case, with respect to the financial condition, environmental matters, or otherwise) since April 12, 2019 that in the reasonable judgment of the Administrative Agent and the Lenders, has or can reasonably be expected to have a Material Adverse Effect on the (A) rights and remedies of the Administrative Agent or the Lenders or (B) the ability of the Credit Parties to perform their obligations under this Agreement, (ii) satisfaction of all conditions precedent set forth in <u>Section 6</u> and (iii) all representations and warranties made by any Credit Party contained herein or in the other Credit Documents shall be true and correct in all material respects (or, to the extent that a particular representation or warranty is qualified as to materiality, such representation or warranty shall be true and correct) with the same effect as though such representations and warranties had been made on and as of the date of such Credit Event (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or, to the extent that a particular representation or warranty is qualified as to materiality, such representation or warranty shall be true and correct) as of such earlier date).

6.12    <u>Notice of Borrowing</u>.

(a)    Prior to the making of the Initial New-Money Loan, the Administrative Agent shall have received a written Notice of Borrowing meeting the requirements of <u>Section 2.3</u>.

(b)    The acceptance of the benefits of the Initial New-Money Loan shall constitute a representation and warranty by each Credit Party to each of the Lenders that all the applicable conditions specified in <u>Section 7</u> have been satisfied as of that time.

Without limiting the generality of the provisions of <u>Section 12.3</u>, for purposes of determining compliance with the conditions specified in this <u>Section 6</u>, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

SECTION 7.
CONDITIONS PRECEDENT TO CREDIT EVENTS.

The agreement of each Lender to make the Additional New-Money Loans requested to be made by it from time to time on any date during the Availability Period is subject to the satisfaction of the following conditions precedent, except as otherwise agreed or waived pursuant to Section 13.1:

7.1     Additional New-Money Loans.  The Administrative Agent (with copy to the Lenders) shall have received (a) a certified copy of the Final DIP Order, which Final DIP Order (i) shall have been entered on the docket of the Bankruptcy Court on or before the date any Additional New-Money Loans are requested and within the time period set forth in clause (a) of the definition of "Milestone", and (ii) shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is adverse to the interests of the Administrative Agent or the Lenders, and (b) an order approving the stalking horse bidder shall have been entered on the docket of the Bankruptcy Court on or before the date set forth in clause (f) of the definition of "Milestone", which shall provide for, among other things, the satisfaction of the Minimum Repayment Condition, on terms and conditions acceptable to the Administrative Agent and the Existing Administrative Agent in their sole discretion.

7.2     No Default; Representations and Warranties.  At the time of each Credit Event and also after giving effect thereto (i) no material adverse change has occurred in the Credit Parties' operations, performance or properties (in each case, with respect to the financial condition, environmental matters, or otherwise) since April 12, 2019 that in the reasonable judgment of the Administrative Agent and the Lenders, has or can reasonably be expected to have a Material Adverse Effect on the (A) rights and remedies of the Administrative Agent or the Lenders or (B) the ability of the Credit Parties to perform their obligations under this Agreement, (ii) satisfaction of all conditions precedent set forth in Section 6 and (iii) all representations and warranties made by any Credit Party contained herein or in the other Credit Documents shall be true and correct in all material respects (or, to the extent that a particular representation or warranty is qualified as to materiality, such representation or warranty shall be true and correct) with the same effect as though such representations and warranties had been made on and as of the date of such Credit Event (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or, to the extent that a particular representation or warranty is qualified as to materiality, such representation or warranty shall be true and correct) as of such earlier date).

7.3     Notice of Borrowing.

(a)     Prior to the making of each Loan, the Administrative Agent shall have received a written Notice of Borrowing meeting the requirements of Section 2.3.

(b)     The acceptance of the benefits of each Credit Event shall constitute a representation and warranty by each Credit Party to each of the Lenders that all the applicable conditions specified in Section 7 have been satisfied as of that time.

SECTION 8.
REPRESENTATIONS, WARRANTIES AND AGREEMENTS.

In order to induce the Lenders to enter into this Agreement, to make the Loans and issue or participate in Letters of Credit as provided for herein, the Borrower makes (on the Closing Date and on each other date as required or otherwise set forth in this Agreement) the following representations and

warranties to, and agreements with, the Lenders, all of which shall survive the execution and delivery of this Agreement and the making of the Loans and the issuance of the Letters of Credit:

8.1    <u>Corporate Status</u>.    Each Credit Party (a) is a duly organized and validly existing corporation or other entity in good standing under the laws of the jurisdiction of its organization and has the corporate or other organizational power and authority to own its property and assets and to transact the business in which it is engaged and (b) has duly qualified and is authorized to do business and is in good standing (if applicable) in all jurisdictions where it is required to be so qualified, except where the failure to have such power and authority or to be so qualified would not reasonably be expected to result in a Material Adverse Effect.

8.2    <u>Corporate Power and Authority; Enforceability</u>.    Each Credit Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Credit Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Credit Documents to which it is a party. Each Credit Party has duly executed and delivered each Credit Document to which it is a party and each such Credit Document constitutes the legal, valid and binding obligation of such Credit Party enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity whether considered in a proceeding in equity or law).

8.3    <u>No Violation</u>.    None of the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party, the compliance with the terms and provisions thereof or the consummation of the transactions contemplated hereby or thereby will (a) contravene any applicable provision of any material Requirement of Law, (b) result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien upon any of the property or assets of such Credit Party (other than DIP Liens created under the Credit Documents) pursuant to the terms of any material indenture, loan agreement, lease agreement, mortgage, deed of trust, agreement or other material instrument to which such Credit Party is a party or by which it or any of its property or assets is bound (any such term, covenant, condition or provision, a "<u>Contractual Requirement</u>") except to the extent such contravention breach, default or Lien that would not reasonably be expected to result in a Material Adverse Effect or (c) violate any provision of the certificate of incorporation, by-laws or other organizational documents of such Credit Party.

8.4    <u>Litigation</u>.    Except as set forth on <u>Schedule 8.4</u>, there are no actions, suits or proceedings (including Environmental Claims) pending or, to the knowledge of the Borrower, threatened with respect to the Credit Parties that would reasonably be expected to result in a Material Adverse Effect.

8.5    <u>Margin Regulations</u>.    Neither the making of any Loan hereunder nor the use of the proceeds thereof will violate the provisions of Regulation T, Regulation U or Regulation X of the Board. No part of the proceeds of any Borrowing will be used for purchasing or carrying directly or indirectly "margin stock" (as such term is defined or used, directly or indirectly, in Regulation U of the Board).

8.6    <u>Approvals</u>.    The execution, delivery and performance of each Credit Document do not require any consent or approval of, registration or filing with, or other action by, any Governmental Authority or any other Person, except for (a) such as have been obtained or made and are in full force and effect, (b) filings and recordings in respect of the Liens created pursuant to the Security Documents and (c) such licenses, approvals, authorizations or consents the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

8.7    <u>Investment Company Act</u>.  No Credit Party is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

8.8    <u>True and Complete Disclosure</u>.

(a)    None of the written factual information and written data (taken as a whole) furnished by or on behalf of the Borrower, any of the Subsidiaries or any of their respective authorized representatives to the Administrative Agent and/or any Lender heretofore or hereafter (including all such information and data contained in the Credit Documents) for purposes of or in connection with this Agreement or any transaction contemplated herein contained any untrue statement of any material fact or omitted to state any material fact necessary to make such information and data (taken as a whole) not materially misleading at such time (after giving effect to all supplements so furnished prior to such time) in light of the circumstances under which such information or data was furnished; it being understood and agreed that for purposes of this <u>Section 8.8(a)</u>, except for the Approved Budget, such factual information and data shall not include *pro forma* financial information, projections or estimates (including financial estimates, forecasts and other forward-looking information) and information of a general economic or general industry nature (collectively, "<u>Pro Forma Projections</u>").

(b)    The projections (including financial estimates, forecasts and other forward-looking information) contained in the information and data referred to in <u>Section 8.8(a)</u> were based on good faith estimates and assumptions believed by the Borrower to be reasonable at the time made; it being recognized by the Administrative Agent and the Lenders that such projections are as to future events and are not to be viewed as facts, the projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrower and the Subsidiaries, that no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projections may differ from the projected results and such differences may be material.

8.9    <u>Financial Condition; Financial Statements</u>.

(a)    The Historical Financial Statements present fairly in all material respects the consolidated financial position of the Borrower and its consolidated Subsidiaries at the date of such information and for the period covered thereby and have been prepared in accordance with GAAP consistently applied except to the extent provided in the notes thereto, if any.  The Borrower has heretofore furnished to the Lenders a *pro forma* unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of the Closing Date, after giving effect to the making of the initial extensions of credit hereunder, the application of the proceeds thereof and to the Transactions contemplated to occur on the Closing Date, certified by an Authorized Officer of the Borrower.  The *pro forma* financial statement described above presents fairly, in all material respects, the financial position of the Borrower and its consolidated Subsidiaries as of the Closing Date.  After the Closing Date, there has been no Material Adverse Effect.

(b)    As of the Closing Date, neither the Borrower nor any Guarantor has any material Indebtedness (including Disqualified Stock) or any material contingent liabilities, off balance sheet liabilities or partnerships, liabilities for Taxes or unusual forward or long-term commitments that, in each such case, are not reflected or provided for in the Historical Financial Statements.

8.10    <u>Tax Matters</u>.  Except where the failure of which would not be reasonably expected to have a Material Adverse Effect, (a) each of the Borrower and the Subsidiaries has filed all federal income Tax returns and all other Tax returns, domestic and foreign, required to be filed by it and has paid all material Taxes payable by it that have become due, other than those (i) not yet delinquent or (ii) contested

in good faith as to which adequate reserves have been provided to the extent required by law and in accordance with GAAP and (b) the Borrower and each of the Subsidiaries have paid, or have provided adequate reserves in accordance with GAAP for the payment of, all federal, state, provincial and foreign Taxes applicable for the current fiscal year.

8.11    Compliance with ERISA.

(a)    An "ERISA Event" means any of the following: (i) the failure of any Plan (other than a Multiemployer Plan) or any Multiemployer Plan to comply with ERISA, the Code, and any applicable Requirement of Law; (ii) a Reportable Event has occurred (or is reasonably likely to occur) with respect to any Plan; (iii) a determination that a Multiemployer Plan is "insolvent" (within the meaning of Section 4245 of ERISA) or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA), or a written notice of any such insolvency or status has been given to the Borrower or any ERISA Affiliate; (iv) the failure of any Plan (other than a Multiemployer Plan) to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Plan (or the filing of an application for a waiver of the minimum funding standards with respect to any Plan pursuant to Section 412(c) of the Code or Section 302(c) of ERISA), or a determination that any such Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (v) the Borrower or any ERISA Affiliate has incurred (or is reasonably likely to incur) any liability to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4203, 4204, or 4205 of ERISA or Section 4971 or 4975 of the Code or receipt by the Borrower or any ERISA Affiliate of notice in writing that it will incur any liability under any of the foregoing Sections with respect to any Plan; (vi) a proceeding has been instituted (or is reasonably likely to be instituted) to terminate any Plan or to appoint a trustee to administer any Plan, or written notice of any such proceedings has been given to the Borrower or any ERISA Affiliate; and (vii) a Lien has been imposed under Section 430(k) of the Code or Section 303(k) or Section 4068 of ERISA on the assets of the Borrower or any ERISA Affiliate (or is reasonably likely to be imposed), or the Borrower or any ERISA Affiliate has been notified in writing that such a Lien will be imposed on the assets of the Borrower or any ERISA Affiliate on account of any Plan.  Except as would not result, individually or in the aggregate, in a Material Adverse Effect, no ERISA Event has occurred or is reasonably likely to occur.  No Plan (other than a Multiemployer Plan) has an Unfunded Current Liability that would, individually or when taken together with any other liabilities referenced in this Section 8.11(a), be reasonably likely to have a Material Adverse Effect.

(b)    There are no Foreign Plans.

8.12    Subsidiaries.  Schedule 8.12 lists each Subsidiary of the Borrower (and the direct and indirect ownership interest of the Borrower therein), in each case existing on the Closing Date.

8.13    Parent Company Ownership.  Schedule 8.13 lists each direct ownership interest in the Parent Company existing on the Closing Date, including the percentage of ownership.

8.14    Environmental Laws.

(a)    Except as would not reasonably be expected to have a Material Adverse Effect: (i) the Borrower and each of the Subsidiaries and all Oil and Gas Properties, are in compliance with all Environmental Laws; (ii) neither the Borrower nor any Subsidiary has received written notice of any Environmental Claim or any other liability under any Environmental Law; (iii) neither the Borrower nor any Subsidiary is conducting any investigation, removal, remedial or other corrective action pursuant to any Environmental Law at any location; and (iv) no underground storage tank or related piping, or any impoundment or disposal area containing Hazardous Materials has been used by the Credit Parties or, to

the knowledge of the Borrower, is located at, on or under any Oil and Gas Properties currently owned or leased by the Credit Parties.

(b)     Except as would not reasonably be expected to have a Material Adverse Effect, neither the Borrower nor any of the Subsidiaries has treated, stored, transported, released or disposed or arranged for disposal or transport for disposal of Hazardous Materials at, on, under or from any currently or formerly owned or leased Oil and Gas Properties or facility in a manner that could reasonably be expected to give rise to liability of the Borrower or any Subsidiary under Environmental Law.

8.15    Properties.

(a)     Except as set forth on Schedule 8.15, the Borrower and each Guarantor has good and defensible title to the Oil and Gas Properties evaluated in the most recently delivered Reserve Report (other than those (i) disposed of in compliance with Section 10.4 since delivery of such Reserve Report, (ii) leases that have expired in accordance with their terms and (iii) with title defects disclosed in writing to the Administrative Agent), and good title to all its material personal properties, in each case, free and clear of all Liens other than Liens permitted by Section 10.2.  After giving full effect to the Liens permitted by Section 10.2, the Borrower or the Guarantor specified as the owner owns the working interests and net revenue interests in production attributable to the Hydrocarbon Interests as reflected in the most recently delivered Reserve Report, and the ownership of such properties shall not in any material respect obligate the Borrower or such Guarantor to bear the costs and expenses relating to the maintenance, development and operations of each such property in an amount in excess of the working interest of each property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in the Borrower's or such Guarantor's net revenue interest in such property.

(b)     All material leases and agreements necessary for the conduct of the business of the Borrower and the Guarantors are valid and subsisting, in full force and effect, except to the extent that any such failure to be valid or subsisting would not reasonably be expected to have a Material Adverse Effect.

(c)     The rights and properties presently owned, leased or licensed by the Borrower and the Guarantors including all easements and rights of way, include all rights and properties necessary to permit such Credit Parties to conduct their respective businesses as currently conducted, except to the extent any failure to have any such rights or properties would not reasonably be expected to have a Material Adverse Effect.

(d)     All of the properties of the Borrower and the Guarantors that are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with prudent business standards, except to the extent any failure to satisfy the foregoing would reasonably be expected to have a Material Adverse Effect.

(e)     Except for those as could not be reasonably expected to have a Material Adverse Effect, the wells comprising a part of the Oil and Gas Properties (or properties unitized therewith) of a Credit Party are bottomed under and are producing from, and the well bores are wholly within, the relevant Oil and Gas Properties or appropriate zones (or in the case of wells located on properties unitized therewith, such unitized properties) of a Credit Party.

8.16    Insurance.  The properties of the Borrower and the Guarantors are insured in the manner contemplated by Section 9.3.

8.17   Violations of Law.  No Credit Party is in violation of any applicable Requirement of Law except for such violations that could not reasonably be expected to have a Material Adverse Effect.

8.18   Gas Imbalances, Prepayments.  On the Closing Date, except as set forth on Schedule 8.19, on a net basis, there are no gas imbalances, take or pay or other prepayments exceeding 5% of Hydrocarbon volumes (stated on a gas equivalent basis) in the aggregate, with respect to the Oil and Gas Properties of Borrower and the Guarantors that would require any such Credit Party to deliver Hydrocarbons either generally or produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

8.19   Marketing of Production.  On the Closing Date, except as set forth on Schedule 8.20, no agreements exist (which are not cancelable on 60 days' notice or less without penalty or detriment) for the sale of production of Hydrocarbons of the Borrower and the Guarantors at a fixed price (including calls on, or other rights to purchase, production, whether or not the same are currently being exercised) that have (a) represent in respect of such agreements 2.5% or more of the Credit Parties' average monthly production of Hydrocarbon volumes or (b) have a maturity or expiry date of longer than six (6) months from the Closing Date.

