## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>EDGEMARC ENERGY HOLDINGS, LLC, *et al.,*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-11104 (BLS)<br><br>(Jointly Administered)<br><br>Ref. Dkt. Nos. 13, 19, 62<br><br>**Hearing Date: June 17, 2019 at 10:00 am (ET)**<br>**Objection Deadline: June 10, 2019 at 4:00 pm (ET)** |

## OBJECTION OF OFFICIAL
## COMMITTEE OF UNSECURED CREDITORS TO DEBTORS'
## (I) DIP FINANCING MOTION, AND (II) BIDDING PROCEDURES MOTION

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the above-captioned chapter 11 cases of EdgeMarc Energy Holdings, LLC and its affiliated debtors and debtors-in-possession (collectively, the "**Debtors**"), by and through their undersigned counsel, hereby files this objection (the "**Objection**") to:

(i)     the *Motion of Debtors for Entry of Interim and Final Orders, pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, and 507, (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Post-Petition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling Final Hearing, and (VII) Granting Related Relief* [Docket No. 13] (the "**DIP Financing Motion**"); and

(ii)    the *Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief and (II)(A) Approving Sale of Debtors' Assets Free and Clear of Liens,*

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: EdgeMarc Energy Holdings, LLC (6900), EM Energy Manager, LLC (5334), EM Energy Employer, LLC (8026), EM Energy Ohio, LLC (6935), EM Energy Pennsylvania, LLC (1541), EM Energy West Virginia, LLC (3771), EM Energy Keystone, LLC (7506), EM Energy Midstream Ohio, LLC (1268), and EM Energy Midstream Pennsylvania, LLC (3963). The Debtors' corporate headquarters and mailing address is 1800 Main Street, Suite 220, Canonsburg, PA 15317.

*Claims, Interests and Encumbrances, (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 19] (the "**Bidding Procedures Motion**").[2]

In support of this Objection, the Committee states as follows:

## PRELIMINARY STATEMENT

1.      These cases are unusual in that they were not precipitated by an over-leveraged balance sheet, failed business plan, or natural headwinds within the Debtors' industry.  These cases are further unusual in that there can be no confidence that the typical M&A process will realize the Debtors' intrinsic value, given the numerous extrinsic circumstances potentially impacting this sale process.  The Debtors' proposed sale process may be the best way to maximize the value of the Debtors' assets, or it may not be.  As of now, no party, including the Debtors, knows whether a sale will realize optimal value for the Debtors' assets.  The problem is that the DIP Facility and Bidding Procedures compel a sale transaction within two months (August 2019), regardless of whether the sale process yields optimal value.  The Committee does not oppose a sale process designed to maximize the value of the Debtors' assets, but the Committee does oppose a sale process with a preordained outcome (via the DIP Facility), given that no one can provide any reliable assessment as to what that outcome may be.[3]

2.      The Debtors' Pennsylvania assets comprise a substantial portion of the Debtors' value (e.g., approximately 46% of the Debtors' fiscal year 2018 total revenue ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ These Pennsylvania assets are currently "shut in" following the September 10,

---

[2]      Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the DIP Financing Motion or Bidding Procedures Motion, as applicable.

[3]      In this regard, it bears noting that the fee structure for the Debtors' proposed investment bankers (i.e., a flat $4 million transaction fee for any sale, regardless of value) suggests that not even the Debtors' investment bankers have a clear view as to what value the proposed sale process is likely to yield.

REDACTED USING REDACT-IT

2018 explosion (the "**Revolution Explosion**") that occurred along a pipeline and gathering system (the "**Revolution System**") located in Beaver County, Pennsylvania.  According to the Debtors, the Revolution System is the system that, if completed, would enable gas from the Debtors' Pennsylvania wells to be gathered, processed, and sold.  ETC Northeast Pipeline LLC ("**ETC**"), a subsidiary of publicly-owned Energy Transfer Partners (the operator of one of the largest interstate pipeline systems in the United States, with a market capitalization as of this filing of approximately $37 billion), was and is responsible for building the Revolution System.

3.       Most bidders, we can assume, will seek to monetize the Debtors' Pennsylvania assets.  The obvious and critical question, then, is what impact the Revolution Explosion and current "shut in" of the Debtors' Pennsylvania assets will have on the sale process and potential bids.  The answer, at the moment, is unclear, but the Committee has a healthy degree of skepticism that the sale process, as compelled by the DIP Facility, will yield optimal value given these circumstances.

4.       First, it is uncertain when—or even if—ETC will ever be able to complete the Revolution System.  The Pennsylvania Department of Environmental Protection has suspended review of all permit applications and amendments for construction of the Revolution System, and has informed ETC that it will be withholding the issuance of all clean water permits for ETC and its affiliates.  As of May 14, 2019, ETC had still not completed a full assessment to determine all wetlands and streams adversely affected by ETC's construction of the Revolution System, as required under Pennsylvania law.  The Debtors, for their part, state that the Revolution Explosion will leave the Revolution System inoperable "for a substantial period of time."

5.       Second, the estates may hold potentially valuable, unencumbered, inchoate claims (the "**Inchoate Estate Claims**") in respect of the Revolution Explosion, including potentially

3

REDACTED USING REDACT-IT

against ETC.  In this regard, the Debtors and ETC are currently in litigation (which has been stayed) regarding the Revolution Explosion, with the Debtors alleging that they "suffer[ed] substantial financial losses" as a result of ETC's conduct.  Assuming, for the moment, that ETC can complete the Revolution System, it appears likely that any third party bidder will want ETC's cooperation to enable such bidder to monetize the Debtors' Pennsylvania assets.  ETC may condition such cooperation on receiving a full release of estate claims,

6.      The Committee's concern is that the proposed DIP Facility and Bidding Procedures, which require the Debtors to obtain approval of a sale by August 2019, create structural impediments to maximizing the value of the estates' assets (including Inchoate Estate Claims) by compelling the Debtors to move forward and attempt to consummate any sale that repays the DIP loans in full, or else face an immediate event of default, termination of DIP commitments, and acceleration of $108 million of DIP obligations (including the Roll-Up), without any notice to the Debtors or opportunity to cure.

