B 2100A (Form 2100A) (12/15)

# UNITED STATES BANKRUPTCY COURT

District of Delaware

In re  EM Energy Ohio, LLC _____,                    Case No.   19-11107 _____

## TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

Paragon Integrated Services Group LLC _____                    Anchor Drilling Fluids USA, LLC _____
Name of Transferee                                                Name of Transferor

Name and Address where notices to transferee                     Court Claim # (if known): _____330_____
should be sent:                                                   Amount of Claim*:__$1,390,471.30__
                                                                  Date Claim Filed: _____08/19/2019__
  See attached.

Phone: _____                                 Phone: _____
Last Four Digits of Acct #: _____                      Last Four Digits of Acct. #: _____

Name and Address where transferee payments
should be sent (if different from above):                        * Secured claim amount:    $968,522.15
                                                                    Unsecured claim amount: $421,949.15

Phone: _____                                 See attached Addendum for further
Last Four Digits of Acct #:_____                      information.

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____                    Date: 12/17/2020 _____
      Transferee/Transferee's Agent

*Penalty for making a false statement:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.

## ADDENDUM TO TRANSFER OF CLAIM
## OTHER THAN FOR SECURITY

### I.     NOTICES AND PAYMENT

1.      All notices respecting the Claims (defined below) must be served upon the

following persons:

Paragon Integrated Services Group LLC      Alan M. Root
825 Town & Country Lane, Suite 1200      Archer & Greiner, P.C.
Houston, TX 77024      300 Delaware Ave., Suite 1100
Attn: Celina Carter      Wilmington DE, 19801
ccarter@paragonisg.com      Phone: 302-356-6623
     E-mail: aroot@archerlaw.com

All payments or distributions on account of the Claims should be directed to:

Paragon Integrated Services Group LLC
825 Town & Country Lane, Suite 1200
Houston, TX 77024
Attn: Celina Carter

### II.    CLAIMS

2.      On August 19, 2019 and November 22, 2019, Anchor Drilling Fluids USA, LLC

("Anchor") filed the following proofs of claim (collectively, the "Claims"):

| Claim # | Filed | Debtor | Secured Amount | General Unsecured Amount | Total Claim Amount |
|---|---|---|---|---|---|
| 330 | 8/19/2019 | EM Energy Ohio, LLC | $968,522.15 | $421,949.15 | $1,390,471.30 |
| 344 | 8/19/2019 | EM Energy Pennsylvania, LLC | $968,522.15 | $421,949.15 | $1,390,471.30 |
| 347 | 8/19/2019 | EdgeMarc Energy Holdings, LLC | $968,522.15 | $421,949.15 | $1,390,471.30 |
| 662 | 11/22/2019 | EdgeMarc Energy Holdings, LLC | $968,522.15 (Permitted Prior Lien Form) | | |

III.    **TRANSFER OF CLAIMS**

3.      On May 24, 2020, Anchor and an affiliated debtor, Q'Max America, Inc., filed voluntary chapter 7 petitions in the United States Bankruptcy Court for the Southern District of Texas (the "Texas Bankruptcy Court").  *See* Jointly Administered Case No. 20-60030 (CML) (Bankr. S.D. Tex.) (together, the "Texas Bankruptcy Cases").

4.      Christopher R Murray was appointed the chapter 7 trustee in the Texas Bankruptcy Cases (the "Chapter 7 Trustee").

5.      On July 1, 2020, the Texas Bankruptcy Court entered an order (the "Sale Order") authorizing and approving the sale of, *inter alia,* substantially all of the assets of Anchor and its affiliated debtor to Drilling Services, LLC, as assignee of the stalking horse purchaser.  *See* Order at Dkt. No. 196, Case No. 20-60030 (CML) (Bankr. S.D. Tex.).

6.      On July 2, 2020, Drilling Services, LLC changed its name to Paragon Integrated Services Group LLC ("Paragon").  A copy of the Certificate of Amendment reflecting the name change is attached hereto.

7.      The sale of the assets of Anchor and its affiliated debtor to Paragon closed on or about July 2, 2020.

8.      A copy of the fully executed *Second Amended and Restated Asset Purchase Agreement* between the Chapter 7 Trustee and Paragon (the "APA") is annexed hereto.

9.      The assets acquired by Paragon included, among other things:

> all of the assets, properties and rights of Sellers used in the Sellers' business of providing drilling and completion fluids, chemical additives, solids control services and equipment, waste management services and equipment, fluid engineering services and other products and services in the northeastern United States, in support of oil and gas drilling . . . .

APA § 2.1

10.    Paragon also acquired, *inter alia*, all of Anchor's "accounts receivable, notes receivable, bill receivables, trade accounts, hold backs, retention, book debts, . . . and other receivables" as well as all refunds and all "causes of action, lawsuits, judgments, Claims and demands of any nature" in each case relating to the Acquired Assets (as defined in the APA). *Id.*

11.    Pursuant to the Sale Order and the APA, Paragon is the transferee and owner of each of the Claims.

## IV.    <u>RESERVATION OF RIGHTS</u>

12.    The filing of this Transfer of Claim Other than for Security shall not be construed to be a consent to jurisdiction of the Bankruptcy Court, a waiver of the right to withdraw the reference, a waiver of the right to a jury trial, or an election of remedies, which waives or otherwise affects any other remedy.    Paragon hereby asserts and reserves all of its rights under the Bankruptcy Code and applicable non-bankruptcy law.

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:38 PM 07/02/2020
FILED 04:38 PM 07/02/2020
SR 20206052654 - File Number 3054536

## CERTIFICATE OF AMENDMENT
### OF
## CERTIFICATE OF FORMATION
### OF
## DRILLING SERVICES, LLC

1.      The name of the limited liability company is Drilling Services, LLC.

2.      The first paragraph of the Certificate of Formation of the limited liability company is hereby amended in its entirety to read as follows:

> "1.    Name.  The name of the limited liability company is Paragon Integrated Services Group LLC (the "Company")."

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Amendment of Certificate of Formation of Drilling Services, LLC this 2nd day of July, 2020.

By:    */s/ Caleb Clark*
Name:  Caleb Clark
Title:  Authorized Person

**SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

dated as of July 2, 2020

by and among

QMAX ACQUISITION CORP.

as Buyer,

DRILLING SERVICES, LLC,

as Assignee,

and

CHRISTOPHER R. MURRAY, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE

OF Q'MAX AMERICA INC.,

and

CHRISTOPHER R. MURRAY, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE

OF ANCHOR DRILLING FLUIDS USA, LLC

as Sellers

---

# TABLE OF CONTENTS

**SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT** ...................1

**ARTICLE 1 DEFINITIONS** ...........................................................................................2
    1.1    Defined Terms ...............................................................................2
    1.2    Interpretation...............................................................................14

**ARTICLE 2 ACQUIRED ASSETS AND ASSUMPTION OF LIABILITIES** ....................15
    2.1    Assets to be Acquired ...................................................................15
    2.2    Excluded Assets ...........................................................................18
    2.3    Liabilities to be Assumed by Buyer..................................................19
    2.4    Assignment and Assumption of Contracts..........................................20
    2.5    Excluded Liabilities .....................................................................21
    2.6    Withholding ................................................................................23

**ARTICLE 3 CLOSING; CASH PURCHASE PRICE** ....................................................23
    3.1    Closing; Transfer of Possession; Certain Deliveries ...........................23
    3.2    Consideration ..............................................................................24
    3.3    Deposit ......................................................................................25
    3.4    Allocation of Purchase Price...........................................................25
    3.5    Consideration for Avoidance Actions ...............................................25
    3.6    Continuing Employees Expense Amount ...........................................26
    3.7    Funding of Additional Admin Amount...............................................26

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES REGARDING
SELLERS** ...............................................................................................26
    4.1    Organization................................................................................26
    4.2    Litigation; Orders.........................................................................27
    4.3    Compliance with Laws; Permits ......................................................27
    4.4    Real Property. .............................................................................27
    4.5    Environmental Matters...................................................................28
    4.6    Suppliers; Customers. ...................................................................28
    4.7    RESERVED.................................................................................29
    4.8    Contracts ....................................................................................29
    4.9    Taxes. .......................................................................................29
    4.10   Brokers' Fees and Commissions......................................................30

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER AND
ASSIGNEE** ............................................................................................30
    5.1    Organization................................................................................31
    5.2    Due Authorization, Execution and Delivery; Enforceability..................31
    5.3    Governmental Approvals ................................................................31
    5.4    No Conflicts................................................................................31

3750713.10

| | | | |
|---|---|---|---|
| 5.5 | Sufficiency of Funds | | 32 |
| 5.6 | Condition of Business | | 32 |

**ARTICLE 6 COVENANTS OF THE PARTIES** .............................................................. **32**

| | | | |
|---|---|---|---|
| 6.1 | Conduct Pending the Closing | | 32 |
| 6.2 | Access | | 32 |
| 6.3 | Physical Inventory | | 33 |
| 6.4 | Tax Matters | | 33 |
| 6.5 | Approvals; Commercially Reasonable Efforts; Notification; Consent | | 33 |
| 6.6 | Further Assurances | | 34 |
| 6.7 | Bankruptcy Actions and Court Filings | | 34 |
| 6.8 | Expense Reimbursement | | 35 |
| 6.9 | Preservation of Books and Records | | 35 |
| 6.10 | Notification of Certain Matters | | 35 |
| 6.11 | Confidentiality | | 36 |
| 6.12 | Contractors | | 36 |
| 6.13 | Continuing Employee | | 36 |
| 6.14 | Right to Assume Benefit Plans | | 36 |
| 6.15 | Payments from Third Parties | | 36 |
| 6.16 | Indemnification | | 37 |

**ARTICLE 7 CONDITIONS TO OBLIGATIONS OF THE PARTIES** ............................... **40**

| | | | |
|---|---|---|---|
| 7.1 | Conditions Precedent to Obligations of Buyer | | 40 |
| 7.2 | Conditions Precedent to the Obligations of the Sellers | | 42 |
| 7.3 | Frustration of Conditions Precedent | | 42 |

**ARTICLE 8 TERMINATION** ............................................................................................ **42**

| | | | |
|---|---|---|---|
| 8.1 | Termination of Agreement | | 42 |
| 8.2 | Consequences of Termination | | 44 |

**ARTICLE 9 MISCELLANEOUS** ....................................................................................... **45**

| | | | |
|---|---|---|---|
| 9.1 | Expenses | | 45 |
| 9.2 | Assignment | | 45 |
| 9.3 | Parties in Interest | | 45 |
| 9.4 | Notices | | 45 |
| 9.5 | Choice of Law | | 46 |
| 9.6 | Entire Agreement; Amendments and Waivers | | 46 |
| 9.7 | Counterparts; Electronic Signatures | | 46 |
| 9.8 | Severability | | 47 |
| 9.9 | Headings | | 47 |
| 9.10 | Exclusive Jurisdiction and Specific Performance | | 47 |
| 9.11 | WAIVER OF RIGHT TO TRIAL BY JURY | | 47 |
| 9.12 | Survival | | 47 |
| 9.13 | Time of Essence | | 48 |
| 9.14 | Non-Recourse | | 48 |
| 9.15 | Disclosure Schedules | | 48 |

3750713.10

9.16    Mutual Drafting ......................................................................................................48

3750713.10

### SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT, dated as of July 2, 2020 (the "Agreement Date"), is entered into by and among Christopher R. Murray, Chapter 7 Trustee for the bankruptcy estate of Q'Max America Inc., a company incorporated under the laws of Delaware ("Q'Max"), and Christopher R. Murray, Chapter 7 Trustee for the bankruptcy estate of Anchor Drilling Fluids USA, LLC, a Delaware limited liability company ("Anchor Drilling" and, together with Q'Max (or, as applicable, the Trustee acting on behalf of Anchor Drilling and/or Q'Max), "Sellers" and each, a "Seller"), QMax Acquisition Corp., a Delaware corporation ("Buyer"), and Drilling Services, LLC, a Delaware corporation ("Assignee").  Each Seller, Buyer and Assignee are referred to herein individually as a "Party" and collectively as the "Parties".

### WITNESSETH:

**WHEREAS**, subject to the Bankruptcy Court's approval, Sellers have agreed to sell to Buyer, and Buyer has agreed to purchase, the Acquired Assets as of the Closing, and Buyer is willing to assume from Sellers the Assumed Liabilities as of the Closing upon terms and subject to the conditions set forth hereinafter.

**WHEREAS**, Sellers and Buyer previously entered into that certain Asset Purchase Agreement (the "Original Asset Purchase Agreement"), dated as of May 24, 2020;

**WHEREAS,** Sellers and Buyer previously amended the Original Asset Purchase Agreement by entering into that certain Amended and Restated Asset Purchase Agreement, dated as of June 5, 2020 (the "A&R Asset Purchase Agreement");

**WHEREAS**, pursuant to Section 9.2 of the A&R Asset Purchase Agreement and that certain Assignment and Assumption Agreement, dated as of June 12, 2020 (the "Drilling Services Assignment and Assumption Agreement"), by and between Buyer and Assignee, Buyer previously assigned, transferred, granted and conveyed unto Assignee (its wholly owned subsidiary) all if its rights and obligations under the A&R Asset Purchase Agreement, but agreed to remain jointly liable with Assignee for Buyer's obligations under the A&R Asset Purchase Agreement; and

**WHEREAS,** the Parties now desire to amend and restate the A&R Asset Purchase Agreement in its entirety as set forth hereunder.

**NOW**, **THEREFORE**, in consideration of the agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the A&R Asset Purchase Agreement is hereby amended and restated in its entirety by this Agreement and all references to the Original Asset Purchase Agreement set forth in the Drilling Services Assignment and Assumption Agreement shall apply to this Agreement *mutatis mutandis*, and the Parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1     Defined Terms.  As used herein, the terms below shall have the following respective meanings:

"A&R Asset Purchase Agreement" shall have the meaning specified in the preamble.

"ABL Facility" shall mean the credit agreement (as amended, restated, supplemented or otherwise modified from time to time) dated as of September 6, 2019, by and among Anchor Drilling Fluids USA, LLC, Q'Max America Inc., the lenders party thereto and Encina Business Credit, LLC as agent on behalf of such lenders.

"Accounts Receivable" shall have the meaning specified in Section 2.1(a).

"Acquired Assets" shall have the meaning specified in Section 2.1.

"Additional Admin Amount" shall have the meaning specified in Section 2.3(e).

"Administrative Claim Funding" shall mean any amounts funded to the Trustee by any of the Sellers' pre-petition lenders for the administration or disposition of the pre-petition lenders' collateral and any amounts funded to Sellers or the Trustee under the New Money Financing Agreement prior to Closing to pay post-petition administrative expenses of Sellers' bankruptcy estate.

"Administrative Claims" shall have the meaning specified in Section 2.3(e).

 "Affiliate" shall, with respect to any Person, mean any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise.  For purposes of this Agreement, Q'Max Solutions Inc. and each of its Subsidiaries (including each of the Sellers), on the one hand, and the Buyer and its Affiliates, on the other hand, shall not be deemed to be Affiliates of each other.

"Agreement" shall mean this Amended and Restated Asset Purchase Agreement, together with the exhibits and Disclosure Schedules hereto, in each case as amended, restated, supplemented or otherwise modified from time to time.

"Agreement Date" shall have the meaning specified in the preamble.

"Allocation" shall have the meaning specified in Section 3.4.

"Alternative Transaction" shall mean (i) any investment in, financing of, capital contribution or loan to, or restructuring or recapitalization of the Sellers, (ii) any merger, consolidation, share exchange or other similar transaction to which a Seller or any of its Affiliates

-2-

is a party that has the effect of transferring, directly or indirectly, all or any portion of the Acquired Assets, or any issuance, sale or transfer of equity interests in, the Sellers, (iii) any direct or indirect sale of all or any portion of the Acquired Assets, (iv) any issuance, sale or transfer of equity interests in, the Sellers or any of their Subsidiaries or (v) any other transaction (other than a liquidation or a plan of liquidation), including a reorganization (in any jurisdiction, whether domestic, foreign, international or otherwise), that transfers or vests ownership of, economic rights to, or benefits in all or a portion of the Acquired Assets, to any party other than Buyer or any of its Affiliates, in each instance, whether or not such transaction is entered into in connection with any bankruptcy, insolvency, arrangement, proposal, receivership or similar Proceedings.