8.20   Hedge Agreements.  Schedule 8.21 sets forth, as of the Closing Date, a true and complete list of all commodity Hedge Agreements of Borrower and each Guarantor, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark to market value thereof (as of the last Business Day of the most recent fiscal quarter preceding the Closing Date and for which a mark to market value is reasonably available), all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

8.21   Use of Proceeds.  The Borrower's uses of the proceeds of the Loans and of Letters of Credit are consistent with Section 9.12.

8.22   Primary Business.  The Borrower and its Subsidiaries are engaged primarily in the business of acquiring, Disposing, owning, exploring, developing and operating Oil and Gas Properties and the gathering, marketing, processing and transporting of Hydrocarbons produced therefrom and businesses incidental or related thereto.

8.23   Patriot Act.  On the Closing Date, each Credit Party is in compliance in all material respects with the material provisions of the Patriot Act, and the Borrower has provided to the Administrative Agent all information related to the Credit Parties (including but not limited to names, addresses and tax identification numbers (if applicable)) reasonably requested in writing by the Administrative Agent and mutually agreed to be required by the Patriot Act to be obtained by the Administrative Agent or any Lender.

8.24   Sanctions Laws and Regulations.  The Borrower has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, members, officers, managers, employees and agents with Anti-Corruption Laws and Sanctions applicable to the Borrower and its Subsidiaries, and the Borrower, its Subsidiaries and their respective officers and directors, and to the knowledge of the Borrower, their respective employees and agents are in compliance with Anti-Corruption Laws and Sanctions applicable to the Borrower and its Subsidiaries in all material respects.  None of (a) the Borrower, any Subsidiary or, to the knowledge of the Borrower or such Subsidiary, any of their respective directors, members, officers, managers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby is a Sanctioned Person.

8.25    <u>EEA Financial Institutions</u>.  No Credit Party is an EEA Financial Institution.

SECTION 9.
AFFIRMATIVE COVENANTS.

The Borrower hereby covenants and agrees that on the Closing Date and thereafter, until the Termination Date:

9.1    <u>Information Covenants</u>.  The Borrower will furnish to the Administrative Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a)    <u>Annual Financial Statements</u>.  As soon as available and in any event within five (5) days after the date on which such financial statements are required to be filed with the SEC (after giving effect to any permitted extensions) (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 120 days after the end of each such fiscal year), beginning with the financial statements for the fiscal year ending December 31, 2018, the audited consolidated balance sheets of the Parent Company and the Subsidiaries and the related consolidated statements of operations, shareholders' equity and cash flows for such fiscal year, setting forth comparative consolidated figures for the preceding fiscal years, all in reasonable detail and prepared in accordance with GAAP.

(b)    <u>Quarterly Financial Statements</u>.  As soon as available and in any event within five (5) days after the date on which such financial statements are required to be filed with the SEC (after giving effect to any permitted extensions) with respect to each of the first three quarterly accounting periods in each fiscal year of the Parent Company (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 60 days after the end of each such quarterly accounting period), beginning with the financial statements for the fiscal quarter ending March 31, 2019, the consolidated balance sheets of the Parent Company and the its Subsidiaries as at the end of such quarterly period and the related consolidated statements of operations for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period, shareholders' equity and the related consolidated statement of cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period, and setting forth comparative consolidated figures for the related periods in the prior fiscal year or, in the case of such consolidated balance sheet, for the last day of the prior fiscal year, all of which shall be certified by an Authorized Officer of the Parent Company as fairly presenting in all material respects the financial condition, results of operations, equity holders' equity and cash flows, of the Parent Company and its consolidated Subsidiaries in accordance with GAAP.

(c)    <u>Officer's Certificates</u>.  At the time of the delivery of the financial statements provided for in <u>Section 9.1(a)</u> and <u>9.1(b)</u>, a certificate of a Financial Officer of the Borrower to the effect that no Default or Event of Default exists or, if any Default or Event of Default does exist, specifying the nature and extent thereof, which certificate shall set forth beginning with the fiscal period ending March 31, 2019, the calculations required to establish whether the Borrower and its Subsidiaries were in compliance with the Financial Performance Covenants as at the end of such fiscal year or period, as the case may be.

(d)    <u>Monthly Operating Reports</u>.  Substantially concurrently with the filing thereof with the Bankruptcy Court, the monthly operating report of the Credit Parties required to be filed with the Bankruptcy Court and (i) a financial forecast model including an income statement, balance sheet and statement of cash flows, in each case in form and substance acceptable to the Administrative Agent, (ii) all required Reserve Reports prepared and delivered in accordance with this Agreement, and (iii) a Variance Report on a weekly roll forward basis on the days set forth under <u>Section 9.1(n)</u>.

(e)    <u>Weekly Cash Balance Report</u>. On the first Business Day of each week, a report detailing the amount of, without duplication, unrestricted cash available to the Borrower, in form and substance acceptable to the Administrative Agent in its sole discretion.

(f)    <u>Motions, etc.</u>  As soon as reasonably practicable in advance of filing or distribution, copies of all pleadings and motions to be filed by or on behalf of the Credit Parties with the Bankruptcy Court in the Cases relating to this Agreement, the Existing Credit Agreement, the Sale Transaction or a Chapter 11 Plan, or otherwise seeking any form of relief that impacts or affects any of the rights of the Administrative Agent, the Lenders the Existing Administrative Agent or the Existing Lenders.

(g)    <u>Notice of Default; Litigation</u>. Promptly after an Authorized Officer of the Borrower or any of the Guarantors obtains actual knowledge thereof, notice of:

(i)    the occurrence of any event that constitutes a Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

(ii)    any litigation or governmental proceeding pending against the Borrower or any of the Guarantors that could reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect; and

(iii)    any other event that could reasonably be expected to result in a Material Adverse Effect.

(h)    <u>Environmental Matters</u>. Promptly after obtaining actual knowledge of any one or more of the following environmental matters, unless such environmental matters would not, individually, or when aggregated with all other such matters, be reasonably expected to result in a Material Adverse Effect, notice of:

(i)    any pending or threatened Environmental Claim against any Credit Party or any Oil and Gas Properties;

(ii)    any condition or occurrence on any Oil and Gas Properties that (A) could reasonably be expected to result in noncompliance by any Credit Party with any applicable Environmental Law or (B) could reasonably be anticipated to form the basis of an Environmental Claim against any Credit Party or any Oil and Gas Properties;

(iii)    any condition or occurrence on any Oil and Gas Properties that (A) would reasonably be expected to result in material noncompliance by any Credit Party with any applicable Environmental Law or (B) would reasonably be anticipated to cause such Oil and Gas Properties to be subject to any restrictions on the ownership, occupancy, use or transferability of such Oil and Gas Properties under any Environmental Law; and

(iv)    the conduct of any investigation, or any removal, remedial or other corrective action in response to the actual or alleged presence, release or threatened release of any Hazardous Material on, at, under or from any Oil and Gas Properties.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the response thereto.

(i)    Other Information.  Promptly upon filing thereof, copies of any filings (including on Form 10-K, 10-Q or 8-K) or registration statements with, and reports to, the SEC or any analogous Governmental Authority in any relevant jurisdiction by the Borrower or any of the Subsidiaries (other than amendments to any registration statement (to the extent such registration statement, in the form it becomes effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statements on Form S-8) and copies of all financial statements, proxy statements, notices and reports that the Borrower or any of the Subsidiaries shall send to the holders of any publicly issued debt of the Borrower and/or any of the Subsidiaries, in each case in their capacity as such holders, lenders or agents (in each case to the extent not theretofore delivered to the Administrative Agent pursuant to this Agreement) and, with reasonable promptness, such other information (financial or otherwise) as the Administrative Agent on its own behalf or on behalf of any Lender (acting through the Administrative Agent) may reasonably request in writing from time to time.

(j)    Certificate of Authorized Officer - Hedge Agreements.  Concurrently with the delivery of each Reserve Report (including the Initial Reserve Report), a certificate of an Authorized Officer of the Borrower, setting forth as of the last Business Day of the most recently ended fiscal year or period, as applicable, a true and complete list of all commodity Hedge Agreements of the Borrower and each Guarantor, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value thereof (as of the last Business Day of such fiscal year or period, as applicable and for which a mark to-market value is reasonably available), any new credit support agreements relating thereto not listed on Schedule 8.21 or on any previously delivered certificate delivered pursuant to this Section 9.1(j), any margin required or supplied under any credit support document and the counterparty to each such agreement, and supporting calculations to confirm compliance with Section 9.18.

(k)    Certificate of Authorized Officer - Gas Imbalances.  Concurrently with the delivery of each Reserve Report, a certificate of an Authorized Officer of the Borrower, certifying that as of the last Business Day of the most recently ended fiscal year or period, as applicable, except as specified in such certificate, on a net basis, there are no gas imbalances, take or pay obligations or other prepayment obligations exceeding 5% of Hydrocarbon volumes (stated on a gas equivalent basis) in the aggregate, with respect to the Oil and Gas Properties of the Borrower and Guarantors that would require any such Credit Party to deliver Hydrocarbons either generally or produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

(l)    Certificate of Authorized Officer - Production Report and Lease Operating Statement.  Concurrently with the delivery of each Reserve Report, a certificate of an Authorized Officer of the Borrower, setting forth, for each calendar month during the then current fiscal year to date, the volume of production of Hydrocarbons and sales attributable to production of Hydrocarbons (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Oil and Gas Properties, and setting forth the related ad valorem, severance and production Taxes and lease operating expenses attributable thereto for each such calendar month.

(m)    Lists of Purchasers.  At the time of the delivery of the financial statements provided for in Section 9.1(a), a certificate of an Authorized Officer of the Borrower setting forth a list of Persons purchasing Hydrocarbons from a Credit Party who collectively account for at least 85% of the revenues resulting from the sale of all Hydrocarbons from the Borrower and such Guarantors during the fiscal year for which such financial statements relate.

(n)    Budget; Variance Reports.

(i) <u>Budget</u>. No later than 12:00 a.m. on Wednesday of each week starting with the first full calendar week following the Petition Date, the Borrower may propose an updated budget (the "<u>Proposed DIP Budget</u>") to the Administrative Agent, (i) which such report, certified in accordance with <u>Section 10.12</u>, shall set forth in comparative form the projected cash receipts and disbursements of the Credit Parties for the succeeding thirteen-week period, for all collections and disbursements, consistent in form and substance (other than Dollar amounts) with the Approved Budget delivered pursuant to <u>Section 6.1</u>. Each Proposed DIP Budget and the Approved Budget delivered pursuant to <u>Section 6.1</u> shall be accompanied by a certificate from a Financial Officer of the Borrower certifying that such projections were prepared in good faith on the basis of the assumptions stated herein, which assumptions were believed by the preparer thereof to be reasonable at the time prepared. The Administrative Agent and the Required Lenders may approve such Proposed DIP Budget, which will then become the "Approved Budget" then in effect in their sole and absolute discretion; provided that if the Proposed DIP Budget is not approved by the Administrative Agent and the Lenders, the Approved Budget that was last approved by the Administrative Agent and the Lenders shall continue to be in effect. Notwithstanding the foregoing, the Borrower may not modify allocations between line items within the Approved Budget without the prior written authorization of the Administrative Agent and the Lenders. The budget shall report Professional Fees of the Credit Parties on an accrual basis without regard to allowance by the Bankruptcy Court or any required holdback.

(ii) <u>First Variance Report</u>. No later than 12:00 a.m. on the first Tuesday following the Closing Date, including on an interim basis, the Credit Parties shall deliver to the Administrative Agent an initial variance report (the "<u>First Variance Report</u>"). The First Variance Report shall measure performance against the first week of the Approved Budget and shall include calculations that demonstrate that the Credit Parties are in compliance with <u>Section 10.12(b)</u> for the preceding week.

(iii) <u>Second Variance Report</u>. No later than 12:00 a.m. on the second Tuesday following the Closing Date, the Credit Parties shall deliver to the Administrative Agent a second variance report (the "<u>Second Variance Report</u>"). The Second Variance Report shall measure performance against the first and second week of the Approved Budget (provided, however, that the second week may be revised relative to the Approved Budget as provided hereunder and as approved by the Administrative Agent and the Required Lenders in their sole discretion) and shall include calculations that demonstrate that the Credit Parties are in compliance with <u>Section 10.12(b)</u> in aggregate for the prior two weeks.

(iv) <u>Third Variance Report</u>. No later than 12:00 a.m. on the third Tuesday following the Closing Date, the Credit Parties shall deliver to the Administrative Agent a third variance report (the "<u>Third Variance Report</u>"). The Third Variance Report shall measure performance against the first, second and third week of the Approved Budget (provided, however, that the second and third weeks may be revised relative to the Approved Budget as provided hereunder and as approved by the Administrative Agent and the Required Lenders in their sole discretion) and shall include calculations that demonstrate that the Credit Parties are in compliance with <u>Section 10.12(b)</u> in aggregate for the prior three weeks.

(v) <u>Rolling Variance Reports</u>. Following the delivery of the Third Variance Report, and in any event no later than each successive Tuesday of each week thereof, the Credit Parties shall deliver to the Administrative Agent a variance report (the "<u>Rolling Variance Report</u>"). The Rolling Variance Report shall include calculations that demonstrate that the Credit Parties are in compliance with <u>Section 10.12(b)</u>.

(o)     <u>Certificate of Authorized Officer - Marketing Agreements</u>.  Concurrently with any delivery of each Reserve Report, a certificate of an Authorized Officer of the Borrower, setting forth as of the last Business Day of the most recently ended fiscal year or period, as applicable, a true and complete list of all material marketing agreements (which are not cancellable on 60 days' notice or less without penalty or detriment) for the sale of production of the Hydrocarbons of the Borrower and the Guarantors at a fixed price (including calls on, or other parties rights to purchase, production, whether or not the same are currently being exercised) that have a maturity date or expiry date of longer than six months from the last day of such fiscal year or period, as applicable.

(p)     <u>Notice of Waiver, Default, Amendment, Modification or Termination of LLC Agreement</u>.  Promptly after an Authorized Officer of the Borrower or any of the Guarantors obtains actual knowledge thereof, notice of any waiver, amendment, default, modification or termination of the LLC Agreement.

(q)     <u>Notice of Hedge Liquidations</u>.  In the event that the Borrower or any Subsidiary receives any notice of early termination of any Hedging Agreement to which it is a party from any of its counterparties, or any Hedging Agreement to which a Credit Party is a party is subject to a Hedge Liquidation, prompt written notice of the receipt of such early termination notice or such Hedge Liquidation (and in the case of a voluntary Hedge Liquidation of any Hedging Agreement, prompt written notice thereof), as the case may be, setting forth in reasonable detail, (i) the effect of such Hedge Liquidation on the aggregate notional volume of crude oil, natural gas and natural gas liquids, subject to the Borrower's and its Subsidiaries' Hedge Agreements and (ii) the amount of net cash proceeds received by such Credit Party as a result of such Hedge Liquidation.

(r)     <u>Intentionally Reserved</u>.

(s)     <u>Notice of Hedge Agreement Modifications</u>.  Prompt written notice of any amendment to or other modification of any Hedge Agreement or the terms thereof since the delivery of the last certificate pursuant to <u>Section 9.1(j)</u> (including a summary of the terms of such amendment or modification and the net mark-to-market value therefor).

(t)     <u>Update Calls</u>.  Host regular conference calls (which shall occur no less than once during each week, and more frequently as requested by the advisors to the Administrative Agent and the Lenders), for the Credit Parties to provide updates as to the Credit Parties' liquidity and other developments and information regarding the Cases, business, operations, business affairs and financial condition.

It is understood that documents required to be delivered pursuant to <u>Sections 9.1(a)</u> through <u>(l)</u> may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto to the Administrative Agent and the Lenders on the Borrower's website on the Internet at the website address listed on <u>Schedule 13.2</u>, (ii) on which such documents are posted on the Borrower's behalf on IntraLinks, Debtdomain or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent) and on which the Administrative Agent and the Lenders have been notified of such or (iii) on which such documents are transmitted by electronic mail to the Administrative Agent; <u>provided</u> that: (A) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents delivered pursuant to <u>Section 9.1</u> to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (B) the Borrower shall, contemporaneously with the posting and/or delivery of such documents set forth in this paragraph, notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such

documents and provide to the Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

9.2  <u>Books, Records and Inspections</u>.