7.      Imagine if, come August, the highest bid that the Debtors receive for their assets is a peppercorn above the secured debt, provides no recovery for any other constituency, and is conditioned on the release of all estate claims against ETC.  Facing an immediate DIP default and liquidity crisis, the Debtors would be compelled to attempt to consummate this transaction.  At that point, the cases would likely devolve into round-the-clock litigation regarding, among other things, the value of the Inchoate Estate Claims being released, the fairness of the sale process, whether the sale is in the best interests of the estates, and likely appeals.  The Debtors' proposed sale process (concluding in August) provides a very short window in which to attempt to resolve many difficult and complex issues attendant to these cases.  At bottom, these cases

4

demand a better process.  The Debtors' sale process should be allowed to mature in the normal course, without the threat of a looming DIP default, to ensure that the Debtors can ferret out the true, intrinsic value of their assets.

8.       In addition to its structural infirmities, the DIP Facility contains numerous off-market terms and conditions, and represents a vast overreach by KeyBank (the proposed DIP lender and agent).  Given the "shut in" of the entirety of the Debtors' Pennsylvania business and a resulting 50% reduction in the borrowing base under the Debtors' prepetition reserve based facility (the "**Prepetition RBL Facility**") (for which KeyBank was lender and agent), KeyBank had the Debtors "over a barrel" during negotiations, and exploited this leverage to the estates' substantial detriment.  In such circumstances, it is incumbent on the Bankruptcy Court to serve as an appropriate check.  The Debtors' lack of bargaining power is reflected in certain onerous terms of the DIP Facility, including the following:

(i)      Cost: The interest rate, fees, and other costs attendant to the DIP Facility result in an all-in financing cost of approximately $4.89 million, or nearly 17% of the New Money loans, over the seven-month life of the loan, resulting in an approximately 28% return (prorated over the course of a year).  Further, the high interest rate applies to both New Money and Roll-Up amounts, and far exceeds the interest rate under the Prepetition RBL Facility, resulting in an estimated incremental interest expense on the prepetition/Roll Up amounts totaling $1.36 million through the DIP maturity (December 2019).

(ii)     Milestones and Case Controls/Events of Default: The DIP Facility contains onerous milestones and covenants that, if breached, would enable the Debtors to

REDACTED USING REDACT-IT

immediately call an event of default, without any notice, grace period, or cure rights.

(iii)    <u>Roll-Up</u>: The DIP Facility seeks a Roll-Up of approximately $78 million of prepetition debt, which is unjustified, particularly in light of the only approximately $30 million in New Money being made available— ████████████ ██████████████████████████████████ ██████████████████████████████ The Roll-Up is excessive and serves no purpose other than to foreclose all exit options, other than a sale.

(iv)    <u>Liens on Unencumbered Assets</u>: The DIP Facility inappropriately seeks to grant liens and claims in respect of previously unencumbered assets, including the proceeds of Inchoate Estate Claims, other commercial tort claims, and avoidance actions, thereby potentially depriving unsecured creditors of what may be the only valuable sources of recovery in these cases.

(v)    <u>Carve-Out/Budget</u>: The Carve-Out includes only allowed and unpaid estate professionals fees to the extent provided for in the "Approved Budget." The Approved Budget runs through only August 9, 2019 (two weeks prior to the proposed Auction date), and does not provide a line item for Committee professionals. ██████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ Further, the

6

post-Carve-Out Reserve: (a) is capped at only $1 million for post-Carve-Out Trigger Date professional fees; (b) does not include all pre-Carve-Out Trigger Date allowed and unpaid professional fees (instead, such fees are capped at $1 million); and (c) is to be shared pro rata among all estate professionals, which unreasonably benefits certain of the Debtors' professionals that have retainers, and prejudices the Committee's professionals, as professionals with retainers will be able to look to their retainers first before looking to the Carve-Out Reserve for payment of any allowed and unpaid fees. Finally, although the Committee is still analyzing the DIP Facility and budget, it does not appear that the budget provides for the payment of all post-petition trade claims through sale closing.

(vi)     <u>Challenge Rights/Credit Bid Issues</u>: The DIP Facility unduly limits the Committee's ability to fulfill its fiduciary duties by providing for too short a Challenge Period (60 days) and a minimal ($50,000) Investigation budget. The sale process and related litigation and regulatory issues will already demand considerable time and attention. Given this, the 60 day Challenge Period for the Committee to conduct its Investigation, which appears will require, among other things, review of thousands of mortgages and leases, is simply not enough time. Any Final DIP Order must be revised to provide for: (i) a longer Challenge Period; (ii) automatic standing for the Committee to prosecute a Challenge on behalf of the estates or, alternatively, tolling of the Challenge Period upon the filing of a standing motion through final adjudication of such standing motion and, if successful, Challenge; and (iii) a substantially increased Investigation budget. The Final DIP Order must further expressly provide that any Roll-Up of

REDACTED USING REDACT-IT

prepetition secured debt (and credit bid rights) may be unwound in the event of a successful Challenge, and must specify that the releases, as well as the stipulations and admissions, contained in the DIP Orders are expressly subject to the Committee's Challenge rights.

(vii)    <u>Waivers of Estate Rights</u>:  In light of the foregoing, the following DIP Order provisions are unreasonable and should be deleted:  (a) waiver of the estates' Section 506(c) rights; (b) waiver of the estates' Section 552(b) rights; and (c) waiver of the estates' rights under the equitable doctrine of marshaling.

(viii)   <u>Adequate Protection</u>: The proposed Adequate Protection Package appears facially excessive.

(ix)     <u>Permitted Variance</u>: The permitted budget variance of 10% (tested weekly) is too restrictive.  A permitted variance of not less than 15% (tested every four weeks) is more appropriate in the context of these cases.