"Anchor Drilling" shall have the meaning specified in the preamble.

"Assignee" shall have the meaning specified in the preamble.

"Assignment and Assumption Agreement" means an assignment and assumption agreement, in a form mutually agreed to by the Parties, evidencing the assignment and assumption of all Assumed Contracts and Assumed Liabilities by Buyer and Assignee.

"Assumed Contracts" means those Leases and Executory Contracts that have been designated by Buyer for assumption and assignment to Buyer and Assignee by Sellers pursuant to Section 2.4 and with respect to which an order has been entered by the Bankruptcy Court (which may be the Sale Order) authorizing the assumption and assignment of the Lease or Executory Contract and an Assumption Notice has been delivered and filed with the Bankruptcy Court. For the avoidance of doubt, "Assumed Contracts" shall not include any Executory Contract or Lease that is excluded and rejected pursuant to Section 2.4.

"Assumed Liabilities" shall have the meaning specified in Section 2.3.

"Assumption Notice" has the meaning set forth in Section 2.4(b).

"Avoidance Actions" means all avoidance claims, causes of action, or rights of recovery under Chapter 5 of the Bankruptcy Code or similar state Laws available to the Trustee, that may exist against any current trade vendors of the Regional Business, but do not include any such causes of action against (i) vendors with no ongoing business with the Regional Business or (ii) the Buyer, Sellers, or pre-petition lenders or any of their Affiliates.

"Bankruptcy Cases" shall mean the jointly administered bankruptcy cases commenced by the Sellers.

"Bankruptcy Code" shall mean title 11 of the United States Code, 11 U.S.C. §101 et seq.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of Texas.

"Benefit Plans" shall mean the health care, retirement and benefit agreements, plans, policies and programs of Sellers or their Affiliates in effect as of the Agreement Date and set forth on Schedule 1.1(d).

"<u>Bidding Procedures</u>" shall mean the "bidding procedures" pursuant to which all of the Sellers' assets, including the Acquired Assets, will be marketed and sold, and which bidding procedures shall be acceptable to the Buyer in its sole and absolute discretion.

"<u>Bidding Procedures Order</u>" shall mean an Order of the Bankruptcy Court approving the Bidding Procedures, the Expense Reimbursement, and the related relief requested by the Sale Motion, which Order shall be in form and substance acceptable to Buyer.

"<u>Bill of Sale</u>" means a bill of sale, in a form mutually agreed to by the Parties, evidencing the transfer and assignment to Buyer and Assignee of all of Sellers' rights, title and interests in and to the Acquired Assets.

"<u>Business Day</u>" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the City of New York are not required to open.

"<u>Buyer</u>" shall have the meaning specified in the preamble.

"<u>Buyer's and Assignee's Conditions Certificate</u>" shall have the meaning specified in <u>Section 7.2(d).</u>

"<u>Capital Lease</u>" shall mean, for any Person, a lease of any interest in any kind of property (whether real, personal or mixed) or asset by such Person as lessee that is, should be or should have been recorded as a "capital lease" on the balance sheet of such Person in accordance with GAAP.

"<u>Cash Purchase Price</u>" shall have the meaning specified in <u>Section 3.2(a)</u>.

"<u>Chapter 7</u>" means Chapter 7 of the Bankruptcy Code.

"<u>Claim</u>" shall mean all actions, claims, counterclaims, suits, Proceedings, rights of action, causes of action, Liabilities, obligations, losses, damages, remedies, penalties, judgments, settlements, costs, expenses, fines, disbursements, demands, reasonable costs, fees and expenses of counsel, including in respect of investigation, interest, demands and actions of any nature or any kind whatsoever, known or unknown, disclosed or undisclosed, accrued or unaccrued, matured or unmatured, choate or inchoate, legal or equitable, and arising in tort, contract or otherwise, including any "claim" as defined in the Bankruptcy Code.

"<u>Claim Dispute</u>" shall have the meaning specified in <u>Section 6.16(h)</u>.

"<u>Closing</u>" shall have the meaning specified in <u>Section 3.1(a)</u>.

"<u>Closing Date</u>" shall have the meaning specified in <u>Section 3.1(a)</u>.

"<u>Closing Date Inventory</u>" shall mean the carrying value of the Inventory as of the Closing Date (other than the Excluded Inventory) calculated as such Inventory would be recorded on a balance sheet of the Sellers in accordance with GAAP and consistent with past practice.

"COBRA" shall have the meaning specified in Section 2.5(l).

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Conditions Certificates" shall have the meaning specified in Section 7.2(d).

"Consent" means a counterparty or third party (including any Governmental Entity's) consent.

"Continuing Employees" means those employees set forth on Schedule 1.1(a).

"Continuing Employees Expense Amount" means $500,000 (Five Hundred Thousand Dollars).

"Contract" shall mean any contract, agreement, indenture, note, bond, loan, instrument, lease (including Capital Lease), conditional sales contract, purchase order, mortgage, license, franchise, insurance policy, letter of credit, commitment or other binding arrangement or commitment, whether or not in written form, that is binding upon a Person or any of its property.

"Cure Amounts" has the meaning set forth in Section 2.4(c).

"C&A Grinding Equity Interests" shall have the meaning specified in Section 2.1(w).

"C&A Grinding" shall mean C&A Grinding, LLC, a Georgia limited liability company.

"Deposit" shall have the meaning specified in Section 3.3.

"Designated Contracts" has the meaning set forth in Section 2.4(b).

"Designation Deadline" means the later of (i) 5:00 p.m. (prevailing Eastern time) on June 9, 2020 and (ii) the date bids are required to be submitted for the Acquired Assets under the Bidding Procedures.

"Disclosure Schedules" shall mean the disclosure schedules, delivered by Sellers and Buyer concurrently with the execution and delivery of this Agreement, as amended from time to time in accordance with and subject to the terms hereof.

"Drilling Services Assignment and Assumption Agreement" shall have the meaning specified in the preamble.

"Encina" means Encina Business Credit, LLC.

"Encina Exit Financing Commitment Letter" shall mean an executed commitment letter, in form and substance acceptable to Buyer, pursuant to which Encina or its Affiliates shall have agreed to lend at the Closing the amounts set forth therein to Buyer in order to fund, subject to the terms and conditions thereunder, the Regional Business and refinance (or assume on amended terms) the ABL Facility and the financing provided in the New Money Financing Agreement.

"Environmental Law" means any Law relating to pollution, the protection of human health and safety (with respect to exposure to hazardous materials), the environment, natural resources or the release, manufacture, processing, treatment, storage, disposal or handling of, or exposure to, hazardous materials.

"Environmental Liabilities and Obligations" means all Liabilities arising from any impairment, impact or damage to the environment, health or safety, or any failure to comply with Environmental Law, including Liabilities related to: (a) the transportation, storage, use, arrangement for disposal or disposal of, or exposure to, Hazardous Materials; (b) the Release of Hazardous Materials, including migration onto or from the Owned Real Property and Leased Real Property that are Acquired Assets; (c) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (d) any other obligations imposed under Environmental Law including pursuant to any applicable Permits issued pursuant to under any Environmental Law; (e) Orders, notices to comply, notices of violation, alleged non-compliance and inspection reports with respect to any Liabilities pursuant to Environmental Law; and (f) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business, whether or not incorporated, that together with the Sellers would be deemed a "single employer" within the meaning of Section 4001(b)(i) of ERISA.

"Excluded Assets" shall have the meaning specified in Section 2.2.

"Excluded Cash Amounts" means collectively all cash and cash equivalents listed on Schedule 1.1(c) and such amounts shall not be considered Accounts Receivable.

"Excluded Contract" has the meaning set forth in Section 2.4(b).

"Excluded Inventory" shall mean the inventory set forth on Schedule 1.1(b).

"Excluded Liabilities" shall have the meaning specified in Section 2.5.

"Executory Contract" means a Contract to which one or more of the Sellers are party that is subject to assumption or rejection under sections 365 of the Bankruptcy Code, other than the Leases.

"Expense Reimbursement" shall mean $650,000 (Six Hundred Fifty Thousand Dollars).

"GAAP" shall mean generally accepted accounting principles as in effect from time to time in the United States.

"Governmental Entity" shall mean any federal, state, provincial, local, municipal, domestic, foreign, multinational, international or other (a) government, (b) governmental or quasi-

governmental authority of any nature (including any governmental agency, ministry, branch, department, official, or entity and any court or other tribunal), or (c) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, prosecutorial, police, regulatory, or Tax Authority or power of any nature, including any arbitration tribunal or stock exchange.

"Guarantee" by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing, or having the economic effect of guaranteeing, any Indebtedness of any other Person (the "Primary Obligor") in any manner, whether directly or indirectly, and including, without limitation, any obligation of such Person: (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness; (ii) to purchase property, securities or services for the purpose of assuring the holder of such Indebtedness of the payment of such Indebtedness; or (iii) to maintain working capital, equity capital or other financial statement condition or liquidity of the Primary Obligor so as to enable the Primary Obligor to pay such Indebtedness (and "Guaranteed," "Guaranteeing" and "Guarantor" shall have meanings correlative to the foregoing).

"Hazardous Material" means any substance, material or waste which is regulated by any Governmental Entity, including petroleum and its by-products, asbestos, polychlorinated biphenyls and any material, waste or substance which is defined or identified as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or otherwise regulated under or subject to any provision of Environmental Law.

"Horseheads Warehouse" shall mean that certain warehouse leased by the Sellers located at 124 Wygant Road, Building B, Horseheads, New York 14845.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by (or which customarily would be evidenced by) bonds, debentures, notes or similar instruments, (c) all reimbursement obligations of such Person with respect to letters of credit and similar instruments, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (e) all obligations of such Person incurred, issued or assumed as the deferred purchase price of property other than accounts payable incurred and paid on terms customary in the business of such Person (it being understood that the "deferred purchase price" in connection with any purchase of property or assets shall include only that portion of the purchase price which shall be deferred beyond the date on which the purchase is actually consummated), (f) all obligations secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all obligations of such Person under forward sales, futures, options and other similar hedging arrangements (including interest rate hedging or protection agreements), (h) all obligations of such Person to purchase or otherwise pay for merchandise, materials, supplies, services or other property under an arrangement which provides that payment for such merchandise, materials, supplies, services or other property shall be made regardless of whether delivery of such merchandise, materials, supplies, services or other property is ever made or

tendered, (i) all guaranties by such Person of obligations of others, (j) all Capital Lease obligations of such Person and (k) any obligations of such Person Guaranteeing or intended to Guarantee (whether directly or indirectly Guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness of such other Person under any of clauses (a) through (j) above.

"Indemnified Parties" and "Indemnified Party" shall have the meaning specified in Section 6.16(a).

"Indemnifying Parties" and "Indemnifying Party" shall have the meaning specified in Section 6.16(a).

"Interim Period" shall have the meaning specified in Section 6.1.

"Intellectual Property" means all intellectual property and industrial property, throughout the world, whether or not registerable, patentable or otherwise formally protectable, and whether or not registered, patented, otherwise formally protected or the subject of a pending application for registration, patent or any other formal protection, including all (i) trade-marks, corporate names and business names currently or formerly used in connection with the Regional Business, including, the "Q'Max America" and "Anchor Drilling Fluids" names and brands, (ii) inventions, (iii) works and subject matter in which copyright, neighboring rights or moral rights subsist, (iv) industrial designs, product designs, patents and design rights (v) know-how, trade secrets, proprietary information, confidential information and information of a sensitive nature that have value to the Regional Business or relate to business opportunities for the Regional Business, in whatever form communicated, maintained or stored, (vi) telephone numbers and facsimile numbers, (vii) registered domain names, and (viii) social media usernames and other internet identities and all account information relating thereto.

"Inventory" means all inventory (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts), stock-in-trade and merchandise related to the Regional Business maintained or held by, stored by or on behalf of, or in transit to, any Seller other than the Excluded Inventory.

"Knowledge" shall mean, with respect to any Seller, the actual knowledge of Rafael Andres Diaz-Granados, Chris Pennington, Celina Carter and Eric Glover after reasonable and due inquiry.

"Law" shall mean any federal, state, provincial, municipal, local, foreign, international or multinational constitution, statute, law, ordinance, regulation, rule, code, by-law, Order, principle of common law or equity, or decree enacted, promulgated, issued, enforced or entered by any Governmental Entity, or court of competent jurisdiction, or other requirement or rule of law.

"Lease" shall have the meaning set forth in Section 4.4(a).

"Leased Real Property" means all of the real property leased, subleased, used or occupied by any Seller, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights privileges, easements, licenses, hereditaments and other appurtenances

-8-

relating thereto, and used, or held for use, in connection with the operation of the Regional Business.

"Leetsdale Warehouse" shall mean that certain warehouse and office building leased by the Sellers located at 545 W. Park Road, Leetsdale, Pennsylvania 15056.

"Liabilities" shall mean, as to any Person, all debts, adverse Claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, whether accrued or unaccrued, vested or otherwise, liquidated or unliquidated, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

"License Agreement" shall mean that certain Exclusive License Agreement by and between Q'Max Solutions Inc. and Q'Max, dated May 22, 2020, pursuant to which Q'Max was granted a license to certain Intellectual Property Rights as set forth thereunder.

"Lien" shall mean (i) any claim, Liability, prior claim, right of retention, lien, security interest, floating charge, mortgage, pledge option, deed assignments, conditional sale, warrant, adverse claim, charge (including court-ordered charge), easement, right-of-way, encroachment, defect of title, hypothec, trust debenture, deemed trust (statutory or otherwise), judgment, writ of seizure or execution, notice of sale, restriction on transfer, contractual right (including purchase option, right of first refusal, rights of first offer or any other pre-emptive contractual right), restriction on use or encumbrance, whether imposed by agreement, law, equity or otherwise and whether or not registered, published or filed and whether secured, unsecured or otherwise, and (ii) without limiting the foregoing clause (i), "Lien", as such term is defined pursuant to section 101(37) of the Bankruptcy Code.

"Litigation Conditions" shall have the meaning specified in Section 6.16(f).

"Material Contracts" means, collectively, those contracts that are in the opinion of the Buyer, necessary and essential to the operation of the Regional Business as listed and specified as "Material Contracts" on Schedule 2.4(b)(i).

"Midland Assets" shall have the meaning specified in Section 2.2(a).

"Midland Business" means the drilling and completion fluids, chemical additives, fluid engineering services and solid control services and equipment provided by Sellers in the Permian Basin, including all of the assets located at, and the operations conducted at, the Midland Solid Control Warehouse.

"Midland Solid Control Warehouse" shall mean that certain warehouse leased by the Sellers located at 2106 East Country Road 120, Midland, Texas 79706.

"New Money Financing Agreement" means a senior secured superpriority credit agreement or note and any documents or instruments related thereto, to be entered into by Sellers and Encina and/or any other Post-Petition Lenders (including Palladium Fund IV or its Affiliates), in each case, in form and substance satisfactory to Buyer.

-9-

"Newcomerstown Warehouse" shall mean those certain warehouses and buildings leased by the Sellers located at 1122 West State Street, Newcomerstown, Ohio 43832 and 200 Enterprise Drive, Newcomerstown, Ohio 43832.

"Notices" shall have the meaning specified in Section 9.4.

"Officer's Certificate" shall have the meaning specified in Section 7.1(e).

"Operating Order" shall mean the *Order Granting Trustee's Emergency Motion to: (1) Continue Operation of Business; (2) Use of Cash Collateral with Consent on an Interim Basis; and (3) Maintain Cash Management System* (the "Order to Operate") [Docket Number 43] entered in the Bankruptcy Cases.