(a)  The Borrower will, and will cause each Guarantor to, permit officers and designated representatives of the Administrative Agent or the Required Lenders (as accompanied by the Administrative Agent), in each case who agree to be subject to the customary safety policies and procedures of the Borrower, to visit and inspect any of the properties or assets of the Borrower or such Guarantor in whomsoever' s possession to the extent that it is within such party's control to permit such inspection (and shall use commercially reasonable efforts to cause such inspection to be permitted to the extent that it is not within such party's control to permit such inspection), and to examine the books and records of the Borrower and any such Guarantor and discuss the affairs, finances and accounts of the Borrower and of any such Guarantor with, and be advised as to the same by, its and their officers and independent accountants, upon reasonable advance notice to the Borrower, all at such reasonable times and intervals during normal business hours and to such reasonable extent as the Administrative Agent or the Required Lenders may desire (and subject, in the case of any such meetings or advice from such independent accountants, to such accountants' customary policies and procedures).  The Administrative Agent and the Required Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  Notwithstanding anything to the contrary in this <u>Section 9.2(a)</u>, none of the Borrower nor any Subsidiary shall be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by any Requirement of Law or (iii) is subject to attorney-client or similar privilege or constitutes attorney work-product.

(b)  The Borrower will, and will cause each of the Subsidiaries to, maintain proper books of record and account, in which entries that are full, true and correct in all material respects and in conformity with GAAP consistently applied.

9.3  <u>Maintenance of Insurance</u>.  The Borrower will, and will cause each Guarantor to, at all times maintain in full force and effect, pursuant to self-insurance arrangements or with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management of the Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment of management of the Borrower) is reasonable and prudent in light of the size and nature of its business; and will furnish to the Administrative Agent, upon written request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried.  The Secured Parties shall be the additional insureds on any such liability insurance as their interests may appear and, if property insurance is obtained, the Administrative Agent shall be the loss payee under any such property insurance; provided that, so long as no Event of Default has occurred and is then continuing, the Secured Parties will provide any proceeds of such property insurance to the Borrower.

9.4  <u>Payment of Taxes</u>.  The Borrower will pay and discharge, and will cause each of the Subsidiaries to pay and discharge, all material Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on

which material penalties attach thereto, and all lawful material claims in respect of any Taxes imposed, assessed or levied that, if unpaid, could reasonably be expected to become a Lien upon any properties of the Borrower or any of the Subsidiaries; provided that neither the Borrower nor any of the Subsidiaries shall be required to pay any such Tax, assessment, charge, levy or claim that is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with, GAAP and the failure to pay would not reasonably be expected to result in a Material Adverse Effect.

9.5    Consolidated Corporate Franchises.  The Borrower will do, and will cause each Guarantor to do, or cause to be done, all things necessary to preserve and keep in full force and effect its existence, corporate rights and authority, except to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect; provided, however, that the Borrower and its Subsidiaries may consummate any transaction permitted under Section 10.3, Section 10.4 or Section 10.5.

9.6    Compliance with Statutes, Regulations, Etc.  The Borrower will, and will cause each Guarantor to, comply with all Requirements of Law applicable to it or its property, including all governmental approvals or authorizations required to conduct its business, and to maintain all such governmental approvals or authorizations in full force and effect, in each case except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  The Borrower will maintain in effect policies and procedures reasonably designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and Sanctions applicable to the Borrower and its Subsidiaries.

9.7    ERISA.

(a)    Promptly after the Borrower or any ERISA Affiliate knows or has reason to know of the occurrence of any ERISA Event that, individually or in the aggregate (including in the aggregate such events previously disclosed or exempt from disclosure hereunder, to the extent the liability therefor remains outstanding), would be reasonably likely to have a Material Adverse Effect, the Borrower will deliver to the Administrative Agent a certificate of an Authorized Officer or any other senior officer of the Borrower setting forth details as to such occurrence and the action, if any, that the Borrower or such ERISA Affiliate is required or proposes to take, together with any notices (required, proposed or otherwise) given to or filed with or by the Borrower or such ERISA Affiliate the PBGC, a Plan participant (other than notices relating to an individual participant's benefits) or the Plan administrator with respect thereto.

(b)    Promptly following any request therefor, the Borrower will deliver to the Administrative Agent copies of (i) any documents described in Section 101(k) of ERISA that the Borrower and any of its Subsidiaries or any ERISA Affiliate may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l) of ERISA that the Borrower and any of its Subsidiaries or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided, that if the Borrower, any of its Subsidiaries or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the Borrower, the applicable Subsidiary(ies) or the ERISA Affiliate(s) shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices to the Administrative Agent promptly after receipt thereof.

9.8    Maintenance of Properties.  The Borrower will, and will cause each of the Guarantors to:

(a)    operate its Oil and Gas Properties and other material properties or cause such Oil and Gas Properties and other material properties to be operated in accordance with the practices of the

industry and in compliance with all applicable Contractual Requirements and all applicable Requirements of Law, including applicable proration requirements and Environmental Laws, and all applicable Requirements of Law of every other Governmental Authority from time to time constituted to regulate the development and operation of its Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom, except, in each case, where the failure to so comply would not reasonably be expected to result in a Material Adverse Effect;

(b)     keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its material Oil and Gas Properties and other material properties, including all equipment, machinery and facilities; and

(c)     to the extent a Credit Party is not the operator of any property, the Borrower shall use reasonable efforts to cause the operator to comply with this Section 9.8.

9.9     Intentionally Reserved.

9.10     End of Fiscal Years; Fiscal Quarters.   The Borrower will, for financial reporting purposes, cause (a) each of its, and each of its Subsidiaries', fiscal years to end on December 31 of each year and (b) each of its, and each of its Subsidiaries', fiscal quarters to end on dates consistent with such fiscal year-end; provided, however, that the Borrower may, upon written notice to the Administrative Agent, change the financial reporting convention specified above to any other financial reporting convention reasonably acceptable to the Administrative Agent, in which case the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary in order to reflect such change in financial reporting.

9.11     Additional Guarantors, Grantors and Collateral.

(a)     Subject to any applicable limitations set forth in the Guarantee or the Security Documents, the Borrower will cause any direct or indirect Subsidiary formed or otherwise purchased or acquired after the Closing Date, in each case, within 10 Business Days from the date of such formation, acquisition or cessation, as applicable (or such longer period as the Administrative Agent may agree in its sole discretion), to execute a supplement to each of the Guarantee, the Security Agreement and the Pledge Agreement, substantially in the form of Annex A or Exhibit H, as applicable to the respective agreement in order to become a Guarantor under the Guarantee, a grantor under the Security Agreement, and/or a pledgor under such Pledge Agreement, as applicable.

(b)     Subject to any applicable limitations set forth in the Pledge Agreement to which it is a party, the Borrower will pledge, and, if applicable, will cause each other Guarantor (or Person required to become a Guarantor pursuant to Section 9.11(a)) to pledge, to the Administrative Agent, for the benefit of the Secured Parties, (i) all of the Stock (other than any Excluded Stock) of each Subsidiary directly owned by a Credit Party (or Person required to become a Guarantor pursuant to Section 9.11(a)), in each case, formed or otherwise purchased or acquired after the Closing Date, pursuant to a supplement to such Pledge Agreement substantially in the form of Annex A thereto and, (ii) all evidences of Indebtedness for borrowed money (other than intercompany Indebtedness of a Credit Party) in a principal amount in excess of $5,000,000 (individually) that is owing to a Credit Party (or Person required to become a Guarantor pursuant to Section 9.11(a)) (which shall be evidenced by a promissory note), in each case pursuant to a supplement to such Pledge Agreement substantially in the form of Annex A thereto.

(c)     The Borrower agrees that all Indebtedness of the Borrower and each of its Subsidiaries that is owing to any Credit Party (or a Person required to become a Guarantor pursuant to

Section 9.11(a)) shall be evidenced by an intercompany promissory note, which promissory note shall be required to be pledged to the Administrative Agent, for the benefit of the Secured Parties, pursuant to the Pledge Agreements.

(d)     Intentionally Reserved.

(e)     Concurrently with delivery of the documents described in Section 9.11(a) above (or such longer period of time as the Administrative Agent may agree in its sole discretion), the Borrower agrees to deliver, if requested by the Administrative Agent, favorable opinions from legal counsel reasonably acceptable to the Administrative Agent with respect to (i) any new Guarantor covering the matters covered by the opinions on the Closing Date with respect to the original Guarantors and (ii) any mortgages filed in jurisdictions other than jurisdictions in which opinions have been delivered with respect to such Person's Oil and Gas Properties, confirming that such Collateral is subject to Mortgages securing Obligations that constitute and create legal, valid and duly perfected Liens in such properties, and covering such other matters as the Administrative Agent may reasonably request.

(f)     The Borrower will at all times cause the other material tangible and intangible assets of the Borrower and each Subsidiary, including all Oil and Gas Properties to be subject to a DIP Lien pursuant to the Security Documents and the DIP Orders.

9.12   Use of Proceeds.   On and after the Closing Date, the Borrower will use the Loans solely for the following, in each case subject to the terms, conditions and amounts herein and the agreed Approved Budget (collectively, the "Approved Purposes"):

(a)     Adequate Protection Payments;

(b)     working capital and general corporate purposes approved in the Approved Budget; provided that up to $50,000 shall be made available to the Committee for investigation costs in respect of any Existing Obligations and Liens in accordance with the DIP Orders;

(c)     Bankruptcy Court approved administrative expenses for estate professionals; and

(d)     such other expenses to which all the Lenders may consent in writing in their sole discretion.

As between Loans hereunder and the Cash Collateral, the Cash Collateral shall be used first for Approved Purposes unless otherwise agreed by all of the Lenders in writing in their sole discretion. As set forth in the DIP Orders, no portion of the Loans or the Collateral (including any Cash Collateral) shall be used (i) to challenge the amount, validity, perfection, priority, extent or enforceability of the Obligations or the Existing Obligations, (ii) to investigate or assert any other claims or causes of action against the any Lender, any Existing Lender or their respective agents, Affiliates, Subsidiaries, directors, officers, representatives, attorneys or advisors or (iii) fund acquisitions, Capital Expenditures or any other expenditure other than as set forth in the Approved Budget. The Borrower and its Subsidiaries are not engaged principally, or as one of its or their important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation T, U or X of the Board). No part of the proceeds of any Loan or Letter of Credit will be used for any purpose which violates the provisions of Regulations T, U or X of the Board.

9.13   Further Assurances.   Subject to the applicable limitations set forth in the Security Documents, the Borrower will, and will cause each other Credit Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including

the filing and recording of financing statements, fixture, filings, assignments of as-extracted collateral, mortgages, deeds of trust and other documents) that may be required under any applicable Requirements of Law, or that the Administrative Agent or the Required Lenders may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the DIP Liens and security interests created or intended to be created by the applicable Security Documents, all at the expense of the Borrower and the Guarantors.

9.14    Reserve Reports.

(a)    On or before March 15th and September 15th of each year, commencing March 15, 2018, the Borrower shall furnish to the Administrative Agent a Reserve Report, as of the immediately preceding December 31st and June 30th. The Reserve Report as of December 31 of each year shall be prepared by one or more Approved Petroleum Engineers, and the Reserve Report as of June 30 of each year shall be prepared, at the option of the Borrower, (i) by the Borrower, any Subsidiary of the Borrower or the Parent Company and, in each case, under the supervision of the chief engineer of the Parent Company and an Authorized Officer of the Borrower shall certify such Reserve Report to be true and accurate in all material respects and, except as otherwise specified therein, to have been prepared in all material respects in accordance with the procedures used in the immediately preceding December 31 Reserve Report or the Initial Reserve Report, if no December 31 Reserve Report has been delivered or (ii) by one or more Approved Petroleum Engineers.

(b)    The Borrower shall furnish to the Administrative Agent a Reserve Report prepared by or under the supervision of the chief engineer of the Parent Company and an Authorized Officer of the Borrower shall certify such Reserve Report to be true and accurate in all material respects and to have been prepared, except as otherwise specified therein, in all material respects in accordance with the procedures used in the immediately preceding December 31 Reserve Report or the Initial Reserve Report, if no December 31 Reserve Report has been delivered.

(c)    With the delivery of each Reserve Report, the Borrower shall provide to the Administrative Agent a Reserve Report Certificate from an Authorized Officer of the Borrower certifying that in all material respects:

(i)    in the case of Reserve Reports prepared by or under the supervision of the chief engineer of the Parent Company, such Reserve Report has been prepared, except as otherwise specified therein, in accordance with the procedures used in the immediately preceding December 31 Reserve Report or the Initial Reserve Report, if no December 31 Reserve Report has been delivered;

(ii)    other than with respect to Pro Forma Projections, the information contained in the Reserve Report and any other information delivered in connection therewith is true and correct in all material respects; with respect to Pro Forma Projections, such Pro Forma Projections were based on good faith estimates and assumptions believed by the Borrower or any Approved Petroleum Engineer, as applicable, to be reasonable at the time made; it being recognized by the Administrative Agent and the Lenders that such projections are as to future events and are not to be viewed as facts, the projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrower and the Subsidiaries, that no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projections may differ from the projected results and such differences may be material;

(iii)     except as set forth in an exhibit to such certificate, the Borrower or another Credit Party has good and defensible title to the Oil and Gas Properties evaluated in such Reserve Report (other than those (A) Disposed of in compliance with <u>Section 10.4</u> since the date of such Reserve Report, (B) leases that have expired in accordance with their terms and (C) with title defects disclosed in writing to the Administrative Agent) and such Oil and Gas Properties are free of all Liens except for Liens permitted by <u>Section 10.2</u>;

(iv)     except as set forth on an exhibit to such certificate or previously disclosed to the Administrative Agent in writing, as of the date of such Reserve Report, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in <u>Section 8.18</u> with respect to the Credit Parties' Oil and Gas Properties evaluated in such Reserve Report that would require the Borrower or any other Credit Party to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor;

(v)     none of the Oil and Gas Properties have been Disposed since the date of the immediately preceding Reserve Report to the date of the Reserve Report being delivered, except those Oil and Gas Properties listed on such certificate as having been Disposed; and

(vi)     the certificate shall also attach, as schedules thereto, a list of as of the last Business Day of the most recently ended fiscal year or period, as applicable, all material marketing agreements entered into subsequent to the later of the Closing Date and the most recently delivered Reserve Report for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other parties rights to purchase, production, whether or not the same are currently being exercised) that (1) represent in respect of such agreements 2.5% or more of the Credit Parties' average monthly production of Hydrocarbon volumes and (2) have a maturity date or expiry date of longer than six (6) months from the last day of such fiscal year or period, as applicable, and are not cancellable on 60 days' notice or less without penalty or detriment.

9.15     <u>Title Information</u>.

(a)     On or before the delivery to the Administrative Agent of each Reserve Report required by <u>Section 9.14(a)</u>, the Borrower will use commercially reasonably effort to deliver title information in form and substance reasonably acceptable to the Administrative Agent and consistent with usual and customary standards for the geographic regions in which the Oil and Gas Properties are located covering enough of the Oil and Gas Properties evaluated by such Reserve Report that were not included in the immediately preceding Reserve Report, so that the Administrative Agent shall have received together with title information previously delivered to the Administrative Agent, reasonably satisfactory title information on 85% of the total value of the Oil and Gas Properties evaluated by such Reserve Report.

(b)     If title information for additional properties has been provided under <u>Section 9.15(a)</u> and the Administrative Agent shall provide written notice to the Borrower that title defects or exceptions exist with respect to such additional properties (to the extent that such title defects or exceptions are not otherwise permitted under this agreement), then the Borrower shall, within 60 days of its receipt of such notice (or such longer period as the Administrative Agent may agree in its sole discretion) cure any such title defects or exceptions raised by such information.

9.16     <u>Commodity Exchange Act Keepwell Provisions</u>.  Each Qualified ECP Guarantor hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or

other support as may be needed from time to time by each other Credit Party to honor all of its obligations under the Credit Documents in respect of Swap Obligations (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under any Guarantee voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations and undertakings of each Qualified ECP Guarantor under this Section 9.16 shall remain in full force and effect until the Obligations have been indefeasibly paid and performed in full and the Commitments are terminated. Each Credit Party intends this Section 9.16 to constitute, and this Section 9.16 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each other Credit Party for all purposes of the Commodity Exchange Act.