(x)      <u>Minimum Cash Balance</u>:  The $3 million minimum cash balance requirement is unnecessarily high and serves to artificially constrain the Debtors' liquidity and, as a result, artificially increase its borrowing needs and costs.

(xi)     <u>Committee Information Rights</u>:  The DIP Orders and DIP Credit Agreement do not provide the Committee with adequate information rights.

9.    In addition, the Committee objects to the proposed Bidding Procedures.  Prior to the filing of this Objection, the Committee provided the Debtors with proposed revisions to the Bidding Procedures and Bidding Procedures Order in substantially the form as attached hereto. *See* **<u>Exhibit A</u>**.  The Committee intends to work diligently with the Debtors prior to the final hearing on the Bidding Procedures to attempt to resolve the Committee's objection points to the

8

proposed Bidding Procedures and Bidding Procedures Order on a consensual basis. To the extent that the parties are unable to consensually resolve any objection points, the Committee will seek modifications to the final Bidding Procedures and Bidding Procedures Order consistent with the revised forms attached hereto.

10.     Finally, the Committee was formed only on May 28, 2019, and continues to diligence the proposed DIP Facility and Bidding Procedures. Accordingly, the Committee reserves the right to amend, supplement, or modify this Objection, including by raising additional objection points to the DIP Facility and Bidding Procedures, at any time prior to or at the final hearing on the same.

## RELEVANT FACTUAL BACKGROUND

### A.     Events Precipitating Debtors' Chapter 11 Filings.

11.     According to the Debtors, the Revolution Explosion was the principal cause of their chapter 11 filings. *Declaration of Callum Streeter in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 3] (the "**Streeter Decl.**"), ¶ 6; *Declaration of Elliot Ross in Support of the Debtors' [DIP Financing Motion]* [Docket No. 13-2] (the "**Ross Decl.**"), ¶ 7. The Revolution Explosion occurred on September 10, 2018 along the Revolution System, a pipeline and gathering system that the Debtors state was expected to go into commercial service in or around the time of the Revolution Explosion and enable the Debtors to gather, process, and sell gas from their newly-drilled wells in Butler County, Pennsylvania. Streeter Decl. ¶ 6; Ross Decl. ¶ 7. But, the Debtors state that the Revolution Explosion prevented the Debtors from utilizing the Revolution System to flow their Pennsylvania gas and, ultimately, following certain disputes with ETC, the Debtors determined to "shut in" their Pennsylvania assets. Streeter Decl. ¶¶ 6, 9.

REDACTED USING REDACT-IT

12.     The Debtors (and their equity sponsors) and ETC are presently in litigation regarding the Revolution Explosion and related issues.  *See* **Exhibits B**, **C**, and **D**.  ETC has filed motions to remove and transfer all such litigation to the Bankruptcy Court on the grounds that the litigation involves "material rights, claims and liabilities" and other "potential claims" of the Debtors and that the resolution of the litigation "will impact the Debtors' sale process."  *See* **Exhibits E** and **F**.

13.     According to the Debtors (and their equity sponsors, who have purportedly invested approximately $850 million into the Debtors), the Revolution Explosion had a material and adverse impact on the Debtors' business and operations, caused the Debtors to incur "substantial financial losses," and left the Debtors unable to satisfy their funded debt obligations and perform under certain commercial agreements, including under certain firm transport agreements.  *See* **Exhibit C** ¶ 87; **Exhibit D** ¶ 81; Streeter Decl. ¶¶ 11, 13.

14.     First, the Debtors allege that the Revolution Explosion resulted in the Debtors having to "shut in" the entirety of their Pennsylvania operations.  Streeter Decl. ¶ 9.  As a result, the Debtors state that they were (and continue to be) unable to sell gas from their Pennsylvania wells and earn attendant revenue.  Streeter Decl. ¶ 5; Ross Decl. ¶ 7.  The Debtors' Pennsylvania operations constitute a substantial portion of the Debtors' business, comprising approximately 46% ($54.2 million) of the Debtors' total revenues for the twelve months ended December 31, 2018, *see* Streeter Decl. ¶ 24.

15.     The Debtors' Pennsylvania operations are still currently "shut in," and there does not appear to be any certainty as to when such operations may be back up and running.  The

REDACTED USING REDACT-IT

Pennsylvania Department of Environmental Protection has suspended review of all permit applications and amendments for construction of the Revolution System and informed ETC that it would be withholding the issuance of all clean water permits for ETC and its affiliates. *See* **Exhibit H**. As of May 14, 2019, ETC had still not completed a full assessment to determine all wetlands and streams adversely affected by ETC's construction of the Revolution System, as required under Pennsylvania law. *See* **Exhibit I**. The Debtors, for their part, state that the Revolution Explosion will leave the Revolution System inoperable "for a substantial period of time." Ross Decl. ¶ 7.

16.    Second, following the Revolution Explosion and Pennsylvania "shut in," on March 21, 2019, KeyBank notified the Debtors that it was reducing the borrowing base under the Prepetition RBL Facility from $80 million to $40 million. *See* Streeter Decl. ¶¶ 12, 49; Ross Decl. ¶ 7. The Debtors state that under the terms of the Prepetition RBL Facility, they were required to repay the outstanding amounts in excess of the reduced borrowing base, approximately $38 million, commencing May 1, 2019. *See* Streeter Decl. ¶ 12. According to the Debtors, these events put further strain on the Debtors' liquidity. *See* Ross Decl. ¶ 7.

17.    Finally, the Debtors allege that the Revolution Explosion and Pennsylvania "shut in" rendered the Debtors unable to utilize specified pipeline capacity for which they were paying fixed minimum amounts under certain firm transport agreements. The Debtors state that, in anticipation of the Revolution System going on-line by no later than January 1, 2019, the Debtors entered into several contracts for fixed amounts of transportation capacity under certain firm transportation service agreements (the "**FT Agreements**"). *See* Streeter Decl. ¶ 11. The Debtors allege that, as a result of the Revolution Explosion and Pennsylvania "shut in," they were no longer able to satisfy their obligations under the FT Agreements. *See* Streeter Decl. ¶

REDACTED USING REDACT-IT

13.   As a result, the Debtors are presently seeking to reject certain of the FT Agreements (and related contracts), which appears likely to result in substantial rejection damages claims against the estates.