"Order" shall mean any judgment, order, injunction, writ, ruling, decree, stipulation, determination, decision, verdict, or award of any Governmental Entity.

"Ordinary Course of Business" shall mean that an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if that action is taken in the ordinary course of business of such Person, consistent with past practices.

"Original Asset Purchase Agreement" shall have the meaning specified in the preamble.

"Other Businesses" shall have the meaning specified in Section 2.1.

"Owned Real Property" shall have the meaning set forth in Section 4.4(b).

"Party" or "Parties" shall have the meaning specified in the preamble.

"Permits" shall mean permits, licenses, registrations, certificates of occupancy, approvals, consents, clearances, directives, orders, variances, registrations, rights, privileges, concessions and other authorizations issued, granted, conferred or otherwise created by any Governmental Entity.

 "Permitted Liens" shall mean:  (a) Liens for Taxes not yet due and payable or which are being contested in good faith by appropriate Proceedings and for which an adequate reserve has been established by Sellers; (b) statutory liens of landlords, carriers, warehousemen, mechanics, and materialmen incurred in the Ordinary Course of Business for sums not yet due; (c) Liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security; or (d) Liens or encumbrances that arise solely by reason of acts of Buyer or its successors and assigns or otherwise consented to by Buyer in accordance with the terms of this Agreement.

"Person" shall mean an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity or any other entity.

"Petition Date" shall mean the date the Bankruptcy Cases are commenced by the Sellers.

-10-

"Post-Closing Covenant" shall have the meaning specified in Section 9.12.

"Post-Petition Financing Order" shall mean interim and final orders granting a motion by the Sellers pursuant to U.S.C. §§ 105, 361 and 364 and Federal Bankruptcy Rules 2002, 4001 and 994 seeking authorization for the Sellers to incur post-petition secured Indebtedness and approving the New Money Financing Agreement which shall be in form and substance acceptable to Buyer.

"Post-Petition Lenders" means Encina and any other lender under the New Money Financing Agreement.

"Post-Petition Trade Payables" shall mean the amount of Trade Payables of the Sellers relating to the Regional Business that were incurred from and after the Petition Date that are outstanding as of the Closing Date.

"Pre-Closing Taxes" means any Liability for any Tax of or owed with respect to the Acquired Assets allocable for a taxable period (or portion thereof) ending on or before the Closing Date. In the case of any Taxes imposed on the Acquired Assets for a taxable period that begins before and ends after the Closing Date, Pre-Closing Taxes shall equal (i) in the case of any Taxes other than the Taxes based upon or related to income or receipts, the amount of such Tax for the entire Tax period multiplied by a fraction the numerator of which is the number of days in the Tax period ending on the Closing Date and the denominator of which is the number of days in the entire Tax period; and (ii) in the case of any Tax based upon or related to income or receipts be deemed equal to the amount which would be payable if the relevant Tax period ended on the Closing Date.

"Previously Omitted Contract" shall have the meaning specified in Section 2.4(b)(i).

"Primary Obligor" shall have the meaning specified in the definition of Guarantee in Section 1.1.

"Proceeding" shall mean any action, arbitration, audit, known investigation (including a notice of preliminary investigation or formal investigation), notice of violation, hearing, litigation or suit (whether civil, criminal or administrative), other than the Bankruptcy Cases, commenced, brought, conducted or heard by or before any Governmental Entity, including but not limited to any and all such actions related to restitution or remission in criminal proceedings and civil forfeiture and confiscation proceedings under the Law of any jurisdiction.

"Property Taxes" shall mean all personal property Taxes and similar ad valorem Taxes.

"Purchase Price" shall have the meaning specified in Section 3.2(b).

"Q'Max" shall have the meaning specified in the preamble.

"Q'Max Transition Services Agreement" means a transition services agreement, in form and substance agreed by the Parties, setting forth Sellers' and QSI's obligations to provide certain services to Buyer and Assignee, and Buyer's and Assignee's obligations to provide certain services to Sellers and QSI, from and after the Closing Date for the periods set forth therein.

"QSI" means KPMG Inc., receiver of Q'Max Solutions Inc., a corporation incorporated under the laws of British Columbia, Canada, an Affiliate of Sellers.

"Regional Business" shall have the meaning specified in Section 2.1.

"Regional Business Warehouses" means, collectively, the Wellsville Warehouse, the Horseheads Warehouse, the Leetsdale Warehouse and the Newcomerstown Warehouse.

"Release" means any actual or threatened release, spill, emission, leaking, pumping, pouring, emptying, dumping, injection, deposit, disposal, discharge, dispersal or leaching into the indoor or outdoor environment, or including migration to or from a property, including but not limited to any Owned Real Property or Leased Real Property.

"Remedial Action" means all actions to (a) investigate, clean up, remove, treat or in any other way address any Hazardous Material; (b) prevent the Release of any Hazardous Material; (c) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (d) to correct or abate a condition of noncompliance with Environmental Laws.

"Representative" shall mean, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, consultant, other advisor, agent, representative or expert retained by or acting on behalf of such Person or its Subsidiaries).

"Sale Motion" shall mean a motion, in form and substance acceptable to Buyer, for entry of an Order (i) approving the Bidding Procedures, (ii) approving the Expense Reimbursement and other bidding protections, (iii) approving the sale of the Acquired Assets free and clear of Liens, Claims, interests, and encumbrances, (iv) approving the assumption and assignment of Contracts and leases, and (v) granting requested related relief, which motion shall be in form and substance acceptable to Buyer.

"Sale Order" shall mean an Order of the Bankruptcy Court approving the Agreement and the Transactions, approving the sale of the Acquired Assets free and clear of Liens, Claims, interests, and encumbrances and granting the related relief requested in the Sale Motion, which Order shall be in form and substance acceptable to Buyer.

"Selected Benefit Plans" shall have the meaning specified in Section 6.14.

"Seller" or "Sellers" shall have the meaning specified in the preamble.

"Subject Materials" shall have the meaning specified in Section 6.16(g).

"Subsidiary" shall mean, with respect to any Person (a) a corporation, a majority of whose capital stock with voting power, under ordinary circumstances, to elect directors is at the time, directly or indirectly, owned by such Person, by a subsidiary of such Person, or by such Person and one or more subsidiaries of such Person, (b) a partnership in which such Person or a subsidiary of such Person is, at the date of determination, a general partner of such partnership, or (c) any other Person (other than a corporation) in which such Person, a subsidiary of such Person or such

Person and one or more subsidiaries of such Person, directly or indirectly, at the date of determination thereof, has (i) at least a majority ownership interest thereof or (ii) the power to elect or direct the election of a majority of the directors or other governing body of such Person.

"Target Inventory" shall mean $4,390,000 (Four Million Three Hundred Ninety Thousand Dollars).

"Tax" or "Taxes" shall mean (a) any and all taxes, assessments, levies, duties or other governmental charge imposed by any Governmental Entity, including any income, alternative or add-on minimum, accumulated earnings, franchise, capital stock, unclaimed property or escheatment, environmental, profits, windfall profits, gross receipts, sales, use, value added, transfer, registration, stamp, premium, excise, customs duties, severance, real property, personal property, ad valorem, occupancy, license, occupation, employment, payroll, social security, disability, unemployment, withholding, corporation, inheritance, value added, stamp duty reserve, estimated or other tax, assessment, levy, duty (including duties of customs and excise) or other governmental charge of any kind whatsoever, including any payments in lieu of taxes or other similar payments, chargeable by any Tax Authority together with all penalties, interest and additions thereto, whether disputed or not and (b) any liability in respect of any of the items described in clause (a) payable under a tax sharing allocation, indemnity or similar agreement or by reason of successor, transferee, or other liability, by contract, operation of law, or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereto or any analogous or similar provision of state, local or foreign Law).

"Tax Authority" shall mean any taxing or other authority (whether within or outside the U.S.) competent to impose Tax.

"Tax Return" shall mean any and all returns, declarations, reports, documents, Claims for refund, or information returns, statements or filings which are supplied or required to be supplied to any Tax Authority or any other Person, including any schedule or attachment thereto, and including any amendments thereof.

"Top Customers" shall have the meaning specified in Section 4.6(b)(i).

"Top Suppliers" shall have the meaning specified in Section 4.6(a)(i).

"Third Party Claim" shall have the meaning specified in Section 6.16(a).

"Trade Payables" shall mean those accounts payable owned to the Sellers' vendors for Inventory-related goods.

"Transaction Documents" shall mean this Agreement and any agreement, instrument or other document entered into pursuant to the terms hereof, including the Assignment and Assumption Agreement, Bill of Sale, the Drilling Services Assignment and Assumption Agreement, and the Q'Max Transition Services Agreement.

"Transactions" shall mean the transactions contemplated by this Agreement, including the purchase and sale of the Acquired Assets as provided for in this Agreement.

-13-

"<u>Transfer Tax</u>" or "<u>Transfer Taxes</u>" shall mean any sales, use, transfer, conveyance, documentary transfer, stamp, recording or other similar Tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto, but such term shall not include any Tax on, based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

"<u>Trustee</u>" shall mean Christopher R. Murray, the trustee appointed by the Office of the United States Trustee in the Bankruptcy Cases.

"<u>Trustee Funds</u>" shall have the meaning set forth in <u>Section 2.1(g)</u>.

"<u>Trustee's Conditions Certificate</u>" shall have the meaning set forth in <u>Section 7.1(d)</u>.

"<u>Trustee's Operation Orders</u>" shall mean the Post-Petition Financing Order and the Operating Order.

"<u>WARN Act</u>" means the United States Worker Adjustment and Retraining Notification Act, and the rules and regulations promulgated thereunder.

"<u>Wellsville Warehouse</u>" shall mean that certain warehouse leased by the Sellers located at 2400 Clark Avenue, Wellsville, Ohio 43968.

1.2    <u>Interpretation</u>.

(a)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)    Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(c)    A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(d)    A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(e)    All references to "$" and dollars shall be deemed to refer to United States currency.

(f)    All references to any financial or accounting terms shall be defined in accordance with GAAP.

(g)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Disclosure Schedule and exhibit references are to this

Agreement unless otherwise specified. All article, section, paragraph, schedule and exhibit references used in this Agreement are to articles, sections and paragraphs of, and schedules and exhibits to, this Agreement unless otherwise specified.

(h)     The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(i)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day. All references herein to time are references to New York City time, unless otherwise specified herein.

(j)     If a word or phrase is defined, its other grammatical forms have a corresponding meaning.

(k)     A reference to any agreement or document (including a reference to this Agreement) is to the agreement or document as amended or supplemented, except to the extent prohibited by this Agreement or that other agreement or document.

(l)     Exhibits, Schedules and Annexes to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

## ARTICLE 2
## ACQUIRED ASSETS AND ASSUMPTION OF LIABILITIES

2.1     Assets to be Acquired. Subject to the granting of the Sale Order, and the terms and conditions of this Agreement and the Sale Order, at the Closing, the Sellers shall sell, assign, transfer and deliver to Buyer, and Buyer shall purchase and acquire from the Sellers, all of Sellers' right, title and interest, free and clear of all Liens (except for Liens supporting the Assumed Liabilities described in Section 2.3(a) and other Permitted Liens expressly set forth in the Sale Order), in each and all of the assets, properties and rights of Sellers used in the Sellers' business of providing drilling and completion fluids, chemical additives, solids control services and equipment, waste management services and equipment, fluid engineering services and other products and services in the northeastern United States, in support of oil and gas drilling (the "Regional Business"), including, without limitation, all assets located at or used in the operations of the Sellers at the Regional Business Warehouses, and the following as of the Closing, but excluding the Excluded Assets (collectively, the "Acquired Assets" and, for the avoidance of doubt, other than the Accounts Receivable (as defined below), the term "Acquired Assets" shall not include, and Sellers are not selling to Buyer, Sellers' assets solely used in its other businesses (collectively, the "Other Businesses")):

(a)     all accounts receivable, notes receivable, bill receivables, trade accounts, hold backs, retention, book debts, insurance claims (but, only to the extent that such claims relate to the Acquired Assets or Assumed Liabilities and do not relate to any Excluded Liabilities),

-15-

negotiable instruments, chattel paper (including without limitation, completed work which has not yet been billed) and other receivables (including, without limitation, in respect of goods shipped, products sold, licenses granted, services rendered or otherwise and all amounts that may be returned or returnable with respect to letters of credit or other financial collateral drawn down prior to the Closing of the Transactions) from third parties, together with any unpaid financing charges accrued thereon, in each instance, of the Sellers (whether or not related to the Regional Business) (collectively, the "Accounts Receivable");

(b)     all Intellectual Property used in the Regional Business (provided that, with respect to the Intellectual Property rights granted to Q'Max under the License Agreement, only to the extent such Intellectual Property Rights were granted to Q'Max under the License Agreement) including, without limitation, the Intellectual Property set forth on Schedule 2.1(b);

(c)     all tangible assets, including all equipment, machinery, industrial and motor vehicles, trailers, fixtures, furniture and other tangible property, including all such property that is damaged and all attachments, appliances, fittings, gas and oil burners, chemical products, motors, pumps, tanks, tools, manifolds, systems, blowers, molds, dies, tooling, lighting fixtures, signs, doors, cabinets, partitions, mantels, screens, plumbing, heating, air conditioning, refrigerators, freezers, refrigerating and cooling systems, waste disposal and storing, wiring, electrical systems, telephones, televisions, monitors, security systems, racks, ovens, stoves, carpets, floor coverings, wall coverings, office equipment, kitchen appliances, computers (including point-of-sale terminals and systems), software, registers and safes, trash containers, meters and scales, combinations, codes and keys, and any other furniture, fixtures, equipment and improvements, in each instance, used in the operation of the Regional Business;

(d)     all Inventory and goods related to the Regional Business now owned or hereinafter acquired, wherever located, including raw materials, work in process, finished goods, supplies, parts, subassemblies or material used or consumed in the operation of the Regional Business maintained or held by, stored by or on behalf of, or in transit to, any of the Sellers other than the Excluded Inventory;

(e)     all goodwill, payment intangibles and general intangible assets and rights of Sellers to the extent associated with the Regional Business or the Acquired Assets;

(f)     all cash and cash equivalents resulting from the operation of the Regional Business (including payments made with respect to any Accounts Receivable), other than the Cash Purchase Price;

(g)     all deposits (including, without limitation, customer deposits and security deposits (whether held in trust or otherwise) for rent, electricity, telephone or otherwise), advances, prepayments, rights in respect of promotional allowances, vendor rebates and other refunds, Claims, causes of action, rights of recovery, rights under warranties and guaranties, rights of setoff and rights of recoupment, and the right to receive and retain mail, accounts receivable payments and other communications of the Sellers, in each instance, relating to the Regional Business, other than any retainers, deposits or escrows for professional fees paid by Sellers pre-petition and post-

petition in connection with the Transactions, the administration of the Bankruptcy Cases or any Administrative Claim Funding (collectively, the "Trustee Funds");

(h)      all customer lists, data, and information (including all lists of current and past customers of each Seller), and any and all information relating thereto (including personal information, such as name, address, telephone number, email address, website and any other database information), and customer purchase history of the Regional Business;

(i)       all right of publicity and all similar rights, including, all commercial merchandising rights used in the Regional Business;

(j)       all real estate leased by either of the Sellers as a lessee, sub-lessee or assignee and covered by an Assumed Contract or owned by either of the Sellers, in each case together with all interests in and to all improvements and fixtures located thereon or attached thereto (including all warehouses, offices and plants and other tangible and intangible property located thereon), and other appurtenances thereto, and rights in respect thereof, in each case, used in the operation of the Regional Business, including the properties listed on Schedule 2.1(j);

(k)      all Assumed Contracts;

(l)       all of Sellers' deposits, advances or prepaid expenses relating to any of the Assumed Contracts;