9.17    Intentionally Reserved.

9.18    Minimum Hedge Agreements.  Within thirty (30) days after the Closing Date (or such later date as may be reasonably agreed by the Administrative Agent) the Borrower shall enter into and maintain at all times thereafter Hedge Agreements (other than for speculative purposes) in respect of commodities the net notional volumes for which (when aggregated with other commodity Hedge Agreements then in effect, other than puts, floors and basis differential swaps on volumes already hedged pursuant to other Hedge Agreements) equal at least as of the date of the date of the latest hedging transaction is entered into under a Hedge Agreement, 75% of the reasonably anticipated Hydrocarbon production for oil from the Credit Parties' total Proved Developed Producing Reserves as forecast based upon the most recent Reserve Report delivered pursuant to Section 9.14 for each month during the 24 month period from the date such Hedging Agreement is entered into.

SECTION 10.
NEGATIVE COVENANTS.

The Borrower hereby covenants and agrees that on the Closing Date and thereafter, until the Termination Date:

10.1    Limitation on Indebtedness.  The Borrower will not, and will not permit any of the Guarantors to, create, incur, assume or suffer to exist any Indebtedness other than the following:

(a)    Indebtedness arising under the Credit Documents and the Existing Credit Documents;

(b)    Indebtedness of a Credit Party owing to a Credit Party;

(c)    Indebtedness in respect of any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business or consistent with past practice or industry practice (including (i) in respect of workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims and (ii) letters of credit provided as Credit Support under, and as defined in, the ETC Agreements);

(d)    Intentionally Reserved;

(e)    Guarantee Obligations (i) incurred in the ordinary course of business or consistent with past practice or industry practice in respect of obligations (excluding Indebtedness) of (or to) suppliers, customers, franchisees, lessors, licensees or sublicensees, or (ii) any guarantee by an Affiliate of the Borrower required by the ETC Agreements;

(f)      Indebtedness (including Indebtedness arising under Capital Leases) incurred to finance the acquisition, construction, lease, repair, replacement expansion, or improvement of such fixed or capital assets; provided that the aggregate amount of Indebtedness incurred at any time outstanding shall not exceed $1,000,000;

(g)      Indebtedness outstanding on the date hereof listed on Schedule 10.1;

(h)      Indebtedness in respect of Hedge Agreements, subject to the limitations set forth in Section 10.11;

(i)      Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations not in connection with money borrowed (including, for the avoidance of doubt, any Credit Support required by, and as defined in, the ETC Agreements), in each case provided in the ordinary course of business or consistent with past practice or industry practice, including those incurred to secure health, safety and environmental (including plugging and abandonment) obligations in the ordinary course of business or consistent with past practice or industry practice;

(j)      Cash Management Services and other Indebtedness in respect of netting services, automatic clearing house arrangements, employees' credit or purchase cards, overdraft protections and similar arrangements, in each case incurred in the ordinary course of business or consistent with past practice or industry practice;

(k)      Indebtedness incurred in the ordinary course of business or consistent with past practice or industry practice in respect of obligations of a Credit Party to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services;

(l)      Indebtedness of a Credit Party consisting of (i) obligations to pay insurance premiums or (ii) obligations contained in firm transportation or supply agreements, in each case arising in the ordinary course of business or consistent with past practice or industry practice;

(m)      Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Borrower (or, to the extent such work is done for a Credit Party, any direct or indirect parent thereof) and the Guarantors incurred in the ordinary course of business or consistent with past practice or industry practice;

(n)      Indebtedness associated with bonds or surety obligations required by Requirements of Law or by Governmental Authorities in connection with the operation of Oil and Gas Properties in the ordinary course of business or consistent with past practice or industry practice;

(o)      Indebtedness of a Credit Party to any joint venture (regardless of the form of legal entity) that is not a Subsidiary arising in the ordinary course of business or consistent with past practice or industry practice in connection with the Cash Management Services (including with respect to intercompany self-insurance arrangements) of the Borrower and its Subsidiaries;

(p)      Indebtedness consisting of the undischarged balance of any Production Payments and Reserve Sales; and

(q)      all premiums (if any), interest (including post-petition interest), fees, expenses, charges, and additional or contingent interest on obligations described in clauses (a) through (p) above

10.2   <u>Limitation on Liens</u>.  The Borrower will not, and will not permit any of the Guarantors to, create, incur, assume or suffer to exist any Lien upon any property or assets of any kind (real or personal, tangible or intangible) of a Credit Party, whether now owned or hereafter acquired, except:

(a)   DIP Liens arising under the Credit Documents to secure the Obligations (including Liens contemplated by <u>Section 3.8</u>);

(b)   Permitted Liens;

(c)   Liens securing Indebtedness permitted pursuant to <u>Section 10.1(f)</u>; <u>provided</u> that (A) such Liens attach concurrently with or within 270 days after completion of the acquisition, construction, repair, replacement, expansion or improvement (as applicable) of the property subject to such Liens and (B) such Liens attach at all times only to the assets so financed except (1) for accessions to the property financed with the proceeds of such Indebtedness and the proceeds and the products thereof and (2) that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(d)   Liens existing on the date hereof to the extent such Lien is listed on <u>Schedule 10.2</u>; <u>provided</u> that (i) such Lien shall not apply to any property or asset of a Credit Party other than the property subject to such Lien on the date hereof and (ii) such Lien shall secure only those obligations of a Credit Party which it secures on the date hereof and extensions, renewals and replacements of such obligations that do not increase the outstanding principal amount thereof;

(e)   Liens (i) of a collecting bank arising under Section 4-210 of the UCC on items in the course of collection, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business or consistent with past practice or industry practice and (iii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off);

(f)   Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods entered into by the Borrower or any of the Guarantors in the ordinary course of business or consistent with past practice or industry practice permitted by this Agreement;

(g)   Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to brokerage accounts incurred in the ordinary course of business or consistent with past practice or industry practice and not for speculative purposes;

(h)   Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(i)   the prior right of consignees and their lenders under consignment arrangements entered into in the ordinary course of business;

(j)   Liens securing Indebtedness or other obligations of the Borrower or a Guarantor in favor of a Credit Party;

(k)   agreements to subordinate any interest of a Credit Party in any accounts receivable or other proceeds arising from inventory consigned by a Credit Party pursuant to an agreement entered into in the ordinary course of business;

(l)    Liens securing any Indebtedness permitted by <u>Section 10.1(j)</u> (as long as such Liens attach only to cash and securities and securities held by the relevant Cash Management Bank); and

(m)    Liens on Stock in a joint venture securing obligations of such joint venture so long as the assets of such joint venture do not constitute Collateral.

10.3    <u>Limitation on Fundamental Changes</u>.  Except as permitted by <u>Section 10.4</u> or <u>Section 10.5</u>, the Borrower will not, and will not permit any of the Guarantors to, enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of, in one transaction or a series of related transactions, all or substantially all its business units, assets or other properties, except that:

(a)    Intentionally Reserved;

(b)    Intentionally Reserved;

(c)    Intentionally Reserved;

(d)    Subject to the approval of the Bankruptcy Court, the Credit Parties may enter into the Sale Transactions;

(e)    any Guarantor may liquidate or dissolve if (i) the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders and (ii) any assets or business of such Guarantor not otherwise Disposed of or transferred in accordance with <u>Section 10.4</u> or <u>10.5</u>, in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, the Borrower or a Guarantor after giving effect to such liquidation or dissolution; and

(f)    the Borrower and the Guarantors may consummate a merger, dissolution, liquidation, amalgamation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to <u>Section 10.4</u> or an Investment permitted by <u>Section 10.5</u>.

10.4    <u>Limitation on Sale of Assets</u>.  The Borrower will not, and will not permit any of the Guarantors to, (w) convey, sell, lease, sell and leaseback, assign, farm-out, transfer or otherwise dispose (each of the foregoing a "<u>Disposition</u>") of any of its property, business or assets (including receivables and leasehold interests), whether now owned or hereafter acquired or (x) sell to any Person (other than the Borrower or a Guarantor) any shares owned by it of any Guarantor's Stock and Stock Equivalents, or (y) in the case of any Guarantor, issue any Stock or Stock Equivalents (excluding Disqualified Stock issued pursuant to <u>Section 10.1</u>, other than preferred securities) of such Guarantor to any other Person (other than to the Borrower or a Guarantor) or (z) enter into or permit to exist any Hedge Liquidation except that:

(a)    the Borrower and the Guarantors may Dispose of (i) equipment that is obsolete, worn out, used or surplus, in the ordinary course of business or consistent with past practice or industry practice, that is no longer necessary for the business of the Borrower or such Guarantor and is replaced by equipment of at least comparable value and use) and (ii) sales of Hydrocarbons inventory and other goods for sale in the ordinary course of business;

(b)    the Borrower and the Guarantors may make Dispositions to the Borrower or any other Guarantor;

(c)    to the extent constituting a Disposition, the Borrower and any Guarantor may effect any transaction permitted by Sections 10.3, 10.4, 10.5, or 10.6; and

(d)    Dispositions of accounts receivable in connection with the collection or compromise thereof in the ordinary course of business.

Notwithstanding anything to the contrary herein contained, 100% of the consideration received in respect of such Disposition shall be cash or Permitted Investments.  Neither the Borrower nor any Guarantor will discount, sell, pledge or assign any notes payable to it, accounts receivable or future income except for Dispositions permitted by Section 10.4(d).

10.5    Limitation on Investments.  The Borrower will not, and will not permit any of the Guarantors, to make any Investment except:

(a)    extensions of trade credit and purchases of assets and services (including purchases of inventory, supplies and materials) in the ordinary course of business or consistent with past practice or industry practice;

(b)    Investments that were Permitted Investments when such Investments were made;

(c)    loans and advances to officers, directors, managers, employees and consultants of the Borrower (or any direct or indirect parent thereof) or any of its Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes (including employee payroll advances), (ii) in connection with such Person's purchase of Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof; provided that, to the extent such loans and advances are made in cash, the amount of such loans and advances used to acquire such Stock or Stock Equivalents shall be contributed to the Borrower in cash) and (iii) for purposes not described in the foregoing subclauses (i) and (ii); provided that the aggregate principal amount outstanding pursuant to subclause (iii) shall not exceed $20,000;

(d)    Investments existing on the date hereof as set forth on Schedule 10.5;

(e)    Intentionally Reserved;

(f)    Investments received in connection with the bankruptcy or reorganization of suppliers or customers and in settlement of delinquent obligations of, and other disputes with, customers arising in the ordinary course of business or upon foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(g)    Investments by the Borrower in any Guarantor or by any Guarantor in the Borrower or any other Guarantor;

(h)    Investments constituting non-cash proceeds of Dispositions of assets to the extent permitted by Section 10.4;

(i)    Investments made to repurchase or retire Stock or Stock Equivalents of the Borrower or any direct or indirect parent thereof owned by any current or former employee, officer, director, member, manager or consultant or any stock ownership plan or employee stock ownership plan of the Borrower (or any direct or indirect parent thereof) permitted by Section 10.6;

(j)    Investments consisting of Dividends permitted under Section 10.6;

(k)     Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(l)     guarantee obligations of a Credit Party of leases (other than Capital Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business or consistent with past practice or industry practice;

(m)     Investments (in whole or in part) in direct ownership interests in additional Oil and Gas Properties of the Borrower and the Guarantors and gas gathering systems related thereto or Investments related to farm-out, farm-in, joint operating, joint development, or other area of mutual interest agreements, gathering systems, pipelines or other similar arrangements to be owned or leased by a Credit Party, in each case located in the United States of America;

(n)     Investments in Hedge Agreements permitted by Section 10.1 and Section 10.11;

(o)     Intentionally Reserved;

(p)     Investments consisting of fundamental changes under Section 10.3; and

(q)     Investments resulting from pledges and deposits under clause (d) of the definition of "Permitted Liens".

10.6     Limitation on Dividends.    The Borrower will not pay any dividends (other than Dividends payable solely in its Stock that is not Disqualified Stock) or return any capital to its equity holders or make any other distribution, payment or delivery of property or cash to its equity holders as such, or redeem, retire, purchase or otherwise acquire, directly or indirectly, for consideration, any shares of any class of its Stock or Stock Equivalents or the Stock or Stock Equivalents of any direct or indirect parent now or hereafter outstanding, or set aside any funds for any of the foregoing purposes, or permit any of the Guarantors to purchase or otherwise acquire for consideration any Stock or Stock Equivalents of the Borrower (or any direct or indirect parent thereof), now or hereafter outstanding (all of the foregoing, "Dividends"); except that the Borrower may (or may pay Dividends to permit any direct or indirect parent thereof to) redeem, acquire, retire or repurchase shares of its (or such parent's) Stock or Stock Equivalents held by any present or former officer, manager, consultant, director or employee (or their respective Affiliates, estates, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees or immediate family members) of the Borrower and its Subsidiaries or any parent thereof, in accordance with any equity option or equity appreciation rights plan, any management, director, consultant and/or employee equity ownership, benefit or incentive plan or agreement, equity subscription plan, employment termination agreement or any other employment or consultancy agreements or equity holders' agreement.

10.7     Transaction with Affiliates.    The Borrower will not, and will not permit any Subsidiary to, enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property or the rendering of any service, with any Affiliate; provided, however, that the foregoing restrictions will not apply to (a) transactions that are not otherwise prohibited under this Agreement and are upon fair and reasonable terms no less favorable to it than it would obtain in a comparable arm's length transaction with a Person not an Affiliate, (b) reasonable and customary fees paid to members of the board of directors (or similar governing body) of the Borrower and its Subsidiaries, (c) reasonable and customary indemnification, benefit, compensation and other employment arrangements and agreements for directors, officers and other employees of the Borrower and its Subsidiaries entered into in the ordinary course of business and (d) transactions between or among Credit Parties.

10.8    <u>Case Matters</u>.  (a) All Professional Fees at any time paid by the Credit Parties, or any of them, shall be paid by the Credit Parties pursuant to procedures established by an order of the Bankruptcy Court and pursuant to the Approved Budget.

(b)    Unless all Obligations have been indefeasibly paid in full in cash on terms and conditions acceptable to the Administrative Agent and the Lenders, no Credit Party shall assert, file or seek, or consent to the filing or the assertion of or joinder in, or use any portion of the proceeds of the Loans, Obligations, the Collateral, the Carve-Out or Cash Collateral to compensate services rendered or expenses incurred in connection with, any claim, counterclaim, action, proceeding, order, application, pleading, motion, objection, any other papers or documents, defense (including offsets and counterclaims of any nature or kind), or other contested matter (including any of the foregoing the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration, or similar relief):

(i)    avoiding, re-characterizing, recovering, reducing, subordinating, disallowing, impairing or otherwise challenging (under Sections 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code or applicable nonbankruptcy law), in each case, in whole or in part, of the Obligations, the Liens, the Existing Credit Agreement, the Existing Credit Documents, or the Existing Liens;

(ii)    reversing, modifying, amending, staying or vacating the DIP Orders, without the prior written consent of the Administrative Agent and the Lenders;

(iii)    granting priority for any administrative expense, secured claim or unsecured claim against the Credit Parties (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Administrative Agent and the Lenders' claims, Superpriority Claims, Adequate Protection Liens and DIP Liens in respect of the Obligations and the Existing Obligations, except as provided under the Carve-Out;

(iv)    granting or imposing under Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, any additional financing under such sections or any Lien equal or superior to the priority of the Adequate Protection Liens or DIP Liens, as permitted to have priority under <u>Section 10.2</u> (to the extent, and only to the extent, set forth in the Final DIP Order);

(v)    permitting the use of Cash Collateral, except as expressly permitted by the DIP Orders or this Agreement; or

(vi)    modifying, altering, or impairing in any manner any of the DIP Liens or any of the Administrative Agent's, the Existing Agent's, the Lenders', the Existing Lenders' or the Secured Parties' rights or remedies under the DIP Orders, this Agreement, or any of the Credit Documents or any documents related thereto (including the right to demand payment of all Obligations and to enforce their respective Liens and security interests in the Collateral), whether by a Chapter 11 Plan, order of confirmation, or any financings of, extensions of credit to, or incurring of debt by any Credit Party or otherwise, whether pursuant to Section 364 of the Bankruptcy Code or otherwise

(c)    Without the prior written consent of the Lenders, no Credit Party shall seek or consent to any order (i) dismissing any of the Cases under Sections 105, 305 or 1112 of the Bankruptcy

Code or otherwise; (ii) converting any of the Cases to cases under Chapter 7 of the Bankruptcy Code; (iii) appointing a Chapter 11 trustee in any of the Cases; (iv) appointing an examiner with enlarged powers beyond those set forth in Sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code in any of the Cases; or (v) granting a change of venue with respect to any of the Cases or any related, contested matter or adversary proceeding.

(d)    The Credit Parties will not make any payments or transfer any property on account of claims asserted by any vendors of any Credit Parties for reclamation in accordance with Section 2-702 of any applicable UCC and Section 546(c) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court upon prior notice to the Administrative Agent or unless otherwise consented to by the Lenders.