**C.    The Proposed DIP Facility Compels Inappropriate Case Outcome.**

19.   The Proposed DIP Facility obligates the Debtors to satisfy certain "Milestones," including the following:

(a)   Within 45 Days of the Petition Date (i.e., by June 29, 2019):   Approval of "Acceptable Bid Procedures" (i.e., bid procedures that are consistent with the Milestones).

(b)   Within 70 Days of the Petition Date (i.e., by July 24, 2019):  Entry by the Debtors into a stalking horse asset purchase agreement that repays all DIP Obligations in full and is otherwise acceptable to KeyBank in its sole discretion.

(c)   Within 85 Days of the Petition Date (i.e., by August 8, 2019):   Approval of the aforementioned stalking horse asset purchase agreement.

(d)   Within 100 Days of the Petition Date (i.e., by August 23, 2019):  Commencement of the Auction in accordance with the "Acceptable Bid Procedures."

12

(e)     <u>Within 110 Days of the Petition Date (i.e., by September 2, 2019)</u>:  Entry of an "Acceptable Sale Order" (<u>i.e.,</u> a sale order that provides for the repayment in full of all DIP Obligations).

(f)     <u>Within 15 Days of entry of the Sale Order (i.e., by no later than September 17, 2019)</u>:  Consummation of the sale and repayment of all DIP Obligations in full.

*See* DIP Credit Agreement § 1.1.

20.     The Debtors' failure to satisfy any of these Milestones will result in an immediate "Event of Default" under the DIP Credit Agreement, *see* DIP Credit Agreement §§ 11.1(c), (t), and will enable KeyBank to:

(i)     Immediately terminate all DIP commitments and letters of credit, without demand or further order of the Bankruptcy Court;

(ii)    Immediately declare all DIP obligations due and payable, without presentment, demand, protest, or other notice of any kind to the Debtors or the Committee, or further order of the Bankruptcy Court;

(iii)   Exercise rights to realize on DIP Collateral without obtaining any further relief or order from the Bankruptcy Court, after providing five (5) business days' notice to the Debtors, Committee, and U.S. Trustee (and subject to such parties' limited right to seek relief from the Bankruptcy Court, but solely on the basis that no Event of Default has occurred); and

(iv)    Pursue all other rights or remedies under the DIP Credit Agreement, DIP Orders, and applicable law, without demand or further order of the Bankruptcy Court.

*See* DIP Credit Agreement § 11.2(a).

REDACTED USING REDACT-IT

21.    Accordingly, if approved, the DIP Facility would require the Debtors to obtain approval of a sale transaction, by no later than September 2, 2019, that repays the DIP Obligations in full—even if such sale transaction provides no recovery for general unsecured creditors and impairs potentially valuable Inchoate Estate Claims for little or no value—or else face an immediate Event of Default, termination of DIP commitments, and acceleration of DIP Obligations, without any notice to the Debtors or opportunity to cure.

**D.    Other Terms Of Proposed DIP Facility Are Unreasonable And Represent A Vast Overreach By KeyBank.**

22.    As a result of the "shut in" of the Debtors' Pennsylvania operations and subsequent borrowing base redetermination, the Debtors had no leverage in prepetition negotiations with KeyBank, which is reflected in the terms of the DIP Facility.

23.    The Debtors tacitly acknowledge that the Revolution Explosion, and resulting "shut in" and borrowing base redetermination, put the Debtors "over a barrel" in negotiations with KeyBank.  *See* Ross Decl. ¶ 7.  The Debtors further acknowledge that they ran a limited prepetition marketing process in respect of the DIP financing, and instead focused almost entirely on negotiating with KeyBank, with whom they lacked anything resembling equal bargaining power.  *See id.* ¶ 14.  In fact, the KeyBank proposal was, according the Debtors, the only proposal available to them.  *Id.* ¶ 17.  KeyBank, for its part, exerted maximum leverage over the Debtors during negotiations to extract an off-market DIP Facility skewed heavily in its favor.

(a)    <u>Cost of Capital</u>:  The aggregate interest, fees, and other expenses of the DIP Facility equal approximately $4.89 million through the December 2019 maturity date.  Interest accrues on the DIP Obligations at the Base Rate plus 5.75%-5.25%, with an 11.00%-10.50% floor, which is far in excess of the interest charged under the Prepetition RBL Facility, which is LIBOR + 3.25%-2.25% (which, as of the

REDACTED USING REDACT-IT

Petition Date, equaled approximately 5.75%). *See* DIP Credit Agreement §§ 1.1, 2.8(a). The interest rate under the DIP Facility applies to not only New Money amounts, but also prepetition/Roll-Up amounts, resulting in an incremental interest expense on those amounts of approximately $1.36 million (including an incremental 2.0% default rate under the Prepetition RBL Facility). The DIP Facility also includes an Exit Fee of 3.0%-2.5%, and Upfront Fee of 3.0%, and an Unused Fee of 3.0%-2.5%. *See* DIP Credit Agreement § 4.1.

(b) <u>Milestones and Events of Default</u>: The DIP Credit Agreement contains numerous Milestones, as detailed above, which, if breached, would result in an immediate Event of Default, without notice or any opportunity to cure.

(c) <u>Roll-Up of Prepetition RBL Obligations</u>: The DIP Facility provides for a Roll-Up of $77.8 million of prepetition obligations under the Prepetition RBL Facility and conversion into post-petition allowed superpriority administrative expense claims. *See* DIP Credit Agreement § 2.1.