(m)      all documents (including books and records) of the Regional Business, including all financial, marketing and business data, pricing and cost information, business and marketing plans and other information, files, correspondence, records, data, plans, engineering, reports and recorded knowledge, historical trademark files, prosecution files of the Sellers in whatever media retained or stored, including computer programs and disks, in each case of the Regional Business; including files in the possession of Sellers, in each case, to the extent reasonably available, not subject to claims of solicitor-client or attorney-client privilege, and otherwise permitted by applicable Law; provided, that Trustee shall have a right to retain a copy of all such documents;

(n)      to the extent applicable, all certificates of title and other documentation necessary to convey or otherwise evidence title to the equipment included in the Acquired Assets;

(o)      all personnel files for Continuing Employees except as prohibited by Law; provided, however, that Sellers shall retain all such personnel files, and not transfer them to Buyer, until Continuing Employees are hired by Buyer, Assignee or their Affiliate pursuant to Section 6.13 and Trustee shall have a right to retain a copy of all such files;

(p)      all Permits used in the operation of the Regional Business to the extent transferable;

(q)      all rights under or arising out of all insurance policies relating to the Regional Business (including, without limitation, returns and refunds of any premiums paid, or other amounts due back to the Sellers, with respect to cancelled policies, all proceeds received on

-17-

or after Closing and all proceeds received prior to Closing in connection with casualty events involving tangible Acquired Assets);

(r)    any claim, right or interest in and to all (or the benefit of all to the extent not assignable) Tax refunds, rebates, abatements, credits and similar items received in or relating to any period, or portion of any period, beginning on or after the Closing Date or any Tax Return, relating to the Regional Business received after the Closing Date;

(s)    causes of action, lawsuits, judgments, Claims and demands of any nature, whether arising by way of counterclaim or otherwise, in each case to the extent arising from the Acquired Assets (including, for the avoidance of doubt, the Accounts Receivable generated from the Other Businesses) or the Assumed Liabilities;

(t)    all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Continuing Employees and agents of the Sellers or with third parties relating to the Regional Business;

(u)    all rights under or pursuant to all warranties, representations and guarantees made by vendors, suppliers, manufacturers, contractors and any other Person to the extent relating to products sold, or services provided, to the Sellers in connection with the Regional Business or to the extent affecting any Acquired Assets (including, for the avoidance of doubt, the Accounts Receivable generated from the Other Businesses), other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(v)    all sales and promotional materials, catalogues and advertising literature used in the Regional Business;

(w)    all of Sellers' equity interests, or securities convertible into, exchangeable or exercisable for equity interests, in C&A Grinding and all related rights of Sellers with respect thereto (the "C&A Grinding Equity Interests");

(x)    all Avoidance Actions; and

(y)    all other assets, properties, interests, privileges and rights used in the Regional Business wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP (including any assets acquired by Sellers after the date hereof but prior to Closing).

2.2    Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, assign, transfer or deliver to Buyer, and in no event will Buyer be deemed to purchase and acquire from Sellers the following assets, properties, interests and rights of Sellers (collectively, the "Excluded Assets"):

(a)    assets, properties, interests and rights of Sellers exclusively used in the Midland Business (except the Accounts Receivable) (collectively, the "Midland Assets");

(b)    Sellers' rights under the Transaction Documents;

-18-

(c)      all benefit plans and collective bargaining agreements, if any;

(d)      other than the C&A Grinding Equity Interests, all shares of capital stock or other equity interests issued by any Seller or securities convertible into, exchangeable or exercisable for any such shares of capital stock or other equity interests;

(e)      all books and records of Sellers that are not related to the Regional Business;

(f)      all Tax Returns, received before the Closing Date and relating to a period ending prior to the Closing Date;

(g)      the Excluded Inventory;

(h)      any Contract to which any Seller or Subsidiary of any Seller is party or is otherwise bound that are not Assumed Contracts; and

(i)      the Excluded Cash Amounts, the Continuing Employees Expense Amount and the Trustee Funds.

2.3      <u>Liabilities to be Assumed by Buyer</u>.  Subject to the granting of the Sale Order, and the terms and conditions of this Agreement and the Sale Order, at the Closing, the Sellers shall assign to Buyer, and Buyer shall assume from the Sellers and pay when due, perform and discharge, in due course, without duplication, only the Assumed Liabilities.  "<u>Assumed Liabilities</u>" shall mean solely the following Liabilities:

(a)      all Liabilities of the Sellers under the ABL Facility and the New Money Financing Agreement on the terms and conditions set forth in the Encina Exit Financing Commitment Letter;

(b)      any Cure Amounts under Assumed Contracts;

(c)      any Liability for (i) Property Taxes imposed upon or assessed directly against the Acquired Assets that become due and payable following the Closing Date and (ii) Transfer Taxes payable in connection with the Transactions;

(d)      all Liabilities first arising from or after the Closing (i) as a direct result of the ownership or operation of any of the Acquired Assets or the Regional Business or (ii) under the Assumed Contracts as a result of the assumption by the Buyer of such Assumed Contracts; and

(e)      Liabilities arising from post-petition administrative claims asserted against Sellers' bankruptcy estate in connection with the operation or maintenance of the Regional Business and the operation or maintenance of any businesses of Sellers and its Affiliates that were operated or maintained for the benefit of or to support Buyer, Assignee, the Regional Business or the Acquired Assets (collectively, the "<u>Administrative Claims</u>") in an amount not to exceed $500,000 (Five Hundred Thousand Dollars) *less* the amount of any Administrative Claim Funding drawn from and after June 30, 2020 to the Closing Date to pay any post-petition administrative

-19-

claims and Liabilities of Sellers' bankruptcy estate in excess of $1,495,000 (One Million Four Hundred Ninety-Five Thousand Dollars) (such amount, the "Additional Admin Amount").

2.4    Assignment and Assumption of Contracts.

(a)    The Sale Order shall provide for the assumption by Sellers, and the assignment to the extent legally capable of being assigned by Sellers to Buyer, of the Designated Contracts pursuant to section 365 of the Bankruptcy Code on the terms and conditions set forth in the remainder of this Section 2.4. At Buyer's request, and at Buyer's sole cost and expense, Sellers shall reasonably cooperate from the date hereof forward with Buyer as reasonably requested by Buyer (i) to allow Buyer to enter into an amendment of any Lease upon assumption of such Lease by Buyer (and Sellers shall reasonably cooperate with Buyer to the extent reasonably requested by Buyer in negotiations with the landlords thereof), or (ii) to otherwise amend any Lease to the extent such amendments would not adversely affect any Seller; provided that Sellers shall not be required to enter into any such amendment if such amendment would result in an assumption by any Seller of such Lease, unless such Lease will be assigned to Buyer at the time of such assumption.

(b)    Attached hereto as Schedule 2.4(b) is a list, which list may be changed by the Buyer in its sole discretion by adding or removing Executory Contracts or Leases or moving Executory Contracts or Leases between subpart (i) and subpart (ii), from time to time, prior to the Designation Deadline, identifying the Executory Contracts and Leases that Buyer has decided will be assumed and assigned to Buyer on the Closing Date (the Executory Contracts and Leases listed as of the Designation Deadline, the "Designated Contracts"). Subpart (i) of Schedule 2.4(b) identifies Material Contracts that are also Designated Contracts and subpart (ii) of Schedule 2.4(b) identifies Designated Contracts other than Material Contracts. In connection with the serving of the Sale Motion, the applicable Seller shall file with the Bankruptcy Court and serve notice by first class mail on all non-debtor counterparties to all Designated Contracts (such notice, an "Assumption Notice"), and provide a copy of the same to Buyer, and at the Closing shall assume and assign to, and Buyer shall accept the assignment of and assume such Executory Contract or Lease. In connection with the serving of the Sale Motion, the applicable Seller shall file a notice of rejection as of the Closing Date of every Executory Contract and Lease that is not a Designated Contract ("Excluded Contracts"). The Assumption Notice and the notice of rejection of Excluded Contracts shall be in form and substance acceptable to the Buyer.

(c)    In connection with the assumption and assignment to Buyer of any Designated Contract that is executory pursuant to this Section 2.4, the cure amounts, as determined by the Bankruptcy Court, if any (such amounts, the "Cure Amounts"), necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Designated Contracts, including any amounts payable to any landlord under any Lease that is a Designated Contract that relates to the period prior to the delivery of an Assumption Notice with respect thereto, shall be paid by Buyer within ten (10) Business Days after the Closing, subject to Sections 7.1(k) and 8.1(h) hereunder.

(d)    Sellers shall use their respective reasonable best efforts to obtain one or more orders of the Bankruptcy Court, which order(s) shall be in form and substance reasonably

-20-

acceptable to Buyer, and shall reflect the terms and conditions set forth herein, to assume and assign the Designated Contracts to Buyer on the terms set forth in this <u>Section 2.4</u>.

(e)    **Intentionally Omitted.**

(f)    Notwithstanding the foregoing, a Contract shall not be a Designated Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by a Seller in accordance with the terms hereof, deemed rejected under Section 365 of the Bankruptcy Code, or terminated by the other party thereto or terminates or expires in accordance with its terms on or prior to the Designation Deadline and is not continued or otherwise extended prior to or upon assumption and assignment, or (ii) requires a Consent of any Governmental Entity (other than, and in addition to, that of the Bankruptcy Court) in order to permit the assumption and assignment by Seller to Buyer of such Contract pursuant to Section 365 of the Bankruptcy Code, and no such Consent has been obtained prior to the Closing. In addition, a Permit shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing.

2.5    <u>Excluded Liabilities</u>.  Notwithstanding anything in this Agreement to the contrary, Buyer shall not and does not assume, and shall be deemed not to have assumed and shall not be obligated to pay, perform, discharge or in any other manner be liable or responsible for any Liabilities of the Sellers or any predecessors of Sellers that are not Assumed Liabilities, whether existing on the Closing Date or arising thereafter, whether absolute, accrued, contingent or otherwise, whether due or to become due, known or unknown, matured or unmatured, direct or indirect, and Sellers shall be solely and exclusively liable for any and all such Liabilities, including, without limitation, Liabilities relating to or arising out of any of the following (collectively, the "<u>Excluded Liabilities</u>"):

(a)    all Liabilities arising with respect to or relating to any of the Excluded Assets, whether before, on or after the Closing;

(b)    all Liabilities of Sellers for Indebtedness (including any intercompany Indebtedness among the Sellers and their Affiliates) except as expressly set forth in <u>Section 2.3</u>;

(c)    any Liability for (i) Taxes of Sellers or their Affiliates; (ii) any Pre-Closing Taxes (other than Liabilities related to Property Taxes imposed upon or assessed directly against the Acquired Assets attributable to the period before the Closing Date that become due and payable following the Closing Date); and (iii) Taxes relating to the Excluded Assets or any other Excluded Liability, in each instance, for any period;

(d)    all Liabilities of Sellers in respect of or relating to any Contract to which any Seller is party or is otherwise bound that are not Assumed Contracts and all Liabilities arising out of the rejection of any Excluded Contracts by Sellers;

(e)    all Liabilities incurred or to be incurred by Sellers in connection with negotiation, entry into and consummation of the transactions contemplated by the Transaction

Documents, including the consummation of the Transactions and any "success" fees, change of control payments and any other payment obligations of Sellers payable as a result of the consummation of the Transactions and the documents delivered in connection herewith;

(f)    all Liabilities of Sellers to its equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise, and any liability of Sellers pursuant to any Contract with an Affiliate of Sellers;

(g)    all Liabilities arising out of or relating to any business or property formerly owned or operated by any of the Sellers, any Affiliate or predecessor thereof, but not presently owned and operated by any of the Sellers;

(h)    all Liabilities relating to Claims, actions, suits, arbitrations, litigation matters, Proceedings or investigations (in each case whether involving private parties, Governmental Entities, or otherwise) involving, against, or affecting any Seller, Acquired Asset, the Regional Business, or any assets or properties of Sellers, except as a result of the ownership or operation of any of the Acquired Assets or the Regional Business from and after the Closing;

(i)    all Liabilities arising under Environmental Laws;

(j)    all accounts payable Liabilities;

(k)    Liabilities with respect to employment or other provision of services, compensation, severance, benefits or payments of any nature owed to any current or former employee, officer, director, member, partner or independent contractor of any Seller or any ERISA Affiliate (or any beneficiary or dependent of any such individual), whether or not employed by Buyer or any of its Affiliates after the Closing, that (i) arises out of or relates to the employment, service provider or other relationship between any Seller or ERISA Affiliate and any such individual, including but not limited to the termination of such relationship, (ii) arises out of or relates to any Benefit Plan or (iii) arises out of or relates to events or conditions occurring on or before the Closing Date;

(l)    all Liabilities with respect to any terminated employees with respect to sections 601 through 608 of ERISA and section 4980B of the Code (also known as "COBRA");

(m)    all Liabilities (x) related to the WARN Act, to the extent applicable, with respect to the termination of employment of Sellers' employees and (y) with respect to the termination of employment of the company "insiders" (as such term is defined under the Bankruptcy Code);

(n)    all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by Sellers or any other Person in connection with this Agreement or the administration of the Bankruptcy Cases (including all fees and expenses of professionals engaged by the Sellers or any of their Affiliates) and administrative expenses and priority Claims accrued through the Closing Date and all post-closing administrative wind-down expenses of the Sellers pursuant to the Bankruptcy Code;

(o)    all Liabilities under any futures contracts, options on futures, swap agreements or forward sale agreements;

(p)    all Liabilities to any broker, investment banker, sale advisor, finder or agent or similar intermediary for any broker's fee, finders' fee or similar fee or commission of Sellers or their Affiliates relating to the Transactions; and

(q)    any and all other Liabilities, other than the Assumed Liabilities.

2.6    <u>Withholding</u>.  Buyer and its Affiliates shall be entitled to deduct and withhold from any amounts payable pursuant to this Agreement such amounts as they reasonably determine that they are required to deduct and withhold with respect to the making of such payment under the Code and any provision of state, local or non-U.S. Tax Laws. To the extent that amounts are so withheld and paid over to the applicable Tax Authorities, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person entitled to receipt of such payment.

## ARTICLE 3
## CLOSING; CASH PURCHASE PRICE

3.1    <u>Closing; Transfer of Possession; Certain Deliveries</u>.

(a)    The consummation of the Transactions (the "<u>Closing</u>") shall take place on the second Business Day after the satisfaction of all of the conditions set forth in <u>Article 7</u> (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or the waiver thereof at the Closing by the Party entitled to waive that condition) or on such other date as the Parties hereto shall mutually agree.  The Closing shall be held by electronic exchange of executed documents.  The actual date of the Closing is herein called the "<u>Closing Date</u>".

(b)    At the Closing, Sellers shall deliver, or cause to be delivered to Buyer:

(i)    the Trustee's Conditions Certificate;

(ii)    the Officer's Certificate;

(iii)    one or more duly executed Assignment and Assumption Agreement(s) and Bill(s) of Sale in form and substance mutually acceptable to the Parties;

(iv)    a copy of each Sale Order;

(v)    such other assignments and other instruments of transfer or conveyance as Buyer may reasonably request or as may otherwise be necessary to evidence and effect sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer and assumption of Assumed Liabilities by Buyer;

-23-

(vi)    an affidavit prepared in accordance with Treasury Regulations Sections 1.1445-2 and dated as of the Closing Date attesting that each Seller is not a foreign person, provided, however, that if Buyer does not receive a properly executed affidavit, as described above, from any Seller then Buyer shall be permitted to withhold from any payments to be made pursuant to this Agreement to such Seller any required withholding Tax under Section 1445 of the Code as determined by Buyer and any such amounts withheld shall be treated for all purposes of this Agreement as having been paid to Seller; and

(vii)    a duly executed Q'Max Transition Services Agreement.