(e)    The Credit Parties will not return any inventory or other property to any vendor pursuant to Section 546(g) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court in accordance with Section 546(g) of the Bankruptcy Code upon prior notice to the Administrative Agent or unless otherwise consented to by the Lenders.

No Credit Party shall submit a Chapter 11 Plan to the Bankruptcy Court (other than an Acceptable Plan), without the prior written consent of the Lenders.

10.9    Changes in Business.  The Borrower and the Subsidiaries will not materially alter the character of their business from the business of oil and gas exploration and production and other business activities incidental or reasonably related to any of the foregoing.  The Borrower and its Subsidiaries will not acquire or make any other expenditures (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within the geographical boundaries of the United States, nor create, acquire or permit to exist any Foreign Subsidiary.

10.10    Negative Pledge Agreements.  The Borrower will not, and will not permit any of the Guarantors to, enter into or permit to exist any Contractual Requirement (other than this Agreement or any other Credit Document) that limits the ability of a Credit Party to create, incur, assume or suffer to exist DIP Liens on property of such Person for the benefit of the Secured Parties with respect to the Obligations or under the Credit Documents or restricts any Guarantor from paying Dividends to a Credit Party, or restricts any Guarantor from repaying loans or advances to a Credit Party, or to Guarantee the Obligations, or to transfer any of its property to any Credit Party, or the ability to amend or otherwise modify this Agreement or any other Credit Document, or which requires the consent of or notice to other Persons in connection therewith.

10.11    Hedge Agreements.  The Borrower will not, and will not permit any Guarantor to, enter into any Hedge Agreements with any Person other than:

(a)    Hedge Agreements specifically permitted by Sections 8.21 and 9.18.

(b)    Hedge Agreements in respect of commodities entered into not for speculative purposes the net notional volumes for which (when aggregated with other commodity Hedge Agreements then in effect, other than puts, floors and basis differential swaps on volumes already hedged pursuant to other Hedge Agreements) do not exceed, as of the date the latest hedging transaction is entered into under a Hedge Agreement, 75% of the reasonably anticipated Hydrocarbon production from the total Proved Reserves of the Borrower and the Guarantors as forecast based upon the most recent Reserve Report delivered pursuant to Section 9.14(a) for the 60-month period from the date such hedging arrangement is created (the "Ongoing Hedges").

(c)     Intentionally Reserved.

(d)     If, after the end of any calendar month, commencing with the calendar month ending May 31, 2019, the Borrower determines that the aggregate volume of all commodity hedging transactions for which settlement payments were calculated in such calendar month (other than puts, floors and basis differential swaps on volumes already hedged pursuant to other Hedge Agreements) exceeded 100% of actual production of Hydrocarbons in such calendar month, then the Borrower shall terminate, create off-setting positions, allocate volumes to other production for which a Credit Party is marketing, or otherwise unwind existing Hedge Agreements such that, at such time, future hedging volumes will not exceed 100% of reasonably anticipated projected production for the then-current and any succeeding calendar months.

(e)     In addition to the foregoing, all permitted Hedge Agreements that may require a payment be made to a Credit Party must be entered into with an Approved Counterparty.

(f)     It is understood that for purposes of this Section 10.11, the following Hedge Agreements shall not be deemed speculative or entered into for speculative purposes: (i) any commodity Hedging Agreement intended, at inception of execution, to hedge or manage any of the risks related to existing and or forecasted Hydrocarbon production (based upon the most recently delivered Reserve Report) of a Credit Party (whether or not contracted) and (ii) any Hedge Agreement intended, at inception of execution, (A) to hedge or manage the interest rate exposure associated with any debt securities, debt facilities or leases (existing or forecasted) of a Credit Party, (B) for foreign exchange or currency exchange management, (C) to manage commodity portfolio exposure associated with changes in interest rates or (D) to hedge any exposure that a Credit Party may have to counterparties under other Hedge Agreements such that the combination of such Hedge Agreements is not speculative taken as a whole.

(g)     For purposes of entering into or maintaining Ongoing Hedges, forecasts of reasonably anticipated Hydrocarbon production from the total Proved Reserves of the Borrower and the Guarantors based upon the most recent Reserve Report delivered pursuant to Section 9.14(a) shall be revised to account for any increase or decrease therein anticipated because of information obtained by Borrower or any Guarantor subsequent to the publication of such Reserve Report including the Borrower's or any Guarantor's internal forecasts of production decline rates for existing wells and additions to or deletions from anticipated future production from new wells and acquisitions coming on stream or failing to come on stream.

10.12    Financial Covenants.

(a)     Minimum Liquidity.  The Credit Parties shall, at all times during the term of this Agreement, maintain liquidity of not less than $3,000,000 (of which, $2,000,000 may be held in the Carve-Out Reserve), as determined at the close of each Business Day.

(b)     Budget and Permitted Variance.  On the delivery of each Variance Report following the Petition Date (each a "Test Date"), the Credit Parties shall demonstrate in each such Variance Report that, in the period covered by such Variance Report, the aggregate actual disbursements, excluding debt service and non-Credit Party Professional Fees, shall not exceed the sum of the aggregate amount budgeted therefor in the Approved Budget for such period plus the aggregate of the Professional Fee Carry Forward Amounts and the Non-Professional Fee Carry Forward Amounts, by more than ten percent (10%) of the budgeted amount.  Certification of compliance with this Section 10.12(b) shall be provided on such Test Date, concurrently with delivery of each Variance Report and shall have been certified by a Financial Officer of the Borrower and be in a form satisfactory to the Administrative Agent in its sole discretion.

10.13   Intentionally Deleted

10.14   Amendment to LLC Agreement.  The Borrower will not, without the consent of the Administrative Agent waive, amend, modify or terminate the LLC Agreement.

10.15   Sanctions; Use of Proceeds.  The Borrower will not request any Borrowing or amendment to any Letter of Credit, and the Borrower shall not directly or knowingly indirectly use, and shall not permit any Subsidiary to directly or knowingly indirectly use, the proceeds of any Borrowing or Letter of Credit (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws applicable to the Borrower and its Subsidiaries, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, to the extent such activities, business or transaction would be prohibited by Sanctions applicable to the Borrower and its Subsidiaries or any other party hereto if conducted by a corporation incorporated in the United States or in a European Union member state, or (c) in any manner that would result in the violation of any Sanctions applicable to the Borrower and its Subsidiaries or any other party hereto.

10.16   Superpriority Claims. The Borrower will not, and will not permit any Subsidiary to, incur, create, assume, suffer to exist or permit any other Superpriority Claim pari passu with or senior to the claims of the Secured Parties against the Credit Parties except with respect to the Carve-Out.

10.17   Cash Collateral. The Borrower will not, and will not permit any Subsidiary to, fail to deposit and/or maintain with the Administrative Agent the Cash Collateral in the Cash Collateral Account from and after entry of the Final DIP Order and the approval of the deemed issuance of the Existing Letters of Credit pursuant to this Agreement.

SECTION 11.
EVENTS OF DEFAULT.

11.1   Events of Default. Upon the occurrence of any of the following specified events (each an "Event of Default"):

(a)   Any Credit Party fails timely and fully to perform its payment obligations under this Agreement, the Credit Documents or the DIP Orders, including, without limitation the failure of the Borrower to indefeasibly repay in full in cash on the Termination Date all Obligations or any Credit Party to pay or make any payment of principal, interest, or fees under this Agreement, the Credit Documents or the DIP Orders or make any Adequate Protection Payment, as and when due.

(b)   (i) The breach of any of the representations and warranties in this Agreement or any other Credit Documents or (ii) the breach of any of the stipulations in the DIP Orders in any material respect.

(c)   Any noncompliance by a Credit Party of any other covenant in this Agreement, the Credit Documents or in the DIP Orders, including, without limitation failure of the Credit Parties to achieve any Milestone on the dates as required.

(d)   Any default shall occur with respect to any post-petition Indebtedness of any Credit Party (in each case, other than the Obligations), or under any agreement or instrument under or pursuant to which any such Indebtedness may have been issued, created, assumed or guaranteed by any Credit Party.

(e)      Any Credit Document, including any guaranty of the Obligations, shall be (i) terminated other than in accordance with its terms, (ii) revoked by a Credit Party, (iii) declared void, invalid, or unenforceable, or (iv) challenged in writing by any Credit Party.

(f)      An ERISA Event shall occur with respect to a Plan or Multiemployer Plan which, together with all other ERISA Events, has resulted or could reasonably be expected to result in a Material Adverse Effect.

(g)      Any Lien with respect to any material portion of the Collateral intended to be secured thereby ceases to be, or is not, valid, perfected and prior to all other Liens (other than the Carve-Out) or is terminated, revoked or declared void (other than in accordance with its terms).

(h)      The termination of the exclusivity period of Section 1121(b) of the Bankruptcy Code for any Credit Party.

(i)      The Credit Parties or the Committee commence, or support any person, in any litigation challenging or seeking to challenge the DIP Liens of the Lenders, or file a proposed Chapter 11 Plan that contemplates the commencement of any such litigation after confirmation of such plan.

(j)      Any Credit Party files, or any person other than any of the Credit Parties solicits, acceptances of, a Chapter 11 Plan that does not propose to indefeasibly repay the Obligations and Existing Obligations in full, in cash as a condition to the confirmation of such plan, unless the Lenders consent to such plan in their sole discretion.

(k)      There is a filing of any motion by any Credit Party requesting, or entry of an order granting, any new Lien or new Superpriority Claim which is senior or pari passu with the Superpriority Claims or DIP Liens of the Secured Parties.

(l)      An order with respect to any of the Cases shall be entered appointing, or any Credit Party shall file an application for an order with respect to any of the Cases seeking the appointment of, in either case without the prior written consent of the Lenders (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner or any other Person with enlarged powers relating to the operation of the business (i.e., powers beyond those set forth in Sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code.

(m)      An order shall be entered dismissing any of the Cases or converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code.

(n)      Any Credit Party or any Person with the support of any Credit Party, shall file any pleading, or any order is entered with respect to the Cases, without the prior written consent of the Lenders and the Existing Secured Parties, (i) to permit any administrative expense or any claim (now existing or hereafter arising, or of any kind of nature whatsoever) to have administrative priority equal or superior to the priority of the Superpriority Claims or the Administrative Agent and the Lenders in respect of the Obligations other than the Carve-Out, (ii) to grant or permit the grant of a Lien on any of the Collateral other than the DIP Liens and the Adequate Protection Liens, (iii) to permit any Credit Party to use proceeds of Collateral other than in accordance with the terms of the Credit Documents and the DIP Orders, (iv) to invalidate or otherwise challenge any of the DIP Liens of the Existing Liens, or otherwise object to, or raise defenses to, the extent, amount, validity, perfection priority or enforceability of any of the Existing Obligations, the Obligations, the Existing Liens or the DIP Liens, (v) to surcharge under Section 506(c) or 552 of the Bankruptcy Code any Collateral, or (vi) permit the use of Cash Collateral except as permitted by this Agreement and the DIP Orders.

(o)    An order shall be entered that is not stayed pending appeal granting relief from the automatic stay to any creditor of a Credit Party, with respect to any claim against any property that, when taken together with all other orders entered on the docket of the Bankruptcy Court that are not stayed pending appeal granting relief from the automatic stay with respect to the Collateral, could reasonably be expected to have a Material Adverse Effect.

(p)    The violation by any Credit Party of any of the provisions of the DIP Orders.

(q)    The bringing of a motion by any Credit Party, or the entry of an order or ruling: (i) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement that is senior or pari passu with the Obligations hereunder or in the DIP Orders, (ii) to grant any Lien other than Permitted Liens and the Carve-Out upon or affecting any Collateral without the prior written consent of the Administrative Agent and the Lenders; (iii) except as provided in the DIP Orders, to use the Cash Collateral of the Existing Secured Parties under Section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent and the Lenders, or (iv) any other action or actions adverse to the Administrative Agent or the Lenders, or their rights and remedies hereunder of the interests in the Collateral.

(r)    As of any date during the terms of this Agreement, the absence of an Approved Budget agreed between the Lenders and the Borrower that covers at least four full weeks immediately following such date.

(s)    Any change or alteration that is adverse in any material respect to the Lenders to (i) the cash management system of the Credit Parties, as such system existed on the Petition Date, or (ii) any order entered by the Bankruptcy Court in the Cases approving such management system.

(t)    (i) The Bankruptcy Court shall grant relief that is inconsistent with the Sale Transaction or the Acceptable Bid Procedures and that is adverse to the Administrative Agent's or the Secured Parties' interests or inconsistent with the Credit Documents and (ii) any of the Credit Parties or any Affiliate thereof controlled by the Credit Parties shall file any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with the Sale Transaction or the Acceptable Bid Procedures and such motion or pleading has not been withdrawn prior to the earlier of (A) three (3) Business Days of the Borrower receiving notice from the Administrative Agent and (B) entry of an order of the Bankruptcy Court approving such motion or pleading.

(u)    The entry of an order requiring the inclusion in the Carve-Out of any Professional Fees for any professionals for any official or ad hoc committee other than the Committee.

(v)    The entry of an order without the prior written consent of the Administrative Agent, amended or supplementing or otherwise modifying (each in the sole judgment of the Administrative Agent) either the Interim DIP Order or Final DIP Order.

(w)    The entry of an order seeking to reduce, set-off or subordinate the Adequate Protection Liens, the Obligations or related DIP Liens.

(x)    There is a reversal, vacation or stay of the effectiveness of either the Interim DIP Order or Final DIP Order.

(y)    A Change of Control.

(z)     Any Credit Party shall make any Prepetition Payment or Capital Expenditure, as the case may be, other than (a) in connection with the assumption of executory contracts and unexpired leases in connection with the Sale Transaction approved by the Bankruptcy Court; (b) in respect of accrued payroll and related expenses and employee benefits as of the Petition Date approved by the Bankruptcy Court and provided for in the Approved Budget; (c) as otherwise set forth in the Approved Budget and expressly agreed to in writing by the Administrative Agent before such Prepetition Payment or Capital Expenditure is made or (d) as otherwise ordered by the Bankruptcy Court and agreed to in writing by the Administrative Agent before such Prepetition Payment or Capital Expenditure is made.

(aa)     The entry of an order granting relief from the automatic stay to allow a third party to proceed against assets of any Credit Party.

11.2    <u>Remedies</u>. (a) Then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent shall, upon the written request of the Required Lenders, by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent or any Lender to enforce its claims against the Borrower or any other Credit Party, except as otherwise specifically provided for in this Agreement: (a) declare the Total Commitment terminated, whereupon the Commitments of each Lender shall forthwith terminate immediately and any fees theretofore accrued shall forthwith become due and payable without any other notice of any kind; (b) declare the principal of and any accrued interest and fees in respect of any or all Loans and any or all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; (c) terminate any Letter of Credit that may be terminated in accordance with its terms;  (d) direct the Borrower to pay to the Administrative Agent at the Administrative Agent's Office such additional amounts of cash, to be held as security for the Borrower's respective reimbursement obligations for Drawings that may subsequently occur thereunder, equal to the aggregate Stated Amount of all Letters of Credit issued and then outstanding, (e) exercise the right (after providing five (5) Business Days' notice to the Credit Parties, the United States Trustee, and the Committee and any other official committee (but this shall not serve as a consent to the use of Cash Collateral or the Loans hereunder to pay Professional Fees incurred by any other such official committee)) to realize on all Collateral without necessity of obtaining any further relief or order from the Bankruptcy Court, subject to the right of the Credit Parties to seek relief from the Bankruptcy Court during such five (5) Business Days' period (such period referred to in this <u>Section 11.2</u> as the "<u>DIP Default Notice Period</u>") solely on the basis that no Event of Default has occurred; and (f) pursue its rights and remedies under the Credit Documents, the DIP Orders and/or applicable law.  Except as otherwise provided in the DIP Orders, the foregoing remedies may be exercised without demand and without further application to or order of the Bankruptcy Court.  In any hearing regarding any exercise of remedies under this <u>Section 11.2</u> (which hearing must take place within the DIP Default Notice Period), the only issue that may be raised by any party in opposition thereto shall be whether, in face, an Event of Default has occurred and is continuing, and the Credit Parties, the Committee and all other parties in interest shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Administrative Agent or the Lenders set forth in the DIP Orders, this Agreement or the Credit Documents, as applicable.  If no such order is entered during the DIP Default Notice Period, all use of the Collateral (including Cash Collateral) shall cease immediately and automatically and the Administrative Agent and the Lenders shall be entitled to enforce the remedies hereunder.  In addition, after the occurrence and during the continuance of an Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity.