(d) <u>Liens on Unencumbered Assets</u>: In connection with the DIP Facility, the Debtors seek to grant liens and claims in respect of previously unencumbered assets, including the proceeds of estate litigation claims and avoidance actions.

(e) <u>Carve-Out and DIP Budget</u>: The DIP Order provides that the Carve-Out will include the Committee's allowed and unpaid professional fees, but only to the extent provided for in the "Approved Budget." The Approved Budget runs through only August 9, 2019 (two weeks prior to the proposed Auction date), and does not provide a line item for Committee professionals. ████████████

REDACTED USING REDACT-IT

Further, the post-Carve-Out Reserve: (a) is capped at only $1 million for post-Carve-Out Trigger Date professional fees; (b) does not include all pre-Carve-Out Trigger Date allowed and unpaid professional fees (instead, such fees are capped at $1 million); (c) is to be shared pro rata among all estate professional, including those with pre-existing retainers; and (d) does not include all accrued and unpaid post-petition trade payables.

(f)  <u>Challenge, Investigation Budget, Credit Bidding</u>:  The DIP Order provides the Committee with a sixty (60) day Challenge Period and $50,000 Investigation budget, which may not be used to actually prosecute a Challenge.  Through the DIP Order, KeyBank is seeking the absolute right to credit bid, subject only to an order following a successful Challenge that limits such right.

(g)  <u>Estate Waivers</u>:  The DIP Order contains waivers of the estates' rights under Bankruptcy Code Sections 506(c) and 552(b), and the equitable doctrine of marshaling.

(h)  <u>Adequate Protection</u>:  The proposed Adequate Protection Package includes: (a) granting an allowed post-petition superpriority administrative expense claim; (b) granting a valid, perfected security interest in and lien on the DIP Collateral (including unencumbered assets); and (c) current payment of interest at the default rate in respect of outstanding Prepetition RBL Facility obligations.

16

REDACTED USING REDACT-IT

(i)    <u>Permitted Variances</u>:  The permitted budget variance is 10% and is tested weekly.

(j)    <u>Minimum Cash Balance</u>:  The DIP Facility requires the Debtors to maintain a $3 million minimum cash balance at all times.

(k)    <u>Limited Committee Information Rights</u>:  Neither the DIP Orders nor the DIP Credit Agreement contemplates sharing with the Committee any of the information provided to KeyBank, as agent under the DIP Credit Agreement.

**E.    <u>The Bidding Procedures And Bidding Procedures Order.</u>**

24.    The Debtors' proposed Bidding Procedures and Bidding Procedures Order do not enable the Committee to fulfill its fiduciary duties to general unsecured creditors.  The Committee has revised the proposed Bidding Procedures and Bidding Procedures Order, in the forms attached hereto as **<u>Exhibit A</u>**, to better enable the Committee to fulfill its fiduciary duties to general unsecured creditors.

<strong><u>OBJECTION</u></strong>

**I.    <u>The Proposed DIP Facility Cannot Be Approved Because It Is Not "Fair, Reasonable, And Adequate" Under The Circumstances Of These Cases.</u>**

**(a)    <u>The DIP Facility Compels An Inappropriate Sale Process That Appears Unlikely To Yield Maximum Value For The Debtors' Assets.</u>**

25.    Under the case law, the Debtors bear certain fundamental proof burdens when asking the Court to approve post-petition financing.  One such burden that is of particular importance here is that if the proposed financing, by its terms, compels an immediate Section 363 sale process, the proposal "must be considered in conjunction with the actual sale of the company," and with due consideration of the fairness and appropriateness of the sale process. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 148 (3d Cir. 1986) ("[T]here is no indication in the district court's opinion that it reviewed the record of the August 10 'emergency' hearing in the bankruptcy court; we believe, however, that the court should have done so before

17

REDACTED USING REDACT-IT

it dismissed the appeals from the bankruptcy court. That hearing, and the circumstances surrounding approval of the Interim Agreement, was an integral part of the 'sale' of Abbotts; as such, it must be considered in conjunction with the actual sale of the company at the September 12 hearing. The record from that hearing, moreover, indicates that counsel for a prospective bidder and three unsecured creditors filed a number of written objections going to ADC's 'good faith.' They included, for example, the claim that Interim Agreement so greatly diminished Abbotts' value as to 'create a situation where all competitive bidding for [Abbotts'] business would be eliminated, leaving [ADC] to purchase [Abbotts] at an inadequate price, to the detriment of all interested parties.").

26.    In order for a Section 363 sale process to be deemed appropriate under the law, the sale process must, among other things, be designed to yield optimal value for the estates. *See In re Abbotts Dairies*, 788 F.2d at 147-150; *In re Gucci*, 126 F.3d 380, 391 (2nd Cir. 1997); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *see also Calpine Corp. v. O'Brien Envt'l. Energy, Inc. (In re O'Brien Envt'l. Energy, Inc.)*, 181 F.3d 527, 535-37 (3d Cir. 1999) (value maximizing sale process in best interests of the estate); *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004) (discussing trustee's duty to maximize value of the estate); *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288-89 (B.A.P. 9th Cir. 2005) ("The court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under the circumstances….").

27.    Here, the Debtors' proposed sale process appears unlikely to yield optimal value for the estates. Instead, the sale process appears designed to ensure only repayment of the DIP Obligations, even if the successful bid provides for the impairment of potentially substantial Inchoate Estate Claims for little or no consideration ████████████████████████████████████

18

REDACTED USING REDACT-IT

████████████████████████ There is no clear timeline for when, or even if, the Debtors' Pennsylvania operations will be back up and running. The Debtors may simply not be a good M&A candidate at this moment, and compelling an M&A process through the DIP Facility at the risk of an event of default is inappropriate.