(c)    At the Closing, Buyer and Assignee shall deliver to Sellers:

(i)    a cash payment by wire transfer of immediately available funds to an account set forth by Sellers of an aggregate amount equal to (A) the Cash Purchase Price minus (B) the Deposit;

(ii)    to the extent payable on Closing, evidence that Cure Amounts (if any) in respect of each Assumed Contract have been paid in accordance with the consent of the applicable counterparty or as otherwise agreed upon by the Buyer or Assignee and such counterparty;

(iii)    the Buyer's and Assignee's Conditions Certificate;

(iv)    one or more duly executed Assignment and Assumption Agreement(s) and Bill(s) of Sale in form and substance mutually acceptable to the Parties;

(v)    such other assignments and other instruments of transfer or conveyance as Sellers may reasonably request or as may otherwise be necessary to evidence and effect the sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer and Assignee and assumption of Assumed Liabilities by Buyer and Assignee; and

(vi)    a duly executed Q'Max Transition Services Agreement.

(d)    At the Closing, Buyer and Assignee shall deliver to Encina a duly executed waiver letter, waiving any Claims Buyer and Assignee may have acquired pursuant to Section 2.1(x) to the extent such Claims are against Encina.

3.2    Consideration.

(a)    Cash Purchase Price.  The aggregate cash consideration for the Acquired Assets (the "Cash Purchase Price") shall be $7,200,000 (Seven Million Two Hundred Thousand Dollars).

(b)    Purchase Price. The total consideration for the Acquired Assets payable by the Buyer to the Sellers (the "Purchase Price") shall be the aggregate of (i) the Cash Purchase Price, (ii) the Cure Amounts (if any), and (iii) the value of the Assumed Liabilities.

-24-

3.3    Deposit.  By no later than two (2) Business Days after the date that the Bidding Procedures Order has been entered into by the Bankruptcy Court, and provided the Trustee's Operation Orders have been entered into and are not subject to stay, Buyer shall pay the Sellers, a deposit in the aggregate amount of $720,000 (Seven Hundred Twenty Thousand Dollars) (the "Deposit"), to be held by the Sellers in trust. The Deposit (together with all accrued investment income thereon) shall be released by the Sellers, as applicable, as follows:

(a)    if the Closing shall occur, the Deposit and all accrued investment income thereon shall be transferred from trust to the Sellers;

(b)    if this Agreement is terminated by Sellers pursuant to Section 8.1(g) or Section 8.1(n), the Deposit, together with all accrued investment income thereon, shall be released from trust to Sellers within five (5) Business Days of such termination; or

(c)    if this Agreement is terminated for any reason (other than a termination pursuant to Section 8.1(g) or Section 8.1(n)), the Deposit, together with all accrued investment income thereon, shall be returned from trust by Sellers to Buyer within five (5) Business Days of such termination.

3.4    Allocation of Purchase Price.  (i) The Purchase Price shall be allocated among Sellers and (ii) the amount allocated to the Acquired Assets sold by each such Seller shall be further allocated among such Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder or any similar provision of state, local or foreign Law as applicable (the "Allocation"). The Allocation shall be delivered by Buyer to the Sellers within ninety (90) days after the Closing.  The Sellers will have the right to deliver reasonable objections to the Allocation within thirty (30) days after Buyer's delivery thereof, which objections shall be set forth in writing by the Sellers in reasonable detail. Buyer shall consider any such objections in good faith. Buyer and the Sellers shall file all Tax Returns (including, but not limited to, Internal Revenue Service Form 8594) consistent with the Allocation (taking into account any revisions made by Buyer in response to comments by the Sellers) absent a change in Law. Neither Buyer nor the Sellers shall take any position or permit any of its Affiliates to take any position inconsistent with the final Allocation in the preparation of financial statements or in the course of any audit by any Tax Authority, Tax review or Tax proceeding related to any Tax Returns, unless, and then only to the extent, otherwise required by applicable Law, provided, however, that nothing contained herein shall prevent Buyer or the Sellers from settling any proposed deficiency or adjustment by any Tax Authority based upon or arising out of the Allocation, and neither Buyer nor the Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Tax Authority challenging such Allocation. Buyer and the Sellers shall promptly notify and provide the other with reasonable assistance in the event of an examination, audit, or other proceeding relating to Taxes regarding the Allocation of the Purchase Price and the amount of the Assumed Liabilities pursuant to this Section 3.4. Notwithstanding any other provisions of this Agreement, this Section shall survive the Closing Date without limitation.

3.5    Consideration for Avoidance Actions.  Buyer and Sellers acknowledge and agree that $200,000 (Two Hundred Thousand Dollars) of the Cash Purchase Price payable by Buyer to Sellers is in consideration for, and shall be allocated to the purchase of, the Avoidance Actions.

3.6     Continuing Employees Expense Amount.  Simultaneously with the execution of this Agreement, Buyer and Assignee shall pay and deliver to Sellers the Continuing Employees Expense Amount by wire transfer of immediately available funds to an account designated by Sellers.  The Parties agree that the Continuing Employees Expense Amount shall be used by Sellers solely to pay for the payroll of the Continuing Employees, the benefits under the Benefit Plans for the Continuing Employees and other the Persons participating in or receiving benefits under such Benefit Plans and the services (associated with Sellers' retention of the Continuing Employees following Closing) to be provided by Sellers to Buyer and Assignee under the Q'Max Transition Services Agreement.  If this Agreement is terminated for whatever reason, by any Party, Sellers shall retain the Continuing Employees Expense Amount and Sellers shall have no obligation whatsoever to repay the Continuing Employees Expense Amount to Buyer or Assignee.  If Buyer and/or Assignee assume the Benefit Plans pursuant to Section 6.14, Sellers shall promptly repay any amounts remaining in the Continuing Employees Expense Amount to Buyer.

3.7     Funding of Additional Admin Amount.  Within two (2) weeks following the Closing, Buyer and Assignee shall pay and deliver to Sellers the Additional Admin Amount by wire transfer of immediately available funds to an account designated by Sellers.  Sellers and the Trustee shall utilize the Additional Admin Amount solely to pay Administrative Claims and shall provide Buyer as promptly as practicable after funding with any documentation reasonably requested by Buyer to document and evidence the amount and origin of the Administrative Claims and that they are properly designated Administrative Claims in accordance with the terms of Section 2.3(e).

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES REGARDING SELLERS

Except as set forth in the Disclosure Schedules, Sellers jointly and severally hereby represent and warrant to Buyer, solely for purposes of the conditions set forth in Sections 7.1(b) and 7.1(e) and subject in all respects to the limitations set forth in Section 5.6, as of the Agreement Date as follows:

4.1     Organization; Authority; Consents; Conflicts.

(a)     Each Seller is duly organized, validly existing, and in good standing under the Laws of the State of its formation.

(b)     Each Seller has all requisite corporate or limited liability company power and authority, as applicable, to own, lease and operate its assets and to carry on the Regional Business as currently conducted.

(c)     Subject to the Sale Order having been entered into by the Bankruptcy Court, the execution, delivery and performance by each Seller of any Transaction Document to which such Seller is (or will become at Closing) a party, and the consummation of the Transactions, does not and will not (i) conflict with or result in any breach of any provision of its certificate of incorporation or bylaws or comparable governing documents or (ii) result in a violation of any Law or Order applicable to it.

4.2    <u>Litigation; Orders</u>.    Except for the Bankruptcy Cases and any adversary proceedings or contested motions commenced in connection therewith, or as set forth on <u>Schedule 4.2</u>, there is, no Claim, Proceeding or Order pending, outstanding or, to Sellers' Knowledge, threatened against either Sellers, the Acquired Assets or the Assumed Liabilities that, if adversely determined, would be material to the Regional Business, the Acquired Assets or the Assumed Liabilities or that would materially impair Sellers' ability to consummate the Transactions.

4.3    <u>Compliance with Laws; Permits</u>.    Sellers are in compliance with all applicable Laws related to the Acquired Assets in all material respects, and the Sellers have not received any written notice of any alleged material violation of applicable Law from any Governmental Entity or other Person.  The Sellers hold all material Permits necessary or required pursuant to applicable Law for the operation of the Acquired Assets as presently conducted and for the ownership or operation of the Acquired Assets.  The Sellers have not received written notice of any material default under any Permit related to the Acquired Assets and no material violations exist in respect of such Permits.

4.4    <u>Real Property</u>.

(a)    <u>Schedule 4.4(a)</u> contains a list and brief description of all Leased Real Property held or used for, or necessary to the operation of the Regional Business.  Sellers have made available true and complete copies of all leases with respect to such Leased Real Property (individually, a "<u>Lease</u>" and collectively, the "<u>Leases</u>") to Buyer.  Other than as set forth on <u>Schedule 4.4(a)</u>, Sellers are not in breach of any material term or in "default" under any Lease and, to Sellers' Knowledge, no party to any Lease has given Sellers written notice of or made a claim with respect to any breach or default thereunder.  To Sellers' Knowledge, there are no conditions that currently exist or with the passage of time will (i) result in a default or breach of any material term by any party to a Lease or (ii) give rise to the right of the lessor to accelerate the obligations thereunder or modify the terms thereof.  To Sellers' Knowledge, other than as noted on <u>Schedule 4.4(a)</u>, none of the Leased Real Property is subject to any sublease or grant to any Person of any right to the use, occupancy or enjoyment of the Leased Real Property or any portion thereof that would materially impair the use of the Leased Real Property in the operation of the Regional Business.  The Leased Real Property is not subject to any Liens (other than Permitted Liens).  The Leased Real Property is not subject to any use restrictions, exceptions, reservations or limitations which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business.  There are no pending or, to Sellers' Knowledge, threatened condemnation proceedings or other Claims relating to any of the Leased Real Property.  The Leases that are Acquired Assets will continue to be legal, valid, binding, enforceable and in full force and effect on the same material terms immediately following the consummation of the Transactions.

(b)    <u>Schedule 4.4(b)</u> sets forth a true, correct and complete list of all Owned Real Property, specifying the street address, the current owner and the current use of each parcel of Owned Real Property in which any Seller has any title interest and which is related to, used, useful or held for use in the conduct of the Regional Business (the "<u>Owned Real Property</u>").  Except for Permitted Liens, Sellers have good and marketable title in the Owned Real Property set forth on <u>Schedule 4.4(b)</u>.  To Sellers' Knowledge, other than as noted on <u>Schedule 4.4(b)</u>, none of the

-27-

Owned Real Property is subject to any lease or grant to any Person of any right to the use, purchase, occupancy or enjoyment of such Owned Real Property or any portion thereof required to conduct the Regional Business.  Except for Permitted Liens, the Owned Real Property is not subject to any Liens or to any use restrictions, exceptions, reservations or limitations, which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business and in the same manner after the Closing as conducted by Sellers in the twelve months prior to Closing.  There are no pending or, to Sellers' Knowledge, threatened condemnation proceedings or other Claims relating to any of the Owned Real Property.

4.5    Environmental Matters.  Except as set forth on Schedule 4.5, (a) with respect to the Regional Business and the Acquired Assets, there is no pending or, to Sellers' Knowledge, threatened suit, verbal or written notice, investigation, claim, litigation, proceeding or other Claim by any Governmental Entity or any other Person that could reasonably be expected to result in any material Environmental Liabilities and Obligations, and no Seller is subject to, or in default of, any Order applicable to the Regional Business or the Acquired Assets and issued under or pursuant to any Environmental Law, (b) there has been no Release of Hazardous Materials in connection with the Regional Business, or at, from, on or under the Owned Real Property or the Leased Real Property that could reasonably be expected to result in any material Environmental Liabilities and Obligations, or require any material Remedial Action pursuant to any Environmental Law, (c) Sellers have obtained and are in compliance with and, to the extent applicable, have filed timely applications to renew, all material Permits that are required pursuant to any Environmental Law for the operation of the Acquired Assets and all such Permits are valid and in full force and effect, and no Claim is pending or, to the Knowledge of Sellers, threatened, which seeks to revoke, limit or otherwise affect any such Permit; (d) none of the Sellers has any material financial assurance, escrow, bonding or similar obligation under or pursuant to any Environmental Law, and (e) Sellers have delivered or made available to Buyer copies of the following non-privileged records in Sellers' or its representatives' possession, custody or control: (i) all material Permits issued pursuant to any Environmental Law for the Regional Business or the operation of the Acquired Assets; (ii) all material documents with respect to any pending or threatened material action, litigation, proceeding or other Claim relating to or bearing on the Regional Business or the Acquired Assets and arising under or relating to any Environmental Law, or with respect to any Environmental Liabilities and Obligations; and (iii) all material written environmental reports, audits and assessments (including Phase I environmental site assessment reports) for the Regional Business and the Acquired Assets (including the Owned Real Property and Leased Real Property).

4.6    Suppliers; Customers.

(a)    Suppliers.

(i)    Schedule 4.6(a) sets forth a complete and accurate list of (A) the top ten (10) suppliers (excluding utilities) of the Sellers that accounted for the most expenses of the Regional Business for the twelve month period ended April 30, 2020 (the "Top Suppliers") and (B) with respect to each such Top Supplier the aggregate amount of such expenses.

(ii)    Since April 1, 2020, (A) no Top Supplier has terminated or adversely modified the amount, frequency or terms of the business such Top Supplier conducts

-28-

with the Sellers and (B) the Sellers have not received any notice, nor do the Sellers have any Knowledge, that any Top Supplier intends to terminate or adversely modify the amount, frequency or terms of the business such Top Supplier conducts with the Sellers. The Sellers do not have any outstanding material disputes concerning the products and/or services provided by any Top Supplier, and the Sellers have no Knowledge of any material dissatisfaction on the part of any Top Supplier.

     (b)   <u>Customers</u>.

     (i)   <u>Schedule 4.6(b)</u> sets forth a complete and accurate list of (A) the top ten (10) customers of the Sellers that accounted for the most revenues of the Regional Business for the twelve month period ended April 30, 2020 (the "<u>Top Customers</u>") and (B) with respect to each such Top Customer the aggregate amount of such revenues.

     (ii)   Since April 1, 2020, (A) no Top Customer has terminated or adversely modified the amount, frequency or terms of the business such Top Customer conducts with the Sellers and (B) the Sellers have not received any notice, nor do the Sellers have any Knowledge, that any Top Customer intends to terminate or adversely modify the amount, frequency or terms of the business such Top Customer conducts with the Sellers. The Sellers do not have any outstanding material disputes concerning the products and/or services provided by any Top Customer, and the Sellers have no Knowledge of any material dissatisfaction on the part of any Top Customer.

     4.7   <u>RESERVED</u>.

     4.8   <u>Contracts</u>.  <u>Schedule 4.8</u> sets forth a complete list, as of the date hereof, of (i) all Contracts to which either Seller is a party and that are used in or related to the Regional Business or the Acquired Assets, and (ii) the estimated Cure Amounts for each such Contract (and such other commercial information related to the Contracts listed thereon as shall be reasonably requested by Buyer), and each of the Contracts set forth on <u>Schedule 4.8</u> is in full force and effect and is a valid and binding obligation as to Seller and, to the knowledge of Seller, the other parties thereto, unamended by oral or written agreement, in each case except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other laws (whether statutory, regulatory or decisional), now or hereafter in effect, relating to or affecting the rights of creditors generally or by equitable principles (regardless of whether considered in a proceeding at law or in equity).

     4.9   <u>Taxes</u>.

     (a)   All Tax Returns required to be filed by Sellers in respect of the Acquired Assets have been duly filed on a timely basis or within valid and appropriate extensions of time, and all such Tax Returns were when filed, and continue to be, correct and complete in all material respects.  All Taxes (whether or not shown on any Tax Return) owed by Sellers relating to the Acquired Assets have been timely paid.  There are no Liens with respect to Taxes imposed on the Acquired Assets other than Permitted Liens.

(b)     Sellers have complied with all Laws applicable to the Acquired Assets relating to the payment and withholding of Taxes, and have duly and timely withheld and paid over to the appropriate Tax Authority all amounts required to be so withheld and paid under all such Laws.  Sellers have not given nor requested extensions, waived or requested to waive any statute of limitations in respect of Taxes associated with the Acquired Assets which waiver is currently in effect.  Sellers have not deferred payment of Sellers' portion of payroll taxes otherwise required to be deposited and paid for the period beginning March 27, 2020 through the Closing Date under section 2302 of the Coronavirus, Aid, Relief and Economic Security Act (P.L. 116-136).