(b)     Each Credit Party recognizes that the Administrative Agent may be unable to effect a public sale of any or all of the Collateral that constitutes securities to be sold by reason of certain

prohibitions contained in the laws of any jurisdiction outside the United States or in applicable federal or state securities laws but may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such Collateral to be sold for their own account for investment and not with a view to the distribution or resale thereof. Each Credit Party acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall, to the extent permitted by law, be deemed to have been made in a commercially reasonable manner. Unless required by a Requirement of Law, the Administrative Agent shall not be under any obligation to delay a sale of any of such Collateral to be sold for the period of time necessary to permit the issuer of such securities to register such securities under the laws of any jurisdiction outside the United States or under any applicable federal or state securities laws, even if such issuer would agree to do so. Each Credit Party further agrees to do or cause to be done, to the extent that such Credit Party may do so under a Requirement of Law, all such other acts and things as may be necessary to make such sales or resales of any portion or all of such Collateral or other property to be sold valid and binding and in compliance with any and all requirements of law at the Credit Parties' expense. Each Credit Party further agrees that a breach of any of the covenants contained in this <u>Section 11.2(b)</u> will cause irreparable injury to the Administrative Agent and the other Secured Parties for which there is no adequate remedy at law and, as a consequence, agrees that each covenant contained in this <u>Section 11.2(b)</u> shall be specifically enforceable against such Credit Party, and each Credit Party hereby waives and agrees, to the fullest extent permitted by law, not to assert as a defense against an action for specific performance of such covenants that (i) such Credit Party's failure to perform such covenants will not cause irreparable injury to the Administrative Agent and the Secured Parties or (ii) the Administrative Agent or the Secured Parties have an adequate remedy at law in respect of such breach. Each Credit Party further acknowledges the impossibility of ascertaining the amount of damages which would be suffered by the Administrative Agent and the Secured Parties by reason of a breach of any of the covenants contained in this <u>Section 11.2(b)</u> and, consequently, agrees that, if such Credit Party shall breach any of such covenants and the Administrative Agent or the Secured Parties shall sue for damages for such breach, such Credit Party shall pay to the Administrative Agent, for the benefit of the Administrative Agent and the Secured Parties, as liquidated damages and not as a penalty, an aggregate amount equal to the value of the Collateral or other property to be sold on the date the Administrative Agent shall demand compliance with this <u>Section 11.2(b)</u>.

        (c)      Any amount received by the Administrative Agent from any Credit Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement or any Event of Default with respect to the Credit Parties shall be applied:

        (i)      <u>first,</u> to payment or reimbursement of that portion of the Obligations constituting fees, expenses and indemnities payable to the Administrative Agent its capacity as such, or to the Lenders;

        (ii)      <u>second,</u> to the Secured Parties, an amount equal to all Obligations due and owing to them on the date of distribution and, if such moneys shall be insufficient to pay such amounts in full, then ratably (without priority of any one over any other) to such Secured Parties in proportion to the unpaid amount thereof; provided that such monies will first be applied to the interest and principal relating to the New-Money Loans until paid in full, and then be applied to the interest and principal relating to Roll-Up Loans;

        (iii)      <u>third,</u> *pro rata* to any other Obligations then due and owing; and

        (iv)      <u>fourth,</u> any surplus then remaining, after all of the Obligations then due shall have been indefeasibly paid in full in cash, shall be paid to the Borrower or its successors or

assigns or to whomever may be lawfully entitled to receive the same or as a court of competent jurisdiction may award.

Notwithstanding the foregoing, no amounts received from any Credit Party shall be applied to any Excluded Swap Obligation of such Credit Party.

SECTION 12.
THE ADMINISTRATIVE AGENT.

12.1    Appointment.

(a)    Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Credit Documents and irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto.  The provisions of this Section 12 (other than Section 12.9 with respect to the Borrower) are solely for the benefit of the Administrative Agent and the Lenders, and the Borrower shall not have rights as third party beneficiary of any such provision.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against the Administrative Agent.

(b)    Each Lender and the Letter of Credit Issuer hereby irrevocably designate and appoint the Administrative Agent as the agent with respect to the Collateral, and each Lender and the Letter of Credit Issuer irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto.    Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities except those expressly set forth herein, or any fiduciary relationship with any of the Lenders or the Letter of Credit Issuers, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against the Administrative Agent.

12.2    Delegation of Duties. The Administrative Agent may execute any of its duties under this Agreement and the other Credit Documents by or through agents, sub-agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agents, sub-agents or attorneys-in-fact selected by it in the absence of gross negligence or willful misconduct (as determined in the final judgment of a court of competent jurisdiction).

12.3    Exculpatory Provisions. Neither the Administrative Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by any of them under or in connection with this Agreement or any other Credit Document (except for its or such Person's own gross negligence or willful misconduct, as determined in the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein) or (b) responsible in any manner to any of the Lenders or any participant for any recitals, statements, representations or warranties made by any of the Borrower, any other Credit Party or any

officer thereof contained in this Agreement or any other Credit Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Credit Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Credit Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Security Documents, or for any failure of the Borrower or any other Credit Party to perform its obligations hereunder or thereunder.  No Agent shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of any Credit Party or any Affiliate thereof.  The Administrative Agent shall not be under any obligation to any Lender or Letter of Credit Issuer to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of any Credit Party.

      12.4    <u>Reliance by the Administrative Agent</u>.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex, electronic mail message or teletype message, statement, order or other document or instruction believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent.  The Administrative Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Credit Documents in accordance with a request of the Required Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans; <u>provided</u> that the Administrative Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose it to liability or that is contrary to any Credit Document or applicable Requirements of Law.  For purposes of determining compliance with the conditions specified in <u>Section 6</u> and <u>Section 7.2</u> on the Closing Date, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

      12.5    <u>Notice of Default</u>.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent has received written or electronic notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Administrative Agent receives such a notice, it shall give notice thereof to the Lenders.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

12.6   <u>Non-Reliance on Administrative Agent and Other Lenders</u>.  Each Lender expressly acknowledges that neither the Administrative Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Administrative Agent hereinafter taken, including any review of the affairs of the Borrower or any other Credit Party, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender or Letter of Credit Issuer.  Each Lender and Letter of Credit Issuer represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, operations, property, financial and other condition and creditworthiness of the Borrower and each other Credit Party and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Credit Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Borrower and any other Credit Party.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, assets, operations, properties, financial condition, prospects or creditworthiness of the Borrower or any other Credit Party that may come into the possession of the Administrative Agent any of its respective officers, directors, employees, agents, attorneys-in-fact or Affiliates.

12.7   <u>Indemnification</u>.  The Lenders agree to indemnify the Administrative Agent, in its capacity as such (to the extent not reimbursed by the Credit Parties and without limiting the obligation of the Credit Parties to do so), ratably according to their respective Commitment Percentage of Loans, as applicable, outstanding in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with their respective Commitment Percentage of the Total Exposure in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans) be imposed on, incurred by or asserted against the Administrative Agent in any way relating to or arising out of the Commitments, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent under or in connection with any of the foregoing in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Administrative Agent; <u>provided</u> that no Lender shall be liable to the Administrative Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Administrative Agent's gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction; <u>provided</u>, <u>further</u>, that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this <u>Section 12.7</u>.  In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans), this <u>Section 12.7</u> applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorneys' fees) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration,

modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Credit Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower; provided that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto.  If any indemnity furnished to the Administrative Agent for any purpose shall, in the opinion of the Administrative Agent, be insufficient or become impaired, the Administrative Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Lender to indemnify the Administrative Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's *pro rata* portion thereof; and provided further, this sentence shall not be deemed to require any Lender to indemnify the Administrative Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement resulting from the Administrative Agent's gross negligence or willful misconduct.  The agreements in this Section 12.7 shall survive the payment of the Loans and all other amounts payable hereunder.

12.8    The Administrative Agent in Its Individual Capacity.  The Administrative Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrower and any other Credit Party as though the Administrative Agent was not the Administrative Agent hereunder and under the other Credit Documents.  With respect to the Loans made by it, the Administrative Agent shall have the same rights and powers under this Agreement and the other Credit Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

12.9    Successor Administrative Agent.  The Administrative Agent may at any time give notice of its resignation to the Lenders, the Letter of Credit Issuer and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, subject to the consent of the Borrower (not to be unreasonably withheld or delayed) so long as no Event of Default is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the Letter of Credit Issuer, appoint a successor Agent meeting the qualifications set forth above.  Upon the acceptance of a successor's appointment as the Administrative Agent, hereunder, and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Security Documents, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower (following the effectiveness of such appointment) to the Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Credit Documents, the provisions of this Section 12 (including Section 12.7) and Section 13.5 shall continue in effect for the benefit of such retiring Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as an Agent.

Any resignation of any Person as Administrative Agent pursuant to this Section shall also constitute its resignation as Letter of Credit Issuer.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (a) such successor shall succeed to and become vested with all of the

rights, powers, privileges and duties of the retiring Letter of Credit Issuer, (b) the retiring Letter of Credit Issuer shall be discharged from all of their respective duties and obligations hereunder or under the other Credit Documents, and (c) the successor Letter of Credit Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Letter of Credit Issuer to effectively assume the obligations of the retiring Letter of Credit Issuer with respect to such Letters of Credit.

12.10   <u>Withholding Tax</u>.  To the extent required by any applicable Requirements of Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding Tax ineffective, or for any other reason) or if the Administrative Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding Tax from such payment, such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrower and without limiting the obligation of the Borrower to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including penalties and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.  A certificate as to the amount of any such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Credit Document against any amount due to the Administrative Agent under this <u>Section 12.10</u>.  The agreements in <u>Section 12.10</u> shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Agreement and the repayment, satisfaction or discharge of all the Loans. For the avoidance of doubt, for purposes of this <u>Section 12.10</u>, the term Lender includes the Letter of Credit Issuer. Each Lender and Letter of Credit Issuer hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender or Letter of Credit Issuer, as applicable, under this Agreement or any other Credit Document against any amounts due to the Administrative Agent under this <u>Section 12.10</u>.

12.11   <u>Security Documents and Administrative Agent under Security Documents and Guarantee</u>. Each Secured Party hereby further authorizes the Administrative Agent, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of the Secured Parties with respect to Security Documents and the Guarantee.  Subject to <u>Section 13.1</u>, without further written consent or authorization from any Secured Party, the Administrative Agent, may (a) execute any documents or instruments necessary in connection with a Disposition of assets permitted by this Agreement, (b) release any Lien encumbering any item of Collateral that is the subject of such Disposition of assets or with respect to which Required Lenders (or such other Lenders as may be required to give such consent under <u>Section 13.1</u>) have otherwise consented or (c) release any Guarantor from the Guarantee or with respect to which Required Lenders (or such other Lenders as may be required to give such consent under <u>Section 13.1</u>) have otherwise consented.

12.12   <u>Right to Realize on Collateral and Enforce Guarantee</u>.  Anything contained in any of the Credit Documents to the contrary notwithstanding, the Borrower, the Administrative Agent and each other Secured Party hereby agree that (a) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee; it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the

Security Documents may be exercised solely by the Administrative Agent, and (b) in the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Administrative Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent at such sale or other disposition.

12.13    _Administrative Agent May File Proofs of Claim_.  In connection with the cases or the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding involving any of the Credit Parties, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in the Cases or any such other proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Indebtedness that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel, to the extent due under _Section 13.5_) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, to the extent due under _Section 13.5_.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Indebtedness or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

12.14    _Certain ERISA Matters_.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of 29 CFR §2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Commitments,

(ii)    the transaction exemption set forth in one or more prohibited transaction class exemptions ("PTEs"), such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfy the requirements of subsections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless subclause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in subclause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that:

(i)    none of the Administrative Agent or any of its respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Credit Document or any documents related to hereto or thereto),

(ii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the obligations),

(iv)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Letters of Credit, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)     no fee or other compensation is being paid directly to the Administrative Agent or any its respective Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Letters of Credit, the Commitments or this Agreement.

(c)     The Administrative Agent hereby informs the Lenders that such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Letters of Credit, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans, the Letters of Credit or the Commitments for an amount less than the amount being paid for an interest in the Loans, the Letters of Credit or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Credit Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

## SECTION 13.
## MISCELLANEOUS.

13.1    <u>Amendments, Waivers and Releases</u>.  Except as expressly set forth in this Agreement (including for the avoidance of doubt <u>Sections 13.6(b)</u> and <u>13.6(c)</u>), neither this Agreement nor any other Credit Document, nor any terms hereof or thereof, may be amended, supplemented or modified except in accordance with the provisions of this <u>Section 13.1</u>.

(a)     The Required Lenders may, or, with the written consent of the Required Lenders, the Administrative Agent shall, from time to time:

(i)     enter into with the relevant Credit Party or Credit Parties written amendments, supplements or modifications hereto and to the other Credit Documents for the purpose of adding any provisions to this Agreement or the other Credit Documents or changing in any manner the rights of the Lenders or of the Credit Parties hereunder or thereunder or

(ii)     waive in writing, on such terms and conditions as the Required Lenders or the Administrative Agent, may specify in such instrument, any of the requirements of this Agreement or the other Credit Documents or any Default or Event of Default and its consequences;

<u>provided</u>, <u>however</u>, that each such waiver and each such amendment, supplement or modification shall be effective only in the specific instance and for the specific purpose for which given;

(b)     <u>provided</u>, <u>further</u>, that no such waiver and no such amendment, supplement or modification shall:

(i)        forgive or reduce any portion of any Loan or reduce the stated rate (it being understood that any change to the definition of Commitment or in the component definitions thereof shall not constitute a reduction in the rate and only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the Default Rate or amend Section 2.8(d)), or forgive any portion, or extend the date for the payment, of any principal (including but not limited to the Maturity Date), interest or fee payable hereunder (other than as a result of waiving the applicability of any post-default increase in interest rates), or extend the final expiration date of any Lender's Commitment (provided that any Lender, upon the request of the Borrower, may extend the final expiration date of its Commitment without the consent of any other Lender, including the Required Lenders) or extend the final expiration date of any Letter of Credit beyond the L/C Maturity Date, or increase the amount of the Commitment of any Lender (provided that, any Lender, upon the request of the Borrower, may increase the amount of its Commitment without the consent of any other Lender, including the Required Lenders), or make any Loan, interest, fee or other amount payable in any currency other than Dollars, in each case without the written consent of each Lender directly and adversely affected thereby,

(ii)       amend, modify or waive any provision of Section 6, this Section 13.1, or amend or modify any of the provisions of Section 13.8(a) to the extent it would alter the ratable allocation of payments thereunder, or reduce the percentages specified in the definitions of the terms "Required Lenders", or "Required Lenders", consent to the assignment or transfer by the Borrower of its rights and obligations under any Credit Document to which it is a party (except as permitted pursuant to Section 10.3) or alter the order of application set forth Section 7 or modify any definition used in such final paragraph if the effect thereof would be to alter the order of payment specified therein, in each case without the written consent of each Lender,

(iii)      amend, modify or waive any provision of Section 11.2(c)(iv) without the written consent of the then-current Administrative Agent, or any other former or current Agent to whom Section 12 then applies in a manner that directly and adversely affects such Person,

(iv)       amend, modify or waive any provision of Section 3 with respect to any Letter of Credit without the written consent of each Letter of Credit Issuer to whom Section 3 then applies in a manner that directly and adversely affects such Person,

(v)        release all or substantially all of the Guarantors under the Guarantee (except as expressly permitted by the Guarantee or this Agreement) without the prior written consent of each Lender,

(vi)       release all or substantially all of the Collateral under the Security Documents (except as expressly permitted by the Security Documents or this Agreement) without the prior written consent of each Lender, and

(vii)      affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Credit Document without the prior written consent of the Administrative Agent;

(c)        provided, further, that any provision of this Agreement or any other Credit Document may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent to (i) cure any ambiguity, omission, defect, typographical error, inconsistency or other manifest error, (ii) make administrative or operational changes not adverse to any Lender or make changes favorable to the Lenders, or (iii) adhere to any local Requirement of Law or advice of local

counsel so long as, in each case, the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment. Any such waiver and any such amendment, supplement or modification shall apply equally to each of the affected Lenders and shall be binding upon the Borrower, such Lenders, the Administrative Agent and all future holders of the affected Loans. In the case of any waiver, the Borrower, the Lenders and the Administrative Agent shall be restored to their former positions and rights hereunder after giving effect to such waiver, and under the other Credit Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; it being understood that no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon. In connection with the foregoing provisions, the Administrative Agent may, but shall have no obligations to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.