28.    Moreover, the estates' most valuable asset may well be its Inchoate Estate Claims against ETC and others. The sale process is not designed to maximize the value of these assets, but instead appears likely to squander these assets for little or no consideration, so long as the DIP Facility is repaid. As noted above, ██████████████████████████████ █████████████████████████████████████████████████ any third party bidder will likely require some assurance that the Debtors' Pennsylvania assets will be returned to operation. Operation of those assets are, at present, tied to ETC's completion of the Revolution System, so a third party purchaser will likely require the cooperation of ETC to monetize the Debtors' Pennsylvania wells. ████████████████████████████████ ██████████████████████████████████████ And, the DIP Facility would compel the Debtors to grant ETC a full release in order to close a sale transaction that repays the DIP Facility, or else face an immediate Event of Default, termination of borrowing capacity, and liquidity crisis, without notice or any opportunity to execute an alternate exit strategy.

**(b)    The DIP Facility Is Skewed Too Far In Favor Of KeyBank And Is Not In The Best Interests Of The General Creditor Body.**

29.    To obtain approval of the DIP Facility, the Debtors must also show that the proposed financing is in the "best interests of the general creditor body," and "fair, reasonable, and adequate under the circumstances." *See In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) ("In seeking approval of [DIP financing], the Debtors have the burden of proving

REDACTED USING REDACT-IT

that … the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender."); *In re DB Capital Holdings, LLC*, 454 B.R. 804, 822 (Bankr. D. Colo. 2011) (court must determine that the proposed "financing is in the best interests of the estate and its creditors"); *In re Tenney Village Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (proposed financing must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the … Debtor's principals who guaranteed its debt."); *In re Roblin Industries, Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) ("The proposed financing is in the best interests of the general creditor body").

30.     Because debtors have limited bargaining power when negotiating for post-petition financing, courts do not approve such financing merely on a showing that there was no alternative financing available.   *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) ("[D]ebtors-in-possession generally enjoy little negotiating power with a proposed lender, particularly where the lender has a pre-petition lien on cash collateral."); *In re Levitz Home Furnishing, Inc.,* Case No. 05-45189 (Bankr. S.D.N.Y. Oct. 10, 2005) (Lifland, J.) ("Well, let me just comment about the good faith and arm's length, because it's well known when a Debtor is about to go into bankruptcy it is in a deleveraged position with some of the security stakeholder . . . and it [is] well recognized that the deleveraged Debtor was not in a position to fight off any of the demands, outrageous or rageous, whatever they may be, or was constrained to give in. So as your spear carrier the Debtor is less than adequate. The stakeholders at that particular point in time are not in a position to be heard, they are only in a position to be heard in a hearing like this when they are able to come forth and fully protect the interests of the entire estate."); *see also In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court

REDACTED USING REDACT-IT

should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").

31.     Instead, courts conduct an independent inquiry into whether the proposed financing is fair, reasonable, adequate, and in the best interests of the estates and general creditor body.  *See in re Aqua Associates,* 123 B.R. 192, 196 (Bankr. E.D. Pa.1991) (citing *In re Crouse Group, Inc.*, 71 B.R. 544, 549-51 (Bankr. E.D. Pa.1987)) (debtors must show "terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender"); *Ames Dep't Stores,* 115 B.R. at 39 (same).

32.     Where proposed financing favors the interests of one class of creditors to the detriment of the estate or at the expense of other creditors, or is being used by a secured creditor to obtain greater protection than it had prepetition, it is not considered fair and reasonable or in the best interests of the estate.  *See Ames Dep't Stores*, 115 B.R. at 39 ("[P]roposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008) ("Any proposal should provide a pre-petition secured creditor with 'the same level of protection it would have had if there had not been post-petition superpriority financing.'") (quoting *In re Mosello,* 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996)); *see also Tenney Vill.,* 104 B.R. at 568 (post-petition financing should not be used in a manner that "pervert[s] the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit" of only a subset of the secured creditors).

33.     Here, the Debtors had zero leverage in negotiating the DIP Facility with KeyBank, and this reality is reflected in the onerous DIP Facility's terms described above,

REDACTED USING REDACT-IT

including the high cost of capital, onerous milestones and case controls, and hair-trigger events of default without notice or a reasonable opportunity for the Debtors to cure.  The proposed DIP Facility ignores the interests of the estate and its other creditors, and seeks to impose a process designed solely for the benefit of KeyBank.

      **(c)**      <u>**Additional Bases For Denying Approval Of The Proposed DIP Facility**</u>.

         **i.**      <u>**The Roll-Up Is Not Fair Or Reasonable**</u>.

34.      Roll-ups are "not favored" in bankruptcy, and their approval must be predicated on a substantial showing of need by the Debtors.  *See, e.g., Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.,* 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (roll-up provisions "have the effect of improving the priority of a prepetition creditor"); *Tenney Vill.*, 104 B.R. at 570 (holding that Bankruptcy Code section 364 does not authorize the granting of administrative expense priority for prepetition debt); *see also* Hr'g Tr. 32:20-25, *In re Verasun*, No. 0812606 (BLS) (Bankr. D. Del. Dec. 3, 2008) [Docket No. 316] (J. Shannon noting that Bankruptcy Courts in the District of Delaware, the Southern District of New York, and elsewhere have found that "rollups are not favored.  They are strongly discouraged on day one, and the bottom line is that for approval a substantial showing [of need for the financing] has to be made.").

35.      Here, the only reasons for the Roll-Up appear to be to: (i) enhance KeyBank's prepetition collateral position; (ii) eliminate defects in its prepetition collateral position; (iii) hinder the Debtors' ability to propose a chapter 11 plan which might "cram down" the Prepetition RBL Facility obligations; and (iv) ensure an administratively insolvent estate if the Debtors deviate their case strategy from the one articulated by KeyBank.  For these reasons, the Court should deny the requested Roll-Up.