(c)     There is no Proceeding pending or threatened against Sellers in respect of the Acquired Assets by any Tax Authority, including for the assessment or collection of Taxes. No deficiencies for any Taxes have been proposed, asserted, threatened or assessed against Sellers in respect of the Acquired Assets by any Tax Authority that have not been paid, resolved or settled, and Sellers have not agreed to any requests for waivers of the time to assess or collect any such Taxes.  No Tax Authority with which Sellers do not file a particular Tax Return or to which Sellers do not pay Taxes, in each case in respect of the Acquired Assets, has claimed that Sellers are or may be subject to taxation by that Tax Authority.  No issue has been raised by a Tax Authority in any prior examination of Sellers relating to the Acquired Assets, which, by application of the same or similar principles, could reasonably be expected to result in a material proposed deficiency for any subsequent taxable period.

(d)     Schedule 4.9 lists: (i) all jurisdictions in which Sellers pay Taxes and/or have a duty to file Tax Returns, in each case in respect of the Acquired Assets; and (ii) all types of Tax Returns filed by or on behalf of Sellers that relate in whole or in part to the Acquired Assets.

(e)     Sellers have collected all sales, use, value-added, and similar Taxes in respect of the Acquired Assets required to be collected, and has remitted, or will remit, on a timely basis such amounts to the appropriate Tax Authority.  Sellers have properly requested, received and retained all necessary exemption certificates and other documentation supporting any claimed exemption or waiver of Taxes in respect of the Acquired Assets on sales or similar transactions as to which it would otherwise have been obligated to collect or withhold such Taxes.

4.10    Brokers' Fees and Commissions. No Seller nor any of its Affiliates, members, managers, directors, officers, employees or agents has employed or has an liability to any investment banker, broker, finder, agent or similar intermediary in connection with this Agreement, the other Transaction Documents, or the Transactions contemplated hereby, and no broker, finder, agent or similar intermediary is entitled to any broker's fee, finder's fee, or similar fee or commission for which Buyer could become liable or obligated to pay.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER AND ASSIGNEE

Except as set forth on the Disclosure Schedules, Buyer and Assignee, jointly and severally, hereby represent and warrant to Sellers as of the Agreement Date, and as of the Closing Date, as follows:

-30-

5.1    Organization.  Buyer and Assignee is each duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  Buyer and Assignee each has all necessary corporate power and authority to own and operate its properties, to lease the property it operates under lease and to conduct its business.

5.2    Due Authorization, Execution and Delivery; Enforceability.  Buyer and Assignee each has all requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and to perform its obligations hereunder and thereunder (subject to, in the case of the obligation to consummate the Transactions, to the granting of the Sale Order).  The execution, delivery and performance by Buyer and Assignee of this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate action on the part of Buyer and Assignee and no other corporate action on the part of Buyer or Assignee is necessary to authorize this Agreement and such other Transaction Documents and to consummate the Transactions (subject, in the case of the obligation to consummate the Transactions, to the granting of the Sale Order).  This Agreement and the other Transaction Documents to which Buyer and Assignee is (or will become at Closing) party have been (or will be) duly and validly executed and delivered by Buyer and Assignee and (assuming the due authorization, execution and delivery by all parties hereto and thereto, other than Buyer and Assignee) constitute (or will constitute) valid and binding obligations of Buyer and Assignee, enforceable against Buyer and Assignee in accordance with their terms (subject to, in the case of the obligation to consummate the Transactions, to the granting of the Sale Order), in each case except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

5.3    Governmental Approvals.  No notice to, consent, approval or authorization of or designation, declaration or filing with any Governmental Entity is required by Buyer or Assignee with respect to Buyer's or Assignee's execution and delivery of any Transaction Document to which it is (or will become at Closing) a party or the consummation of the Transactions, except (a) the Sale Order having been entered into by the Bankruptcy Court and (b) any consent, approval or authorization of or designation, declaration or filing with any Governmental Entity the failure of which to be made or obtained would not, individually or in the aggregate, materially affect the ability of Buyer or Assignee to consummate the Transactions.

5.4    No Conflicts.  The execution, delivery and performance by Buyer and Assignee of any Transaction Document to which Buyer or Assignee is (or will become at Closing) a party and the consummation of the Transactions, does not and will not (a) conflict with or result in any breach of any provision of its certificate of incorporation or bylaws or comparable governing documents, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation under, any material Contract of Buyer or Assignee, or (c) result in a violation of any Law or Order applicable to it, except, in the case of clauses (b) and (c), as would not, individually or in the aggregate, materially affect the ability of Buyer or Assignee to consummate the Transactions.

-31-

5.5     Sufficiency of Funds.  Buyer and Assignee, collectively, have sufficient funds to enable them to make payment of the Cash Purchase Price and consummate the transactions contemplated by this Agreement.

5.6     Condition of Business. Buyer and Assignee each hereby acknowledges and agrees that notwithstanding anything expressed or implied herein to the contrary, except as expressly set forth in Article 4 of this Agreement solely for purposes of the conditions set forth in Section 7.1(b) and 7.1(e), Sellers, including each of their directors, officers, employees, agents, shareholders, Affiliates, consultants, counsel, accountants or and other representatives, including the Trustee, make no express or implied representations or warranties whatsoever, including any representation or warranty as to physical condition or value of any of the Acquired Assets or the future profitability or future earnings performance of the Regional Business. Buyer and Assignee will accept the Acquired Assets at the Closing and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS".

## ARTICLE 6
## COVENANTS OF THE PARTIES

6.1     Conduct Pending the Closing.  During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement in accordance with its terms and the Closing (the "Interim Period"), except for (A) the filing of the Bankruptcy Cases, (B) any action or failure to act taken by the Trustee during the Interim Period in order to preserve the property of the Sellers' estate as required by applicable Law and (C) any action authorized by an Order of the Bankruptcy Court and subject to the provisions of the New Money Financing Agreement, Sellers shall use commercially reasonable efforts to (x) operate the Regional Business in the Ordinary Course of Business and (y) (A) preserve intact their respective business organizations, (B) maintain the Regional Business and the Acquired Assets (normal wear and tear excepted), (C) keep available the services of their respective officers and employees, (D) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers, vendors and others having business relationships with Sellers in connection with the operation of the Regional Business, (E) continue to operate the Regional Business and Acquired Assets in all material respects in compliance with all Laws applicable to the Regional Business and Sellers and (F) not remove or permit to be removed from any building, facility, or real property that constitute Acquired Assets any asset, equipment, machinery or any Inventory (other than in connection with the sale of Inventory in the Ordinary Course of Business, the removal of equipment to drill sites in the Ordinary Course of Business or with respect to the Excluded Inventory).

6.2     Access.  Subject to applicable Law, during the Interim Period, the Sellers, (a) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel and other Representatives, books and records of the Sellers to the extent relating to the Acquired Assets, as Buyer reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement, (b) shall furnish to Buyer and its Representatives such financial, operating and property data to the extent relating to the Regional Business and other information as Buyer and its Representatives reasonably request and (c) shall cooperate reasonably with Buyer in its investigation of the

-32-

Acquired Assets.  Buyer agrees that any on-site inspections of any leased real property shall be conducted in the presence of the Sellers or their Representatives. All inspections shall be conducted so as not to interfere unreasonably with the use of any of the leased real property by the Sellers.

6.3    <u>Physical Inventory</u>.  Without limiting <u>Section 6.2</u>, the Sellers (a) shall give Buyer and its Representatives reasonable access to the offices, properties, plants, warehouses, employees, accountants and auditors of the Sellers in order to conduct a physical inventory of the Inventory, Owned Real Property and Leased Real Property prior to the Closing Date and (b) shall cooperate reasonably with Buyer in its investigation of the Inventory, Owned Real Property and Leased Real Property.

6.4    <u>Tax Matters</u>.

(a)    All Transfer Taxes arising out of the transfer of the Acquired Assets pursuant to this Agreement shall be borne by the Buyer and Assignee. Buyer and Assignee shall file all necessary documentation and returns with respect to such Transfer Taxes when due.  Buyer and Assignee shall pay all such Transfer Taxes when due.

(b)    Each of Buyer and Assignee, on the one hand, and Sellers, on the other hand, shall cooperate fully, as and to the extent reasonably requested, in connection with the preparation and filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes and shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets as is reasonably necessary for filing of all Tax Returns, including any Claim for exemption or exclusion from the application or imposition of any Taxes, the preparation for any audit by any Tax Authority and the prosecution or defense of any Proceeding relating to any Tax Return.

6.5    <u>Approvals; Commercially Reasonable Efforts; Notification; Consent</u>.

(a)    Subject to the terms and conditions of this Agreement and any Order of the Bankruptcy Court and allowing for any action or failure to act taken by the Trustee in order to preserve the property of the Sellers' estate as required by applicable Law, each Party shall use its commercially reasonably efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable under applicable Law to consummate and make effective the Transactions.  Without limiting the generality of the foregoing, the Parties will use their respective commercially reasonable efforts to (i) take all actions necessary to transfer the Acquired Assets, (ii) take all actions necessary to cause all conditions set forth in <u>Article 7</u> to be satisfied as soon as practicable, (iii) lift or rescind any existing Order preventing, prohibiting or delaying the consummation of the Transactions, (iv) effect all necessary registration, applications, notices and other filings required by applicable Law, including, as applicable to Sellers, under the Bankruptcy Code, and (v) execute and deliver any additional instruments necessary to fully carry out the purposes of this Agreement; <u>provided</u>, <u>however</u>, that that nothing in this Agreement, including this <u>Section 6.5</u> shall require Buyer to (A) consent to any material condition or material concession required by any Governmental Entity or third party; (B) consent to any divestitures of any material Subsidiary or material assets of Buyer or its Affiliates or accept any material limitation on or material condition

-33-

on the manner in which any of the foregoing conducts their business; (C) pay any material amounts required or requested by any Governmental Entity; or (D) accept an agreement to hold separate any material portion of any business or of any material assets of any material Subsidiary of Buyer or its Affiliates.  Buyer and Assignee and the Sellers shall not, and shall cause their respective Affiliates not to, take any action that would reasonably be expected to prevent or materially delay the approval of any Governmental Entity of any of the filings referred to in this Section 6.5(a).

(b)     Each Party shall (i) respond as promptly as reasonably practicable to any inquiries or requests for additional information and documentary material received from any Governmental Entity relating to the matters described in Section 6.5(a) and (ii) not enter into any agreement with the any Governmental Entity pursuant to which such Party agrees not to consummate the Transactions.

(c)     In connection with and without limiting the foregoing, each Party shall, subject to applicable Law and except as prohibited by any applicable representative of any applicable Governmental Entity: (i) promptly notify the other Parties of any material written communication to that Party from any Governmental Entity concerning this Agreement or the Transactions, and permit the other Parties to review in advance (and to consider any comments made by the other Parties in relation to) any proposed written communication to any of the foregoing; (ii) not participate in or agree to participate in any substantive meeting, telephone call or discussion with any Governmental Entity in respect of any filings, investigation or inquiry concerning this Agreement or the Transactions unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Entity, gives the other Parties the opportunity to attend and participate in such meeting, telephone call or discussion; and (iii) subject to the solicitor-client or attorney-client and similar applicable privileges, furnish outside legal counsel for the other Parties with copies of all correspondence, filings, and written communications (and memoranda setting forth the substance thereof) between such Party and its Affiliates and their respective Representatives, on the one hand, and any Governmental Entity or its members or their respective staffs, on the other hand, with respect to this Agreement and the Transactions; provided, however, that any such Party may limit the disclosure of filings to protect confidential information, including limiting dissemination of filings to an "outside counsel only" basis.

6.6     Further Assurances.  The Parties agree to (i) furnish upon request to each other such further information, (ii) execute, acknowledge and deliver to each other such other documents and (iii) do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transaction Documents; provided, however, that the Trustee shall have no obligation under this Section 6.6 which results in additional expenses or costs to the estate of Sellers.

6.7     Bankruptcy Actions and Court Filings.

(a)     Sellers shall file motions, which shall be in form and substance acceptable to Buyer, seeking entry of the (i) the Operating Order within two (2) Business Days following the Petition Date and (ii) the Post-Petition Financing Order on or before June 5, 2020, subject to reasonable extensions in Buyer's discretion.

-34-

(b)    In the event of any discrepancy between this Agreement and the Sale Motion and the Sale Order, the Sale Motion and the Sale Order shall govern.

(c)    The Sellers shall, on or before June 5, 2020, file with the Bankruptcy Court the Sale Motion and otherwise use their commercially reasonable efforts to have the Bankruptcy Court enter each of the Bidding Procedures Order and the Sale Order as promptly as practicable, subject to reasonable extensions in Buyer's discretion.

6.8    <u>Expense Reimbursement</u>.    If this Agreement is (a) terminated pursuant to <u>Section 8.1(b)(ii)</u>, <u>Section 8.1(b)(iii)</u>, <u>Section 8.1(c)</u>, <u>Section 8.1(d)</u>, <u>Section 8.1(e)</u>, <u>Section 8.1(f)</u>, <u>Section 8.1(h)</u>, <u>Section 8.1(j)</u>, <u>Section 8.1(k)</u>, <u>Section 8.1(l)</u> or <u>Section 8.1(m)</u> and (b) at any time thereafter, an Alternative Transaction is consummated, then Buyer shall be deemed to have earned the Expense Reimbursement, which shall be paid in cash by wire transfer of immediately available funds to an account designated by Buyer, out of the proceeds of such Alternative Transaction, without further order of the Bankruptcy Court, contemporaneously with or as soon as reasonably practicable following the consummation of such Alternative Transaction. For greater certainty, the payment of the Expense Reimbursement to the Buyer shall be in addition to the return of the Deposit in accordance with <u>Section 3.3(c)</u>.

6.9    <u>Preservation of Books and Records</u>.    During the pendency of the Bankruptcy Cases, Buyer and Assignee and (if applicable) Sellers and the Trustee shall provide to Sellers and their respective Affiliates and Representatives (after reasonable notice and during normal business hours and without undue interference to the business operations of Buyer and Assignee, and at the Sellers' sole cost and expense) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Acquired Assets, to the extent necessary to permit the Sellers to determine any matter relating to its rights and obligations hereunder or to any period ending on or before the Closing Date (for example, for purposes of any Tax or accounting audit or any claim or litigation matter, but not for any dispute or claim between Buyer or Assignee and Sellers in connection with this Agreement, the Transaction Documents or otherwise), for periods prior to the Closing and shall preserve such books and records until the earlier of (i) such period as shall be consistent with Buyer's and Assignee's records retention policy in effect from time to time, (ii) the retention period required by applicable Law or (iii) the termination of the Bankruptcy Cases. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer and Assignee each acknowledges that Sellers have the right to retain originals or copies of all of books and records included in or related to the Acquired Assets for periods prior to the Closing.

6.10    <u>Notification of Certain Matters</u>.    Sellers will promptly notify Buyer of: (i) any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions (including with respect to the transfer of personal information); (ii) any written notice or other communication from any Governmental Entity (other than the Bankruptcy Cases) related to or in connection with the Transactions; and (iii) promptly upon discovery thereof, any material variances from, or the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause any of the representations and warranties contained in <u>Article 4</u>

-35-

to be untrue or inaccurate in a manner that would reasonably be expected to cause the conditions set forth in <u>Section 7.1</u> not to be satisfied.

6.11    <u>Confidentiality</u>. Upon and for a period of one (1) year following the Closing (or indefinitely in the case of trade secrets), Sellers shall use commercially reasonable efforts to keep confidential all non-public information regarding the Acquired Assets, except and to the extent such public disclosure as Sellers and their counsel may reasonably determine to be required under any applicable Law or Order (<u>provided</u> that Sellers will provide Buyer with prior written notice of any such disclosure to the extent permitted by applicable Law or Order).

6.12    <u>Contractors</u>.    Sellers shall use commercially reasonable efforts to cause the contractors set forth on <u>Schedule 6.12</u> to continue to support the Regional Business, consistent with past practice, from and after the Agreement Date until the Closing.