(d)     Notwithstanding anything to the contrary herein, no Lender consent is required to affect any subordination agreement or other intercreditor agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral (i) that is for the purpose of adding the holders of such secured or subordinated Indebtedness permitted to be incurred under this Agreement (or, in each case, a representative with respect thereto), as parties thereto, as expressly contemplated by the terms of such intercreditor agreement, such subordination agreement or such other intercreditor agreement or arrangement permitted under this Agreement, as applicable (it being understood that any such amendment or supplement may make such other changes to the applicable intercreditor agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and provided that such other changes are not adverse, in any material respect (taken as a whole), to the interests of the Lenders) or (ii) that is expressly contemplated by any intercreditor agreement, any subordination agreement or other intercreditor agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral or (iii) otherwise, with respect to any material amendments, modifications or supplements, to the extent such amendment, modification or supplement is reasonably satisfactory to the Administrative Agent; provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Credit Document without the prior written consent of the Administrative Agent.

(e)     Notwithstanding anything to the contrary contained in the Credit Documents, the Administrative Agent and the Borrower may enter into any amendment, modification or waiver of this Agreement or any other Credit Document or enter into any agreement or instrument to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or property to become Collateral for the benefit of the Secured Parties or as required by any Requirement of Law to give effect to, protect or otherwise enhance the rights or benefits of any Secured Party under the Credit Documents without the consent of the Letter of Credit Issuer or any Lender.

(f)     Notwithstanding anything to the contrary contained herein, in connection with any Required Lender or all Lender, votes, Goldman Sachs shall not be permitted, in the aggregate, to account for more than 32% of the amounts includable in determining whether the Required Lenders or all Lenders have consented to any amendment, modification, waiver, consent or other action that is subject to such vote. The voting power of Goldman Sachs shall be reduced, pro rata, to the extent necessary in order to comply with the immediately preceding sentence.

13.2    Notices. Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Credit Document shall be in writing

(including by facsimile transmission). All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(a)     if to the Borrower, the Administrative Agent or the Letter of Credit Issuer, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 13.2 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(b)     if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower, the Administrative Agent and the Letter of Credit Issuer.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, three Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail, when delivered; provided that notices and other communications to the Administrative Agent or the Lenders pursuant to Sections 2.3, 4.2 and 5.1 shall not be effective until received.

13.3     No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Credit Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Requirements of Law.

13.4     Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Credit Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

13.5     Payment of Expenses; Indemnification.

(a)     The Borrower agrees (i) to pay or reimburse the Administrative Agent and the Lenders for all reasonable and documented out of pocket costs and expenses incurred in connection with the preparation, negotiation, syndication and execution of this Agreement, and the other Credit Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, or otherwise incurred with respect to the Cases in any manner or for any reason, including all reasonable and documented fees, expenses and disbursements of legal counsel (which amount shall include the allocated cost of the Administrative Agent's internal legal counsel incurred with respect to the Cases in any manner or for any reason), which shall be limited to Hunton Andrews Kurth LLP and one local counsel as reasonably necessary in any relevant jurisdiction material to the interests of the Lenders taken as a whole (and solely in the case of a conflict of interest, one additional counsel and (if reasonably necessary) one local counsel in each relevant jurisdiction to the affected Indemnitees similarly situated) and financial advisors and (ii)

to pay or reimburse the Administrative Agent for all reasonable and documented out of pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Credit Documents (including all such costs and expenses incurred during any legal proceeding, including any bankruptcy or insolvency proceeding, and including all respective all reasonable and documented fees, expenses and disbursements of legal counsel (which amount shall include the allocated cost of the Administrative Agent's internal legal counsel), which shall be limited to one counsel to the Administrative Agent and the Lenders, taken as a whole and one local counsel as reasonably necessary in any relevant jurisdiction material to the interests of the Lenders taken as a whole and solely in the case of a conflict of interest, one additional counsel and (if reasonably necessary) one local counsel in each relevant jurisdiction to the affected Indemnitees similarly situated). The agreements in this Section 13.5 shall survive the repayment of all other Obligations. All amounts due under this Section 13.5 shall be paid in accordance with the terms of the DIP Orders. If any Credit Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Credit Document, such amount may be paid on behalf of such Credit Party by the Administrative Agent in its discretion.

(b)     THE BORROWER SHALL INDEMNIFY AND HOLD HARMLESS THE ADMINISTRATIVE AGENT, THE LENDER, RELATED PERSON AND THEIR AFFILIATES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS, ADVISORS AND OTHER REPRESENTATIVES OF THE FOREGOING (COLLECTIVELY THE "INDEMNITEES") FROM AND AGAINST ANY AND ALL LIABILITIES, LOSSES, DAMAGES, CLAIMS, OR OUT-OF-POCKET EXPENSES (INCLUDING ALL REASONABLE AND DOCUMENTED FEES, EXPENSES AND DISBURSEMENTS OF LEGAL COUNSEL (WHICH AMOUNT SHALL INCLUDE THE ALLOCATED COST OF THE ADMINISTRATIVE AGENT'S INTERNAL LEGAL COUNSEL) BUT LIMITED IN THE CASE OF LEGAL FEES AND EXPENSES TO THE REASONABLE AND DOCUMENTED OUT-OF-POCKET FEES, DISBURSEMENTS AND OTHER CHARGES OF ONE COUNSEL TO ALL INDEMNITEES TAKEN AS A WHOLE AND, IF REASONABLY NECESSARY, ONE LOCAL COUNSEL FOR ALL INDEMNITEES TAKEN AS A WHOLE IN EACH RELEVANT JURISDICTION, AND SOLELY IN THE CASE OF A CONFLICT OF INTEREST, ONE ADDITIONAL COUNSEL AND (IF REASONABLY NECESSARY) ONE LOCAL COUNSEL IN EACH RELEVANT JURISDICTION TO THE AFFECTED INDEMNITEES SIMILARLY SITUATED) OF ANY KIND OR NATURE WHATSOEVER WHICH MAY AT ANY TIME BE IMPOSED ON, INCURRED BY OR ASSERTED AGAINST ANY SUCH INDEMNITEE IN ANY WAY RELATING TO OR ARISING OUT OF OR IN CONNECTION WITH (I) THE EXECUTION, DELIVERY, ENFORCEMENT, PERFORMANCE OR ADMINISTRATION OF ANY CREDIT DOCUMENT OR ANY OTHER AGREEMENT, LETTER OR INSTRUMENT DELIVERED IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED THEREBY OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED THEREBY, (II) ANY COMMITMENT OR LOAN OR THE USE OR PROPOSED USE OF THE PROCEEDS THEREFROM, (III) ANY ACTUAL OR ALLEGED ENVIRONMENTAL CLAIM REGARDING, OR LIABILITY OR OBLIGATION UNDER ENVIRONMENTAL LAW OF, THE CREDIT PARTIES OR ANY SUBSIDIARY OR (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY (INCLUDING ANY INVESTIGATION OF, PREPARATION FOR, OR DEFENSE OF ANY PENDING OR THREATENED CLAIM, INVESTIGATION, LITIGATION OR PROCEEDING) (A "PROCEEDING") AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO OR WHETHER OR NOT SUCH PROCEEDING IS BROUGHT BY THE BORROWER OR ANY OTHER PERSON AND, IN EACH CASE, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE NEGLIGENCE OF THE INDEMNITEE (ALL OF THE FOREGOING, COLLECTIVELY, THE "INDEMNIFIED LIABILITIES"); PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LIABILITIES, LOSSES, DAMAGES, CLAIMS OR OUT-OF-POCKET EXPENSES RESULTED FROM (X) THE GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR OF ANY OF ITS RELATED PARTIES, AS DETERMINED BY A FINAL NON-APPEALABLE JUDGMENT OF A COURT OF COMPETENT JURISDICTION, (Y) A MATERIAL BREACH OF ANY OBLIGATIONS UNDER ANY CREDIT DOCUMENT BY SUCH INDEMNITEE OR OF ANY OF ITS RELATED

PARTIES, AS DETERMINED BY A FINAL NON-APPEALABLE JUDGMENT OF A COURT OF COMPETENT JURISDICTION OR (Z) ANY DISPUTE SOLELY AMONG INDEMNITEES OTHER THAN ANY CLAIMS AGAINST AN INDEMNITEE IN ITS CAPACITY OR IN FULFILLING ITS ROLE AS AN ADMINISTRATIVE AGENT OR ANY SIMILAR ROLE UNDER THIS AGREEMENT AND OTHER THAN ANY CLAIMS ARISING OUT OF ANY ACT OR OMISSION OF THE BORROWER OR ANY OF ITS AFFILIATES. NO INDEMNITEE SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE USE BY OTHERS OF ANY INFORMATION OR OTHER MATERIALS OBTAINED THROUGH INTRALINKS OR OTHER SIMILAR INFORMATION TRANSMISSION SYSTEMS IN CONNECTION WITH THIS AGREEMENT (EXCEPT FOR DIRECT (AS OPPOSED TO INDIRECT, SPECIAL, PUNITIVE OR CONSEQUENTIAL) DAMAGES RESULTING FROM THE GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT, AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE JUDGMENT, OF SUCH INDEMNITEE), NOR SHALL ANY INDEMNITEE, RELATED PARTIES, CREDIT PARTY OR ANY SUBSIDIARY HAVE ANY LIABILITY FOR ANY SPECIAL, PUNITIVE, INDIRECT OR CONSEQUENTIAL DAMAGES RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR ARISING OUT OF ITS ACTIVITIES IN CONNECTION HEREWITH OR THEREWITH (WHETHER BEFORE OR AFTER THE CLOSING DATE) (OTHER THAN, IN THE CASE OF ANY CREDIT PARTY, IN RESPECT OF ANY SUCH DAMAGES INCURRED OR PAID BY AN INDEMNITEE TO A THIRD PARTY, OR WHICH ARE INCLUDED IN A THIRD-PARTY CLAIM). IN THE CASE OF AN INVESTIGATION, LITIGATION OR OTHER PROCEEDING TO WHICH THE INDEMNITY IN THIS SECTION 13.5 APPLIES, SUCH INDEMNITY SHALL BE EFFECTIVE WHETHER OR NOT SUCH INVESTIGATION, LITIGATION OR PROCEEDING IS BROUGHT BY ANY CREDIT PARTY, ANY SUBSIDIARY OF ANY CREDIT PARTY, ITS DIRECTORS, STOCKHOLDERS OR CREDITORS OR AN INDEMNITEE OR ANY OTHER PERSON, WHETHER OR NOT ANY INDEMNITEE IS OTHERWISE A PARTY THERETO AND WHETHER OR NOT ANY OF THE TRANSACTIONS CONTEMPLATED HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS ARE CONSUMMATED. ALL AMOUNTS DUE UNDER THIS SECTION 13.5 SHALL BE PAID WITHIN THIRTY (30) DAYS AFTER WRITTEN DEMAND THEREFOR (TOGETHER WITH BACKUP DOCUMENTATION SUPPORTING SUCH REIMBURSEMENT REQUEST); PROVIDED, HOWEVER, THAT SUCH INDEMNITEE SHALL PROMPTLY REFUND SUCH AMOUNT TO THE EXTENT THAT THERE IS A FINAL JUDICIAL OR ARBITRAL DETERMINATION THAT SUCH INDEMNITEE WAS NOT ENTITLED TO INDEMNIFICATION RIGHTS WITH RESPECT TO SUCH PAYMENT PURSUANT TO THE EXPRESS TERMS OF THIS SECTION 13.5. THE AGREEMENTS IN THIS SECTION 13.5 SHALL SURVIVE THE RESIGNATION OF THE ADMINISTRATIVE AGENT, THE REPLACEMENT OF ANY LENDER AND THE REPAYMENT, SATISFACTION OR DISCHARGE OF ALL THE OTHER OBLIGATIONS. FOR THE AVOIDANCE OF DOUBT, THIS SECTION 13.5(B) SHALL NOT APPLY TO TAXES, EXCEPT ANY TAXES THAT REPRESENT LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, CLAIMS, DEMANDS, ACTIONS, PREPAYMENTS, SUITS, COSTS, EXPENSES AND DISBURSEMENTS ARISING FROM ANY NON-TAX CLAIMS.

  13.6  Successors and Assigns; Participations and Assignments.

    (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Letter of Credit Issuer that issues any Letter of Credit), except that (i) except as expressly permitted by Section 10.3, the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 13.6. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Letter of Credit Issuer that issues any Letter of Credit), Participants (to the extent provided in this Section 13.6(b)(v)) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Letter of Credit Issuer and the Lenders and each other Person

entitled to indemnification under Section 13.5) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i)    Subject to the conditions set forth in Section 13.6(b)(ii) below, any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans (including participations in L/C Obligations) at the time owing to it) with the prior written consent of the Administrative Agent or the applicable Letter of Credit Issuer.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $250,000 and increments of $50,000 in excess thereof, or, each Letter of Credit Issuer and the Administrative Agent otherwise consents (which consents shall not be unreasonably withheld or delayed); provided, that contemporaneous assignments to a single assignee made by Affiliates of Lenders and related Approved Funds shall be aggregated for purposes of meeting the minimum assignment amount requirements stated above;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee in the amount of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment; and

(D)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(iii)    Subject to acceptance and recording thereof pursuant to Section 13.6(b)(iv), from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.10, Section 5.4 and Section 13.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 13.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 13.6(c).

(iv)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount (and stated interest) of the Loans and L/C Obligations and any payment made by the Letter of Credit Issuer under any Letter of Credit

owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). Further, the Register shall contain the name and address of the Administrative Agent and the lending office through which each such Person acts under this Agreement. The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent, the Letter of Credit Issuer and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Letter of Credit Issuer and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in this Section 13.6(b) (unless waived) and any written consent to such assignment required by this Section 13.6(b), the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.

(c)     (i)     Any Lender may, without the consent of the Borrower, the Administrative Agent or any Letter of Credit Issuer, sell participations to one or more banks or other entities other than to a natural person, the Borrower or any Affiliate of the Borrower (other than Goldman Sachs, provided that if such participant is Goldman Sachs it shall not be entitled to vote on any matter), any Defaulting Lender, or any Disqualified Institution (to the extent that the list of Disqualified Institutions has been made available to all Lenders, it being agreed that as of the date hereof, the Administrative Agent has made the list of Disqualified Institutions available to all Lenders), (each, a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, the Letter of Credit Issuer and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement or any other Credit Document; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 13.6(b), Section 13.1(b)(ii) or Section 13.1(b)(v) that affects such Participant. Subject to Section 13.6(b)(ii), the Borrower agrees that each Participant shall be entitled to the benefits of (and the limitations of) Section 2.10 and Section 5.4 to the same extent as if it were a Lender; provided that such Participant agrees to be subject to the requirements of those Sections as though it were a Lender and had acquired its interest by assignment pursuant to Section 13.6(b). To the extent permitted by Requirements of Law, each Participant also shall be entitled to the benefits of Section 13.8(b) as though it were a Lender; provided such Participant agrees to be subject to Section 13.8(a) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Credit Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of

this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(ii)     A Participant shall not be entitled to receive any greater payment under Section 2.10 or Section 5.4 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent; provided that the Participant shall be subject to the provisions in Section 2.12 as if it were an assignee under Section 13.6(a) and Section 13.6(b).

(d)     Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank having jurisdiction over such Lender, and this Section 13.6 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  In order to facilitate such pledge or assignment or for any other reason, the Borrower hereby agrees that, upon request of any Lender at any time and from time to time after the Borrower has made its initial borrowing hereunder, the Borrower shall provide to such Lender, at the Borrower's own expense, a promissory note, substantially in the form of Exhibit E, evidencing the Loans owing to such Lender.

(e)     Subject to Section 13.16, the Borrower authorizes each Lender to disclose to any Participant, secured creditor of such Lender or permitted assignee (each, a "Transferee") and any prospective Transferee any and all financial information in such Lender's possession concerning the Borrower and its Affiliates that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates pursuant to this Agreement or that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates in connection with such Lender's credit evaluation of the Borrower and its Affiliates prior to becoming a party to this Agreement.

(f)     The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Acceptances, amendments or other modifications, Notice of Borrowing, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it.

(g)     Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (a "SPV"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make the Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such

option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior Indebtedness of any SPV, it shall not institute against, or join any other person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this Section 13.6, any SPV may (A) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefore, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (B) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV. This Section 13.6(g) may not be amended without the written consent of the SPV. Notwithstanding anything to the contrary in this Agreement, (I) no SPV shall be entitled to any greater rights under Section 2.10 and Section 5.4 than its Granting Lender would have been entitled to absent the use of such SPV and (II) each SPV agrees to be subject to the requirements of Section 2.10 and Section 5.4 as though it were a Lender and has acquired its interest by assignment pursuant to Section 13.6(b).