REDACTED USING REDACT-IT

36.     There is no evidence supporting the contention that the Roll-Up is reasonable or fair.  Neither the Streeter nor Ross Declarations explain how the Roll-Up benefits the Debtors' estates or its creditors.  At bottom, the Roll-Up serves no purpose other than to preclude exit alternatives, and is excessive and unreasonable, particularly given that only $30 million in New Money is being made available.␀␀␀␀␀  Moreover, the exorbitant interest rate under the DIP Facility, which vastly exceeds the interest rate under the Prepetition RBL Facility, applies to Roll-Up amounts, resulting in an incremental interest expense to the estates totaling approximately $1.36 million through the seven-month term of the loan.

### ii.     The DIP Collateral Inappropriately Includes The Proceeds Of Inchoate Estate Claims And Avoidance Actions.

37.     The Final DIP Order proposes to include liens on all of the Debtors unencumbered assets, including Inchoate Estate Claims, other commercial tort claims, and avoidance action proceeds.  The Inchoate Estate Claims and other commercial tort claims are not part of KeyBank's prepetition collateral package, as they were not specifically identified in the applicable security agreements and financing statements.  *See* NY UCC § 9-108(e)(1) ("A description only by type of collateral defined in this chapter is an insufficient description of … a commercial tort claim…").  And, a related provision of the UCC prohibits attachment of a security interest in after-acquired commercial tort claims.  *See* NY UCC § 9-204(b)(2) ("A security interest does not attach under a term constituting an after-acquired property clause to … a commercial tort claim…").

38.     Avoidance actions are statutory rights created for the benefit of a debtor's entire estates, not just its secured lenders. *See, e.g., Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 568 (3d Cir. 2003) (avoidance powers intended to

REDACTED USING REDACT-IT

"maximize[e] the value of the estate and allowing creditors to recover their claims from that estate"); *Bear, Stearns Sec. Corp. v. Gredd,* 275 B.R. 190, 194 (S.D.N.Y. 2002) (citing *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 597 (9th Cir.1991)) ("the purpose of § 547 is to ensure fair distribution between creditors, while the purpose of § 548 is to protect the estate itself for the benefit of all creditors"); *In re Sapolin Paints, Inc.,* 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) ("[N]either a trustee ... nor a debtor-in-possession, can assign, sell, or otherwise transfer the right to maintain a suit to avoid preference.").

39.     The potentially valuable Inchoate Estate Claims, other commercial tort claims, and avoidance actions may form the only material source of recovery for unsecured creditors in these cases.   These are unencumbered assets of the estates that should be available for distribution to the Debtors' unsecured creditors.   Accordingly, the Court should not permit inclusion of any of these unencumbered assets as DIP Collateral.

<b>iii.     The Carve-Out And Budget Are Not Fair Or Reasonable.</b>

40.     The Carve-Out includes only those allowed and unpaid professionals fees to the extent provided for in the "Approved Budget."   As noted above, the Approved Budget and Carve-Out provisions provide inadequate funding for the Committee's professionals (particularly when compared to the other professionals' compensation), and thereby prejudice the Committee and general unsecured creditors.

<b>iv.     The Limitations On The Committee's Challenge Rights<br>And KeyBank's Credit Bid Protections Are Not Fair Or Reasonable.</b>

41.     The sixty (60) day Challenge Period and miniscule $50,000 Investigation budget are unreasonable in the context of these cases.   Further, the Committee should not be subjected to the requirement that it must first obtain an order granting it standing to assert a Challenge prior to expiration of the Challenge Period.   The Committee submits that standing should be

24

REDACTED USING REDACT-IT

immediately conferred upon the Committee in the Final DIP Order to avoid the unnecessary consumption of resources related to the prosecution of a standing motion.   Such relief is commonly granted to an official committee where, as here, the debtor has waived the right to directly assert the alleged claim.   *See*, *e.g.*, *In re Old Razor Company, LLC (f/k/a American Safety Razor, LLC)*, Case No. 10-12351, [Docket No. 174] (Bankr. D. Del. Aug. 27, 2010); *In re PCAA Parent, LLC*, Case No. 10-10250, [Docket No. 179] (Bankr. D. Del. Mar. 2, 2010); *In re Pliant Corp.*, Case No. 09-10443, [Docket No. 337] (Bankr. D. Del. Mar. 20, 2009); *In re Quebecor World (USA) Inc.*, Case No 08-10152,  [Docket No. 470] (Bankr. S.D.N.Y. Apr. 1, 2008); *In re Dana Corp.*, Case No. 06-10354, [Docket No. 721] (Bankr. S.D.N.Y. Mar. 29, 2006); *In re DPH Holdings Corp.*, Case No. 05-44481, [Docket No. 797] (Bankr. S.D.N.Y. Oct. 28, 2005).

42.     The prohibitions on the use of the Carve-Out by the Committee's professionals to commence or prosecute a Challenge are improper.   Neither the Committee nor its professionals should be forced to conduct an investigation without the ability to prosecute any claims that are uncovered.   Finally, Paragraph 30 of the Interim DIP Order grants KeyBank the right to credit bid the obligations they hold against the Debtors in connection with any sale of the Debtors' assets.   The only limitation to KeyBank's right to credit bid is a "successful Challenge."   The Final DIP Order should not confer upon KeyBank an unfettered right to credit bid.   Such rights remain subject to a limitation to credit bid for "cause" pursuant to Bankruptcy Code Section 363(k).

### v.     The Estate Waivers Are Not Fair Or Reasonable.

43.     The Final DIP Order contemplates a waiver by the Debtors of their right to surcharge collateral pursuant to Bankruptcy Code Section 506(c), absent the prior written consent of KeyBank.   The Section 506(c) waiver is inappropriately broad and should be stricken,

REDACTED USING REDACT-IT

especially since all claims entitled to administrative expense priority are not included in the Carve-Out and might go unpaid depending on the outcome of these chapter 11 cases.  For the same reason, waiver of the estates' rights under Section 552(b) and the equitable doctrine of marshaling is inappropriate.  If administrative solvency was assured by way of, for example, inclusion of post-petition administrative expense claims and all estate professional fees in the Carve-Out, or KeyBank provides assurances that these amounts would be paid in the event that a Carve-Out Trigger Notice is delivered, the Committee would consider consenting to the aforementioned estate waivers.

### vi.    The Adequate Protection Package Is Not Fair Or Reasonable.

44.    The Debtors seek to grant KeyBank a vast bundle of rights as adequate protection in the form of adequate protection claims and liens, payment of interest at the default rate, and the waiver of rights afforded to the Debtors under the Bankruptcy Code to propose a plan to "cram down" the Prepetition RBL Facility obligations.  The purpose of adequate protection is not to allow a secured lender to *enhance* its collateral or to heap upon a secured lender significant rights to induce them to lend money to help preserve and monetize its collateral.  Rather, the purpose is to ensure that prepetition lenders receive the security they bargained for prior to the petition date, or, in other words, preserve the secured creditor's position following the commencement of the bankruptcy case.  *See generally, Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935).  Aspects of the adequate protection package requested here should be rejected because the adequate protection goes beyond anything contemplated by the Bankruptcy Code.

45.    If this Court determines that KeyBank is entitled to some form of adequate protection, the adequate protection package must be limited.  The Committee has no objection to adequate protection in the form of Adequate Protection Claims and Adequate Protection Liens

26

limited to the actual amount of diminution in KeyBank's prepetition collateral package.  The Adequate Protection Liens, however, should not attach to unencumbered assets, including the Inchoate Estate Claims, other commercial tort claims, avoidance actions, or the proceeds of the foregoing.

### vii.    The Permitted Variances, Minimum Cash Balance, And Limitations On The Committee's Information Rights Are Not Fair Or Reasonable.

46.    The permitted budget variance of 10% (tested weekly) is too restrictive.  A permitted variance of 15% (tested every four weeks) is more appropriate in the context of these cases.  The $3 million minimum cash balance requirement is unnecessarily high and serves to artificially constrain the Debtors' liquidity and, as a result, artificially increase its borrowing needs.  Finally, the DIP Credit Agreement contains numerous covenants requiring the Debtors to provide KeyBank with periodic financial reports and notices of Defaults or Events of Default.  Conspicuously, the DIP Credit Agreement does not afford the Committee similar information rights.  The Final DIP Order should be modified to include a provision requiring the Debtors to deliver to the Committee the same information the Debtors are required to provide KeyBank under the DIP Credit Agreement.

## II.    The Proposed Bidding Procedures Should Not Be Approved Without The Committee's Requested Modifications.

47.    The Committee does not object to a sale process in general, but the process must be one designed to maximize the value of all of the Debtors' assets, not one designed only to benefit KeyBank.  *See generally In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (noting that bid procedures must not "give[] an advantage to a favored purchaser over other bidders…..").  Attached hereto are revisions to the proposed Bidding Procedures to ensure a more robust and value-maximizing sale process.  *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D.

REDACTED USING REDACT-IT

Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."). Over the coming days, the Committee will work with the Debtors to attempt to resolve its objection points to the Bidding Procedures on a consensual basis.

48.    But, there is one issue respecting the sales process that the Committee wants to highlight. The Debtors are presently accruing post-petition trade payables, and there is no certainty that the DIP Facility will provide the Debtors with sufficient liquidity to pay all such claims. The potential for credit bidding further threatens administrative insolvency, especially where (as here) a debtor's post-petition financing includes milestones, surcharge waivers, and a narrow "carve out" from collateral.

49.    Even at the bid procedures stage, the Court has the power to ensure that any potential sale provides for the payment in full of post-petition administrative expense claims. *See, e.g., In re R.E. Gas Development, LLC, et al.*, Case No. 18-22032, (Bankr. W.D. Pa. June 29, 2018) (Deller, J.) [Docket No. 370] (requiring all bids to include an amount of cash necessary to pay all accrued and unpaid post-petition trade payables through sale closing); *In re Encore Healthcare Assocs.*, 312 B.R. 52 (Bankr. E.D. Pa. 2004) (denying bid procedures because potential sale would provide no benefit to estates; distinguishing from sales that pay off secured lenders, but also ensure payment of administrative expense claims and establishment of fund for general unsecured claims). Given the present uncertainty regarding the payment of post-petition administrative claims, the proposed Bidding Procedures should be revised to provide that no bid (whether a credit bid or otherwise) will be approved unless it provides for the payment in full of all accrued and otherwise unpaid post-petition administrative expense claims through sale closing.

REDACTED USING REDACT-IT

## **RESERVATION OF RIGHTS**

50.     The Committee reserves its rights to supplement this Objection at any time prior to the final hearing on the DIP Financing Motion and Bidding Procedures Motion.  Additionally, the Committee expressly reserves its rights to raise additional or further objections to any proposed sale of the Debtors' assets, including, without limitation, to any proposed Stalking Horse Bid, Stalking Horse Purchase Agreement, Bid Protections, Successful Bid, or Backup Bid, at or prior to the Sale Hearing or any subsequent hearing.

*[Remainder of page intentionally left blank.]*

REDACTED USING REDACT-IT

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court deny approval of the DIP Financing Motion and Bidding Procedures Motion and grant such other and further relief to the Committee as the Court deems just and proper.

Dated:  June 10, 2019
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Robert J. Dehney*
Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
Eric W. Moats (No. 6441)
1201 North Market Street, 16th Floor
P. O. Box 1347
Wilmington, DE 19899-1347
Telephone:  (302) 658-9200
Email:   rdehney@mnat.com
          aremming@mnat.com
          emoats@mnat.com

- and -

**BROWN RUDNICK LLP**
Robert J. Stark (admitted *pro hac vice*)
Sigmund S. Wissner-Gross (admitted *pro hac vice*)
Andrew M. Carty (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone:  (212) 209-4800
Email:   rstark@brownrudnick.com
          swissnergross@brownrudnick.com
          acarty@brownrudnick.com

Steven D. Pohl (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone:  (617) 856-8200
Email:   spohl@brownrudnick.com

*Proposed Counsel to the*
*Official Committee of Unsecured Creditors*