6.13    <u>Continuing Employees</u>.  Following the Closing, on or before July 31, 2020, Buyer and Assignee shall deliver to each Continuing Employee an offer letter offering such Continuing Employee employment with Buyer or Assignee or one of their respective Affiliates.

6.14    <u>Right to Assume Benefit Plans</u>.

(a)    Buyer or Assignee shall have the right to assume from Sellers, and upon the due exercise of such right by Buyer pursuant to this <u>Section 6.14</u>, Sellers shall have the obligation to assign to Buyer or Assignee, all or some of the Benefit Plans, provided that such assignment and transfer is allowable by applicable Law and the existing terms and conditions of the Benefit Plans.  To exercise this right, Buyer shall provide written notice to Sellers on or prior to July 20, 2020, which notice shall set forth the Benefit Plans to be assumed (those that can be assigned by applicable Law and their terms, the "<u>Selected Benefit Plans</u>").  Upon receipt of such notice, Sellers shall promptly file a motion, in form and substance acceptable to Buyer, seeking entry of an Order by the Bankruptcy Court granting the assignment by Sellers and assumption by Buyer or Assignee, as the case may be, of the Selected Benefit Plans and certain Excluded Liabilities (as set forth below).  Buyer and Assignee agree that, simultaneously with the assumption of the Selected Benefit Plans, they will assume the Excluded Liabilities described in <u>Section 2.5(k)</u> and <u>Section 2.5(l)</u> with respect to such Selected Benefit Plans and the termination of Sellers' employment of the Continuing Employees *mutatis mutandis* and henceforth such Excluded Liabilities shall be considered Assumed Liabilities hereunder.

(b)    The Parties shall use their commercially reasonable efforts, and cooperate with each other to obtain any Consent that is required to assume and assign to Buyer or Assignee any Selected Benefit Plan; provided, however, that none of the Parties or any of their respective Affiliates shall be required to pay any consideration therefor other than filing, recordation or similar fees, which shall be borne by Buyer and Assignee.

6.15    <u>Payments from Third Parties</u>.  From and after the Closing, if any Seller receives or collects any Accounts Receivable or other payments or funds due to Buyer pursuant to the terms of this Agreement, such Seller shall remit such funds to Buyer within ten (10) Business Days after its receipt thereof.

6.16    Indemnification of Sellers and Trustee by Buyer and Assignee.

(a)    From and after the Agreement Date, regardless of the Closing of the Transactions or the termination of this Agreement by any Party, Buyer and Assignee (collectively, the "Indemnifying Parties" and each is an "Indemnifying Party") shall, jointly and severally, indemnify, defend, and hold harmless Sellers and the Trustee and all of their respective, directors, managers, officers, employees, agents, and attorneys (collectively, the "Indemnified Parties" and each is an "Indemnified Party") from and against any Claims arising out of or resulting from:

(i)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer or Assignee pursuant to Section 3.6 or Section 6.13 of this Agreement; and

(ii)    the liabilities of the Indemnified Parties for all eligible claims for benefits under the Benefit Plans (including, without limitation, COBRA Liabilities thereunder) that are incurred by the Continuing Employees, former employees of Sellers or their Affiliates or the beneficiaries or dependents of any such Persons during the period from July 1, 2020 through and including the earlier of (i) the effective date of employment of all the Continuing Employees that are offered employment by Buyer or Assignee or their Affiliate and accept such employment; (ii) the date of assumption of the Benefit Plans and related Liabilities by Buyer or Assignee pursuant to Section 6.14 or (iii) July 31, 2020.

(b)    For purposes of this Agreement, the following Claims shall be deemed to be incurred as follows (A) life, accidental death and dismemberment, short-term disability and workers' compensation insurance benefits, on the event giving rise to such benefit; (B) medical, vision, dental, and prescription drug benefits, on the date the applicable services, materials or supplies were provided; and (C) long-term disability benefits, on the eligibility date determined by the long-term disability insurance carrier for the plan in which the applicable Person participates.

(c)    Nothing contained herein, express or implied, shall be construed to establish, amend or modify any Benefit Plan, program, agreement or arrangement of Sellers or their Affiliates. The Parties acknowledge and agree that the terms set forth in this Agreement, including this Section 6.16 and Section 6.13, shall not create any right in any Continuing Employee or any other Person to any continued employment with Sellers, Buyer, Assignee or any of their Affiliates or compensation or benefits of any nature or kind whatsoever.

(d)    Prior to seeking any indemnification from the Indemnifying Parties pursuant to this Section 6.16, the Indemnified Parties shall first look to the Continuing Employees Expense Amount to satisfy any Claims subject to indemnification pursuant to this Section 6.16, and the Indemnified Parties shall only seek indemnification from the Indemnifying Parties pursuant to this Section 6.16 to the extent there are no available funds remaining in the Continuing Employees Expense Amount.

(e)    If any third party (including any Governmental Entity), who is not an Affiliate of a Party, notifies any Indemnified Party of a matter (a "Third Party Claim") which may give rise to a Claim for indemnification against any Indemnifying Party under this Section 6.16,

-37-

then the Indemnified Party shall promptly notify each Indemnifying Party thereof in writing, describing the Claim (to the extent then known), the amount thereof (if known and quantifiable) and the basis of the Claim; *provided* that the failure to so notify the Indemnifying Party shall not limit the indemnification obligations under this Agreement except to the extent that the Indemnifying Party is actually and materially prejudiced by such failure.

(f)       Any Indemnifying Party shall be entitled to participate in the defense of such Third Party Claim at such Indemnifying Party's expense, and at its option will have the right to, upon written notice to the Indemnified Party, assume and thereafter conduct the defense of the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party; *provided*, *however*, that the Indemnifying Party will not be entitled to assume the defense or prosecution of a Third Party Claim (unless otherwise agreed to in writing by the Indemnified Party) if (i) the Third Party Claim relates to or arises from any criminal act or involves criminal penalties; (ii) the Third Party Claim seeks an injunction or equitable relief against the Indemnified Party; (iii) upon petition by the Indemnified Party, an applicable court rules that the Indemnifying Party failed or is failing to vigorously defend or prosecute such Third Party Claim; (iv) the Third Party Claim does not solely involve (and does not continue to solely involve) monetary damages; (v) the Indemnified Party determines in good faith that the Third Party Claim is reasonably be expected to have a "material adverse effect" on the Indemnified Party as determined by applicable Delaware Law; or (vi) the Indemnified Party has been advised by counsel that an actual conflict exists between the Indemnifying Party and the Indemnified Party in connection with the defense of such Third Party Claim (the conditions set forth in clauses (i) through (vi) are, collectively, the "Litigation Conditions"). However, the Indemnifying Party may not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party unless the judgment or proposed settlement (A) involves only the payment of money damages that the Indemnifying Party has agreed in writing to, and shall, pay in full, (B) does not impose an injunction or other equitable relief upon the Indemnified Party, (C) includes a complete and unconditional release of the Indemnified Party subject to such Third Party Claim, and (D) does not include or involve any finding or admission of any violation of Law or other wrongdoing, in which case no consent will be required. If the Indemnifying Party assumes the defense of a Third Party Claim in accordance with this Section, the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim (it being understood, however, that the Indemnifying Party shall control such defense and shall be liable solely for the costs and expenses of counsel of its choice reasonably satisfactory to the Indemnified Party), and the Indemnifying Party shall consider in good faith any recommendations of the Indemnified Party and its counsel with respect to such defense. If the Indemnifying Party has not assumed the defense of such Third Party Claim (including where one of the Litigation Conditions exists or where the Indemnifying Party fails to accept a tender of the defense of the Third Party Claim in accordance with the first sentence of this Section) and the Indemnified Party defends against or otherwise deals therewith (which shall in no event constitute a waiver of any rights against the Indemnifying Party), the Indemnified Party may, at the expense of the Indemnifying Party, employ counsel reasonably satisfactory to the Indemnifying Party and control the defense, compromise, and settlement of such Third Party Claim. The Indemnified Party shall not settle or compromise or consent to the entry of any judgment or admit any liability with respect to any Third Party Claim without the prior written consent of the Indemnifying Party (not to be unreasonably withheld, conditioned or delayed) unless (1) the Indemnifying Party has not

-38-

acknowledged any obligation to indemnify such Indemnified Party hereunder for such matter or (2) the judgment or proposed settlement (A) involves only the payment of money damages that the Indemnifying Party agreed in writing to pay, (B) does not impose an injunction or other equitable relief upon the Indemnifying Party, (C) includes a complete and unconditional release of the Indemnifying Party and the Indemnified Party subject to such Third Party Claim, and (D) does not include or involve any finding or admission of any violation of Law or other wrongdoing, in which case no consent will be required.  If the named parties in a Third Party Claim include both the Indemnified Party and the Indemnifying Party and the Indemnified Party has been advised by legal counsel that there may be one or more material legal defenses available to it that are different from or additional to those available to the Indemnifying Party and/or the success of defending such Third Party Claim from the Indemnified Party's perspective depends upon employing such different or additional defenses (for which there are not comparable defenses of Indemnifying Party with an equal or greater likelihood of success as determined in the good faith judgment of outside counsel for the Indemnified Party), then any costs and expenses suffered or incurred by such Indemnified Party in connection with the defense of such Third Party Claim shall be considered Claims for which the Indemnified Party may be entitled to indemnification under this Section 6.16.

(g)     The Indemnified Party will not, without the prior written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed) if the Indemnifying Party has assumed the defense of the Third Party Claim in accordance with Section 6.16(f), cause or agree to the waiver of the attorney-client privilege, attorney work-product immunity or any other privilege or protection in respect of confidential legal memoranda and other privileged materials drafted by, or otherwise reflecting the legal advice of, internal or outside counsel of an Indemnified Party (the "Subject Materials") relating to such Third Party Claim. Whether or not the Indemnifying Party chooses, where it has the right, to defend or prosecute any such Third Party Claim, the Parties shall, and shall cause their respective Affiliates to, cooperate with the Party controlling the defense and its counsel in the review, investigation and defense of any such claim or any related claim or counterclaim, shall make available its personnel, and shall provide such testimony and access to its books and records as is reasonably requested by the Party controlling the defense in connection therewith; *provided* that no Indemnified Party shall be required to provide cooperation or make available any books, records or other information that would (x) jeopardize the attorney-client, work product or similar privilege of the Person in possession or control of such records or information or (y) contravene any confidentiality agreement, nondisclosure agreement or similar obligation of the Person in possession or control of such records or information. In furtherance of the foregoing, each Party mutually acknowledges and agrees, on behalf of itself and its Affiliates, that (1) each shares a common legal interest in preparing for the defense of legal proceedings, or potential legal proceedings, arising out of, relating to or in respect of any actual or threatened Third Party Claim or any related claim or counterclaim, (2) the sharing of Subject Materials may further such common legal interest, and (3) by disclosing any Subject Materials to and/or sharing any Subject Materials with the Indemnifying Party, the Indemnified Party shall not waive the attorney-client privilege, attorney work-product immunity or any other privilege or protection. Except with respect to any sharing of Subject Materials as permitted hereunder or as contemplated by any common interest agreement or joint defense agreement entered into by the Parties, the Indemnified Party shall not be required to make available to the Indemnifying Party any information that is subject to an attorney-client or other

-39-

applicable legal privilege that based on the advice of outside counsel would be impaired by such disclosure or any confidentiality restriction under applicable Law; *provided*, *however*, that each Party shall use its commercially reasonable efforts to permit the Indemnifying Party to become party to any joint defense or common interest agreement entered into by an Indemnified Party with any third Person.

(h)    Subject to <u>Section 6.16(e)</u>, in the event of any direct Claim as among any of the Parties, the Indemnified Party shall assert such direct Claim by giving the Indemnifying Party prompt written notice thereof; *provided* that the failure to so notify the Indemnifying Party shall not limit the indemnification obligations under this Agreement except to the extent that the Indemnifying Party is actually and materially prejudiced by such failure. The Indemnifying Party shall respond in writing to such direct claim within thirty (30) days after its receipt of such notice, and, if the Indemnifying Party does not so respond within such 30-day period, the Indemnifying Party shall be deemed not to have objected to such direct Claim. If the Indemnifying Party disputes all or any part of such direct Claim by providing written notice of such dispute to the Indemnified Party within such 30-day period (a "<u>Claim Dispute</u>"), the Indemnified Party and the Indemnifying Party shall first attempt to resolve such Claim Dispute through direct good faith negotiations. Any Party may initiate this process by making a written demand for direct negotiation that describes the Claim Dispute to be negotiated in reasonable detail to the extent of information then available. No settlement reached in such negotiations under this Section shall be binding until reduced to a writing signed by the applicable Parties. If the Claim Dispute is not resolved within thirty (30) days after the date of delivery of such written demand for direct negotiation, then the Trustee and Buyer shall resolve such dispute in accordance with this Agreement. Nothing in this Section shall prevent any Party from seeking specific performance or injunctive relief under this Agreement (which relief, for the avoidance of doubt, may be sought before complying with this Section).

## ARTICLE 7
## CONDITIONS TO OBLIGATIONS OF THE PARTIES

7.1    <u>Conditions Precedent to Obligations of Buyer</u>.    The obligation of Buyer to consummate the Transactions is subject to the satisfaction (or written waiver by Buyer in Buyer's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)    <u>No Order</u>.  No court or other Governmental Entity has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the Transactions.

(b)    <u>Accuracy of Representations and Warranties</u>.  The representations and warranties of Sellers set forth in <u>Article 4</u> shall be true and correct (disregarding all qualifications or limitations as to "materiality" and words of similar import set forth therein) in all material respects as of the Agreement Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

-40-

(c)    <u>Sellers Performance of Obligations</u>.  Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Date.

(d)    <u>Trustee's Conditions Certificate</u>.  Buyer shall have received from the Trustee a certificate (the "<u>Trustee's Conditions Certificate</u>"), dated the Closing Date, certifying that all of the conditions specified in this <u>Section 7.1</u> (other than the condition set forth in <u>Section 7.1(b)</u>) have been fulfilled and/or waived.

(e)    <u>Officer's Certificate</u>.  Buyer shall have received from the Sellers a certificate, dated the Closing Date, of an executive officer of each Seller to the effect that, to the best of such officer's knowledge, all of the conditions specified in <u>Section 7.1(b)</u> been fulfilled and/or waived (the "<u>Officer's Certificate</u>").

(f)    <u>Inventory</u>.  The Closing Date Inventory shall not be less than 90% of the Target Inventory.

(g)    <u>Post-Petition Trade Payables</u>. All Post-Petition Trade Payables shall have arisen in the Ordinary Course of Business, and no such Post-Petition Trade Payables shall be delinquent in its payment in accordance with its terms.

(h)    <u>ABL Facility and New Money Financing Agreement Advances</u>.  Aggregate advances under the ABL Facility and New Money Financing Agreement immediately prior to the Closing (and taking into any account any amounts to be funded at the Closing) are not greater than 85% of the Eligible Accounts Receivable (as such term is defined in the ABL Facility and/or the New Money Financing Agreement, as applicable) inclusive of any amounts funded or committed to be funded by the Buyer thereunder.

(i)    <u>Bidding Procedures Order and Sale Order</u>. Each of the Bidding Procedures Order and the Sale Order shall have been entered and shall not be subject to a stay pending appeal.

(j)    <u>Material Contracts</u>. All consents necessary to assign the Material Contracts to the Buyer shall have been obtained and all Material Contracts shall have been assumed and assigned to Buyer at Closing.

(k)    <u>Cure Amounts</u>.  The aggregate Cure Amounts related to the Material Contracts on the Closing Date shall not exceed $3,614,025 (Three Million Six Hundred Fourteen Thousand Twenty-Five).

(l)    <u>Rig Count</u>.  There shall be no less than thirteen (13) drilling rigs actively servicing well sites that are operated by the Regional Business on the Closing Date.

(m)    <u>Post-Petition Financing Order</u>.  The Bankruptcy Court shall have entered the Post-Petition Financing Order no later than June 5, 2020.

(n)    <u>Encina Exit Financing</u>.  Buyer shall have received the financing on the terms set forth in the Encina Exit Financing Commitment Letter, provided that the condition forth in this

-41-

Section 7.1(m) shall only apply so long as Buyer shall have performed in all material respects its obligations under such financing.

(o)　Q'Max Transition Services Agreement. Buyer and Assignee shall each have received a duly executed copy of the Q'Max Transition Services Agreement from each respective counterparty thereto.

7.2　Conditions Precedent to the Obligations of the Sellers. The obligation of the Sellers to consummate the Transactions is subject to the satisfaction (or written waiver by the Sellers) at or prior to the Closing Date of each of the following conditions:

(a)　No Order. No court or other Governmental Entity has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement.

(b)　Accuracy of Representations and Warranties. The representations and warranties of Buyer and Assignee set forth in Article 5 shall be true and correct (disregarding all qualifications or limitations as to "materiality" and words of similar import set forth therein) in all material respects as of the Agreement Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(c)　Performance of Obligations. Buyer and Assignee each shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date.

(d)　Officer's Certificate. The Sellers shall have received a certificate, dated the Closing Date, of an executive officer of Buyer and Assignee to the effect that all of the conditions specified in this Section 7.2 been fulfilled and/or waived (the "Buyer's and Assignee's Conditions Certificate" and together with the Trustee's Conditions Certificate and the Officer's Certificate, the "Conditions Certificates").

(e)　Q'Max Transition Services Agreement. Sellers shall have received a duly executed copy of the Q'Max Transition Services Agreement from each respective counterparty thereto.

7.3　Frustration of Conditions Precedent. Neither Buyer nor Assignee nor the Sellers may rely on the failure of any condition set forth in this Article 7, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its commercially reasonable efforts to consummate the Transactions contemplated hereby.

## ARTICLE 8
## TERMINATION

8.1　Termination of Agreement. This Agreement may be terminated and the Transactions abandoned at any time prior to the Closing:

-42-

(a)    by written agreement of the Sellers and Buyer;

(b)    by either the Sellers or Buyer:

(i)    if there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited, or if any Order permanently restraining, prohibiting or enjoining Buyer or Sellers from consummating the Transactions is entered and such Order shall become final, provided, however, that no termination may be made by a Party under this <u>Section 8.1(b)(i)</u> if the issuance of such Order was caused by the breach or action or inaction of such Party;

(ii)    upon the filing of a motion by any of the Sellers to approve an Alternative Transaction or the Bankruptcy Court's granting an order approving an Alternative Transaction;

(iii)    upon the Sellers' entry into an Alternative Transaction;

(c)    by Buyer, if there shall have been a breach by either Seller of any of their representations, warranties, covenants or agreements contained in this Agreement or any other event or condition shall result in either Seller being incapable of satisfying one or more of their representations, warranties, covenants or agreements set forth herein, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within three (3) days after written Notice thereof shall have been received by Sellers;

(d)    by Buyer, if (i) the Operating Order shall not have been entered by the Bankruptcy Court within five (5) days after the Petition Date, (ii) the Sale Motion shall not have been filed by the Trustee with the Bankruptcy Court on or prior to June 5, 2020, subject to reasonable extension in the Buyer's discretion, (iii) either the Bidding Procedures Order or the interim Post-Petition Financing Order shall not have been entered by the Bankruptcy Court on or prior to June 5, 2020, subject to reasonable extension in the Buyer's discretion, (iv) the final Post-Petition Financing Order shall not have been entered by the Bankruptcy Court within thirty (30) days after the Petition Date, subject to reasonable extension in the Buyer's discretion, (v) the auction shall not have been completed by June 25, 2020, subject to reasonable extension in the Buyer's discretion, (vi) the Sale Order shall not have been entered by the Bankruptcy Court on or prior to July 3, 2020, subject to reasonable extension in the Buyer's discretion, or (vii) the Closing shall not have occurred on or prior to July 15, 2020; subject to reasonable extension in the Buyer's discretion; provided, however,  that with respect to the foregoing subclause (vii) only, Buyer may not terminate the Agreement if the failure of the Closing to occur is due to a breach of this Agreement by the Buyer;

(e)    by Buyer, at any time after the occurrence of an "Event of Default" under the New Money Financing Agreement in the Bankruptcy Cases;

(f)    by Buyer or the Sellers, if the Trustee repudiates or seeks to reject this Agreement;

-43-

(g)     by the Sellers, if there shall have been a material breach by Buyer or Assignee of any of its representations, warranties, covenants or agreements contained in this Agreement that, shall not have been cured within twenty (20) days after written Notice thereof shall have been received by Buyer or Assignee; provided that as of such date, the Sellers are not in breach of this Agreement;

(h)     by Buyer, at any time, if any of the conditions set forth in Sections 7.1(k) or 7.1(l) are reasonably determined by Buyer to be incapable of being satisfied;

(i)     **Intentionally Omitted**;

(j)     by Buyer, if either of the Trustee's Operation Orders, the New Money Financing Agreement, the Bidding Procedures Order or the Bidding Procedures are modified, amended, vacated or overturned, as applicable, without the Buyer's express prior written consent prior to Closing;

(k)     by Buyer, if the Sellers or Trustee files a motion with the Bankruptcy Court seeking any post-Petition Date financing in the Bankruptcy Cases (other than the New Money Financing Agreement) that seeks to displace or prime any of the liens granted under the New Money Financing Agreement or attach any additional liens to any of the Acquired Assets, without the prior written consent of Buyer;

(l)     by Buyer, if any party seeks entry of an order pursuant to section 362 Bankruptcy Code or any other similar provisions to lift the automatic stay or seeks similar relief with respect to any Acquired Assets without the prior written consent of Buyer;

(m)     by Buyer, if any party seeks to assert control over either of the Sellers, the Regional Business or any Acquired Asset in any court, other than the Bankruptcy Court; or

(n)     by Sellers, if Buyer or Assignee fails to pay the Continuing Employees Expense Amount to Sellers in accordance with Section 3.6.

8.2     Consequences of Termination.  In the event of any termination of this Agreement by either or both of Buyer and the Sellers pursuant to Section 8.1, written Notice thereof shall be given by the terminating Party to the other Parties hereto, specifying the provision hereof pursuant to which such termination is made, this Agreement shall thereupon terminate and become void and of no further force and effect (other than Section 3.3 (*Deposit*), Section 3.6 (*Continuing Employees Expense Amount*), Section 6.8 (*Expense Reimbursement*), Section 6.16 (*Indemnification of Sellers and Trustee by Buyer and Assignee*), this Section 8.2 (*Consequences of Termination*) and Article 9 (*Miscellaneous*) and to the extent applicable in respect of such Sections and Article, Article 1 (*Definitions*)), and the Transactions shall be abandoned without further action or Liability of any of the Parties hereto (other than with respect to the sections set forth in this Agreement that shall continue in full force and effect in accordance with this Section 8.2 following such termination), except that such termination shall not relieve any Party of any Liability for fraud or willful breach of this Agreement.

-44-

## ARTICLE 9
## MISCELLANEOUS

9.1    <u>Expenses</u>.    Except as set forth in this Agreement and whether or not the Transactions are consummated, each Party hereto shall bear all costs and expenses incurred or to be incurred by such Party in connection with the negotiation and entry into the Transaction Documents and the consummation of the Transactions.

9.2    <u>Assignment</u>.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Sellers without the prior written consent of Buyer, or by Buyer without the prior written consent of the Sellers; <u>provided</u> that Buyer may, without the consent of any other party, assign this Agreement and its rights and obligations hereunder in whole or in part to (a) any Affiliate; <u>provided</u> that Buyer shall remain jointly liable with such Affiliates for Buyer's obligations hereunder or (b) following the Closing, to any successor or purchaser of all or part of the business of Buyer or any of its Subsidiaries.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns including the Trustee, any trustee in bankruptcy, receiver, liquidating trustee, responsible Person or similar representative for Sellers appointed in connection with the Bankruptcy Cases or any other Proceeding.

9.3    <u>Parties in Interest</u>.  This Agreement shall be binding upon and inure solely to the benefit of Sellers (and their estate), the Trustee, the Indemnified Parties, Buyer and their respective successors or permitted assigns (including any bankruptcy trustee or receiver appointed in respect thereof), and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein.

9.4    <u>Notices</u>.    All notices, demands, requests, consents, approvals or other communications (collectively, "<u>Notices</u>") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be transmitted by electronic mail, addressed as set forth below, or to such other address as such Party shall have specified most recently by written Notice.  Notice shall be deemed given on the date of service or transmission; <u>provided</u> that if delivered or transmitted on a day other than a Business Day or after 5:00 p.m. New York time, notice shall be deemed given on the next Business Day:

| | |
|---|---|
| If to any Sellers: | Christopher R. Murray |
| | Jones Murray & Beatty LLP |
| | 4119 Montrose Blvd, Suite 230 |
| | Houston, TX 77006 |
| | Email:  christopher.murray@jmbllp.com |
| | |
| With a copy to: | Chamberlain, Hrdlicka, White, Williams & Aughtry, P.C. |
| | 1200 Smith Street, Suite 1400 |
| | Houston, TX 77002-4310 |
| | Attention: Jarrod Martin |
| | Email:   jarrod.martin@chamberlainlaw.com |

-45-

|               |                                    |
|---------------|------------------------------------|
| If to Buyer:  | QMax Acquisition Corp.             |
|               | C/O                                |
|               | Palladium Equity Partners          |

                                      1270 Avenue of The Americas, Suite 31
New York, NY 10020
Attention:     Caleb Clark and Scott Kirschner
Email:         cclark@palladiumequity.com /
                     skirschner@palladiumequity.com

With copies to:    O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
Attention: Nancy Mitchell, Esq. / Matthew Hinker, Esq. / David
Schultz, Esq.
Email: nmitchell@omm.com / mhinker@omm.com /
dschultz@omm.com

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed e-mail address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

9.5     Choice of Law.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the Laws of the State of Delaware, without giving effect to any provision thereof that would require or permit the application of the substantive laws of any other jurisdiction.

9.6     Entire Agreement; Amendments and Waivers.  This Agreement and all Transaction Documents and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement among the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties. This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only in writing by Buyer and Sellers (which may be by way of e-mail), or in the case of a waiver, by the Party waiving compliance.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

9.7     Counterparts; Electronic Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Counterparts to this Agreement may be delivered via electronic mail.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought. Electronic signature are permitted, but in no event shall an email signature block constitute an electronic signature or acceptance of this Agreement.

-46-

9.8     Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

9.9     Headings.  The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

9.10    Exclusive Jurisdiction and Specific Performance.

(a)     Subject to Section 9.10(b), without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby irrevocably and unconditionally consent to, attorn to and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in Section 9.4.  For the avoidance of doubt, this Section 9.10 shall not apply to any Claims that Buyer or its Affiliates may have against any third party following the Closing.

(b)     Notwithstanding anything herein to the contrary, in the event the Bankruptcy Cases are terminated, the Parties hereby agree that all Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, shall be heard and determined exclusively in any federal court sitting in the United States District Court for the Southern District of Texas or, if that court does not have subject matter jurisdiction, in any state court located in the City of Houston, Texas, Harris County (and, in each case, any appellate court thereof), and the Parties hereby consent to and submit to the jurisdiction and venue of such courts.

9.11    WAIVER OF RIGHT TO TRIAL BY JURY.  SELLERS AND BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  FOR THE AVOIDANCE OF DOUBT, THIS SECTION 9.11 SHALL NOT APPLY TO ANY CLAIMS THAT BUYER OR ITS AFFILIATES MAY HAVE AGAINST ANY THIRD PARTY FOLLOWING THE CLOSING.

9.12    Survival.  Each and every representation and warranty contained in this Agreement shall expire and be of no further force and effect as of the Closing.  Each and every covenant and agreement contained in this Agreement (other than the covenants contained in this Agreement which by their terms are to be performed (in whole or in part) by the Parties following the Closing,

-47-

including, without limitation, Section 6.16 (each, a "Post-Closing Covenant")) shall expire and be of no further force and effect as of the Closing. Each Post-Closing Covenant shall survive the Closing until the earlier of (a) performance of such Post-Closing Covenant in accordance with this Agreement or, (b) (i) if time for performance of such Post-Closing Covenant is specified in this Agreement, ninety (90) days following the full performance of such covenant and the expiration of the time period for such performance or (ii) if time for performance of such Post-Closing Covenant is not specified in this Agreement, ninety (90) days following the expiration of the applicable statute of limitations with respect to any Claim for any failure to perform such Post-Closing Covenant; provided that if a written notice of any Claim with respect to any Post-Closing Covenant is given prior to the expiration thereof then such Post-Closing Covenant shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement. Notwithstanding the forgoing, the obligations of Buyer and Assignee, and the rights of the Indemnified Parties, under Section 6.16 shall survive the Closing until the date that is ninety (90) days following the expiration of the applicable statute of limitations with respect to any indemnified Claim under Section 6.16 that can be brought against an Indemnified Party.

9.13    Time of Essence. Time is of the essence of this Agreement.

9.14    Non-Recourse. No past, present or future director, manager, officer, employee, incorporator, member, partner or equity holder of Buyer or Sellers shall have any Liability for any Liabilities of Buyer or Sellers, respectively, under this Agreement or for any Claim based on, in respect of, or by reason of the Transactions. This Agreement may only be enforced against, and any Claim, action, suit, Proceeding or investigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.

9.15    Disclosure Schedules. Except as set forth in this Agreement, the inclusion of any information (including dollar amounts) in Disclosure Schedules shall not be deemed to be an admission or acknowledgment by any Party that such information is required to be listed on such section of the relevant schedule or is material to or outside the Ordinary Course of Business of any Person. The information contained in this Agreement, the exhibits hereto and the Disclosure Schedules is disclosed solely for purposes of this Agreement, and no information contained herein or therein shall be deemed to be an admission by any Party to any third party of any matter whatsoever (including any violation of any Law or breach of contract). Unless the context otherwise requires, all capitalized terms used in the Disclosure Schedules shall have the respective meanings assigned in this Agreement. The Disclosure Schedules set forth items of disclosure with specific reference to the particular Section or subsection of this Agreement to which the information in the Disclosure Schedules relates.

9.16    Mutual Drafting. This Agreement is the result of the joint efforts of Buyer and Sellers, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties and there is to be no construction against any Party based on any presumption of that Party's involvement in the drafting thereof.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of Buyer, Assignee and Sellers as of the date first above written.

BUYER:

QMAX ACQUISITION CORP.

By: _____
  Name: Caleb Clark
  Title: Chief Executive Officer

ASSIGNEE:

DRILLING SERVICES, LLC

By: _____
  Name: Caleb Clark
  Title: Chief Executive Officer

SELLERS:

CHRISTOPHER R. MURRAY, SOLELY IN HIS CAPACITY AS CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF Q'MAX AMERICA INC.

By: _____
  Name:
  Title:

CHRISTOPHER R. MURRAY, SOLELY IN HIS CAPACITY AS CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF ANCHOR DRILLING FLUIDS USA, LLC

By: _____
  Name:
  Title

**SIGNATURE PAGE TO SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of Buyer, Assignee and Sellers as of the date first above written.

BUYER:

QMAX ACQUISITION CORP.

By: _____
    Name: Caleb Clark
    Title: Chief Executive Officer

ASSIGNEE:

DRILLING SERVICES, LLC

By: _____
    Name: Caleb Clark
    Title: Chief Executive Officer

SELLERS:

CHRISTOPHER R. MURRAY, SOLELY IN HIS CAPACITY AS CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF Q'MAX AMERICA INC.

By: _____
    Name: Christopher R. Murray
    Title:   Trustee

CHRISTOPHER R. MURRAY, SOLELY IN HIS CAPACITY AS CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF ANCHOR DRILLING FLUIDS USA, LLC

By: _____
    Name: Christopher R. Murray
    Title:   Trustee

**SIGNATURE PAGE TO SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**