13.7     Replacements of Lenders under Certain Circumstances.

(a)     In the event that any Lender (i) requests reimbursement for amounts owing pursuant to Section 2.10 or Section 5.4, or (ii) becomes a Defaulting Lender, the Borrower shall be entitled to replace such Lender with a bank, lending institution or other financial institution or terminate the Commitment of such Lender; provided that (x) in the case of a replacement, (A) such replacement does not conflict with any Requirement of Law, (B) the replacement bank or institution shall purchase, at par, all Loans and the Borrower shall pay all other amounts (other than any disputed amounts), pursuant to Section 2.10 or Section 5.4, as the case may be) owing to such replaced Lender prior to the date of replacement, (C) the replacement bank or institution, if not already a Lender, and the terms and conditions of such replacement, shall be reasonably satisfactory to the Administrative Agent, (D) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 13.6(b) (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein) and (E) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender and (y) in the case of a termination, repay all Obligations (including amounts (other than any disputed amounts), owing pursuant to Section 2.10 or Section 5.4, as the case may be) owing to such Lender as of such termination date (and in the case of a Letter of Credit Issuer, Cash Collateralize, cancel or backstop on terms satisfactorily to such Letter of Credit Issuer any Letters of Credit issued by it).

(b)     If any Lender (such Lender, a "Non-Consenting Lender") has failed to consent to a proposed amendment, waiver, discharge or termination that, pursuant to the terms of Section 13.1, requires the consent of all of the Lenders affected or the Required Lenders and with respect to which the Required Lenders shall have granted their consent, then the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) to replace such Non-Consenting Lender by requiring such Non-Consenting Lender to assign its Loans and its Commitments hereunder to one or more assignees reasonably acceptable to the Administrative Agent; provided that: (i) all Obligations of the Borrower

owing to such Non-Consenting Lender being replaced (other than principal and interest) shall be paid in full to such Non-Consenting Lender concurrently with such assignment, and (ii) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon.  In connection with any such assignment, the Borrower, Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with Section 13.6.

    13.8    Adjustments; Set-off.

    (a)    If any Lender (a "Benefited Lender") shall at any time receive any payment in respect of any principal of or interest on all or part of the Loans made by it, or the participations in Letter of Credit Obligations held by it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Loans, or interest thereon, such Benefited Lender shall (i) notify the Administrative Agent of such fact, and (ii) purchase for cash at face value from the other Lenders a participating interest in such portion of each such other Lender's Loans, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably in accordance with the aggregate principal of and accrued interest on their respective Loans and other amounts owing them; provided, however, that, (A) if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest and (B) the provisions of this paragraph shall not be construed to apply to (1) any payment made by the Borrower or any other Credit Party pursuant to and in accordance with the express terms of this Agreement and the other Credit Documents, (2) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans, Commitments or participations in Drawings to any assignee or participant or (3) any disproportionate payment obtained by a Lender as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or Commitments or any increase in the Applicable Margin in respect of Loans or Commitments of Lenders that have consented to any such extension.  Each Credit Party consents to the foregoing and agrees, to the extent it may effectively do so under Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Credit Party rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Credit Party in the amount of such participation.

    (b)    After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders provided by Requirements of Law, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable Requirements of Law, upon any amount becoming due and payable by the Borrower hereunder or under any Credit Document (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, Indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower.  Each Lender agrees promptly to notify the Borrower (and the Credit Parties, if applicable) and the Administrative Agent after any such set-off and application made by such Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

    13.9    Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic

transmission, *i.e.* a "pdf" or a "tif"), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

13.10    <u>Severability</u>. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

13.11    <u>Integration</u>. This Agreement and the other Credit Documents represent the agreement of the Borrower, the Guarantors, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Borrower, the Guarantors, the Administrative Agent nor any Lender relative to subject matter hereof not expressly set forth or referred to herein or in the other Credit Documents. This Agreement and the other Credit Documents may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements among the parties.

13.12    <u>GOVERNING LAW</u>. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

13.13    <u>Submission to Jurisdiction; Waivers</u>.    Each party hereto hereby irrevocably and unconditionally:

      (a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Credit Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York and appellate courts from any thereof;

      (b)    consents that any such action or proceeding shall be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

      (c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person at its address set forth on <u>Schedule 13.2</u> at such other address of which the Administrative Agent shall have been notified pursuant to <u>Section 13.2</u>;

      (d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by Requirements of Law or shall limit the right to sue in any other jurisdiction;

      (e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this <u>Section 13.13</u> any special, exemplary, punitive or consequential damages; and

      (f)    agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

13.14    Acknowledgments.  The Borrower hereby acknowledges that:

(a)      it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents;

(b)      (i) the credit facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document) are an arm's-length commercial transaction between the Borrower and the other Credit Parties, on the one hand, and the Administrative Agent and the Lenders on the other hand, and the Borrower and the other Credit Parties are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each of the Administrative Agent and the Lenders, is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary for any of the Borrower, any other Credit Parties or any of their respective Affiliates, equity holders, creditors or employees or any other Person; (iii) neither the Administrative Agent, any other Agent nor any Lender has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrower or any other Credit Party with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Credit Document (irrespective of whether the Administrative Agent or any other Agent or any Lender has advised or is currently advising any of the Borrower, the other Credit Parties or their respective Affiliates on other matters) and none of the Administrative Agent or any Lender has any obligation to any of the Borrower, the other Credit Parties or their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; (iv) the Administrative Agent and its Affiliates, each other Agent and each of its Affiliates and each Lender and its Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its respective Affiliates, and none of the Administrative Agent, any other Agent or any Lender has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) none of the Administrative Agent or any Lender has provided and none will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Credit Document) and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  The Borrower hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Administrative Agent and each Agent with respect to any breach or alleged breach of agency or fiduciary duty; and

(c)      no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower, on the one hand, and any Lender, on the other hand.

13.15    WAIVERS OF JURY TRIAL.  THE BORROWER, THE ADMINISTRATIVE AGENT, EACH LETTER OF CREDIT ISSUER AND EACH LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

13.16    Confidentiality.  The Administrative Agent, each other Agent, any Letter of Credit Issuer and each Lender shall hold all non-public information furnished by or on behalf of the Credit Parties in connection with such Lender's evaluation of whether to become a Lender hereunder or obtained by such Lender, the Administrative Agent, any Letter of Credit Issuer or such other Agent pursuant to the

requirements of this Agreement ("Confidential Information"), confidential in accordance with its customary procedure for handling confidential information of this nature and in any event may make disclosure (a) as required or requested by any Governmental Authority, self-regulatory agency or representative thereof or pursuant to legal process or applicable Requirements of Law, (b) to such Lender's or the Administrative Agent's, any Letter of Credit Issuer's or such other Agent's attorneys, professional advisors, independent auditors, trustees or Affiliates, in each case who need to know such information in connection with the administration of the Credit Documents and are informed of the confidential nature of such information (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential), (c) to an investor or prospective investor in a securitization that agrees its access to information regarding the Credit Parties, the Loans and the Credit Documents is solely for purposes of evaluating an investment in a securitization and who agrees to treat such information as confidential, (d) to a trustee, collateral manager, servicer, backup servicer, noteholder or secured party in connection with the administration, servicing and reporting on the assets serving as collateral for a securitization and who agrees to treat such information as confidential, (e) to a nationally recognized ratings agency that requires access to information regarding the Credit Parties, the Loans and Credit Documents in connection with ratings issued with respect to a securitization, (f) to any other party hereto, (g) in connection with the exercise of any remedy hereunder or under any other Credit Document or any action or proceeding related to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder, or (h) with the consent of the Borrower; provided that unless specifically prohibited by applicable Requirements of Law, each Lender, the Administrative Agent, any Letter of Credit Issuer and each other Agent shall endeavor to notify the Borrower (without any liability for a failure to so notify the Borrower) of any request made to such Lender, the Administrative Agent, any Letter of Credit Issuer or such other Agent, as applicable, by any governmental, regulatory or self-regulatory agency or representative thereof (other than any such request in connection with an examination of the financial condition of such Lender by such governmental agency) for disclosure of any such non-public information prior to disclosure of such information; provided further that in no event shall any Lender, the Administrative Agent, any Letter of Credit Issuer or any other Agent be obligated or required to return any materials furnished by the Borrower or any Subsidiary.  In addition, each Lender, the Administrative Agent and each other Agent may provide Confidential Information to prospective Transferees (for the avoidance of doubt, other than any Disqualified Institution) or to any pledgee referred to in Section 13.6 or to prospective direct or indirect contractual counterparties in Hedge Agreements to be entered into in connection with Loans made hereunder solely for purposes of evaluating whether to become a Lender hereunder and as long as such Person is advised of and agrees to be bound by the provisions of this Section 13.16 or confidentiality provisions at least as restrictive as those set forth in this Section 13.17.

13.17    Release of Collateral and Guarantee Obligations.

(a)    The Lenders hereby irrevocably agree that the DIP Liens granted to the Administrative Agent by the Credit Parties on any Collateral shall be automatically released (i) in full, as set forth in Section 13.17(b) below, (ii) upon the Disposition of such Collateral (including as part of or in connection with any other Disposition permitted hereunder) to any Person other than another Credit Party, to the extent such Disposition is made in compliance with the terms of this Agreement (and the Administrative Agent may rely conclusively on a certificate to that effect provided to it by any Credit Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Credit Party, upon termination or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 13.1), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guarantee (in accordance with the second succeeding sentence and Section

5.14(b) of the Guarantee), (vi) as required by the Administrative Agent to affect any Disposition of Collateral in connection with any exercise of remedies of the Administrative Agent pursuant to the Security Documents, and (vii) upon such Collateral no longer constituting Collateral pursuant to the terms of the Credit Documents. Any such release shall not in any manner discharge, affect, or impair the Obligations or any DIP Liens (other than those being released) upon (or obligations (other than those being released) of the Credit Parties in respect of) all interests retained by the Credit Parties, including the proceeds of any Disposition, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Credit Documents. The Lenders hereby authorize the Administrative Agent to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender. Any representation, warranty or covenant contained in any Credit Document relating to any such Collateral or Guarantor shall no longer be deemed to be repeated.

(b)      Notwithstanding anything to the contrary contained herein or any other Credit Document, upon the Termination Date, and at the request of the Borrower, the Administrative Agent shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all obligations under any Credit Document, whether or not on the date of such release there may be any (i) Hedging Obligations in respect of any Secured Hedge Agreements, (ii) Cash Management Obligations in respect of any Secured Cash Management Agreements and (iii) any contingent or indemnification obligations not then due. Any such release of Obligations shall be deemed subject to the provision that such Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of a Credit Party, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, a Credit Party or any substantial part of its property, or otherwise, all as though such payment had not been made.

13.18    <u>USA PATRIOT Act</u>.  The Administrative Agent and each Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001) the "<u>Patriot Act</u>"), it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow the Administrative Agent and such Lender to identify each Credit Party in accordance with the Patriot Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

13.19    <u>Payments Set Aside</u>.  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by the Administrative Agent, <u>plus</u> interest thereon from the date of such demand to the date such payment is made at a rate *per annum* equal to the applicable Overnight Rate from time to time in effect.

13.20   Reinstatement.  This Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Administrative Agent or any other Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any substantial part of its property, or otherwise, all as though such payments had not been made.

13.21   Disposition of Proceeds.  The Security Documents contain an assignment by the Borrower and/or the Guarantors unto and in favor of the Administrative Agent for the benefit of the Lenders of all of the Borrower's or each Guarantor's interest in and to their as-extracted collateral in the form of production and all proceeds attributable thereto which may be produced from or allocated to the Mortgaged Property.  The Security Documents further provide in general for the application of such proceeds to the satisfaction of the Obligations described therein and secured thereby.  Notwithstanding the assignment contained in such Security Documents, until the occurrence of an Event of Default, (a) the Administrative Agent and the Lenders agree that they will neither notify the purchaser or purchasers of such production nor take any other action to cause such proceeds to be remitted to the Administrative Agent or the Lenders, but the Lenders will instead permit such proceeds to be paid to the Borrower and its Subsidiaries and (b) the Lenders hereby authorize the Administrative Agent to take such actions as may be necessary to cause such proceeds to be paid to the Borrower and/or such Subsidiaries.

13.22   Collateral Matters; Hedge Agreements.  The benefit of the Security Documents and of the provisions of this Agreement relating to any Collateral securing the Obligations shall also extend to and be available on a *pro rata* basis to any Person (a) under any Secured Hedge Agreement, in each case, after giving effect to all netting arrangements relating to such Hedge Agreements or (b) under any Secured Cash Management Agreement.  No Person shall have any voting rights under any Credit Document as a result of the existence of obligations owed to it under any such Secured Hedge Agreement or Secured Cash Management Agreement.

13.23   Limitation of Recourse.  There shall be full recourse to the Credit Parties and to all of their assets for the liabilities of the Credit Parties under this Agreement and the other Credit Documents and their other Obligations, but in no event shall the Permitted Investors, or any officer, director or holder of any Stock in the Borrower, be personally liable or obligated for such liabilities and Obligations of the Credit Parties, except as expressly provided in the Security Documents or in any other Credit Document to which such Person is a party.  Nothing contained herein shall (a) limit or be construed to limit the obligations and liabilities of the Permitted Investors in any Credit Document creating such liabilities or (b) affect or diminish any rights of any Secured Party against such Permitted Investor for such Permitted Investor's fraud, willful misrepresentation, gross negligence, willful misconduct or misappropriation of funds.

13.24   Interest Rate Limitation.  It is the intention of the parties hereto that each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby would be usurious as to any Lender under laws applicable to it (including the laws of the United States of America, the State of Texas or any other jurisdiction whose laws may be mandatorily applicable to such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Credit Documents or any agreement entered into in connection with or as security for the Loans, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to any Lender that is contracted for, taken, reserved, charged or received by such Lender under any of the Credit Documents or agreements or otherwise in connection with the Loans shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by such

Lender on the principal amount of the Loans (or, to the extent that the principal amount of the Loans shall have been or would thereby be paid in full, refunded by such Lender to the Borrower); and (ii) in the event that the maturity of the Loans is accelerated by reason of an election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Lender on the principal amount of the Loans (or, to the extent that the principal amount of the Loans shall have been or would thereby be paid in full, refunded by such Lender to the Borrower).  All sums paid or agreed to be paid to any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Lender, be amortized, prorated, allocated and spread throughout the stated term of the Loans until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (i) the amount of interest payable to any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Lender pursuant to this <u>Section 13.24</u> and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Lender would be less than the amount of interest payable to such Lender computed at the Highest Lawful Rate applicable to such Lender, then the amount of interest payable to such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Lender until the total amount of interest payable to such Lender shall equal the total amount of interest which would have been payable to such Lender if the total amount of interest had been computed without giving effect to this <u>Section 13.24</u>.

13.25    <u>Incorporation of DIP Orders by Reference</u>.  Each of the Credit Parties, the Administrative Agent, and the Lenders agrees that any reference contained herein to (a) the Interim DIP Order shall include all terms, conditions, and provisions of such Interim DIP Order and that the Interim DIP Order is incorporated herein for all purposes, and (b) the Final DIP Order shall include all terms, conditions, and provisions of such Final DIP Order and that the Final DIP Order is incorporated herein for all purposes. To the extent there is any inconsistency between the terms of this Agreement and the terms of either the Interim DIP Order or the Final DIP Order, the terms of the Interim DIP Order and the Final DIP Order, as applicable, shall govern.

13.26    <u>Flood Insurance Provisions</u>.  Notwithstanding anything in this Agreement or any other Credit Document to the contrary, in no event is any "Building" (as defined in the applicable Flood Insurance Laws) or "Manufactured (Mobile) Home" (as defined in the applicable Flood Insurance Laws) included in the definition of "Mortgaged Property" (as defined in any Credit Document) and no "Building" or "Manufactured (Mobile) Home" is hereby encumbered by this Agreement or any other Credit Document.

13.27    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

[Remainder of Page Intentionally Left Blank; Signature Pages Follow.]

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

**EM ENERGY EMPLOYER, LLC**, as Borrower

By:_____
Name: _____
Title:  _____

KEYBANK, NATIONAL ASSOCIATION, as
Administrative Agent and Letter of Credit Issuer and a
Lender


By:_____
Name:
Title: